FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

MAR 26 2015

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA,
### ATLANTA DIVISION

|  |  |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | Civil action no. |
|  | **COMPLAINT** |
| Plaintiff, | **1:15-CV-0859** |
| v. |  |
| UNIVERSAL DEBT & PAYMENT SOLUTIONS, LLC; UNIVERSAL DEBT SOLUTIONS, LLC; WNY ACCOUNT SOLUTIONS, LLC; WNY SOLUTIONS GROUP, LLC; CHECK & CREDIT RECOVERY, LLC; CREDIT POWER, LLC; S PAYMENT PROCESSING & SOLUTIONS, LLC; MARCUS BROWN; MOHAN BAGGA; SARITA BROWN; TASHA PRATCHER; VARINDERJIT BAGGA; SUMANT KHAN; GLOBAL PAYMENTS, INC.; PATHFINDER PAYMENT SOLUTIONS, INC.; FRONTLINE PROCESSING CORP.; FRANCIS DAVID CORP. d/b/a ELECTRONIC MERCHANT SYSTEMS; and GLOBAL CONNECT, LLC; |  |
| Defendants. |  |

The Consumer Financial Protection Bureau ("Bureau") brings this action against Universal Debt & Payment Solutions, LLC; Universal Debt Solutions, LLC; WNY Account Solutions, LLC; WNY Solutions Group, LLC; Check & Credit Recovery, LLC; Credit Power, LLC; S Payment Processing & Solutions, LLC; Marcus Brown; Mohan Bagga; Sarita Brown; Tasha Pratcher; Varinderjit Bagga; and Sumant Khan (collectively, "Debt Collectors"); Global Payments, Inc.; Pathfinder Payment Solutions, Inc.; Frontline Processing Corp.; and Francis David Corp. d/b/a Electronic Merchant Services (collectively, "Payment Processors"); and Global Connect, LLC and alleges as follows:

## INTRODUCTION

1.     The Bureau brings this action under the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. §§ 5531, 5536(a), and the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692-1692p, to obtain preliminary and permanent injunctive relief, restitution, disgorgement for unjust enrichment, civil money penalties, and other appropriate relief for defendants' acts or practices in violation of the CFPA and FDCPA in connection with unlawful collection of purported debt.

2.     The Debt Collectors are engaged in a scheme to defraud consumers by using threats, intimidation, and harassment to collect

"phantom" debts. The Debt Collectors used collectors and automated telephone broadcasting services to contact consumers and their family members to threaten consumers with false allegations of check fraud and false claims of debt owed, which would result, according to the Debt Collectors, in service of a "financial restraining order," notification to the consumer's employer of the alleged fraud or debt, garnishment of wages, and arrest, unless the consumers paid the alleged debt. The Debt Collectors refused to identify the issuer of the supposed debt to consumers, but convinced consumers of their legitimacy by providing the consumer's personal information, including date of birth, place of employment, and Social Security number. In most, if not all, cases, consumers did not owe any debt the Debt Collectors had a right to collect.

3.     Because of the Debt Collectors' threats and false statements, consumers collectively paid millions of dollars to the Debt Collectors.

4.     The Payment Processors facilitated the Debt Collectors' large-scale fraud by enabling the Debt Collectors to accept payment by consumers' bank cards when the Payment Processors knew, or should have known, that the Debt Collectors were engaged in unlawful conduct.

3

5.     The Payment Processors, and the service they provided, gave the Debt Collectors an air of legitimacy and allowed the Debt Collectors to efficiently process a high volume of collections.

6.     The Debt Collectors' conduct was facilitated by Global Connect, LLC, which provided the Debt Collectors with the ability to effortlessly broadcast millions of threatening and false statements to consumers in telephone messages.

7.     Global Connect, LLC provided this service when it knew, or should have known, that the messages it broadcast for the Debt Collectors were unfair or deceptive, and materially contributed to the Debt Collectors' scheme.

## JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction over this action because it is "brought under Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

9.     Venue is proper in this District because defendants do business in this District and the events or omissions giving rise to this complaint substantially took place in this District. 28 U.S.C. § 1391(b) and 12 U.S.C. § 5564(f).

4

## PARTIES

10. The Bureau is an independent agency of the United States charged with regulating the offering and providing of consumer financial products or services under federal consumer financial laws, including the CFPA and FDCPA, 12 U.S.C. §§ 5481(12), 5481(14), 5491(a), and 5531; and 15 U.S.C. §§ 1692-1692p. The Bureau has enforcement authority over, *inter alia*, persons who offer or provide consumer financial products or services ("covered persons"); related persons who have managerial responsibility for, or materially participate in, the covered person's business; persons that provide a material service to a covered person; and persons that knowingly or recklessly provide substantial assistance to a covered person's or service provider's violation of the CFPA. 12 U.S.C. §§ 5481(6), (25), (26), and 5536(a)(3). The Bureau has independent litigating authority to enforce federal consumer financial laws, including the CFPA and the FDCPA. 12 U.S.C. §§ 5564(a), (b); 15 U.S.C. § 1692*l*(b)(6).

**Debt Collectors**

11. Universal Debt & Payment Solutions, LLC is a Georgia limited liability company registered at 3939 Lavista Road, Ste. 312, Tucker, Georgia.

12. This address belongs to a post office box at a UPS Store, which is registered to Marcus Brown.

5

13.    Universal Debt & Payment Solutions, LLC was organized by Mohan Bagga.

14.    Marcus Brown is the entity's registered agent.

15.    Sarita Brown is its treasurer.

16.    Universal Debt & Payment Solutions, LLC is also registered as a limited liability company in New York.

17.    The New York articles of incorporation were filed by Sarita Brown, who provided a mailing address of 142 Stratford Rd., Buffalo, New York, which is Marcus Brown's residential address.

18.    The New York and Georgia entities are indistinct and are collectively referred to in this complaint as "UDPS."

19.    UDPS engaged in offering or providing the collection of debt related to a consumer financial product or service and is, therefore, a "covered person" under the CFPA. 12 U.S.C. §§ 5481(6), (15)(A)(x).

20.    UDPS provided material services to the other Debt Collectors in connection with the other Debt Collectors' offering or provision of consumer financial products or services; UDPS is therefore a "service provider" under the CFPA. 12 U.S.C. § 5481(26).

21.    UDPS transacts, or has transacted, the conduct alleged herein in this District and throughout the United States.

22.     Universal Debt Solutions, LLC ("UDS") is a New York limited liability company also registered at 142 Stratford Rd., Buffalo, New York.

23.     UDS engaged in collecting debt related to a consumer financial product or service and is, therefore, a "covered person" under the CFPA. 12 U.S.C. §§ 5481(6), (15)(A)(x).

24.     UDS provided material services to the other Debt Collectors in connection with the other Debt Collectors' offering or provision of consumer financial products or services; UDS is therefore a "service provider" under the CFPA. 12 U.S.C. § 5481(26).

25.     UDS transacts, or has transacted, the conduct alleged herein in this District and throughout the United States.

26.     WNY Account Solutions, LLC is a New York limited liability company registered at a UPS Store in Williamsville, New York.

27.     WNY Solutions Group, LLC is a limited liability company registered a 140 Chatham Ave., Buffalo, New York, which address is associated with Marcus Brown and Tasha Pratcher, Brown's wife.

28.     WNY Account Solutions, LLC and WNY Solutions Group, LLC are indistinct; for example, Sarita Brown opened and maintained a bank account in the combined name of "WNY Account Solutions Group."

7

29.     WNY Account Solutions, LLC and WNY Solutions Group, LLC are collectively referred to in this complaint as "WNY."

30.     WNY engaged in collecting debt related to a consumer financial product or service and is, therefore, a "covered person" under the CFPA. 12 U.S.C. §§ 5481(6), (15)(A)(x).

31.     WNY provided material services to the other Debt Collectors in connection with the other Debt Collectors' offering or provision of consumer financial products or services; WNY is therefore a "service provider" under the CFPA. 12 U.S.C. § 5481(26).

32.     WNY transacts, or has transacted, the conduct alleged herein in this District and throughout the United States.

33.     Check & Credit Recovery, LLC ("Check & Credit Recovery") is a Georgia limited liability company organized by Marcus Brown at 50 Executive Park Drive South, Suite 5010, Atlanta, Georgia.

34.     Check & Credit Recovery engaged in collecting debt related to a consumer financial product or service and is, therefore, a "covered person" under the CFPA. 12 U.S.C. §§ 5481(6), (15)(A)(x).

35.     Check & Credit Recovery provided material services to the other Debt Collectors in connection with the other Debt Collectors' offering or provision of consumer financial products or services; Check & Credit

8

Recovery is therefore a "service provider" under the CFPA. 12 U.S.C. § 5481(26).

36.     Check & Credit Recovery transacts, or has transacted, the conduct alleged herein in this District and throughout the United States.

37.     Credit Power, LLC ("Credit Power") is a Georgia limited liability company organized by Mohan Bagga at 6375 White Stone Pl., Jones Creek, Georgia.

38.     Credit Power engaged in collecting debt related to a consumer financial product or service and is, therefore, a "covered person" under the CFPA. 12 U.S.C. §§ 5481(6), (15)(A)(x).

39.     Credit Power provided material services to the other Debt Collectors in connection with the other Debt Collectors' offering or provision of consumer financial products or services; Credit Power is therefore a "service provider" under the CFPA. 12 U.S.C. § 5481(26).

40.     Credit Power transacts, or has transacted, the conduct alleged herein in this District and throughout the United States.

41.     S Payment Processing & Solutions, LLC ("SPPS") is a Georgia limited liability company organized by Sumant Khan at 3008 Oak Park Circle, Atlanta, Georgia.

42.    SPPS engaged in collecting debt related to a consumer financial product or service and is, therefore, a "covered person" under the CFPA. 12 U.S.C. §§ 5481(6), (15)(A)(x).

43.    SPPS provided material services to the other Debt Collectors in connection with the other Debt Collectors' offering or provision of consumer financial products or services; SPPS is therefore a "service provider" under the CFPA. 12 U.S.C. § 5481(26).

44.    SPPS transacts, or has transacted, the conduct alleged herein in this District and throughout the United States.

45.    UDPS, UDS, WNY, Check & Credit Recovery, Credit Power, and SPPS are collectively referred to in this complaint as the "Debt Collector LLCs."

46.    Marcus Brown is an individual residing at 142 Stratford Avenue, Buffalo, New York.

47.    Marcus Brown is a person engaged in collecting debt related to consumer financial products or services and is, therefore, a covered person under the CFPA. 12 U.S.C. §§ 5481(6), (15)(A)(x).

48.    Marcus Brown is a related person and officer of the Debt Collector LLCs who materially participated in the conduct of the affairs of the

Debt Collector LLCs and is, therefore, a "covered person" under the CFPA. 12 U.S.C. §§ 5481(6), (25).

49.     Marcus Brown and the entities he controls transact, or have transacted, the conduct alleged herein in this District and throughout the United States.

50.     Mohan Bagga is an individual residing at 6375 Whitestone Place, Duluth, Georgia.

51.     Mohan Bagga is a person engaged in collecting debt related to consumer financial products or services and is, therefore, a covered person under the CFPA. 12 U.S.C. §§ 5481(6), (15)(A)(x).

52.     Mohan Bagga is a related person and officer of the Debt Collector LLCs who materially participated in the conduct of the affairs of the Debt Collector LLCs and is, therefore, a "covered person" under the CFPA. 12 U.S.C. §§ 5481(6), (25).

53.     Mohan Bagga and the entities he controls transact, or have transacted, the conduct alleged herein in this District and throughout the United States.

54.     Sarita Brown is an individual residing at 39 Ritt Avenue, Buffalo, New York.

11

55.     Sarita Brown is a person engaged in collecting debt related to consumer financial products or services and is, therefore, a covered person under the CFPA. 12 U.S.C. §§ 5481(6), (15)(A)(x).

56.     Sarita Brown is a related person and officer of the Debt Collector LLCs who materially participated in the conduct of the affairs of the Debt Collector LLCs and is, therefore, a "covered person" under the CFPA. 12 U.S.C. §§ 5481(6), (25).

57.     Sarita Brown and the entities she controls transact, or have transacted, the conduct alleged herein in this District and throughout the United States.

58.     Tasha Pratcher ("Pratcher") is an individual residing at 142 Stratford Avenue, Buffalo, New York.

59.     Pratcher is a person engaged in collecting debt related to consumer financial products or services and is, therefore, a covered person under the CFPA. 12 U.S.C. §§ 5481(6), (15)(A)(x).

60.     Pratcher is a related person who materially participated in the conduct of the affairs of the Debt Collector LLCs and is, therefore, a "covered person" under the CFPA. 12 U.S.C. §§ 5481(6), (25).

61.    Pratcher and the entities she controls transact, or have transacted, the conduct alleged herein in this District and throughout the United States.

62.    Varinderjit Bagga is an individual residing at 6375 Whitestone Place, Duluth, Georgia.

63.    Varinderjit Bagga is a person engaged in collecting debt related to consumer financial products or services and is, therefore, a covered person under the CFPA. 12 U.S.C. §§ 5481(6), (15)(A)(x).

64.    Varinderjit Bagga is a related person who materially participated in the conduct of the affairs of the Debt Collector LLCs and is, therefore, a "covered person" under the CFPA. 12 U.S.C. §§ 5481(6), (25).

65.    Varinderjit Bagga and the entities she controls transact, or have transacted, the conduct alleged herein in this District and throughout the United States.

66.    Sumant Khan ("Khan") is an individual residing at 3008 Oak Park Circle, Atlanta, Georgia.

67.    Khan is a person engaged in collecting debt related to consumer financial products or services and is, therefore, a covered person under the CFPA. 12 U.S.C. §§ 5481(6), (15)(A)(x).

13

68.     Khan is a related person and officer of the Debt Collector LLCs who materially participated in the conduct of the affairs of the Debt Collector LLCs and is, therefore, a "covered person" under the CFPA. 12 U.S.C. §§ 5481(6), (25).

69.     Khan and the entities he controls transact, or have transacted, the conduct alleged herein in this District and throughout the United States.

70.     The individual defendants and Debt Collector LLCs are collectively referred to in this complaint as the "Debt Collectors."

71.     Defendants UDPS, UDS, WNY, Check & Credit Recovery, Credit Power, SPPS, Marcus Brown, Mohan Bagga, Sarita Brown, Pratcher, Varinderjit Bagga, and Khan have operated as a common enterprise while engaging in debt collection activities that are unfair and harassing and in other conduct alleged below.

72.     The Debt Collectors all operated out of an office at 1401 Peachtree St., Atlanta, Georgia.

73.     The Debt Collector LLCs shared common control of the collection scheme, office space, and officers; transacted business through a maze of interrelated companies; and failed to maintain separate companies.

74.     The Debt Collectors commingled funds among accounts opened and maintained by Sarita Brown in the names of WNY and UDS; by Mohan

14

Bagga in the names of UDPS and Credit Power; and by Sumant Khan in the name of SPPS.

75.    Individuals Marcus Brown, Mohan Bagga, Sarita Brown, Pratcher, Varinderjit Bagga, and Khan participated directly in the conduct described below, had authority to control the corporate defendants, and knew of each other's conduct that constitutes the common enterprise.

**Payment Processors**

76.    Global Payments, Inc. ("Global Payments") is a Georgia corporation with a principal place of business at 10 Glenlake Parkway, Atlanta, Georgia.

77.    Global Payments provided payment processing services, including material payment processing services to persons who collect debt, including the Debt Collectors, in connection with their collection of debt; Global Payments, therefore, is a "covered person" and a "service provider" under the CFPA. 12 U.S.C. §§ 5481(15)(A)(vii), (26).

78.    Global Payments and its subsidiaries transact, or have transacted, the conduct alleged herein in this District and throughout the United States.

79. Pathfinder Payment Solutions, Inc. ("Pathfinder") is a Maryland corporation with a principal place of business at 6452 River Run, Columbia, Maryland.

80. Under its merchant services agreement with Global Payments Direct, Inc., a Global Payments subsidiary, Pathfinder agreed to market Global Payments' processing service to merchants, prescreen and underwrite for credit purposes all potential merchants, monitor processing activity to detect fraud and risk, and advise Global Payments accordingly.

81. Pathfinder provided payment processing services, including material services to persons who collect debt, including the Debt Collectors, in connection with their collection of debt; Pathfinder, therefore, is a "covered person" and a "service provider" under the CFPA. 12 U.S.C. §§ 5481(15)(A)(vii), (26).

82. Pathfinder transacts, or has transacted, the conduct alleged herein in this District and throughout the United States.

83. Frontline Processing Corp. ("Frontline") is a Nevada corporation with a principal place of business at 3701 Trakker Trail, Bozeman, Montana.

84. Under its merchant services agreement with Global Payments Direct, Inc., Frontline agreed to market Global Payments' services to

merchants and prescreen merchants for compliance with Global Payments' credit criteria.

85.     Frontline provided payment processing services, including material services to persons who collect debt, including the Debt Collectors, in connection with their collection of debt; Frontline, therefore, is a "covered person" and a "service provider" under the CFPA. 12 U.S.C. §§ 5481(15)(A)(vii), (26).

86.     Frontline transacts, or has transacted, the conduct alleged herein in this District and throughout the United States.

87.     Global Payments identifies Frontline and Pathfinder, among others, as independent sales organizations ("ISO").

88.     Francis David Corp. d/b/a Electronic Merchant Services ("EMS") is an Ohio corporation with a principal place of business at 5005 Rockside Rd., Cleveland, Ohio.

89.     EMS provided payment processing services, including material payment processing services to persons who collect debt, including the Debt Collectors, in connection with their collection of debt; EMS, therefore, is a "covered person" and a "service provider" under the CFPA. 12 U.S.C. §§ 5481(15)(A)(vii), (26).

17

90.   EMS transacts, or has transacted, the conduct alleged herein in this District and throughout the United States.

**Telephone Broadcast Service Provider**

91.   Global Connect, LLC ("Global Connect") is a New Jersey limited liability company registered at 5218 Atlantic Avenue, Mays Landing, New Jersey.

92.   Global Connect provided material services to persons who collect debt, including the Debt Collectors, in connection with their collection of debt; Global Connect, therefore, is a "service provider" under the CFPA. 12 U.S.C. § 5481(26).

93.   Global Connect transacts, or has transacted, the conduct alleged herein in this District and throughout the United States.

## FACTUAL ALLEGATIONS

**The Debt Collection Scheme**

94.   The Debt Collectors contacted millions of consumers by telephone to collect debts they asserted to be owed.

95.   Typically, the Debt Collectors, using such names as "LRS Litigation Group," "Worldwide Requisitions," and "Arbitration Resolution," accused the consumer of having committed check fraud.

96.    The Debt Collectors threatened that litigation would be filed against the consumer if the consumer, or his or her attorney, did not call the Debt Collectors back within 24-48 hours.

97.    When the consumer returned the call, the Debt Collectors told the consumer that the consumer needed to settle the debt to avoid court action, such as a restraining order or criminal prosecution.

98.    The Debt Collectors refused to identify the supposed lender of the claimed debt, but convinced the consumer that the debt existed and was owed to them by reciting the consumer's personal information, such as date of birth, place of employment, and Social Security number.

99.    With threats of arrest or contact of the consumer's employer, the Debt Collectors convinced the consumer to provide his or her bank card information to the Debt Collectors.

100.    The Debt Collectors provided the consumer's payment information to the Payment Processors, who facilitated the withdrawal of funds from the consumer's account and deposit of funds into the Debt Collectors' accounts.

### Obtaining consumers' information

101.    The Debt Collectors purchased consumer information from debt and data brokers.

19

102. From debt brokers, the Debt Collectors purchased spreadsheets of consumer information including consumers' Social Security numbers, addresses, home phone numbers, work phone numbers, cell phone numbers, employers, email addresses, and, in many cases, bank account and routing numbers.

103. In numerous instances, the Debt Collectors were not owed the purported debt and had no authority to collect it.

104. From data brokers, the Debt Collectors purchased consumer information from payday loan lead generators.

105. The Debt Collectors used this information to collect, and attempt to collect, debts that the Debt Collectors had no authority to collect and may not have ever been owed.

106. To ratify and update, or "scrub," consumer information obtained from debt and data brokers, the Debt Collectors used the services of at least one consumer reporting agency.

### *Contacting consumers*

107. Global Connect provided telephone broadcast services to the Debt Collectors and other persons who collect debt that enabled them to make millions of collection calls to individuals victimized by the Debt Collectors' scheme.

108. To use Global Connect's telephone broadcast service, the Debt

Collectors uploaded to Global Connect a list of names and phone numbers

and a recorded message.

109. To the consumers the Debt Collectors identified, Global Connect

broadcasted the following message, among others, on behalf of the Debt

Collectors:

> We are contacting [consumer's name] in reference to an allegation of
> check or bank fraud. It is imperative that we speak to you regarding
> this allegation. Our office has been mandated to contact your employer
> to verify your employment to issue paperwork for you to appear in
> court. If you wish to stop said action, press 9 or call 202-803-[####].
> Once again, contact us at 202-803-[####]. You have until the close of
> business today.

110. The pre-recorded voice message did not identify the caller.

111. The Debt Collectors concealed their identity by causing "000-000-

0000" to appear on the consumer's caller identification when he or she

received a call from Global Connect.

112. If a consumer did not answer Global Connect's phone call, the

service left the pre-recorded voice message with the consumer's voice mail or

answering machine.

113. Over one million consumers either answered Global Connect's

call and received this message or had it left on their voicemail or answering

machine.

21

114.   If the consumer called the phone number in the message, or pressed "9" during the message, the call was directed to phone numbers registered to the Debt Collectors.

115.   When a consumer responded to this automated message, the Debt Collectors threatened the consumers with legal process, including arrest, that the Debt Collectors were not authorized, and did not intend, to pursue.

116.   In numerous instances, in response to the Debt Collectors' threats, consumers paid debts that they did not owe or that the Debt Collectors were not authorized to collect.

117.   In May 2014, in response to the Bureau's civil investigative demand, Global Connect provided the Bureau with copies of the messages it was broadcasting on behalf of the Debt Collectors.

118.   Global Connect also provided the Bureau will call logs, which showed these messages were being broadcast to millions of consumers.

119.   Since the time it provided the Bureau with copies of the recordings, if not before, Global Connect knew it was broadcasting unfair or deceptive messages that materially contributed to the Debt Collectors' scheme.

### *The individual defendants were personally engaged in the unlawful scheme*

120.   Each individual defendant played an essential role in the debt collection scheme.

121.   Marcus Brown is an officer of UDPS and Check & Credit Recovery, LLC.

122.   All the Debt Collector LLCs are registered to addresses associated with Marcus Brown, including a post office box that is registered to him.

123.   Brown controlled, or was able to control, all aspects of the Debt Collectors' business: he purchased consumer debt and leads, he controlled the data scrubbing accounts used to obtain consumers' current personal information, he controlled the accounts for telephones and telephone broadcasting service, and he leased office space for the collectors. He managed the Debt Collector LLCs' day-to-day operations and controlled the entities' finances.

124.   Marcus Brown received payments for the collection scheme from WNY, UDS, Credit Power, UDPS, and SPPS.

125.   Mohan Bagga is an officer of Credit Power and UDPS and controlled bank accounts in the names of Credit Power and UDPS.

126.   Mohan Bagga used these accounts to receive deposits from the payment processors of funds taken from consumers; to pay for consumer debt and leads, data scrubbing services, telephone services, payment processing services, and the UPS mailbox registered to Marcus Brown; and to distribute funds generated by the collection scheme to Marcus Brown, Sumant Khan, Varinderjit Bagga, UDS, WNY, and Credit Power.

127.   Mohan Bagga opened and controlled the payment processing accounts for Credit Power and UDPS.

128.   Mohan Bagga created and managed the accounts for data scrubbing services and for message broadcasting by Global Connect.

129.   Mohan Bagga also provided a financial guarantee of the lease for the Debt Collectors' office space.

130.   Mohan Bagga received payments for the collection scheme from UDPS and Credit Power.

131.   Sarita Brown is an officer of UDPS.

132.   Sarita Brown controlled bank accounts for WNY and UDS from which she and Marcus Brown paid expenses for the collection scheme, including purchasing consumer information, paying collectors and managers who carried out the collection activities, and paying rent for office space.

133. Sarita Brown received payments for the collection scheme from WNY and UDS.

134. Tasha Pratcher managed a payment processing account in the name of WNY, which was used to process funds from the collection scheme.

135. Pratcher provided financing for the scheme, including paying the rent for office space, and received significant payments generated by the collection scheme from WNY and UDS.

136. Sumant Khan created and controlled SPPS, the sole purpose of which was to further the collection scheme.

137. Khan controlled processing accounts used to process payments from consumers, and associated bank accounts, in which he received consumer funds from the collection scheme and from which he made payments to payment processors, Marcus Brown, WNY, and for other expenses related to the collection scheme.

138. Khan received payments for the collection scheme from SPPS, WNY, UDS, and UDPS.

139. Varinderjit Bagga was the owner of WNY and opened and controlled a payment processing account for the entity.

140. She used this account to collect and distribute consumer funds generated by the collection scheme.

141.   Varinderjit Bagga provided financing for the collection scheme, and is the owner of the residence that the Debt Collector LLCs, at various times, used as their principal place of business, 6375 Whitestone Place.

142.   Varinderjit Bagga also created a limited liability company with Sumant Khan, VS Payment Solutions, LLC, for the sole purpose of furthering the collection scheme.

143.   Varinderjit Bagga received payments for the collection scheme from WNY, Credit Power, and UDPS.

**The Payment Processors Facilitated the Debt Collection Scheme**

144.   Payment processors, like Global Payments and EMS, provide services that enable merchants to accept check, card, and electronic payments at a point of sale.

145.   Payment processors promote their service as providing increased sales and "enhanced business image."

146.   By enabling the Debt Collectors and other persons who collect debt to accept credit and debit card payments, the Payment Processors enabled them to efficiently accept payments and convince consumers that they were credible merchants.

147.   During the typical card transaction, when a cardholder presents a card for payment at a merchant location, the card information is captured

26

by a point of sale terminal card reader and transmitted to a payment network.

148.   Payment processors must be sponsored by an acquiring bank that is registered with one or more of the card associations, such as Visa or MasterCard.

149.   Payment processors are subject to the rules and credit risk policies of the card associations.

150.   The illustration below shows the flow of a typical $100 card transaction:

## Illustrative Card Transaction Flow



151. By granting access by the Debt Collectors and other persons who collect debt to this payment processing infrastructure, the Payment Processors enabled them to quickly, conveniently, and efficiently collect consumer payments.

### *The Payment Processors and ISOs failed to follow policies and procedures to prevent consumer harm*

152. In general, because merchants are paid quickly for card transactions, the merchant processing relationship creates credit exposure for payment processors.

153. Consumers' payments are provisional and may be reversed when a consumer disputes a charge, which may result in a "chargeback."

154. If a merchant is unable or unwilling to fund the reversed transaction, the chargeback would become the responsibility of the payment processor.

155. To minimize credit exposure, the Payment Processors were required to follow policies and procedures to evaluate merchant creditworthiness and identify fraud.

156. One such card association policy stated, "A Merchant must not accept a Card to collect or refinance an existing debt...."

157.   Similarly, consistent with the card networks' policy, Global Payments' own credit policy specifically identified collection agencies among "prohibited merchants" that ISOs were not to solicit, and which required Global Payments' approval.

158.   Pathfinder (but not Frontline) also deemed collection agencies to be prohibited merchants.

159.   The Payment Processors deemed collection agencies to be high risk merchants.

160.   In addition to collection agencies, Global Payments' list of prohibited merchants included "Aggregators," or merchants that use their processing account to process payments for other merchants, a practice known as "factoring."

161.   According to Global Payments' policy, an indicator for factoring was "any Merchants using 'Pay' or 'Payment' in either DBA or Legal names."

162.   The Payment Processors and card associations also considered the Debt Collectors high risk merchants because they processed only "card-not-present" transactions.

163.   Global Payments' policies required enhanced scrutiny of card-not-present merchants.

164. Although the Payment Processors classified the Debt Collectors and other persons who collect debt as high risk – indeed, prohibited – merchants, as described below, the Payment Processors approved the Debt Collectors' numerous applications for payment processing accounts and failed to reasonably monitor those accounts for signs of unlawful conduct.

### *Pathfinder's underwriting and risk monitoring were deficient*

165. In February 2011, Mohan Bagga, on behalf of Credit Power, submitted an application to Pathfinder for a Global Payments merchant processing account.

166. Pathfinder's underwriting purported to include a review for criminal activity, associates, verification of addresses, business filings or corporate affiliations.

167. Although Credit Power's "chief executive officer" had recently finished a sentence for drug trafficking and shared an address with Mohan Bagga, Pathfinder and Global Payments approved Credit Power's application.

168. In November 2011, Mohan Bagga applied for a second account with Pathfinder, in the name of UDPS.

169. In the application, Mohan Bagga identified UDPS as a collection agency that had been in business for one month.

30

170.   The application provided the same address for Mohan Bagga's residence and UDPS's business.

171.   Although Pathfinder's vice president for compliance recognized that a merchant's operating out of his home indicated the business may not be legitimate, Pathfinder and Global Payments approved the application.

172.   Pathfinder's site survey for the UDPS application stated that the business premises, Mohan Bagga's home, was leased and "the amount of inventory and merchandise on the shelves and floor appear to be consistent with the type of business."

173.   UDPS's application shows that Mohan Bagga's minimal income was derived from self-employment and he had a subprime credit score.

174.   Although the Global Payment's risk policy stated that a principal's creditworthiness was critical to the underwriting decision, Pathfinder and Global Payments approved UDPS's application notwithstanding Bagga's credit history and status.

175.   Global Payments deposited monies processed through the UDPS and Credit Power accounts into bank accounts opened and maintained by Mohan Bagga in the names of UDPS and Credit Power.

176.  Once Credit Power and UDPS began processing with Global
Payments, Global Payments and Pathfinder continued to ignore indicators
that the collectors were committing fraud.

177.  For example, in January 2012, Pathfinder recognized that UDPS
was processing payments for RSB Equity Group, LLC ("RSB"). Although
Global Payments' policy prohibited processing payments for another
merchant, or "factoring," the Payment Processors allowed UDPS and Credit
Power to continue processing payments.

178.  In November 2012, Pathfinder received a MATCH alert for UDPS
and RSB.

179.  MATCH refers to the "Member Alert to Control High-risk
merchants" system that MasterCard maintains to identify and prevent fraud,
which Global Payments, EMS, and their ISOs are required to consult,
according to MasterCard's and Global Payments' rules.

180.  The MATCH alert stated that another processor terminated
affiliates of UDPS and RSB because the processor, after investigation, found
factoring and excessive chargeback volume.

181.  Although Pathfinder, in January 2012, had identified this same
factoring conduct by RSB and UDPS, it did not conduct any further

investigation into its merchants' conduct and allowed the Debt Collectors to continue processing payments.

182.   In March 2013, Global Payments notified Pathfinder that Visa had prohibited Credit Power from processing payments using the Visa network.

183.   However, Pathfinder and Global Payments continued to allow Credit Power and UDPS to process payments with other card brands.

184.   On July 8, 2013, Global Payments notified Pathfinder that the Discover card association was requiring closure of UDPS's account due to "prohibited business practices."

185.   However, Pathfinder and Global Payments allowed UDPS and Credit Power to continue processing MasterCard transactions for almost another year.

186.   Pathfinder routinely experienced difficulties making contact with representatives of UDPS and Credit Power.

187.   For example, mail was often returned and voicemail boxes were full.

188.   Additionally, on at least one occasion, in July 2013, Pathfinder placed a call to UDPS customer service and the owner of RSB answered the phone.

33

189.   Communication problems like these should have caused the ISO to more closely monitor or terminate the Debt Collectors.

190.   By Pathfinder's own admission, any chargeback rate greater than zero was a sign of suspicious activity.

191.   Yet Pathfinder allowed the Debt Collectors to continue processing when, based on data provided by Global Payments, it noted that Credit Power's chargeback rate for July 2013 was 28.5% and UDPS's chargeback rate in August 2013, was 31%.

192.   These high rates should have caused Pathfinder and Global Payments to investigate the Debt Collectors' business practices, if not terminate their accounts.

193.   In August 2013, UDPS changed its address to 3939 Lavista Rd., the address for a UPS store, and changed the contact person to Marcus Brown.

194.   In December 2013, Brown requested an increase in UDPS's processing volume limit.

195.   Also in December 2013, Pathfinder acknowledged that Marcus Brown was one of its most profitable clients by sending him a gift basket.

***Frontline's underwriting and risk monitoring were deficient***

34

196.  In March 2013, Mohan Bagga submitted merchant applications to Frontline on behalf of UDPS and Credit Power.

197.  Although Frontline is an ISO of Global Payments, whose policy purports to prohibit collection agencies, Frontline's own list of prohibited merchants does not include collection agencies.

198.  Frontline's Underwriting Manual begins by declaring Frontline's "Underwriting Philosophy": "At Frontline Processing we look for ways to say YES."

199.  The Debt Collectors' merchant processing applications were again replete with indicators of fraudulent activity.

200.  UDPS's March 2013 application identified a physical and legal address as 2256 Northlake Parkway, Suite 301.

201.  UDPS never occupied this space.

202.  The fax imprint on the application shows that it was faxed from a FedEx Office location, and the address on the voided check UDPS provided with its application belongs to another collection agency.

203.  Frontline's underwriting manual stated that Merchant Category Codes are used by the card associations for activity tracking, reporting, and risk management purposes. "Therefore," the policy states, "it is important to ensure that the correct MCC code is assigned to a merchant."

35

204.   Although the UDPS application clearly stated that UDPS was in the business of "debt collections," the underwriting summary included Merchant Category Code 5651, which was the card issuers' code for "Family Clothing Stores."

205.   Frontline's underwriting summary of the UDPS application stated, "Prohibited business model per Global Credit Guidelines."

206.   Directly underneath this summary, Frontline wrote, "Approved."

207.   Global Payments also approved the UDPS application.

208.   On March 23, 2013, just weeks after Frontline and Global Payments approved the UDPS application, Mohan Bagga submitted a merchant processing application to Frontline in the name of Credit Power.

209.   The application provided a legal address, 3939 Lavista Rd., that belonged to a UPS Store.

210.   The application was faxed from the same FedEx Office as the UDPS application.

211.   The Better Business Bureau ("BBB") review of Credit Power, which was included in the underwriting package, showed that Credit Power was rated "F."

212.   The BBB review also identified Credit Power's principal as an ex-felon.

213. Frontline's underwriting policy states, "The underwriting department is responsible for verifying information contained on the application, including the [customer service] number and website provided. The purpose of verifying this information is to ensure the business is legitimate."

214. The manual explains, "In addition to verifying that the number belongs to our merchant, this is a great opportunity to make sure that the guarantor is an active part of the business."

215. Neither the UDPS application nor the Credit Power applications that Bagga submitted included a customer service phone number.

216. Global Payments deposited monies processed through these accounts into bank accounts opened and maintained by Mohan Bagga in the names of UDPS and Credit Power.

217. In a letter Frontline posted among customer testimonials on its website, Bagga acknowledged Frontline's assistance in the debt collection scheme.

218. The letter from Mohan Bagga, "President of Universal Debt & Payment Solutions," recommends Frontline because it "has been extremely helpful in jump starting my business for many reasons."

37

### *Global Payments, Pathfinder, and Frontline failed to appropriately monitor the UDPS and Credit Power accounts*

219. Chargebacks occur when a consumer disputes a charge with his or her bank because, for example, a charge was unauthorized, merchandise was not received, or the consumer was victimized by fraud.

220. Under its agreement with its sponsor bank, Global Payments was responsible for handling all chargebacks and related costs.

221. The agreement required Global Payments to "[p]erform standard investigations of chargeback transactions" and "provide documentation to the merchant as 'case documentation' supporting an adjustment."

222. When a consumer disputed a charge that Global Payment processed, Global Payments received the chargeback complaint from the issuing bank and generated a chargeback advice, which it mailed to the merchant to attempt to resolve the dispute.

223. The advice contained card information, transaction information, and the narrative of a consumer's dispute.

224. If the merchant contested the chargeback, it could respond with supporting documentation to Global Payments.

225.   Global Payments processed the chargeback of one Texas consumer, for example, who disputed a Credit Power transaction from September 16, 2013.

226.   The consumer complained that she received a call from LRS Litigations.

227.   The caller from LRS Litigations said the consumer owed LRS money and stated the consumer's social security number.

228.   The consumer did not provide debit card information or authorize a charge, but Credit Power withdrew $500 from her account without authorization.

229.   Global Payments processed the chargeback of another consumer who complained that he received a threatening call while he was asleep.

230.   The caller stated that he had a "restraining order against [the consumer] to appear in court if I didn't settle with them."

231.   The caller said the consumer had 24 hours to pay $500 on a $1,600 debt to Bank of America, or the collector would "contact [the consumer's] employer to levy [his] wage, and they were also contacting the local police to serve papers against [the consumer]."

232.   According to the complaint, because he was scared, the consumer provided his bank card information.

233. After making the payment, the consumer's wife informed him that they had never done business with Bank of America.

234. Global Payments processed a Pennsylvania consumer's dispute of a $250 debit by Credit Power.

235. The consumer complained that he received a call on January 30, 2014 from a collection agency that the consumer had to pay two payments of $250 to settle a $3,000 MasterCard debt, or he would be "forced to go to court and pay further fees such as court costs, settlement fees, etc."

236. Although the consumer was already paying a collection agency for his credit card debt, "with the scare of court and more fees … I simply gave my debit card number for settlement."

237. The caller promised to send a receipt by email, but the consumer never received any paperwork.

238. Upon hanging up, the caller remembered that he only had one credit card, a Visa.

239. Global Payments processed the chargeback of a consumer from Oregon who disputed a $600 payment to UDPS.

240. The consumer complained that a caller claimed to have lost the consumer's payment information because of a computer server outage.

241.  However, the consumer had never provided his payment information to the agency the caller claimed to represent.

242.  The caller promised to send a settlement agreement before charging the consumer's card, but did not.

243.  As the consumer summarized in this dispute, "They lied about who they were, they lied about what they were doing, and they lied about providing documentation."

244.  Other consumers disputed charges by Credit Power and UDPS when they were unable to reach the merchant, payments they made were not applied to an actual debt, the consumer did not receive a verification of debt, or simply that the charge was not authorized.

245.  Many of the complaints about Credit Power and UDPS refer to LRS Litigations or IRS Equity, which, at least, should have alerted Global Payments, Frontline, and Pathfinder to factoring.

246.  Global Payments, Frontline, and Pathfinder ignored these red flags and allowed UDPS and Credit Power to continue processing unlawfully obtained payments.

### *EMS's underwriting and risk monitoring were deficient*

247.   Like Global Payments, EMS provided frontline customer service, chargeback processing and risk monitoring functions for merchant transactions.

248.   EMS's agreement with its sponsor bank required EMS to maintain underwriting standards, perform due diligence on merchant applications, and monitor risk.

249.   EMS's agreements with its ISOs required the ISO to market EMS to only "bona fide lawful businesses and merchants that meet EMS' criteria" and conform with EMS's, the sponsor bank's, and the card associations' underwriting requirements.

250.   In August 2013, UDPS and Credit Power submitted applications to EMS to process an average monthly sales volume of $50,000 and $75,000, respectively.

251.   The applications provided 3939 Lavista Rd. as a legal and physical address.

252.   This address, 3939 Lavista Rd., is the address of a UPS Store.

253.   UDPS and Credit Power also provided 3939 Lavista Rd. as Mohan Bagga's residential address, while the phone number provided as

Mohan Bagga's residential phone is Marcus Brown's cell phone, including a Buffalo area code.

254.   The site inspection section of the applications stated that the merchant owns the premises, which is consistent with the type of business, but that the inspector did not physically inspect the business.

255.   The address information in the applications was contradicted by other documents in the underwriting packages, including Mohan Bagga's driver's license, Mohan Bagga's credit report, and a voided check for the UDPS bank account.

256.   EMS utilized a fraud detection tool as part of the underwriting process.

257.   On a scale of zero to 50, fraud detection reports included in EMS's underwriting file rated UDPS and Credit Power zero, or high risk, because there was "[n]othing found to confirm the existence of the business."

258.   Although the application identified UDPS as a "collections" business, EMS assigned merchant code 7321, "Consumer Credit Reporting Agencies."

259.   Although the Credit Power and UDPS applications provided the same business address, the Credit Power underwriting file included a merchant site inspection report.

260. The inspection was never completed; instead, the report stated, "Inspection was placed on hold because the site contact would not return inspectors [*sic*] phone calls. Received email from [client] 10/04/13 asking that this order be cancelled out."

261. EMS approved both the Credit Power and UDPS applications.

262. EMS, like Global Payments, processed consumer chargebacks.

263. Consumer chargebacks processed by EMS involved, for example, a consumer's complaint that he received a call from "Arbitration Resolution" claiming that he owed a debt to a bank.

264. The caller told the consumer that the debt was "in the lawyers' hands now so if I did not settle it today I would be subject to a judgment on my bank accounts."

265. After the consumer paid "Arbitration Resolution," his account showed a corresponding withdrawal by UDPS.

266. After paying, the consumer learned from his bank that no such debt had existed.

267. EMS processed the chargeback of a Nebraska consumer who provided an affidavit to her bank disputing a UDPS charge. The affidavit states,

44

I was called on Fri Jan 31, 2013 [*sic*] and was told they were calling from arbitration and that if I didn't give them $1000.00 the sheriff would be out to take me to jail at 6 pm. I told them what was this about and he said it was in regards to capital one credit card. I told him I only receive SSI, so he asked me how much I could pay and I just got scared and I really thought I was going to jail so I just said $200.00 and he said that was good and they would set up payments for March and April.

268.    Despite numerous consumer disputes telling the same story of fraud, EMS took no action to terminate the UDPS or Credit Power accounts.

269.    In response to the Bureau's civil investigative demand, in March 2014, EMS terminated UDPS and submitted a MATCH alert to notify payment processors of UDPS's and Credit Power's possible fraud.

270.    In April 2014, after the payment processors terminated accounts for Credit Power and UDPS, Khan and Varinderjit Bagga formed SPPS and VS Payment Solutions, LLC for the sole purpose of furthering the collection scheme.

271.    Khan, Varinderjit Bagga, and Brown entered indemnity agreements that stated, "Any investigation by the FTC commission or the Consumer Financial Protection Bureau (CFPB) for any violations will be the responsibility for [*sic*] Marcus Brown and he will indemnify the company and Mr. Sumant Khan and Ms. Veena Bagga incase [*sic*] of any violations,

including violations for processing payments and any fines assessed based on a Civil Investigative Demand by CFPB."

272. On April 10, 2014, Varinderjit Bagga submitted an application for a processing account with EMS in the name of WNY.

273. On the application, the business address is listed as 1401 Peachtree St., the same address UDPS used.

274. The application also identified as the contact person "Marcus – Office Manager" and included Marcus Brown's cell phone number.

275. The application identifies Varinderjit Bagga as the owner of WNY.

276. Varinderjit's residential address is listed as 6375 Whitestone Place, the same address the entities had used in prior applications to EMS.

277. EMS's business verification report rated WNY as zero, or high risk, because nothing could be found to confirm the existence of the business.

278. EMS approved the application and capped the account at $30,000 per month.

279. WNY processed just shy of that limit in the months of April, May, and June 2014.

280. EMS deposited payments consumers made to WNY in an account opened and maintained by Sarita Brown in WNY's name.

281.  In May 2014, Khan submitted an application to EMS for SPPS.

282.  The application provides SPPS's corporate address as 1401 Peachtree St.

283.  It lists "Marcus" as the office manager and includes Brown's cell phone number.

284.  EMS performed a business verification report that gave SPPS a zero rating because nothing could be found to confirm the existence of the business.

285.  EMS approved SPPS's application, and permitted the Debt Collectors to process about $80,000 through the account between May and August 2014, when EMS terminated the account in response to the Bureau's inquiry.

### *To continue their collection scheme, Brown, Varinderjit Bagga, and Khan opened additional processing accounts with another payment processor*

286.  In April 2014, Marcus Brown contacted another payment processor to open processing accounts for WNY and SPPS.

287.  Brown identified himself to the processor as a consultant for the entities.

288.  WNY's application for a processing account identified Varinderjit Bagga as WNY's president and 100% owner.

47

289. SPPS's application for a processing account identified Sumant Khan as SPPS's 100% owner.

290. Both applications referenced the 1401 Peachtree St. address.

291. In August and September 2014, Khan made significant payments to Brown and WNY from the checking account of SPPS.

## DEBT COLLECTORS' VIOLATIONS OF THE FDCPA

292. The Debt Collector defendants are "debt collectors" as defined by Section 803(6) of the FDCPA, 15 U.S.C. § 1692a(6), because they used instrumentalities of interstate commerce in a business, the principal purpose of which was the collection of any debts, and/or regularly collected or attempted to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

293. A "consumer," as defined in Section 803(3) of the FDCPA, 15 U.S.C. § 1692a(3), "means any natural person obligated or allegedly obligated to pay any debt."

294. A "debt," as defined in Section 803(5) of the FDCPA, 15 U.S.C. § 1692a(5), "means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance or services which are the subject of the transaction are primarily for

personal, family, or household purposes, whether or not such obligation has been reduced to judgment."

### Count I: Harassment and Abuse in Connection with Collection of a Debt

295. The Bureau incorporates by reference the allegations in paragraphs 1-294 of the complaint.

296. In numerous instances, in connection with the collection of purported debts, the Debt Collectors engaged in conduct the natural consequence of which was to harass, oppress, or abuse the consumer, including, but not limited to, placing telephone calls without meaningful disclosure of the caller's identity, concealing their identity by causing "000-000-0000" to appear on the consumer's caller identification, threatening arrest and garnishment of wages, and making false allegations that the consumer committed a crime.

297. The Debt Collectors' harassment and oppressive and abusive conduct violated Section 806 of the FDCPA, 15 U.S.C. § 1692d.

### Count II: Using False, Deceptive, and Misleading Representations to Collect a Debt

298. The Bureau incorporates by reference the allegations in paragraphs 1-297 of the complaint.

299. The Debt Collectors used false, deceptive, or misleading representations or means in connection with the collection of alleged debt, including, but not limited to:

      a. falsely representing the character, amount, or legal status of the debt, in violation of 15 U.S.C. § 1692e(2)(A);

      b. implying that nonpayment of an alleged debt would result in arrest or garnishment, where the Debt Collectors had no intent or ability to take such action, in violation of 15 U.S.C. § 1692e(4);

      c. threatening to take action that they could not legally take, or did not intend to take, in violation of 15 U.S.C. § 1692e(5);

      d. falsely representing that the consumer committed the crime of check fraud to disgrace and threaten the consumer, in violation of 15 U.S.C. § 1692e(7);

      e. using false representations and deceptive means, by making allegations of fraud, to collect or attempt to collect any debt, in violation of 15 U.S.C. § 1692e(10);

      f. using business names other than the true name of the Debt Collectors' business, in violation of 15 U.S.C. § 1692e(10); and

50

    g.  failing to disclose in the initial oral communication with the consumer that the Debt Collectors were attempting to collect a debt and that any information obtained would be used for that purpose, in violation of 15 U.S.C. § 1692e(11).

300.  The Debt Collectors' false, deceptive, and misleading representations violated Section 807 of the FDCPA, 15 U.S.C. § 1692e.

## Count III: Failing to Validate Debts

301.  The Bureau incorporates by reference the allegations in paragraphs 1-300 of the complaint.

302.  The Debt Collectors failed to validate alleged consumer debt by failing to provide consumers a written notice, within five days of their initial communication with a consumer, containing:

    a.  the amount of the debt;

    b.  the name of the creditor to whom the debt was owed;

    c.  a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

    d.  a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any

51

portion thereof, is disputed, the debt collector will obtain
verification of the debt or a copy of the judgment against the
consumer and a copy of such verification or judgment will be
mailed to the consumer by the debt collector; and

e. a statement that, upon the consumer's written request within
the thirty-day period, the debt collector will provide the
consumer with the name and address of the original creditor, if
different from the current creditor.

303. The Debt Collectors' failure to validate debt violated Section 809
of the FDCPA, 15 U.S.C. § 1692g.

## THE CONSUMER FINANCIAL PROTECTION ACT

304. The CFPA prohibits covered persons or service providers from
engaging "in any unfair, deceptive, or abusive act or practice." 12 U.S.C.
§§ 5531, 5536(a)(1)(B). Section 1054(a) of the CFPA grants the Bureau
authority to commence a civil action against any person who violates a
federal consumer financial law. 12 U.S.C. § 5554(a). The CFPA and FDCPA
are federal consumer financial laws. 12 U.S.C. § 5481(14).

305. Under the CFPA, a "related person" is deemed to mean a covered
person. A related person is:

(i) any director, officer, or employee charged with managerial
responsibility for, or controlling shareholder of, or agent for, such
covered person; (ii) any shareholder, consultant, joint venture partner,
or other person, as determined by the Bureau (by rule or on a case-by-
case basis) who materially participates in the conduct of the affairs of
such covered person; and (iii) any independent contractor (including
any attorney, appraiser, or accountant) who knowingly or recklessly
participates in any . . . violation of any provision of law or
regulation . . . .

12 U.S.C. § 5481(25).

306.   The CFPA defines a "service provider" as "any person that
provides a material service to a covered person in connection with the
offering or provision by such covered person of a consumer financial product
or service." 12 U.S.C. § 5481(26).

307.   The CFPA further makes it unlawful for any person to knowingly
or recklessly provide substantial assistance to a covered person or service
provider engaged in unfair, deceptive, or abusive acts or practices; the
provider of substantial assistance is deemed in violation of the law to the
same extent as the person to whom such assistance is provided. 12 U.S.C.
§ 5536(a)(3).

## DEBT COLLECTORS' VIOLATIONS OF THE CFPA

### Count IV: Violations of the FDCPA

308.   The Bureau incorporates by reference the allegations in
paragraphs 1-307 of the complaint.

309. Section 1036(a)(1)(A) of the CFPA provides that it is "unlawful for any covered person to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A).

310. The Debt Collectors committed acts in violation of a Federal consumer financial law, the FDCPA.

311. The Debt Collectors' harassment and oppressive and abusive conduct, in violation of Section 806 of the FDCPA, 15 U.S.C. § 1692d; false, deceptive, and misleading representations, in violation of Section 807 of the FDCPA, 15 U.S.C. § 1692e; and failure to validate debt, in violation of Section 809 of the FDCPA, 15 U.S.C. § 1692g also violated Section 1036(a)(1)(A) of the CFPA, 12 U.S.C. § 5536(a)(1)(A).

## Count V: Deceptive Acts or Practices

312. The Bureau incorporates by reference the allegations in paragraphs 1-311 of the complaint.

313. In numerous instances, in connection with the collection of alleged debt, the Debt Collectors, for example, represented, directly or indirectly, expressly or by implication, that:

      a. the consumer committed a crime that the Debt Collectors were authorized to prosecute;

      b. consumers owed a debt that the Debt Collectors had authority to collect;

      c. the consumer had a legal obligation to pay the Debt Collectors; and

      d. the Debt Collectors had authority to take, and would take, legal action against consumers, including arrest, because of crimes the consumers were alleged to have committed.

314. In truth and in fact, in numerous instances in which Debt Collectors made the representations set forth in the preceding Paragraph:

      e. the consumer did not commit a crime that the Debt Collectors had authority to prosecute;

      f. consumers did not owe a debt that the Debt Collectors had authority to collect;

      g. the consumer did not have a legal obligation to pay the Debt Collectors; and

      h. the Debt Collectors did not have authority to take, and did not intend to take, legal action against consumers, including

arrest, because of crimes the consumers were alleged to have
committed.

315.  The Debt Collectors' misrepresentations led consumers to
reasonably believe that they owed the Debt Collectors payment for a debt.

316.  The Debt Collectors' misrepresentations were material to
numerous consumers' decisions to pay the Debt Collectors.

317.  Therefore, the Debt Collectors' representations as set forth in
Paragraph 313 are false and misleading, and constitute deceptive acts or
practices in violation of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

## Count VI: Unfair Acts or Practices

318.  The Bureau incorporates by reference the allegations in
paragraphs 1-317 of the complaint.

319.  In numerous instances, the Debt Collectors caused consumers'
bank accounts to be debited without consumers' consent, or by using threats
and harassment to obtain consumers' purported consent.

320.  The Debt Collectors' acts or practices caused, or were likely to
cause, substantial injury to consumers that was not reasonably avoidable by
consumers and was not outweighed by countervailing benefits to consumers
or to competition.

321. Therefore, the Debt Collectors' practices as described in
Paragraph 319 constitute unfair acts or practices in violation of the CFPA,
12 U.S.C. §§ 5531, 5536(a)(1)(B).

### Count VII: Providing Substantial Assistance to the Debt Collector LLCs' Unfair or Deceptive Conduct

322. The Bureau incorporates by reference the allegations in
paragraphs 1-321 of the complaint.

323. The individual defendants provided substantial assistance to the
Debt Collector LLCs' unlawful conduct by purchasing debt and leads,
providing skip tracing services, providing telephone lines and broadcasting
services, leasing office space, providing access to payment processing
services, and hiring and paying collectors.

324. The individual defendants knowingly or recklessly provided this
substantial assistance to the collection scheme and accepted significant
monetary returns for their contributions.

325. Therefore, the individual defendants provided substantial
assistance to the unlawful conduct of the Debt Collector LLCs, in violation of
12 U.S.C. § 5536(a)(3).

## PAYMENT PROCESSORS' VIOLATIONS OF THE CFPA

### Count VIII: Providing Substantial Assistance to the Debt Collectors' Unfair or Deceptive Conduct

326.   The Bureau incorporates by reference the allegations in paragraphs 1-325 of the complaint.

327.   Under the CFPA, it is unlawful for any person to "knowingly or recklessly provide substantial assistant to a covered person or service provider in violation of the provisions of section 1031, or any rule or order issued thereunder." 12 U.S.C. § 5536(a)(3).

328.   The Payment Processors provided substantial assistance to the unlawful conduct of the Debt Collectors and other persons who collect debt by enabling them to accept payment by credit and debit card, legitimizing the Debt Collectors' business, making transactions easy for consumers and the Debt Collectors, enabling the Debt Collectors to accept payment from consumers with insufficient cash, and facilitating the Debt Collectors' efficient collection of consumers' funds.

329.   The Payment Processors knowingly or recklessly provided this substantial assistance by approving merchant applications from the Debt Collectors and other persons who collect debt that were replete with indicia of fraud and ignoring warnings from industry and consumers that the

Payment Processors' clients were engaged in a scheme to defraud consumers.

330.    Therefore, the Payment Processors provided substantial assistance to the unlawful conduct of the Debt Collectors and other persons who collect debt, in violation of 12 U.S.C. § 5536(a)(3).

## Count IX: Unfair Acts or Practices

331.    The Bureau incorporates by reference the allegations in paragraphs 1-330 of the complaint.

332.    The Payment Processors provided material services, including payment processing services, to the Debt Collectors and other persons who collect debt in connection with their collection of debt by enabling them to take funds from consumers.

333.    The Payment Processors failed to conduct reasonable due diligence to detect the unlawful conduct of the Debt Collectors and other persons who collect debt, approved merchant applications that were replete with indicia of fraud, and ignored warnings from industry and consumers that the Payment Processors' clients were engaged in a scheme to defraud consumers.

334.    The Payment Processors' acts or practices caused, or were likely to cause, substantial injury to consumers that was not reasonably avoidable

by consumers and was not outweighed by countervailing benefits to

consumers or to competition.

335.   Therefore, the Payment Processors' practices described in

Paragraph 333 constitute unfair acts or practices in violation of the CFPA,

12 U.S.C. §§ 5531(a) and (c)(1), and 5536(a)(1)(B).

## GLOBAL CONNECT'S VIOLATIONS OF THE CFPA

### Count X: Providing Substantial Assistance to the Debt Collectors' Unfair or Deceptive Conduct

336.   The Bureau incorporates by reference the allegations in

paragraphs 1-335 of the complaint.

337.   Global Connect provided substantial assistance to the unlawful

conduct of the Debt Collectors and other persons who collect debt by

broadcasting threatening messages to consumers and enabling them to

communicate with millions of consumers using Global Connect's automated

system.

338.   Global Connect knowingly or recklessly provided this substantial

assistance by broadcasting a message that it knew, or should have known,

was unfair or deceptive, and materially contributed to unlawful debt

collection, including the Debt Collectors' scheme.

339. Therefore, Global Connect provided substantial assistance to the unlawful conduct of Debt Collectors and other persons who collect debt, in violation of 12 U.S.C. § 5536(a)(3).

## Count XI: Unfair Acts or Practices

340. The Bureau incorporates by reference the allegations in paragraphs 1-339 of the complaint.

341. Global Connect provided material services to the Debt Collectors and other persons who collect debt in connection with their collection of debt by broadcasting millions of threatening collection messages to consumers on their behalf.

342. Global Connect's acts or practices caused, or were likely to cause, substantial injury to consumers that was not reasonably avoidable by consumers and was not outweighed by countervailing benefits to consumers or to competition.

343. Therefore, Global Connect's practices as described in Paragraph 341 constitute unfair acts or practices in violation of the CFPA, 12 U.S.C. §§ 5531(a) and (c)(1), and 5536(a)(1)(B).

## THIS COURT'S POWER TO GRANT RELIEF

344. The CFPA empowers this Court to grant any appropriate legal or equitable relief with respect to violations of federal consumer financial law,

including the CFPA and FDCPA. This relief includes, without limitation, permanent or temporary injunction, rescission or reformation of contracts, the refund of monies paid, restitution, disgorgement or compensation for unjust enrichment, payment of damages, limits on the activities and functions of defendants, and civil money penalties. 12 U.S.C. § 5565(a). In addition, the CFPB may recover its cost in connection with the action, if it is the prevailing party. 12 U.S.C. § 5565(b).

## PRAYER FOR RELIEF

Wherefore, the Bureau requests that the Court:

1. Preliminarily and permanently enjoin defendants from committing future violations of the CFPA and FDCPA;

2. Award such relief as the Court finds necessary to redress injury to consumers resulting from defendants' violations of the CFPA and FDCPA, including, but not limited to, rescission or reformation of contracts, the refund of moneys paid, restitution, and payment of damages;

3. Award disgorgement or compensation for unjust enrichment;

4. Award the Bureau civil money penalties;

5. Award the Bureau the costs of bringing this action; and

6. Such other and additional relief as the Court may determine to be

just and proper.

Dated: March 26, 2015                    Respectfully Submitted,

                                         Attorneys for Plaintiff

                                         Consumer Financial Protection Bureau:

                                         ANTHONY ALEXIS
                                         Enforcement Director

                                         FRANK KULBASKI
                                         Acting Deputy Enforcement Director for
                                         Litigation

                                         /s/ Jonathan B. Engel
                                         _____
                                         JONATHAN B. ENGEL (MA bar #664518)
                                         DAVID DUDLEY (WI Bar #1062812)
                                         ENFORCEMENT ATTORNEYS
                                         1700 G Street NW
                                         Washington, DC 20552
                                         Phone (Engel): 202-435-9037
                                         Phone (Dudley): 202-435-9284
                                         Email: Jonathan.Engel@cfpb.gov
                                         Email: David.Dudley@cfpb.gov
                                         Fax: 202-435-7722

                                         And

                                         Local Counsel
                                         JOHN A. HORN
                                         ACTING UNITED STATES ATTORNEY

                                         LENA AMANTI
                                         ASSISTANT U.S. ATTORNEY
                                         Georgia Bar No. 666825

600 Richard B. Russell Federal Bldg.
75 Spring Street, S.W.
Atlanta, GA 30303
Telephone: (404) 581-6225
Facsimile: (404) 581-6163
Email: lena.amanti@usdoj.gov