## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

CONSUMER FINANCIAL
PROTECTION BUREAU,

       Plaintiff,

   v.

UNIVERSAL DEBT & PAYMENT
SOLUTIONS, LLC; *et al.*,

      Defendants.

Case No. 1:15-cv-0859

## DEFENDANT PATHFINDER PAYMENT SOLUTIONS, INC.'S
## MOTION TO DISMISS AND MEMORANDUM IN SUPPORT

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. ii

OVERVIEW ....................................................................................... 2

ARGUMENT AND CITATIONS OF AUTHORITY .............................. 4

    A.  Count VIII Is Facially Deficient:  It Fails as a Matter of Law. ..................... 5

        1.  *In Pari Materia* ................................................................. 6

        2.  Application of "Substantial Assistance" in Securities Actions ................................................................................ 7

        3.  The Allegations Against Pathfinder Are Inadequate. ............ 9

        4.  The Broad Application the Bureau Seeks Is Impermissible. ................. 9

    B.  Count IX Is Facially Deficient:  It Fails as a Matter of Law ....................... 12

        1.  There Is No Primary Violation of the Unfair Practices Provision. ............................................................................ 12

        2.  Statutory Exemptions to the Definition of "Service Provider" ............................................................................. 13

        3.  Pathfinder Is Not a "Service Provider." ............................... 19

            a.  Unfair Practices Provision ....................................... 20

            b.  Prohibited Acts Provision ........................................ 21

    C.  Like *Choke Point*, This Action Involves Regulatory Overreach ...................................................................................... 22

CONCLUSION ................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2008) ............................................................ 4, 5, 8

*Central Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164 (1993).......... 21, 22

*Coles v. Bank of N.Y. Mellon*, 2012 U.S. Dist. LEXIS 90765
    (N.D. Ga. Mar. 30, 2012)..................................................................................6, 8

*Employers Mut. Liab. Ins. Co. v. Tollefsen*, 219 Wis. 434 (1935) .........................12

*In re Doubleclick Privacy Litig.*, 154 F. Supp. 2d 497 (S.D.N.Y. 2001) ......... 15, 16

*SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012) ............................................. 7, 8, 9, 21

*SEC v. Familant*, 910 F. Supp. 2d 83 (D.D.C. 2012) .................................................8

*SEC v. Jackson*, 908 F. Supp. 2d 834 (S.D. Tex. 2012) ...........................................8

*United States v. Peoni*, 100 F.2d 401 (2d Cir. 1938).................................................7

**Statutes**

12 U.S.C. § 5481 ................................................................................................ passim

12 U.S.C. § 5531 .................................................................................................3, 13

12 U.S.C. § 5536................................................................................................ 3, 6, 21, 22

15 U.S.C. § 78t............................................................................................................6

**Other Authorities**

111 H.R. 4173m § 210(11)(F) ................................................................................17

July 21, 2010, P.L. 111-203, Title IX, Subtitle B, § 929M(b)...................................6

July 21, 2010, P.L. 111-203, Title VII, Subtitle B, § 762(d)(6) ...............................6

Mar. 20, 2013, *Remarks of Financial Fraud Enforcement Task Force*
    *Executive Director Michael J. Bresnickat* (Exchequer Club of
    Washington, DC) ..................................................................................................22

Todd Zywicki, *FDIC retreats on Operation Choke Point?*, The
    Washington Post, Jan. 29, 2015,
    http://www.washingtonpost.com/news/volokh-conspiracy/
    wp/2015/01/29/fdic-retreats-on-operation-choke-point/)...................................24

### *Rules*

Fed. R. Civ. P. 12(b)(6)...............................................................................................5

Wielding the morning star[1] that is the enforcement power of federal regulatory agencies, Plaintiff Consumer Financial Protection Bureau (the "Bureau") has filed suit against 18 defendants, alleging an assortment of fraudulent conduct, illegal schemes, and aiding and abetting violations.  The Bureau further threatens that the Court has the power to "grant *any* appropriate legal or equitable relief" in connection with those alleged violations—including the extraordinary relief of

- permanent or temporary injunctions;

- rescissions or reformations of contracts;

- restitution/disgorgement;

- limiting the activities/functions of Defendants;

- civil monetary penalties; and

- damages.[2]

In seeking such sanctions for the conduct alleged in the Complaint, however, the Bureau has exceeded the bounds of its statutory authority in its attempt to convert its congressional mandate into strict liability for any entity or person that engages in

---

[1]   Wikipedia, Morning Star (weapon), http://en.wikipedia.org/wiki/Morning_star_ (weapon) ("A morning star is any of several medieval club-like weapons that included one or more spikes. Each used, to varying degrees, a combination of blunt-force and puncture attack to kill or wound the enemy.").

[2]   Compl.¶ 344 (emphasis supplied).

business with the administratively-disfavored category of companies engaged in debt collection.  The Bureau's tactics could just as easily be applied to phone companies, internet service providers, or janitors.

The Consumer Financial Protection Act (the "Consumer Protection Act" or "Act") does not permit this overreach.  Neither should the Court.  Accordingly, Pathfinder Payment Solutions, Inc. respectfully requests that the Court put an end to this conduct and dismiss all claims against it.

## OVERVIEW

The Bureau's claims against Pathfinder are based on a novel strict liability theory that is neither supported nor warranted by its authorizing statute—the Consumer Protection Act.  The Complaint alleges that Pathfinder provides electronic payment processing to other *businesses*.[3]  The Bureau has marshaled the full force of its regulatory power against Pathfinder, despite the fact that it cannot allege that Pathfinder offered financial products or services *to a single consumer*.  Despite its length, the 11-count, 344-paragraph Complaint asserts only two causes of action against Pathfinder.  Both are facially deficient and fail as a matter of law.

Using only two *substantive* paragraphs, Count VIII attempts to plead aiding

---

[3]     Compl. ¶¶ 80-81.

2

and abetting liability against Pathfinder for primary violations allegedly committed by others.[4]   Under the Act, the Bureau must therefore establish that Pathfinder provided "substantial assistance" to a primary violator.  Elsewhere in the Dodd-Frank Act (of which the Consumer Protection Act was a part), Congress used the exact same "substantial assistance" language on which Count VIII depends.  The Second Circuit has made clear what must be shown in order to satisfy the "substantial assistance" standard.  It is not met here.

Count IX is a baffling, neither-nor claim that conflates two separate statutory causes of action.  It satisfies the standard for neither.  The three substantive paragraphs in Count IX do not state a claim for either a direct or an aiding and abetting (*i.e.*, "substantial assistance") violation.[5]   The Bureau cannot plead a violation of the Act's "Unfair Practices Provision"[6]  because it cannot adequately allege substantial assistance.

Nor does Count IX state a claim under the Act's "Prohibited Acts Provision"[7] because the Bureau cannot establish that Pathfinder qualifies as a "service provider."

---

[4]   Compl. ¶¶ 328-329; *see generally id.* ¶¶ 326-330.

[5]   Compl. ¶¶ 332-334; *see generally id.* ¶¶ 331-335.

[6]   12 U.S.C. § 5531(a).

[7]   12 U.S.C. § 5536(a)(1)(B).

3

The Bureau claims merely that Pathfinder provided the alleged primary violators with the same type of services that Pathfinder provided to businesses generally. The Complaint itself makes clear that Pathfinder transmitted financial data without the requisite level of knowledge required by the statute.

Neither cause of action asserted against Pathfinder is sufficient to satisfy the *Twombly/Iqbal* motion to dismiss standard. Nor would discovery aid the bureau in its quest. It has already pleaded its best case against Pathfinder, having issued a substantial amount of pre-suit discovery using its investigatory powers. In good-faith compliance with the Bureau's requests, Pathfinder produced more than 21,000 pages of responsive documents and submitted deposition testimony from corporate officers. Even after Pathfinder diligently and forthrightly produced this enormous amount of information, the Bureau has still failed to meet its pleading obligations.

The Bureau asks this Court to vastly expand the class of possible defendants under the Consumer Protection Act—an expansion that would not help it fulfill its statutory duties to regulate companies that provide *consumer* financial products and services. The Court should reject the Bureau's invitation to upset existing law and distort the aims of the statute.

## ARGUMENT AND CITATIONS OF AUTHORITY

A motion to dismiss for failure to state a claim under Rule 12(b)(6) of the

4

Federal Rules of Civil Procedure may be brought in the movant's first responsive pleading.  Dismissal is appropriate where the complaint does not offer "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" and merely presents "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."[8]    To withstand a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[9]  Where the well-pleaded facts alleged in a complaint "do not permit the court to infer more than the mere possibility of misconduct," the complaint is deficient and must be dismissed.[10]

## A.    Count VIII Is Facially Deficient:  It Fails as a Matter of Law.

The Dodd-Frank Wall Street Reform and Consumer Protection Act Conference Report outlines Congress's actions in enacting the Consumer Protection Act and attempts to harmonize existing law with it as part of an overall regulatory scheme.  The language of the "Aiding and Abetting Provision" in the Act makes it unlawful for "any person to knowingly or recklessly provide substantial assistance to a covered person or service provider" in violation of the relevant law

---

[8]    *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2008) (quotation marks & citation omitted).

[9]    *Id.* (quotation marks & citation omitted).

[10]    *Id.* at 679.

(the "Substantial Assistance Provision").[11]  **As part of the same legislative act,** Congress modified Section 15 of the Securities Exchange Act to create aiding and abetting liability for any person who "knowingly or recklessly provides substantial assistance" to another in violation of that law.[12]  Congress, then, used the Substantial Assistance Provision *verbatim* elsewhere in the same legislation.  Both the Substantial Assistance Provision and the identical amendment to the Securities Exchange Act outline how a regulatory action may be brought against a party who aids and abets another in committing a primary violation.

### 1.    *In Pari Materia*

The two provisions of Dodd-Frank serve equivalent purposes and employ identical language.  They must, therefore, be construed consistently:

> a statute must be construed in relation to other statutes of which it is a part, and all statutes relating to the same subject-matter, briefly called statutes "*in pari materia*," are construed together, and harmonized wherever possible, so as to ascertain the legislative intendment and give effect thereto.[13]

---

[11]   12 U.S.C. § 5536(a)(3).

[12]   15 U.S.C. § 78t(e).  *Compare* July 21, 2010, P.L. 111-203, Title IX, Subtitle B, § 929M(b) *with* July 21, 2010, P.L. 111-203, Title VII, Subtitle B, § 762(d)(6).

[13]   *Coles v. Bank of N.Y. Mellon*, 2012 U.S. Dist. LEXIS 90765, at *7 (N.D. Ga. Mar. 30, 2012) (quotation marks & citations omitted).

6

The Substantial Assistance Provision in the Consumer Protection Act cannot be subject to differing interpretations depending on its location within Dodd-Frank. The Bureau, however, must convince the Court of exactly that if the Complaint against Pathfinder is to withstand dismissal.

### 2. Application of "Substantial Assistance" in Securities Actions

In *SEC v. Apuzzo* (an SEC enforcement action)*, the United States Court of Appeals for the Second Circuit interpreted and applied the same language that is contained in the Substantial Assistance Provision.[14]   The court clarified that the "substantial assistance" language in the Securities Exchange Act embodies the classic formulation of aiding and abetting liability originally set forth by Judge Learned Hand.[15]   Specifically, to withstand a motion to dismiss on a "substantial assistance" claim, the complaint must plausibly allege that the defendant:

> in some sort associate[d] himself with the venture, that [the defendant] participate[d] in it as something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed.[16]

The *Apuzzo* court reversed the trial court's grant of a motion to dismiss, finding that

---

[14]   689 F.3d 204 (2d Cir. 2012).

[15]   *Id.* at 212.

[16]   *Id.* at 212 (citing *United States v. Peoni*, 100 F.2d 401 (2d Cir. 1938)).

the complaint sufficiently alleged that:

> Apuzzo associated himself with the venture, participated in it as something that he wished to bring about, and sought by his action to make it succeed.  ***Specifically***, Apuzzo agreed to participate in the Terex I & Terex II transactions; negotiated the details of those transactions, through which he extracted certain agreements from URI in exchange for Terex's participation; approved and signed separate agreements with GECC and URI, which he knew were designed to hide URI's continuing risks and financial obligations relating to the sale-leaseback transaction in furtherance of the fraud; and approved or knew about the issuance of Terex's inflated invoices, which he also knew were designed to further the fraud.[17]

Federal district courts in other Circuits, including the Fifth Circuit, have adopted *Apuzzo*'s application of substantial assistance in SEC enforcement actions.[18] The same definition must be applied here, as well.[19]  The Complaint's allegations, however, fall well short of this required standard, providing little more than a "formulaic recitation of the elements of a cause of action."[20]

---

[17]   *Apuzzo*, 689 F.3d. at 214 (emphasis supplied).

[18]   *See SEC v. Jackson*, 908 F. Supp. 2d 834, 863 (S.D. Tex. 2012); *see also SEC v. Familant*, 910 F. Supp. 2d 83, 91 (D.D.C. 2012).

[19]   *Coles*, 2012 U.S. Dist. LEXIS 90765, at *7.

[20]   *Iqbal*, 556 U.S. at 678 (quotation marks & citation omitted).

### 3. The Allegations Against Pathfinder Are Inadequate.

Count VIII consists of *two* substantive paragraphs.[21]  Paragraph 329 alleges that Pathfinder and the other Payment Processors' acts were knowing or reckless because "merchant applications from the Debt Collectors and others who collect debt" were "replete with indicia of fraud" and because "industry and consumers" provided "warnings" of fraudulent activity.

Paragraph 328 says the same thing several different ways, alleging at its heart, that "substantial assistance" is satisfied simply because Pathfinder allowed Debt Collectors to accept payment by credit and debit card.  The Complaint is devoid of any allegation that Pathfinder in some way associated itself with the Debt Collectors' venture; that it participated in that venture as something that it wished to bring about; or that it sought by its actions to make that venture succeed.  Nor do the allegations in Count VIII approach the detailed factual allegations presented in *Apuzzo*.  Count VIII is facially deficient and should be dismissed.

### 4. The Broad Application the Bureau Seeks Is Impermissible.

Reading the Substantial Assistance Provision so broadly that Count VIII could satisfy it would contradict *Apuzzo* and create an inconsistency of interpretation of

---

[21]   Compl. ¶¶ 328-329; *see generally id.* ¶¶ 326-330.

the same language contained in two different places within the Dodd-Frank Act itself.  Moreover, the policy implications would be absurd:  if Pathfinder provided substantial assistance, then the Substantial Assistance Provision could be satisfied by practically anything.

For instance, many consumer financial service providers hire janitorial services to clean their offices so that they may present a professional atmosphere to customers.  They get business licenses from the state; obtain business checking accounts from banks; and use internet service providers, mail services, and phone companies as necessary parts of their business.  Under the only interpretation that would allow Count VIII to survive, the Bureau could argue that any such service "legitimized" the financial service provider and supplied "substantial assistance" by helping it appear professional and trustworthy, or by allowing it to operate at all.  It could impute to the State of Georgia, Bank of America, Verizon, Comcast, or other businesses a duty to investigate whether their clients' practices violate the Consumer Protection Act.  The Act, however, does not authorize the Bureau to turn every business that touches a debt collector into a *de facto* super-regulator.

The interpretation of the Substantial Assistance Provision necessary to the

Bureau's claims turns the Consumer Protection Act into a game of Mad Libs:[22]

The _____ provided substantial assistance to the
(noun—Defendant)
unlawful conduct of the _____ and other persons . . .
(noun 2)
by enabling them to accept payment . . . , legitimizing the

_____s' business, making transactions easy for
(noun 2)
consumers and the _____, enabling the
(noun 2)
_____ to accept payment from consumers with
(noun 2)
insufficient cash, and facilitating the _____s'
(noun 2)
efficient collection of consumers' funds.[23]

If the Bureau is permitted to fill in the blanks with payment processors, it could do the same with banks, States, internet service providers, office leasing companies, janitors, or any other business that "gives an air of legitimacy" to a consumer financial product or service provider.[24]   Allowing the Bureau to bring an enforcement action against practically any business at all without notice of what

---

[22]   Wikipedia, Mad Libs, https://en.wikipedia.org/wiki/Mad_Libs ("Mad Libs is a phrasal template word game where one player prompts others for a list of words to substitute for blanks in a story, before reading the—often comical or nonsensical—story aloud.").

[23]   Compl. ¶ 328.

[24]   Compl. ¶ 5.

activities constitute potential wrongdoing would impose a crushing burden on businesses and the financial system while contributing nothing to the Bureau's ability to sanction violations by consumer financial service providers or to protect consumers.

## B.    Count IX Is Facially Deficient:  It Fails as a Matter of Law.

Count IX is a Janus-faced monstrosity that conflates two separate statutory causes of action while satisfying the standard for neither.[25]  The three substantive paragraphs in this count purport to present a claim for "Unfair Acts or Practices" and includes references to the Unfair Practices and the Prohibited Acts Provisions.[26] This pastiche of theories is so confusing that it would likely fail even notice pleading standards, leaving Pathfinder to guess at the true nature of the Bureau's allegations.

### 1.    There Is No Primary Violation of the Unfair Practices Provision.

The Unfair Practices Provision describes the primary violations against which the Bureau may take regulatory action:

> to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial

---

[25]    *See Employers Mut. Liab. Ins. Co. v. Tollefsen*, 219 Wis. 434, 437 (1935) ("It is manifest that we are confronted with the task of first construing 'and/or,' that befuddling, nameless thing, that Janus-faced verbal monstrosity . . . .").

[26]    Compl. ¶¶ 332-334; *see generally id.* ¶¶ 331-335.

> product or service or the offering of a consumer financial
> product or service.[27]

To the extent the Complaint seeks to establish a primary violation under this language, it must allege that *Pathfinder* entered into a "transaction with a consumer for a consumer financial product or service or the offering of a consumer financial product or service." The Bureau does not allege this, nor can it. Pathfinder does not offer financial services to consumers; it does business with other businesses.[28] The alleged consumer financial products and services described in the Complaint were offered by other entities—not Pathfinder. Accordingly, Count IX cannot state a claim against Pathfinder for a primary violation of the Unfair Practices Provision.

### 2.     Statutory Exemptions to the Definition of "Service Provider"

Both the Unfair Practices Provision and the Prohibited Acts Provision provide liability only for a "covered person or service provider."[29] "Covered person" and "service provider" are defined by the Act. A "covered person" is either (a) "any person that engages in offering or providing a consumer financial product or service"

---

[27]   12 U.S.C. §§ 5531(a), (c)(1).

[28]   Compl. ¶ 81 ("Pathfinder provided payment processing services, including material services to persons who collect debt, including the Debt Collectors."). *See generally* Compl. ¶¶ 80-81.

[29]   12 U.S.C. § 5531(a).

or (b) such person's "affiliate" (defined as "any person that controls, is controlled by, or is under common control with another person") where that affiliate also acts as a service provider.  The Complaint does not even attempt to allege that Pathfinder or the other payment processors are covered persons.  There is no allegation that Pathfinder provided or offered a consumer financial product or service, or acted as an affiliate to anyone who did.

Rather, Count IX attempts to assert that Pathfinder is a "service provider." This term has a complicated definition set forth as follows:

> (A)  In general.  The term "service provider" means any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service, including such a person that—
>
> (i)   participates in designing, operating, or maintaining the consumer financial product or service; or
>
> (ii)  processes transactions relating to the consumer financial product or service (*other than unknowingly or incidentally transmitting or processing financial data* in a manner that such data is undifferentiated from other types of data of the same form as the person transmits or processes).
>
> (B)  Exceptions.  The term "service provider" does not include a person solely by virtue of such person offering or providing to a covered person—
>
> (i)   *a support service of a type provided to*

*businesses generally or a similar ministerial service*.[30]

The statute therefore specifically excludes two classes of persons from consideration as "service providers"—(a) those who "unknowingly" transmit financial data[31] and (b) those who provide a "support service of a type provided to businesses generally or a similarly ministerial service."[32]  As the allegations of the Complaint make clear, each statutory exception is satisfied here.

Such exemptions can be either as statutory exceptions or affirmative defenses. In the former case, to state an essential element of the claim, the complaint must plead that the statutory exception does *not* apply.  (Here, the Complaint would have to demonstrate that Pathfinder *is* a "service provider.")   In the latter case, the *defendant* is responsible for pleading as an affirmative defense that the exception applies.   "As a general matter, a plaintiff need not plead denials of affirmative defenses . . . whereas courts may dismiss a claim based on a statutory exception that appears on the face of the complaint."[33]

In *In re Doubleclick Privacy Litigation*, the United States District Court for

---

[30]   12 U.S.C. § 5481(26) (emphasis supplied).

[31]   12 U.S.C. § 5481(26)(A)(ii).

[32]   12 U.S.C. § 5481(26)(B)(i).

[33]   *In re Doubleclick Privacy Litig.*, 154 F. Supp. 2d 497, 507 (S.D.N.Y. 2001).

the Southern District of New York addressed an "exception" under the Electronic Communications Privacy Act ("ECPA").  The Court determined that it was a statutory exception, and granted dismissal where the exception was met on the face of the complaint.[34]  In defining a certain type of prohibited act, the ECPA carves out an exception before providing (under "Exceptions") that the statute "does not apply" to certain types of conduct.[35]  The *Doubleclick* court held the ECPA exemption was a statutory exception because:  (1) it was titled an "exception"; (2) it was carved out of the definition of the conduct to be governed; (3) other sections in the same statute provided for affirmative defenses; and (4) nothing in the legislative history suggested that the section should be treated as an affirmative defense.[36]

These factors are met here as well.  The Bureau had to allege that Pathfinder is either a "covered person" or a "service provider" in order to state a claim.  Both the unknowingly transmitting data exception and the exception of providing support services to businesses generally are contained within the statutory definition of "service provider."  "Service provider" defines the class of persons governed by the

---

[34]  *Id.*

[35]  *Id*. at 508.

[36]  *Id.* 507-08.

Act and establishes how this essential element must be met.  The exception for services offered to businesses generally is listed under the heading "Exceptions."[37] The exception for the unknowing transmission of data is clearly carved out of the definition of service provider and appears in an entire section of definitions—not of affirmative defenses.[38]   The fact that these exceptions are not designated as affirmative defenses must be read as deliberate:  Elsewhere in Dodd-Frank, Congress addressed affirmative defenses and designated them as such.[39]   Finally, the legislative history of the Consumer Protection Act does not reveal any evidence that Congress intended for the exceptions to be treated as affirmative defenses.

Treating these definitions as statutory exceptions effectuates the intent of Congress in enacting the Consumer Protection Act.  The unknowing transmission language clarifies the class of persons whom Congress intended to regulate:  those who participate in "designing, operating, or maintaining the consumer financial product or service"[40]—not those who unknowingly transmit financial data or who

---

[37]   12 U.S.C. § 5481(26)(B).

[38]   12 U.S.C. § 5481(26)(A)(ii).

[39]   *See* 111 H.R. 4173m § 210(11)(F).

[40]   12 U.S.C. § 5481(26)(A)(i).

17

otherwise provide services of a type provided to businesses generally.[41]  To state a claim against Pathfinder, then, the Bureau was required to plead facts sufficient to show that the exceptions are not met.  It did not.

As a matter of policy, this reading of the Act protects from regulatory abuse those merchants who interacted with consumer financial products and services companies just as they interacted with any other commercial client.  Pathfinder is not alleged to have participated in designing, operating, or maintaining a consumer product or service.  The fact that it provided basic payment processing services does not warrant treating it like someone who did.  As with Count VIII, for the Complaint against Pathfinder to survive dismissal, the Court must read the Act so expansively as to allow the Bureau to bring claims against a debt collector's janitorial services company, its telephone company, its bank, the State agency that issued it a business licensing, or its internet service provider.  The Bureau could simply fill in the blank with practically any defendant it desired—even when it cannot allege any participation in the design, operation, or maintenance of a consumer product or service.  There is no reason for this Court to adopt such an expansive interpretation of the statute, which would dramatically expand the class of potential Consumer

---

[41]   12 U.S.C. § 5481(26)(A)(ii); 12 U.S.C. § 5481(26)(B)(i).

Protection Act defendants in contravention of the manifest intent of Congress.

### 3.    Pathfinder Is Not a "Service Provider."

It is clear on the face of the Complaint that both statutory exceptions to the definition of "service provider" are met.  According to Paragraph 144, Pathfinder and the Payment Processors "provide services that enable merchants to accept check, card, and electronic payments at a point of sale."  Nothing about such services is alleged to be specific to debt collection or consumer financial products or services.  Rather, simple observation demonstrates that basic payment processing is provided to nearly every kind of business in the contemporary economy.  The Complaint makes clear that Pathfinder provided a "support service of a type provided to businesses generally"—an express exception.[42]  Under the statute, providing this type of generally-available service does not justify treating Pathfinder the same as a company that participated in the design of a consumer financial product.  Because the facts demonstrating this exception are clear on the face of the Complaint the Bureau cannot plausibly allege that Pathfinder is a "service provider."[43]

Further, Paragraph 147 alleges that Pathfinder and the Payment Processors

---

[42]    Compl. ¶¶ 80-81; 12 U.S.C. § 5481(26)(B)(i).

[43]    12 U.S.C. § 5481(26)(B)(i).

captured credit card information through a point of sale terminal card reader and "transmitted" that information to a payment network.  The Complaint is bare of any allegation that Pathfinder examined this financial information—only that it transmitted it.   The face of the Complaint therefore shows that Pathfinder "unknowingly or incidentally transmit[ed] or process[ed] financial data,"[44] undifferentiated from other types of data.  For this reason as well, the Complaint fails to plead that Pathfinder is a "service provider."[45]

### 3.    Count IX Does Not Adequately Allege Aiding and Abetting Liability.

If the jumbled allegations of Count IX seek to impose aiding and abetting liability on Pathfinder, this cause of action is just as baseless as Count VIII.  Count IX does not even mention "substantial assistance."

### a.    Unfair Practices Provision

To establish liability for aiding and abetting the violation of the Unfair Practices Provision "or any rule or order issued thereunder," the Bureau must demonstrate that Pathfinder "knowingly or recklessly provide[d] substantial

---

[44]   12 U.S.C. § 5481(26)(A)(ii).

[45]   12 U.S.C. § 5481(26)(A)(ii).

assistance" to another who committed a primary violation.[46]  The *Apuzzo* court has already interpreted the Substantial Assistance Provision.  It is not satisfied here.  The Complaint is devoid of any allegation that Pathfinder associated itself with the Debt Collectors' venture; that Pathfinder participated in that venture as something that it wished to bring about; or that Pathfinder sought to make that venture succeed.

### b.    Prohibited Acts Provision

Moreover, Count IX cannot allege aiding and abetting liability for a violation of the Prohibited Acts Provision.  Aiding and abetting liability exists only under the Unfair Practices Provision of the Act.[47]  This provides the standard under which the Bureau must establish aiding and abetting liability.[48]  The Supreme Court has made perfectly clear that such secondary liability cannot be read into statutes.

In *Central Bank, N.A. v. First Interstate Bank, N.A.*, the Supreme Court addressed a plaintiff's effort to create aiding and abetting liability under Section 10(b) of the Securities Exchange Act.[49]  The Tenth Circuit reversed a ruling by the trial court (which had granted a motion to dismiss on the grounds that the Complaint

---

[46]   12 U.S.C. § 5536(a)(3).

[47]   *Compare* 12 U.S.C. § 5536(a)(1) *with* § 5536(a)(3).

[48]   12 U.S.C. § 5536(a)(3).

[49]   511 U.S. 164 (1993).

did not allege a primary violation and that the statute did not explicitly permit aiding and abetting liability). The Supreme Court itself reversed, holding that dismissal had been proper. It reasoned that, where the relevant statutory language did not provide for aiding and abetting liability, it would be

> anomalous to impute to Congress an intention in effect to expand the defendant class for 10b-5 actions beyond the bounds delineated for comparable express causes of action.[50]

The same reasoning is applicable here. Congress demonstrated its ability and willingness to expressly create aiding and abetting liability under other provisions of the Act.[51] That standard is not met here. Nor would it be appropriate for the Court to read aiding and abetting liability into the Act through any other means.

## C.   Like *Choke Point*, This Action Involves Regulatory Overreach.

In March 2013, the Department of Justice announced a new enforcement initiative known as *Operation Choke Point*.[52] Under this operation, the FDIC and Department of Justice investigated banks that did business with payday lenders and other types of businesses the government believed to pose a risk of fraud and money

---

[50]   *Id.* at 179.

[51]   12 U.S.C. § 5536(a)(3).

[52]   **Exhibit A**, Mar. 20, 2013, *Remarks of Financial Fraud Enforcement Task Force Executive Director Michael J. Bresnickat* (Exchequer Club of Washington, DC).

22

laundering.  In so doing, the government purported to hold banks accountable for the actions of their customers: "banks should endeavor not only to know their customers, but also to know their customers' customers."[53]

Under *Operation Choke Point*, banks claimed they were being subjected to a boundless pseudo-regulatory obligation to investigate their clients.  Many banks terminated service agreements with clients in targeted industries—such as payday lending—even when those clients had not been accused of wrongdoing.  The risk of a federal regulatory action against the bank was simply too daunting.  Businesses in the targeted industries joined in opposing the government's course of action.[54]

Ultimately, the FDIC admitted that Operation Choke Point was improper.  On January 29, 2015, the FDIC issued Financial Institution Letter FIL-5-2015, directing that supervised banks should *not* "declin[e] to provide banking services to entire categories of customers" based on the threat of a regulatory action.[55]    The

---

[53]  Ex. A at 5.

[54]  *See generally* Ex. A; **Exhibit B**, FDIC, FIL-5-2015, Financial Institution Letter (Jan. 29, 2015); Frank Miniter, *FDIC Admits to Strangling Legal Gun Stores' Banking Relationships*, FORBES, Jan. 30, 2015, http://www.forbes.com/sites/frankminiter/2015/01/30/fdic-admits-to-strangling-legal-gun-stores-banking-relationships/) (hereinafter, "Miniter Article").

[55]  Ex. B.

Washington Times noted that the letter "effectively end[ed] Operation Choke Point."[56]  With "many businesses threatening legal action,"  the government was forced "to admit misconduct and to stop financial attacks on legal businesses" in politically-disfavored industries.[57]

In suing Pathfinder, the Bureau has taken up the discredited reasoning behind *Operation Choke Point*.  The Director of the Bureau has made this clear:

> The ringleaders of the scheme, the telemarketing company that broadcast millions of robo-calls, and the *companies that processed the payments should all be held accountable for taking advantage of vulnerable consumers*.[58]

As the FDIC did with *Operation Choke Point*, the Bureau seeks to intimidate companies that provide general business services to a disfavored industry—here, debt collectors—by bringing regulatory actions against those companies.  The Bureau is trying to impose on businesses an unbounded, pseudo-regulatory obligation to investigate not only their customers, but their customers' customers.

---

[56] Todd Zywicki, *FDIC retreats on Operation Choke Point?*, THE WASHINGTON POST, Jan. 29, 2015,  http://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/01/29/fdic-retreats-on-operation-choke-point/).

[57] Miniter Article.

[58] http://www.consumerfinance.gov/newsroom/cfpb-sues-participants-in-robo-call-phantom-debt-collection-operation/

The Bureau should not be allowed to exert this type of powerful, chilling effect on Pathfinder or other payment processors—acts beyond its statutory authorization.  As with *Operation Choke Point*, the Bureau apparently seeks to have companies conclude that the threat of a federal enforcement action is so great that they will terminate their relationships with debt collectors—even when those debt collectors are not alleged to have engaged in any wrongdoing.  The FDIC has acknowledged that *Operation Choke Point* had a substantial chilling effect.  The Bureau should not be permitted to continue these discredited practices in yet another area of the financial industry.

## CONCLUSION

For the reasons set forth herein, Pathfinder respectfully requests that the claims against it in Counts VIII and IX of the Complaint be dismissed for failure to state a claim.  Pathfinder should be dismissed as a defendant in this action.

/s/ Kristina M. Jones

John Da Grosa Smith
jdsmith@smithlit.com
Georgia Bar No. 660946

Kristina M. Jones
kjones@smithlit.com
Georgia Bar No. 435145

*Attorneys for Defendant
Pathfinder Payment Solutions, Inc.*

SMITH LLC
1320 Ellsworth Industrial Blvd.
Suite A1000
Atlanta, GA 30318
Tel: 404-605-9680
Fax: 404-935-5226

25

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), the undersigned counsel certifies that the foregoing ***DEFENDANT PATHFINDER PAYMENT SOLUTIONS, INC.'S MOTION TO DISMISS AND MEMORANDUM IN SUPPORT*** was prepared in Times New Roman, 14 point font, in accordance with Local Rule 5.1.

/s/ Kristina M. Jones
Kristina M. Jones
kjones@smithlit.com
Georgia Bar No. 435145

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, <br><br> Plaintiff, <br><br> v. <br><br> UNIVERSAL DEBT & PAYMENT SOLUTIONS, LLC; *et al.*, <br><br> Defendants. | Case No. 1:15-cv-0859 |

## <u>CERTIFICATE OF SERVICE</u>

I, Kristina M. Jones, hereby certify that on May 12, 2015 I caused to be electronically filed the foregoing ***DEFENDANT PATHFINDER PAYMENT SOLUTIONS, INC.'S MOTION TO DISMISS AND MEMORANDUM IN SUPPORT*** with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all counsel of record.

/s/ Kristina M. Jones
Kristina M. Jones
kjones@smithlit.com
Georgia Bar No. 435145