**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 1:15-cv-0859-RWS |
| UNIVERSAL DEBT & PAYMENT SOLUTIONS, LLC; *et al.,* | ) ) ) | |
| Defendants. | ) ) | |

**FRONTLINE PROCESSING CORPORATION'S MEMORANDUM OF
LAW IN SUPPORT OF MOTION TO DISMISS COMPLAINT WITH
PREJUDICE**

## **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................1

PLEADED FACTS AND CLAIMS ......................................................................3

I.    Frontline's Relationship with Global and Its Limited Role Pursuant to the Terms of the Frontline Merchant Services Agreement. ..................................................................................3

II.   Frontline's Receipt of Merchant Applications from UDPS and Credit Power. ...................................................................................7

III.  The CFPB's Lawsuit and Allegations Against Frontline.....................9

     A.   The CFPB's Allegations Regarding the Prescreening Conducted by Frontline.......................................................10

     B.   The CFPB's Allegations Regarding Chargebacks...................12

ARGUMENT .....................................................................................................13

I.    Count VIII: The Complaint Does Not Plausibly Allege that Frontline Knowingly or Recklessly Provided Substantial Assistance to the Debt Collectors.......................................................14

     A.   The Complaint Does Not Plausibly Allege that Frontline Provided "Substantial Assistance" to the Debt Collectors. .............................................................15

     B.   The Complaint Does Not Plausibly Allege that Frontline Knowingly or Recklessly Gave Substantial Assistance to the Debt Collectors' Alleged Fraud...................17

     C.   Any Assistance Provided By Frontline Was Given to Global Under the MSA, Not to the Alleged Debt Collectors. .............................................................19

     D.   The Court Should Reject the Complaint's Group-Pleading With Respect to Alleged Acts or Knowledge of "Payment Processors.".........................................19

II.   Count IX: The CFPB Fails to State a Plausible Claim that Frontline Independently Engaged in An Unfair Practice...................21

     A.   Frontline Itself Is Not a "Covered Person" Because Frontline Does Not Provide or Offer a "Consumer Financial Product or Service" For Use by Consumers and Does Not Collect Debt. ....................................21

      B.      Frontline Is Not a "Service Provider."......................................22

      C.      The CFPB Identifies No Unfair Practice By Frontline.............23

CONCLUSION..........................................................................................25

CERTIFICATE OF COMPLIANCE.......................................................27

CERTIFICATE OF SERVICE ...............................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544, 127 S. Ct. 1955 (2007)....................................................................14

*Bryant v. Avado Brands, Inc.*,
  187 F.3d 1271 (11th Cir. 1999) ...........................................................................17

*Camp v. Dema*,
  948 F.2d 455 (8th Cir. 1991) ...............................................................................15

*CFPB v. ITT Educ. Servs., Inc.*,
  2015 WL 1013508 (S.D. Ind. Mar. 6, 2015) .......................................................24

*In re Clarus Corp. Sec. Litig.*,
  201 F. Supp. 2d 1244 (N.D. Ga. 2002).................................................................18

*In re Comptronix Sec. Litig.*,
  831 F. Supp. 1563 (N.D. Ala. 1993).....................................................................15

*Erickson v. Pardus*,
  551 U.S. 89, 127 S. Ct. 2197 (2007)...............................................................19, 20

*In re Friedman's Inc. Sec. Litig.*,
  385 F. Supp. 2d 1345 (N.D. Ga. 2005).................................................................18

*Garfield v. NDC Health Corp.*,
  466 F.3d 1255 (11th Cir. 2006) ...........................................................................17

*Horsley v. Feldt*,
  304 F.3d 1125 (11th Cir. 2002) .............................................................................3

*Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
  537 F.3d 527 (5th Cir. 2008) .........................................................................17, 18

*In re ITT Corp., Derivative Litig.,*
   653 F. Supp. 2d 453 (S.D.N.Y. 2009) ................................................................19

*Mizzaro v. Home Depot, Inc.,*
   544 F.3d 1230 (11th Cir. 2008) ........................................................................18

*In re Netbank, Inc. Sec. Litig.,*
   2009 WL 2432359 (N.D. Ga. Jan. 29, 2009)....................................................20

*In re Premier Techs. Inc. Sec. Lit.,*
   2000 WL 33231639 (N.D. Ga. Dec. 8, 2000) ...................................................20

*SEC v. Apuzzo,*
   689 F.3d 204 (2d Cir. 2012) ..............................................................................15

*SEC v. Benger,*
   697 F. Supp. 2d 932 (N.D. Ill. 2010)................................................................15

*West Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.,*
   287 F. App'x 81 (11th Cir. 2008) ......................................................................20

*Ziemba v. Cascade Int'l, Inc.,*
   256 F.3d 1194 (11th Cir. 2001) ........................................................................17

**Statutes**

12 U.S.C. § 5481(5)(A)...................................................................................................21

12 U.S.C. § 5481(6)(A)...................................................................................................21

12 U.S.C. § 5481(15) ......................................................................................................21

12 U.S.C. § 5481(26) ................................................................................................22, 23

12 U.S.C. § 5481(26)(B) .................................................................................................23

12 U.S.C. § 5531 .......................................................................................................14, 25

12 U.S.C. §§ 5531, 5536(a)(1)(B) ................................................................................21

12 U.S.C. § 5531(a) ........................................................................................................14

12 U.S.C. § 5531(c)(1)(A-B) ...................................................................24

12 U.S.C. § 5536(a)(1)(B) ....................................................................21

12 U.S.C. § 5536(a)(3)................................................................14, 17, 19

## <u>INTRODUCTION</u>

Frontline Processing Corporation ("Frontline") is a Montana-headquartered company that has reputably operated in the payment processing industry since 1997.  Frontline is an Independent Sales Organization ("ISO") of Global Payments, Inc. ("Global").  Frontline does not underwrite for Global or oversee or conduct risk monitoring for Global.  Frontline does not process payments.  And Frontline has no contractual relationship with Global merchants.  Frontline's services are defined by contract and are provided to Global.  Those services are limited in nature to include marketing Global's services and prescreening potential merchants for Global for its consideration and ultimate approval.

In this case, the Consumer Financial Protection Bureau ("CFPB") attempts to impose a truly unprecedented strict liability on Frontline (along with Global and another one of its ISOs) for the alleged fraudulent conduct of others—the named merchants that allegedly used Global's payment processing systems in connection with the commission of consumer fraud.  Even taking the CFPB's scant allegations relating to Frontline as true, the CFPB fails to state a claim against it.  At most, the CFPB's allegations show that Defendant Mohan Bagga defrauded Frontline in order to obtain additional payment processing accounts with Global.

The sole pleaded, factual connection between Frontline and the Defendant Debt Collectors is that in March 2013 Frontline received, prescreened, and submitted to Global merchant applications for Credit Power, LLC ("Credit Power") and Universal Debt & Payment Solutions ("UDPS"). The ultimate authority to approve or deny those merchants' applications was held by Global, which approved and processed payments for those same merchants as debt collectors beginning in 2011.

Frontline had no way to know of any fraud by either merchant when Frontline submitted their applications for Global's approval, and the CFPB has pleaded no facts to the contrary. A merchant providing false information on an application does not constitute—and cannot plausibly serve as—the basis for a claim that a company such as Frontline knowingly and recklessly provided "substantial assistance" to other companies' violations of consumer protection laws. Furthermore, the only "assistance" possibly provided was to Global, and even that cannot be considered "substantial."

Frontline had no knowledge of any "scheme to defraud" consumers or the violation of any consumer protection laws. The CFPB pleads no facts to the contrary, nor can it. In light of the time the CFPB had to investigate its claims and the pre-litigation discovery that the CFPB conducted—without uncovering facts

sufficient to state a claim against Frontline—dismissal of the CFPB's claims against Frontline with prejudice is warranted.

## PLEADED FACTS AND CLAIMS[1]

I.   **Frontline's Relationship with Global and Its Limited Role Pursuant to the Terms of the Frontline Merchant Services Agreement.**

Frontline is a Nevada corporation headquartered in Bozeman, Montana. (Compl. ¶ 83.)  Frontline maintains a contractual relationship with Global, which is alleged to have processed payments for Debt Collectors[2] allegedly perpetrating a fraud to collect phantom debt.  Frontline's role and relationship with Global is defined by its Merchant Services Agreement ("MSA").  (Ex. 1.)[3]  Frontline has provided certain services to Global as an ISO pursuant to the terms of the MSA since 2001.  (*Id.*; *see also* Compl. ¶¶ 144-164 (outlining alleged role of "Payment

---

[1] Frontline attaches as exhibits in support of its motion to dismiss only documents that are specifically referenced and incorporated by reference into the CFPB's Complaint.  Specifically, Frontline's Merchant Services Agreement with Global (Ex. 1) is discussed at paragraphs 83-84, and the merchant applications for UDPS and Credit Power (Exs. 2 & 3) are discussed at paragraphs 199-212. These exhibits, which are central to the allegations against Frontline and Global, can be considered by this Court without converting the motion to one for summary judgment. *See, e.g., Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).

[2] "Debt Collectors" as used herein has the same meaning ascribed by the CFPB in its Complaint.  (*See* Compl. at pg. 2.)

[3] The version of the MSA filed by Global as Doc. No. 93-4, omits the subsequent amendments, including important language regarding Global's final approval of all merchant applications in its discretion.  (*See* Ex. 1 at First Amendment § 4.)

Processors").)  Frontline does not process payments for merchant accounts, and it is not alleged to have processed transactions for the Debt Collectors.  (*See* Compl. ¶¶ 84, 144-146, 216.)

Pursuant to the MSA, Frontline's limited role was to market Global's "merchant processing services to merchants," "prescreen all potential merchants," and "retain a complete application package containing all required information and supporting documentation."  (Ex. 1 at § A.)  In performing these services, Frontline does not control who is accepted as a merchant.  Indeed, the MSA states that "Frontline has no authority to accept any business on behalf of [Global]" and that "business referred by [Frontline] shall be considered an offer from a prospective customer, subject to [Global's] acceptance or rejection."  (Ex. 1 at § F.2.)  Marketing of services to potential merchants and threshold prescreening of applicants is the extent of Frontline's role in connection with merchants' applications to Global for payment processing.

Importantly, Global has always maintained the ultimate right to approve or reject any merchant application submitted by Frontline.  Originally, Global had the right to "reject a merchant, within 5 business days of the merchant's first transaction, if the merchant d[id] not meet the credit criteria" and such decision

was "at the reasonable discretion of" Global.  (Ex. 1 at § A.)   In 2003, that provision was modified to the following:

> Global may accept or reject a merchant applicant or Merchant at any time, in its reasonable discretion, including in the event such merchant applicant or Merchant does not come within Global's credit criteria set forth in Appendix C.

(Ex. 1 at First Amendment § 4.)

Upon Global's acceptance of a merchant applicant, the merchant enters into a contract for payment processing services.  Frontline is not a party to the merchant contract.  The Card Services Terms & Conditions attached to each merchant application make clear that the relationship is by and between Global, the merchant, and the member bank, which in turn is a member of the various card networks such as Visa and MasterCard.  (*See, e.g.,* Exs. 2 and 3 at § 1 ("The 'Card Services Agreement' consists of these Card Services Terms & Conditions and the Merchant Application and is made by and among Merchant (or 'you'), Global Payments Direct, Inc. ('Global Direct'), and Member (as defined below).").)  The merchant contract further provides that during its terms, "Global Direct will be the sole and exclusive provider of all card services to Merchant."  (*Id.*)

Pursuant to the MSA with Frontline, Global agreed to provide the ongoing credit review for all merchants and agreed to take reasonable attempts to collect on amounts owed by merchants.  (Ex. 1 at §§ B.1. & B.2.)  Frontline, as the ISO,

agreed to reasonably assist only if requested by Global.  (*Id.*)  In addition, as alleged in the Complaint, Global agreed to process chargebacks relating to merchants.  (Ex. 1 at § B.3; Compl. ¶¶ 219-221.)  Importantly, Frontline has no merchant-monitoring obligation under the MSA or otherwise.[4]

Just as Global had authority at the outset of a merchant relationship to accept or reject the applicant, Global retained the right and authority to terminate a merchant.  The MSA states:

> <u>Right to Terminate Merchant Agreements</u>.  [Global] shall have the right, in its reasonable, sole discretion, to terminate, suspend or otherwise close any Merchant in the event of Merchant fraud or impropriety in connection with its processing activity or in the event [Global] reasonably believes that continuing to process for the Merchant poses financial risk to ISO or to [Global].

(Ex. 1 at § F.2.)

---

[4] Notably, the CFPB and Global improperly and incorrectly conflate the contractual obligations of Frontline with those of Defendant Pathfinder Payment Solutions Inc. ("Pathfinder").  (*See, e.g.*, Doc. 93-1 at 6-7; Compl. ¶¶ 328-329, 332-334.)  The two companies cannot be lumped together generically as "ISOs," either with respect to the duties and obligations owed pursuant to their respective merchant service agreements or with respect to any claimed or purported factual knowledge of the acts or conduct of UDPS or Credit Power.  Pathfinder is a wholly separate and distinct entity and ISO of Global that operated pursuant to an entirely different merchant services agreement, to which Frontline is not a party.  Importantly, the dispositive terms of the Frontline MSA, UNLIKE the Pathfinder merchant services agreement, do NOT provide for underwriting or account monitoring.  (*Compare* Pathfinder MSA, Doc. 93-3 at §A *with* Frontline MSA, Ex. 1 at §A.)  Likewise, the alleged facts in connection to Pathfinder differ from those alleged against Frontline.  (Compl. ¶¶ 165-195 & 196-218.)

6

## II.   Frontline's Receipt of Merchant Applications from UDPS and Credit Power.

Frontline's only alleged connection to the misconduct alleged in the CFPB's Complaint is Frontline's receipt and prescreening of the merchant applications of UDPS and Credit Power, and the forwarding of those application materials for approval or rejection by Global.  (Compl. ¶ 196.)  Frontline received a Merchant Application from UDPS dated March 11, 2013 (Ex. 2) and a Merchant Application from Credit Power dated March 26, 2013 (Ex. 3).  The applications identified the applicants' respective types of business as "Debt Collections."  (Ex. 2 & Ex. 3.)

Frontline preliminarily approved UDPS and Credit Power as potential merchants.  (Compl. ¶ 206.)  Such preliminary approval fails to provide an adequate basis for the claims against Frontline.  Debt collection is not improper or illegal, nor is it prohibited by Frontline policy.  (Compl. ¶¶ 158 & 197.)  Although collection agencies were deemed a "prohibited" type of merchant account by Global, such merchant applicants could still be underwritten and approved by Global in its discretion.  (Compl. ¶ 157; Ex. 1 at First Amendment § 4.)  Global, in fact, did so by approving the merchant accounts both when submitted by Pathfinder in 2011 and again by Frontline in 2013.  (Compl. ¶¶ 165-168.)  As briefed by Global, the mere fact that collection agencies were internally deemed by

Global to be "prohibited" does not mean that their approval as merchants was improper or unlawful.  (*See* Doc. 93-1 at 8-9.)

As for the application process, there is no dispute that Global knew UDPS and Credit Power were in the collection industry when Frontline submitted their applications to Global in 2013.  Both companies had open accounts with Global through Pathfinder, starting in 2011.  (*See* Compl. ¶¶ 165-168.)  In addition, in conjunction with each respective application, UDPS and Credit Power signed the following acknowledgement required of collection agencies by Global:

**Collection Policy Acknowledgement**

As a condition to acceptance of your Card Services Agreement, Global Direct, Inc. requires that you acknowledge your understanding of the limitations of a merchant account within the collection agency industry.   More specifically, Card Scheme (Visa & Mastercard) regulations strictly prohibit the following:

- Accepting a card to collect or refinance an existing debt that has been deemed uncollectible by the merchant providing the associated goods or services.

- Processing a card transaction that represents the collection of a dishonored check.

By signing this document, you acknowledge and agree to the above collection policy information.  You further acknowledge that Global's acceptance of your Card Services Agreement is based upon your compliance with the requirements of Visa USA, Mastercard International, and HSBC USA, National Association, as set forth herein and in your Card Service Agreement.  . . .

(Ex. 2 at FLP13 & Ex. 3 at FLP117 (emphasis added).)

Upon receipt of the UDPS and Credit Power applications, Global approved the merchants for payment processing and processed payments for UDPS and Credit Power. (Compl. ¶ 216.) Frontline did not process payments for UDPS or Credit Power, and it did not handle chargebacks related to UDPS and Credit Power. (Compl. ¶ 220 (acknowledging "Global Payments was responsible for handling all chargebacks"; *see generally id.* at ¶¶ 220-244 (allegations regarding Global's handling of chargebacks).)

## III.    The CFPB's Lawsuit and Allegations Against Frontline.

In this lawsuit, the CFPB alleges that Frontline violated the Consumer Financial Protection Act ("CFPA") in two ways: (1) by knowingly and recklessly providing "substantial assistance" to the Debt Collectors' alleged violations of § 1031 of the CFPA (Count VIII) and (2) by engaging in an "unfair act or practice" as a "covered person or service provider" under the CFPA (Count IX). Although the purported claims against Frontline stem from Global's alleged payment processing for UDPS and Credit Power, they fail to state a claim.

At a high level, the CFPB claims that the "Payment Processors" rendered substantial assistance to the Debt Collectors because payment processing, conducted by Global, allowed the Debt Collectors to receive funds through

accepting credit and debit cards, which alone provided a purported "air of legitimacy." (Compl. ¶¶ 5, 144-150, 328.) The CFPB alleges that making the debit/credit card payment ability available to the Debt Collectors caused Global to provide an "enhanced business image" to consumers. (Compl. ¶ 145, 155.)

The CFPB further claims that the "Payment Processors" "facilitated the debt collection scheme" because the use of payment processing systems enables quick, convenient, and efficient collection of consumer payments. (Compl. ¶ 151.) According to the CFPB, Global and its ISOs, collectively, "facilitated" an intricate phantom-debt fraud by "enabling the Debt Collectors to accept payment by consumers' bank cards" when they "knew" or "should have known" that the Debt Collectors were engaged in unlawful conduct. (Compl. ¶ 4.) At most, however, the CFPB alleges that Global (and its ISOs) failed to follow or comply with internal policies and procedures designed to identify and prevent consumer fraud and minimize chargebacks and resultant loss. (*See* Compl. ¶¶ 152-164.)

## A. The CFPB's Allegations Regarding the Prescreening Conducted by Frontline.

The CFPB's primary allegations with respect to Frontline's involvement are that Mohan Bagga, UDPS and Credit Power committed an act of fraud on Frontline that was not detected during Frontline's prescreening application process. (*See, e.g.*, Compl. ¶¶ 199-202, 209-210.)

10

With respect to Frontline, the CFPB summarily alleges that the UDPS and Credit Power applications were "replete with indicators of fraudulent activity." (Compl. ¶ 199.)   Those supposed indicators are that:

- An internal underwriting summary included the wrong merchant code (with no allegations to support that such an error was intentional or knowing or had any effect whatsoever);

- The addresses submitted to Frontline were for physical locations that were not actually occupied by UDPS or Credit Power (with no allegations to support that Frontline knew that to be the case at the time);

- The applications were faxed from a FedEx Office (which is neither remarkable nor out of the ordinary);

- Frontline correctly recognized that UDPS was a prohibited business model of Global (which alone did not prevent submitting the merchant for Global's review and approval);

- The Better Business Bureau review of Credit Power was an "F" (which Frontline reviewed and stated the underlying basis for in its internal underwriting summary); and

- The applications did not list a customer service phone number, the absence of which proves nothing.

(Compl. ¶¶ 199-215.)   As discussed below, these few specific factual allegations relating to Frontline's prescreening are hindsight-laden and insufficient to state a claim.

According to the CFPB, Frontline's threshold approval and submission of the UDPS and Credit Power merchant applications for review by Global amounts to substantial assistance to the Debt Collectors, even though Global retained

ultimate authority to reject or approve the merchants, and even though, at the time, Global had already previously approved similar applications received from Pathfinder in February and November, 2011.  (Compl. ¶¶ 165-168, 171, 174.)

**B.    The CFPB's Allegations Regarding Chargebacks.**

A second theme of the CFPB's allegations against the "Payment Processors" relates to chargebacks that occurred during the course of processing with respect to these two merchant accounts.  But these allegations do not concern Frontline.  The CFPB alleges that after approval of the merchants, Global was "responsible for handling all chargebacks and related costs," as well as for investigating all chargeback transactions and documenting the transactions.  (Compl. ¶¶ 220-224.) Contested chargebacks were resolved between the merchant (UDPS/Credit Power) and Global, the processor.  (Compl. ¶ 224.)  All of the CFPB's allegations relating to chargeback and consumer complaints relate to chargebacks processed by Global or allegedly known by Pathfinder.  (Compl. ¶¶ 191, 225-245.)  There is not a single allegation that Frontline had notice of any history of chargebacks at the time the merchants submitted applications with Frontline.

Moreover, according to the Complaint, in the course of the relationships that Global had with UDPS and Credit Power, Global: (1) approved UDPS and Credit Power for Pathfinder and received a MATCH alert in November 2012 without

12

terminating the accounts (Comp. ¶ 178); (2) was on notice in March 2013 that Visa deemed Credit Power a prohibited merchant (Compl. ¶ 182); and (3) was on notice in July 2013 that Discover required closure of the UDPS account (Compl. ¶ 184). But there is no allegation that Frontline was notified of these developments, and there is no factual support or allegations for the CFPB's conclusory assertion that Frontline "ignored these red flags," (Compl. ¶ 246), all of which post-dated Frontline's submission of the applications to Global, and particularly where Global held the authority to terminate merchants. (Ex. 1 at § F.2.)

## ARGUMENT

The CFPB's Complaint paints a picture of an extensive scheme to defraud allegedly undertaken by the Debt Collectors, one which continued and morphed over years and through numerous company names. (*See, e.g.,* Compl. ¶¶ 11-75; 94-106; 120-143.) Because the CFPB's claims against Frontline are in substance that Frontline facilitated a phantom-debt fraud, the CFPB's claims must be pled with particularity under Federal Rule of Civil Procedure 9(b). (*See* Doc. 93-1 at 26-30 (legal argument incorporated herein by reference).) But even leaving aside Rule 9(b)'s particularity requirement, the CFPB's Complaint still fails to state plausible claims against Frontline on which relief can be granted, as required by Federal Rule of Civil Procedure 8.

To survive a motion to dismiss, the CFPB is required to plead specific allegations of fact that "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007). The complaint must allege "enough facts to state a claim to relief that is plausible on its face," and the CFPB is required to plead more than "labels and conclusions." *Id.* at 570 & 555. Here, because the Complaint fails to state plausible claims against Frontline, Frontline should be dismissed with prejudice.

I.    **Count VIII: The Complaint Does Not Plausibly Allege that Frontline Knowingly or Recklessly Provided Substantial Assistance to the Debt Collectors.**

The CFPA makes it unlawful "for any person to **knowingly or recklessly** provide **substantial assistance** to a **covered person or service provider** in violation of § 5531 . . . ." 12 U.S.C. § 5536(a)(3) (emphasis added). Section 5531, in turn, authorizes the CFPB to "prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice . . . in connection with any transaction with a consumer . . . or the offering of a consumer financial product or service." 12 U.S.C. § 5531(a). Here, the Complaint fails to state a claim against Frontline because the Complaint does not plausibly allege that: (1) Frontline provided "substantial assistance"; (2) Frontline acted recklessly

14

or with knowledge of the alleged fraud; or (3) Frontline provided assistance to the Debt Collectors.

> **A.    The Complaint Does Not Plausibly Allege that Frontline Provided "Substantial Assistance" to the Debt Collectors.**

Decisions interpreting the meaning of "substantial assistance" in the analogous securities context, in reviewing aiding and abetting liability for securities fraud, provide useful guidance here.  (*See generally* Doc. 93-1 at 21-23 (discussing caselaw; incorporated by reference herein).)  Adequately alleging the provision of "substantial assistance" presents a high bar.  There must be a substantial causal link between the conduct of the person alleged to have provided assistance and the resulting harm.  *See, e.g., Camp v. Dema*, 948 F.2d 455, 460 (8th Cir. 1991); *SEC v. Benger*, 697 F. Supp. 2d 932, 942 (N.D. Ill. 2010) (aiding and abetting liability requires showing of proximate cause).  Moreover, in order to "substantially assist" a violation of consumer laws, the assistance must be knowing, substantial, and provided to assist "the primary violator in carrying out the fraud[.]"  *See SEC v. Apuzzo*, 689 F.3d 204, 212-14 (2d Cir. 2012).  Still further, in light of the total absence of factual allegations to show any direct or independent knowledge of the alleged fraud on the part of Frontline, here, the CFPB is required to plead an even "greater showing of substantial assistance."  *In re Comptronix Sec. Litig.*, 831 F. Supp. 1563, 1577 (N.D. Ala. 1993).

15

As set forth in detail above, the Complaint's allegations do not plausibly demonstrate that Frontline "substantially assisted" the Debt Collectors.  Frontline only received, prescreened, and forwarded potential merchant applications to Global for Global's acceptance or rejection.   Frontline clearly maintains no authority over the approval of a merchant for processing.  (Ex. 1 at § F.2 & First Amendment § 4; Compl. ¶ 84.)  And, here, this limited prescreening function was of even lesser significance given that Global had already been processing transactions for UDPS and Credit Power for more than a year.  (Compl. ¶¶ 165-168.)  Frontline was not involved in any consumer transactions or the processing of payments for merchants.  Indeed, the merchant agreement (which Frontline is not a party to) states that Global "will be the sole and exclusive provider of all card services to Merchant."  (Exs. 2 & 3 at § 1.)  There are simply no allegations that Frontline knew of the underlying alleged wrongdoing in the Complaint, that Frontline's minimal actions were a substantial cause of the alleged consumer injuries, or that Frontline associated itself with UDPS or Credit Power's violations of the CFPA and participated in them as something Frontline wished to bring about.   The Complaint does not plausibly allege that Frontline provided "substantial assistance" to the Debt Collectors' alleged fraud.

16

**B.    The Complaint Does Not Plausibly Allege that Frontline Knowingly or Recklessly Gave Substantial Assistance to the Debt Collectors' Alleged Fraud.**

The CFPB does not contend or plead that Frontline had actual knowledge of the Debt Collectors' alleged fraud.  Rather, the CFPB claims that Frontline recklessly gave substantial assistance to the Debt Collectors.

While the Eleventh Circuit has not interpreted the recklessness standard of 12 U.S.C. § 5536(a)(3) in the pleading context, federal courts, including Eleventh Circuit courts, have addressed the pleadings standards in the analogous securities context—in reviewing aiding and abetting claims under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.  (*See* Doc. 93-1 at 15-16 (incorporating legal argument herein by reference).)

Allegations of negligence are insufficient to satisfy a recklessness standard. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1281-83 (11th Cir. 1999).  Rather, the "severe recklessness" required is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care . . . ." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1210 (11th Cir. 2001); *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008); *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1264

17

(11th Cir. 2006) (same); *In re Clarus Corp. Sec. Litig.*, 201 F. Supp. 2d 1244, 1249 (N.D. Ga. 2002) (pleading scienter requires actual knowledge or "severe recklessness"). The Plaintiff must allege a plausible claim establishing an "extreme departure from the standard of ordinary care" such that the defendant must have been aware of the allegedly wrongful conduct. *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008); *see also In re Friedman's Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1361 (N.D. Ga. 2005) ("scienter must be found with respect to each defendant and with respect to each alleged violation"); *Indiana Elec.*, 537 F.3d at 533 (rejecting group pleading approach to scienter).

When the allegations specific to Frontline, alone, are evaluated, they do not support a plausible claim that Frontline engaged in any departure from the ordinary standard of care, much less an extreme departure. At most, the Complaint alleges that Frontline was defrauded along with others, and the CFPB identifies no facts that would have put Frontline on notice of any actual fraud or consumer law violations. None of the alleged, innocuous facts alleged in regard to the UDPS or Credit Power merchant applications made Frontline's preliminary approval of the merchants, for Global's ultimate review and decision, an extreme or severely reckless act. (*See infra* at pg. 11.)

**C.    Any Assistance Provided By Frontline Was Given to Global Under the MSA, Not to the Alleged Debt Collectors.**

The Complaint contains the conclusory allegation that Frontline provided "substantial assistance" to the Debt Collectors.   (Compl. ¶ 329.)   But that allegation is unfounded and implausible.   Even if it could rise to the level of "substantial assistance" (and it cannot), Frontline's prescreening of merchant applications was for the benefit of Global, not the Debt Collectors.   Frontline's limited handling of the merchant applications was done pursuant to Frontline's MSA with Global (Ex. 1), and it is illogical to construe this activity as assistance to the Debt Collectors, which are adverse to Frontline and Global in this application context.   The CFPB's allegations under 12 U.S.C. § 5536(a)(3), therefore, fail.

**D.    The Court Should Reject the Complaint's Group-Pleading With Respect to Alleged Acts or Knowledge of "Payment Processors."**

The CFPB's claims against Frontline should also be dismissed because the CFPB has not provided Frontline "fair notice" of a factual predicate to support any claims or unlawful conduct.   *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S. Ct. 2197 (2007).   In failing to account for the role served by Frontline (distinct from that of Global or services provided by Pathfinder to Global), the CFPB fails to plead a basis upon which Frontline plausibly knew of the predicate for each claim.   This type of group pleading has been rejected.   *See, e.g., In re ITT Corp., Derivative*

19

*Litig.*, 653 F. Supp. 2d 453, 464 (S.D.N.Y. 2009). The CFPB's sweeping allegations and legal conclusions violate the "fair notice" pleading requirements of Rule 8. *Erickson,* 550 U.S. at 93. Given the unique and separate role of Frontline and the fact that the terms of the Pathfinder and Frontline merchant services agreements were materially different, there is no basis to permit group pleading to allow the CFPB to plead "knowing" or "reckless" behavior on the part of Frontline. *See In re Premier Techs. Inc. Sec. Lit.*, 2000 WL 33231639, at *10 (N.D. Ga. Dec. 8, 2000) (dismissing group pleaded claims); *cf. In re Netbank, Inc. Sec. Litig.*, 2009 WL 2432359, at *15-16 (N.D. Ga. Jan. 29, 2009) (permitting group pleading where individual defendants were all similarly situated board members and officers of the same co-defendant company).

Because Frontline is a separate entity with a distinct role, this Court should reject the CFPB's lumping together of Frontline with Global and Pathfinder. *See West Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F. App'x 81, 86 (11th Cir. 2008) ("In a case with multiple defendants, the complaint should contain specific allegations with respect to each defendant; generalized allegations 'lumping' multiple defendants together are insufficient").

**II.     Count IX: The CFPB Fails to State a Plausible Claim that Frontline Independently Engaged in An Unfair Practice.**

As a back-up to its substantial-assistance claim, the CFPB attempts to plead a direct claim against Frontline for engaging in "Unfair Practices" in violation of the CFPA, 12 U.S.C. § 5536(a)(1)(B).  The CFPA prohibits a "covered person" or a "service provider" from engaging in "any unfair, deceptive, or abusive act or practice."  12 U.S.C. §§ 5531, 5536(a)(1)(B).  The CFPB's claim fails because Frontline does not fall within the statutorily defined categories of "covered person" or "service provider" subject to the CFPA, and it also fails because Frontline did not participate in any unfair consumer practice.

**A.     Frontline Itself Is Not a "Covered Person" Because Frontline Does Not Provide or Offer a "Consumer Financial Product or Service" For Use by Consumers.**

As relevant here, the CFPA defines a "covered person" to mean any person that engages in "offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6)(A).  The term "consumer financial product or service" is defined by statute to specifically include certain enumerated services set forth at 12 U.S.C. § 5481(15).  Importantly, to qualify as a "consumer financial product or service" under the statute, the product or service must be "offered or provided for use by consumers," 12 U.S.C. § 5481(5)(A).  Here, even if Frontline offered a product or service that fit within those enumerated in § 5481(15) (which it does not),

21

Frontline offers no products or services "for use by consumers." To the contrary, Frontline provides limited ISO-services to Global, which is a commercial entity. Frontline, which does not conduct payment processing, did not even provide services to the Debt Collectors. The CFPB simply pleads no factual basis to support that Frontline falls within the definition of a "covered person."

### B.     Frontline Is Not a "Service Provider."

Any argument that Frontline is a "service provider" under 12 U.S.C. § 5481(26) must also be rejected. The CFPA defines a "service provider" as:

> any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service, including a person that—
>
> > (i) participates in designing, operating, or maintaining the consumer financial product or service; or
> >
> > (ii) processes transactions relating to the consumer financial product or service . . . .

*Id.* The CFPB claims that Frontline is a "service provider," alleging that Frontline "provided payment processing services, including material services to persons who collect debt, including the Debt Collectors in connection with their collection of debt." (Compl. ¶ 86.) But as set forth in further detail above, the limited marketing and prescreening activities undertaken by Frontline were for the benefit of Global, not services to the Debt Collectors. And those activities cannot

22

have been "*material* service[s]" to the Debt Collectors, in any event, because Global retained authority to accept or deny Credit Power and UDPS for payment processing, as it had done previously.  Still furthermore, Frontline does not come within the two enumerated examples of service providers, and the CFPB's Complaint does not allege otherwise.[5]

For these reasons, Frontline cannot plausibly be deemed to be a "service provider" under 12 U.S.C. § 5481(26).  Count IX of the CFPB's Complaint, therefore, fails as a matter of law.

### C.    The CFPB Identifies No Unfair Practice By Frontline.

Although the CFPA authorizes the CFPB to regulate and enforce "unfair practices," the CFPA equally makes clear that the CFPB has "no authority" to declare an act or practice to be unlawful on grounds of unfairness unless the CFPB can establish that:

---

[5] Similarly, even assuming Frontline could be said to have provided services to the Debt Collectors (which it cannot), Frontline would fall within the CFPA's exception to the "service provider" definition, which states that a "'service provider' does not include a person solely by virtue of such person offering or providing to a covered person—(i) a support service of a type provided to businesses generally or a similar ministerial service . . . ."  12 U.S.C. § 5481(26)(B).  Frontline's marketing and prescreening activities are routine activities that apply to all businesses generally.

(1)     the act or practice is "likely to cause substantial injury to consumers which is not reasonably avoidable by consumers" and

(2)     the substantial consumer injury "is not outweighed by countervailing benefits to consumers or to competition."

12 U.S.C. § 5531(c)(1)(A-B).   The CFPB fails to identify any act or practice <u>by Frontline</u> that: (i) is likely to cause any injury to consumers (let alone "substantial injury" to consumers); (ii) causes consumer injury, or (iii) is not outweighed by the benefits that the role of ISOs within the payment processing industry provides. *See CFPB v. ITT Educ. Servs., Inc.*, 2015 WL 1013508, at *30 n.34 (S.D. Ind. Mar. 6, 2015) (recognizing that proximate cause is a necessary element of an unfairness claim under §§ 5531 & 5536).

Frontline is far removed from any consumer allegedly injured by UDPS or Credit Power.  Frontline is not alleged to have had contact with injured consumers, and did not communicate with consumers, provide services to consumers, advertise to consumers, receive money from consumers, or make disclosures to consumers. Rather, the isolated and limited role Frontline played was in prescreening and giving preliminary approval of the merchants so that Global could determine whether to accept or reject them.  This simply cannot be said to have proximately caused injury to consumers, particularly where Global had already been processing payments in connection to the merchants for more than a year.

24

Notably, pursuant to CFPB Bulletin 2013-07,[6] the CFPB provided guidance on what acts can potentially constitute "unfair acts or practices" for purposes of § 5531.  The CFPB's own guidance confirms that the act or practice that serves as the basis for a claim must "cause" or be "likely to cause" substantial consumer injury.  In other words, there must be some causal nexus between the unfair "act or practice" and the likely injury to consumers.  There is no such nexus alleged here with respect to Frontline's role as a Global ISO.

Moreover, the CFPB guidance identified ten concrete examples of practices that could potentially violate 12 U.S.C. § 5531.  Every single category identified by the CFPB itself involves direct action taken by the potential target that could potentially and directly cause consumer harm.  *Id.*  The services offered by Frontline to Global pursuant to its MSA do not come close to any of the categories of conduct the CFPB itself identified as potentially constituting an unfair "act or practice" capable of regulation under the CFPA.

## CONCLUSION

For the reasons outlined above, Frontline respectfully requests that this Court dismiss Counts the CFPB's claims against Frontline with prejudice.

_____

[6] CFPB Bulletin 2013-07, dated July 10, 2013, is publicly available at http://files.consumerfinance.gov/f/201307_cfpb_bulletin_unfair-deceptive-abusive-practices.pdf (last visited on May 18, 2015).

**LINDQUIST & VENNUM LLP**

*/s/ Bryan R. Freeman*
Kirstin D. Kanski
Bryan R. Freeman
4200 IDS Center
80 S. 8th Street
Minneapolis, MN 55402
(612) 752-1076
(612) 371-3207 Facsimile
kkanski@lindquist.com
bfreeman@lindquist.com

-with-

**PARKER, HUDSON, RAINER & DOBBS, LLP**
William J. Holley, II
Georgia Bar No. 362310
Scott E. Zweigel
Georgia Bar No. 786616
Tiffany R. Johnson
Georgia Bar No. 638051
1500 Marquis Two Tower
285 Peachtree Center Ave., N.E.
Atlanta, Georgia 30303
(404) 523-5300
(404) 522-8409 Facsimile
wjh@phrd.com
sez@phrd.com
trj@phrd.com

*Counsel for Frontline Processing Corporation*

## <u>CERTIFICATE OF COMPLIANCE</u>

In compliance with Local Rule 7.1(D), I certify that the foregoing brief has been prepared in conformity with Local Rule 5.1.   This memorandum was prepared with Times New Roman (14 point) type, with a top margin of one and one-half (1 ½) inches and a left margin of one (1) inch.

This 19th day of May, 2015.

Respectfully submitted,


*/s/ Bryan R. Freeman*
Bryan R. Freeman

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2015, I electronically filed the foregoing MEMORANDUM IN SUPPORT OF MOTION TO DISMISS COMPLAINT WITH PREJUDICE with the Clerk of Court using the CM/ECF system, which will send notifications of such filings to all counsel of record in this action.

This 19th day of May, 2015.

Respectfully submitted,

*/s/ Bryan R. Freeman*
Bryan R. Freeman