**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA,**
**ATLANTA DIVISION**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | |
| Plaintiff, | |
| v. | |
| UNIVERSAL DEBT & PAYMENT SOLUTIONS, LLC, *et al.*, | **Civil Action No.** **1:15-CV-0859-RWS** |
| Defendants. | |

**PLAINTIFF'S CONSOLIDATED OPPOSITION TO PATHFINDER, GLOBAL**
**PAYMENTS, AND FRONTLINE'S MOTIONS TO DISMISS**

# TABLE OF CONTENTS

I.    Preliminary Statement ....................................................................................1

II.   Argument and Authorities ...........................................................................3

      A. Standard of review on a motion to dismiss ...........................................3

      B. The Payment Processors committed unfair acts or practices by
         expanding the scope and providing legitimacy to the Debt Collectors'
         scheme, when the Payment Processors knew or should have known
         about the Debt Collectors' illegal conduct ...........................................4

            1. Global, Pathfinder, and Frontline are subject to the CFPA's
               prohibition of unfair practices......................................................4

                  a. Global, Pathfinder, and Frontline are "covered persons"
                     under the CFPA ....................................................................5

                  b. Global, Pathfinder, and Frontline are also "service
                     providers" under the CFPA .................................................6

            2. Global, Pathfinder, and Frontline committed unfair acts or
               practices by ignoring clear signs of illegal conduct while collecting
               consumers' payments for the Debt Collectors...........................8

                  a. The Payment Processors caused substantial injury to
                     consumers........................................................................ 11

                  b. Consumers could not reasonably avoid the harm the
                     Payment Processors caused............................................. 13

                  c. The Payment Processors' injurious practices were not
                     outweighed by benefits to consumers ............................. 13

      C. The Bureau's complaint sufficiently pleads that the Payment
         Processors knowingly or recklessly substantially assisted the Debt
         Collectors' unfair and deceptive conduct ........................................... 14
            1. The Court has found the Bureau is likely to succeed in its
               primary CFPA claims against the Debt Collectors.................. 15

2. The Payment Processors knew of or were reckless about their role in the illegal debt collection scheme................................... 15

3. The Payment Processors knowingly or recklessly substantially assisted the illegal debt collection scheme...................................
...................................................................................................20

D. Although the Bureau's statutory claims should not be required to meet Rule 9(b)'s heightened pleading standard, the complaint includes sufficient factual allegations to satisfy Rule 9(b)............................. 23

III. Conclusion ............................................................. 25

# TABLE OF AUTHORITIES

## CASES

*Access 4 All, Inc. v. Trump Int'l; Hotel & Tower Condominium*, 458 F. Supp. 2d 160 (S.D.N.Y. 2006) ................................................................................................ 14

*Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043 (11th Cir. 2007) ................. 25

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................. 3, 4

*Bell Atl. v. Twombly*, 550 U.S. 544 (2007) ................................................................. 3

*Bryant v. Avado Brands, Inc.*, 187 F.3d 1271 (11th Cir. 1999) ......................... 3, 14

*CFPB v. ITT Educ. Services, Inc.*, No. 1:14-cv-292, 2015 WL 1013508 (S.D. Ind. March 6, 2015) ......................................................................................................... 8

*Farmer v. Brennan*, 511 U.S. 825 (1994) .............................................................. 16

*Federal Trade Comm'n v. Freedom Commc'ns, Inc.*, 401 F.3d 1192 (10th Cir. 2005) ................................................................................................................................ 24

*Federal Trade Comm'n v. Global Mkt'g Grp., Inc.*, 594 F. Supp. 2d 1281 (M.D. Fla. 2008) ................................................................................................................ 10, 11

*Federal Trade Comm'n v. Interbill, Ltd.*, 06-cv-01644-JCM-PA, 2009 WL 10267504 (D. Nev. April 30, 2009) ........................................................................................ 13

*Federal Trade Comm'n v. Lights of Am., Inc.*, 760 F. Supp. 2d 848 (C.D. Cal. 2010) ................................................................................................................................ 24

*Federal Trade Comm'n v. Neovi*, 604 F.3d 1150 (9th Cir. 2010) ................ 9, 11, 13

*Federal Trade Comm'n v. Sterling Precious Metals, LLC*, No. 12-80597, 2013 WL 595713 (S.D. Fla. Feb. 15, 2013) .......................................................................... 24

*Federal Trade Comm'n v. Wells*, 385 Fed. Appx. 712 (9th Cir. 2010) (mem.) ...9,10, 12, 13

*Federal Trade Comm'n v. Windward Mkt'g, Inc.*, No. 1:96-cv-615F, 1997 WL 33642380 (N.D. Ga. Sept. 30, 1997) ................................................................. 10, 13

*Graham v. SEC*, 222 F.3d 994 (D.C. Cir. 2004) ..................................................... 22

*Lindley v. FDIC*, 733 F.3d 1043 (11th Cir. 2013) .................................................. 17

*SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012) ................................................... 21, 22

*SEC v. Big Apple Consulting USA*, 783 F.3d 786 (11th Cir. 2015) ....................... 17

*US v. Chow*, 841 F. Supp. 1286 (Ct. Int'l Trade 1993) ......................................... 25

*W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 Fed. Appx. 81 (11th Cir. 2008) ...................................................................................................... 24

*Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004 (11th Cir. 1985) ........... 19

## FEDERAL STATUTES

12 U.S.C. §§ 5301-5641 (2010) .............................................................................. 15

12 U.S.C. § 5481(6)(A) (2010) ............................................................................ 4, 5

12 U.S.C. § 5481(15)(A)(vii) (2010) ................................................................... 5, 7

12 U.S.C. § 5481(15)(A)(x) (2010) ......................................................................... 7

12 U.S.C. § 5481(26) (2010) ................................................................................... 4

12 U.S.C. § 5481(26)(A) (2010) .............................................................................. 6

12 U.S.C. § 5481(26)(A)(i) (2010) ...................................................................... 6, 7

12 U.S.C. § 5481(26)(A)(ii) (2010) ......................................................................... 7

12 U.S.C. § 5481(26)(B)(i) (2010) .......................................................................... 7

12 U.S.C. § 5531 (2010) .................................................................................. 1, 4, 6

12 U.S.C. § 5531(a) & (c)(1) (2010)........................................................8

12 U.S.C. § 5536 (2010) ................................................................. 4, 6

12 U.S.C. § 5536(a) (2010) ................................................................1

12 U.S.C. § 5536(a)(1)(B) (2010)......................................................8

12 U.S.C. § 5536(a)(3) (2010)........................................................ 15

15 U.S.C. §§ 1692-1692p (2010) .......................................................1

**FEDERAL RULES**

Fed. R. Civ. P. 8(a)(2)........................................................................3

## I. Preliminary Statement

On March 26, 2015, the Consumer Financial Protection Bureau ("Bureau") brought its complaint[1] and, at the Bureau's request, this Court issued a temporary order halting a phantom debt collection scheme in which millions of consumers were falsely threatened with arrest if they did not pay purported debt. Many consumers succumbed to these threats and paid the Debt Collectors; [2] other consumers refused to pay but the Debt Collectors were still able to remove money from consumers' bank accounts. On April 7, 2015, the Court found that the Bureau is likely to prevail on the merits of its claims that the Debt Collectors engaged in acts or practices that violate the Consumer Financial Protection Act ("CFPA")[3] and the Fair Debt Collection Practices Act ("FDCPA"),[4] and preliminarily enjoined those practices.[5]

The scope and scale of the harm the Debt Collectors inflicted on consumers was possible only because of the unfair conduct and substantial assistance of their payment processors, including Global Payments, Inc. ("Global"); Pathfinder

---

[1] Docket Entry ("DE") 1.
[2] The term "Debt Collectors" means Universal Debt & Payment Solutions, LLC; Universal Debt Solutions, LLC; WNY Account Solutions, LLC; WNY Solutions Group, LLC; Check & Credit Recovery, LLC; Credit Power, LLC; S Payment Processing & Solutions, LLC; Marcus Brown; Mohan Bagga; Sarita Brown; Tasha Pratcher; Varinderjit Bagga; and Sumant Khan.
[3] 12 U.S.C. §§ 5531, 5536(a) (2010).
[4] 15 U.S.C. §§ 1692-1692p (2010).
[5] DE 16.

1

Payment Solutions, Inc. ("Pathfinder"); and Frontline Processing Corp. ("Frontline").[6] The Payment Processors knew the risk of providing merchants like the Debt Collectors with a gateway to consumers' bank accounts. But the Payment Processors knowingly or recklessly ignored the risk and obvious signs of unlawful activity in their underwriting process. When the risk became reality, the Payment Processors again ignored signs of unlawful activity and ongoing consumer harm. The Payment Processors now seek impunity for their contributions to an unlawful scheme that resulted in foreseeable harm.

Payment processors are not strictly liable for all harm to consumers, and the Payment Processors' assertion that the Bureau seeks to impose such a standard is simply false. But those that knowingly or recklessly provide substantial assistance to unfair or deceptive conduct – and those that commit their own unfair acts – should be held accountable. Far from seeking to impose strict liability on all payment processors, the Bureau seeks to impose liability on certain payment processors that assisted the Debt Collectors over a period of years when they knew or should have known they were furthering an illegal scheme causing substantial consumer harm.

As explained in more detail below, the Bureau's action against the Payment Processors is well-grounded in statutory authority and is amply

_____

[6] "Payment Processors" refers, collectively, to Global, Pathfinder, and Frontline.

2

supported by precedent, including cases against payment processors brought under the Federal Trade Commission Act ("FTC Act"). Accordingly, the Bureau submits this opposition to the Payment Processors' Motions to Dismiss and their supporting memoranda.[7]

## II. Argument and Authorities

### A. Standard of review on a motion to dismiss

A complaint should contain a "short and plain statement of the claim showing that the pleader is entitled to relief."[8] While "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do," this standard does not require "detailed factual allegations."[9] The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[10] A complaint is plausible on its face when the plaintiff pleads factual content necessary for the court to draw the reasonable inference that the defendant is liable for the conduct alleged.[11] At the motion to dismiss stage, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff."[12] "When

---

[7] DE 89 (Pathfinder), DE 93 (Global Payments), DE 97 (Frontline).
[8] Fed. R. Civ. P. 8(a)(2).
[9] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544 (2007)).
[10] *Id.* (quoting *Twombly*, 550 U.S. at 570).
[11] *Id.*
[12] *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999).

there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."[13]

## B. The Payment Processors committed unfair acts or practices by expanding the scope and providing legitimacy to the Debt Collectors' scheme, when the Payment Processors knew or should have known about the Debt Collectors' illegal conduct.

The Payment Processors are subject to the CFPA's prohibition of unfair practices, as both "covered person[s]"[14] and "service provider[s],"[15] because they played a key role in providing the infrastructure the Debt Collectors used to take consumers' money. The Payment Processors also violated the CFPA's prohibition of unfair practices by processing payments for the Debt Collectors despite knowing or recklessly ignoring clear signals revealing an illegal debt collection scheme.

### 1. Global, Pathfinder, and Frontline are subject to the CFPA's prohibition of unfair practices.

The CFPA prohibits any "covered person or service provider" from engaging in any unfair act or practice.[16] A person who is either a "covered person" or a "service provider" is subject to the CFPA. The complaint sufficiently alleges that Global, Pathfinder, and Frontline fit the definitions of both "covered

---

[13] *Iqbal*, 556 U.S. at 679.
[14] 12 U.S.C. § 5481(6)(A) (2010).
[15] 12 U.S.C. § 5481(26) (2010).
[16] 12 U.S.C. §§ 5531, 5536 (2010).

persons" and "service providers."

### a. Global, Pathfinder, and Frontline are "covered persons" under the CFPA.

The CFPA defines a "covered person" as any person who "engages in offering or providing a consumer financial product or service."[17] The CFPA then defines "consumer financial product or service" to include "providing payments or other financial data processing products or services to a consumer by any technological means, including . . . through any payments systems or network used for processing payments data."[18]

Global does not appear to dispute its status as a "covered person." Pathfinder and Frontline, however, argue that they are not "covered persons," because they don't directly do business with consumers.[19] But while they may not interact directly with consumers, Pathfinder and Frontline both play a key role in the consumer payment processing network.[20] For example, the Bureau alleged that Pathfinder "agreed to market Global Payments' processing service to merchants, prescreen and underwrite for credit purposes all potential merchants, monitor processing activity to detect fraud and risk, and advise

---

[17] 12 U.S.C. § 5481(6)(A) (2010).
[18] 12 U.S.C. § 5481(15)(A)(vii) (2010).
[19] DE 89, 13-15; DE 97-1, 22-23. Contrary to Pathfinder's claims, the Bureau alleged that Pathfinder is a "covered person" under the CFPA. Compl. ¶ 81.
[20] *E.g.*, Compl. ¶¶ 80, 84, 144-151,165, 205.

Global Payments accordingly."[21] Similarly, the Bureau alleged that Frontline "agreed to market Global Payments' services to merchants and prescreen merchants for compliance with Global Payments' credit criteria."[22] While Frontline and Pathfinder may not have directly contacted the Debt Collectors' victims, their work enabled consumers to pay the Debt Collectors with bank and credit cards[23] and they thus fit squarely within the statutory definition of a "covered person."

### b. Global, Pathfinder, and Frontline are also "service providers" under the CFPA.

The CFPA also prohibits "service providers" from committing unfair acts.[24] The CFPA defines a "service provider" as a person that "provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service, including a person that . . . processes transactions relating to the consumer financial product or service."[25] The definition includes persons that "participate[] in designing, operating, or maintaining the consumer financial product or service."[26] It exempts persons who "unknowingly or incidentally" transmit or process financial

---

[21] Compl. ¶ 80.
[22] Compl. ¶ 84.
[23] Compl. ¶ 146, 151.
[24] 12 U.S.C. §§ 5531, 5536 (2010).
[25] 12 U.S.C. § 5481(26)(A) (2010).
[26] 12 U.S.C. § 5481(26)(A)(i) (2010).

data,[27] as well as those who "solely . . . offer[] or provide[] . . . a support service of a type provided to a business generally or a similarly ministerial service."[28]

The Bureau alleges specific facts describing the material services the Payment Processor defendants provided to the Debt Collectors, who themselves are covered persons.[29] The Payment Processors also qualify as service providers because they participated in operating a consumer financial product or service, the payment processing network.[30] Pathfinder and Frontline's conduct also makes them service providers to Global, itself a covered person.[31]

The exceptions to the general definition of "service provider" invoked by Frontline and Pathfinder are inapplicable to the Bureau's claims. The Payment Processors processed transactions relating to the collection of debts, and did so knowingly.[32] These service were not ministerial, but rather, critical to the success of the Debt Collectors' unlawful conduct.[33] For example, Frontline and Pathfinder were directly involved in helping the Debt Collectors establish and maintain their payment processing accounts in a manner that would help elude

---

[27] 12 U.S.C. § 5481(26)(A)(ii) (2010).
[28] 12 U.S.C. § 5481(26)(B)(i) (2010).
[29] Compl. ¶¶ 85, 144-146, 151, 174, 175, 181, 196, 206, 216; 12 U.S.C. § 5481(15)(A)(x) (2010) (defining "consumer financial product or service" to include "collecting debt related to any consumer financial product or service").
[30] Compl. ¶¶ 80, 81, 84, 85, 144-246; *See* 12 U.S.C. § 5481(26)(A)(i) (2010).
[31] Compl. ¶¶ 80, 84; 12 U.S.C. § 5481(15)(A)(vii) (2010).
[32] *See* 12 U.S.C. § 5481(26)(A)(ii) (2010).
[33] *E.g.*, Compl. ¶¶ 80, 84, 144-151,165, 205, 217, 218.

fraud detection, even when they had ample reason to suspect illegal activity.[34]

Frontline and Pathfinder went well beyond providing only a "ministerial service."

### 2. Global, Pathfinder, and Frontline committed unfair acts or practices by ignoring clear signs of illegal conduct while collecting consumers' payments for the Debt Collectors.

An act or practice is unfair under the CFPA when it: (1) causes substantial consumer injury; (2) the injury is not reasonably avoidable by consumers; and (3) the injury is not outweighed by countervailing benefits to consumers or competition.[35] As explained below, Global, Pathfinder, and Frontline committed unfair acts or practices by enabling the Debt Collectors to take funds from consumers while ignoring their own guidelines and other signals of fraud.

The cases brought against payment processors under the FTC Act should guide this Court's interpretation of the CFPA's prohibition of unfair acts or practices.[36] Under the FTC Act, processing payments when a person has reason to know that payments are made pursuant to an underlying fraud is an unfair act or practice. For example, in *Federal Trade Comm'n v. Neovi*, the Ninth Circuit affirmed the district court's grant of summary judgment finding such

---

[34] Compl. ¶¶165-218.

[35] 12 U.S.C. §§ 5531(a) & (c)(1) (2010), and 5536(a)(1)(B) (2010).

[36] *See CFPB v. ITT Educ. Services, Inc.*, No. 1:14-cv-292, 2015 WL 1013508 at *17 (S.D. Ind. March 6, 2015) (finding CFPA's prohibition on "unfair" practices "taps into a well-developed and long-established definition of the term), appeal docketed, No. 15-1761 (7th Cir. April 9, 2015).

conduct illegal.[37]

The defendants in *Neovi* operated a website that allowed users to "create and send checks by post or email."[38] The service was popular with fraudsters, who used consumers' information to draw checks on accounts that were not their own.[39] The defendants argued that they "did not 'obtain, input, or direct' the delivery of consumer information nor facilitate the theft."[40] The Ninth Circuit rejected the argument, finding the defendants "created and controlled a system that facilitated fraud and that the company was on notice as to the high fraud rate."[41]

Similarly, in *Federal Trade Comm'n v. Wells*, the Ninth Circuit affirmed a district court judgment finding the defendants "engaged in unfair trade practices by 'processing debit transactions to consumers' bank accounts, while knowing or consciously avoiding knowing that those debit transactions were unauthorized by consumers."[42] The court explained that it imposed "liability based on a finding that Appellants knew or consciously avoided knowing that they were facilitating unauthorized transactions."[43] The court further noted that the payment

---

[37] 604 F.3d 1150 (9th Cir. 2010).

[38] *Id.* at 1152.

[39] *Id.* at 1154.

[40] *Id.* at 1155.

[41] *Id.* at 1155.

[42] 385 Fed. Appx. 712, 713 (9th Cir. 2010) (mem.).

[43] *Id.* at 713.

9

processor had received reports of fraud, had high chargeback rates, and failed to conduct due diligence as support for the trial court's order.[44]

District Courts in the Eleventh Circuit have also found that processing payments in furtherance of an underlying illegal scheme is an unfair practice. In *Federal Trade Comm'n v. Windward Mkt'g, Inc.*, the court granted summary judgment to the FTC, finding the defendant committed an "unfair practice of issuing bank drafts on consumers' accounts without the consumers' authorization."[45] The court noted the payment processor's 40% chargeback rate and its receipt of a warning letter from a bank as relevant factors in inferring its recklessness.[46] Yet another court held that processing payments for companies it knew or should have known were violating the telemarketing sales rule was an unfair practice.[47]

As these cases show, Global, Pathfinder, and Frontline can be held liable for processing payments in furtherance of the Debt Collectors' underlying fraudulent scheme as an unfair practice in its own right. The Bureau's complaint alleges that Global, Pathfinder, and Frontline, like the defendants in *Neovi* and

---

[44] *Id.*

[45] 1:96-cv-615F, 1997 WL 33642380 at *13 (N.D. Ga. Sept. 30, 1997).

[46] *Id.* at *12 ("Defendant Wholesale contends that selling Defendants informed Defendant Wholesale that all of the bank drafts were authorized and that it had no reason to believe otherwise. The evidence shows the contrary.").

[47] *FTC v. Global Mkt'g Grp., Inc.*, 594 F. Supp. 2d 1281, 1288-89 (M.D. Fla. 2008) (finding defendant "engaged in unfair acts and practices by withdrawing funds from consumers' bank accounts").

the other cases cited above, turned a blind eye to their roles in the Debt
Collectors' fraudulent scheme. They operated a system that allowed the Debt
Collectors to execute and enlarge their scheme by accepting payments by credit
card and bank card when they knew or should have known of the Debt
Collectors' unlawful conduct.

### a. The Payment Processors caused substantial injury to consumers.

Global, Pathfinder, and Frontline, as alleged in the complaint, caused
substantial consumer injury by taking millions of dollars from the consumers'
accounts pursuant to the Debt Collectors' illegal scheme.[48] The Payment
Processors point their fingers at the Debt Collectors (and at each other) as the
source of consumer harm. But processing payments when the party has reason to
know the underlying transactions are illegal is "behavior that [is], *itself*,
injurious to consumers."[49]

The Bureau also need not show that the Payment Processors had actual
knowledge of the Debt Collectors' fraudulent conduct. As the court in *Neovi*
explained, "[n]or is actual knowledge of the harm a requirement under the Act."[50]
Similar to the defendant in *Wells*, the Payment Processors blew past obvious

---

[48] *See Global Mkt'g* 594 F. Supp. 2d at 1288-89 (finding substantial injury where
defendant "processed more than $26 million dollars in payments made by
consumers to the telemarketers").
[49] *Neovi*, 604 F.3d at 1157 (emphasis in original).
[50] *Id.* at 1156 (citations omitted).

11

warning signs during their underwriting and prescreening,[51] and ignored reports of fraud and high chargeback rates.[52] And similar to *Neovi* and the other cases cited above, they were on notice as to the underlying fraud.

The complaint pleads facts to show that the Payment Processors knew or should have known about the underlying fraudulent conduct.[53] For example, another payment processor was so troubled by similar indicia of the Debt Collectors' fraud that it terminated their accounts back in January 2012, which triggered a system-wide notice through MasterCard's network.[54] And yet, the Payment Processors continued to do business with the Debt Collectors for more than two years after that termination.[55]

The Payment Processors argue that the high return rates, consumer complaints, lack of underwriting, and the MasterCard fraud alert were insufficient reasons to suspect the Debt Collectors' fraud as a matter of law. Global argues that it was reasonable to ignore monthly chargeback rates of 28.5% and 31% because there was a "low transaction volume."[56] But, in issuing a permanent injunction to a payment processor, one court found that any

---

[51] Compl. ¶¶ 165-218.
[52] *Wells*, 385 Fed. Appx. at 713; Compl. ¶¶ 190-192, 225-246.
[53] Compl. ¶¶ 164-246.
[54] Compl. ¶¶ 178-180.
[55] Compl. ¶¶ 183-185.
[56] DE 93-1, 11.

chargeback rate exceeding 2.5% should trigger an immediate investigation.[57]

Moreover, such contentions of reasonableness are not appropriately resolved at

the motion to dismiss stage.

### b. Consumers could not reasonably avoid the harm the Payment Processors caused.

The Bureau's factual pleadings and the reasonable inferences drawn from

them demonstrate that consumer harm was not reasonably avoidable. Consumer

harm is not reasonably avoidable when consumers lack the free and informed

choice to avoid it.[58] On many occasions, even when a consumer did not yield to

the Debt Collectors' threats and authorize payment, the Payment Processors

enabled the Debt Collectors to access consumers' bank accounts and remove

funds.[59] It is difficult to imagine how consumers, particularly the victims of a

fraudulent debt collection scheme and victims who made payments based on

false threats, or never authorized withdrawals from their accounts, could have

reasonably avoided the resulting harm.[60]

### c. The Payment Processors' injurious practices were not outweighed by benefits to consumers.

---

[57] *FTC v. Interbill, Ltd.*, 06-cv-01644-JCM-PA, 2009 WL 10267504 at *3 (D. Nev. April 30, 2009), *aff'd sub nom FTC v. Wells*, 385 Fed. Appx. 712 (9th Cir. 2010).
[58] *Windward Mkt'g, Inc.*, 1997 WL 33642380 at * 11.
[59] Compl. ¶¶ 228, 239-241.
[60] *See Neovi*, 604 F.3d at 1158 ("It is likely that some consumers never noticed the unauthorized withdrawals. Even if the consumer did notice, obtaining a reimbursement required a substantial investment of time, trouble, aggravation, and money.").

13

Similarly, the Bureau has alleged ample facts to demonstrate the Payment Processors' injurious practices were not outweighed by any corresponding benefits to consumers or competition.[61] Global makes a policy argument that imposing liability could result in increased costs being passed through to merchants.[62] But Global's unsupported doomsday scenarios are not appropriate matters for judicial notice and therefore not amenable to a motion to dismiss.[63] If another payment processor could uncover the Debt Collectors' scheme and terminate their accounts back in January of 2012,[64] then it wouldn't seem to impose a crushing obligation on Global to follow its own guidelines and take similar precautions – or at least act on the warnings of others.

## C. The Bureau's complaint sufficiently pleads that the Payment Processors knowingly or recklessly substantially assisted the Debt Collectors' unfair and deceptive conduct.

In addition to the assertions that the Payment Processors directly committed unfair acts, the complaint asserts that the Payment Processors

---

[61] Compl. ¶¶ 3-4.

[62] DE 93-1, 4.

[63] *Compare Bryant v. Avado Brands, Inc.*, 187 F.3d 1271 (11th Cir. 1999) (holding that a district court may take judicial notice of "relevant public documents . . . for the purpose of determining what statements the documents contain.") *with Access 4 All, Inc. v. Trump Int'l; Hotel & Tower Condominium*, 458 F. Supp. 2d 160,164 (S.D.N.Y. 2006) ("When the parties ask the Court to weigh evidence outside of the pleadings and thereby test the merits of the evidence, not the complaint, such action is 'more appropriately reserved for the summary judgment procedure . . .'").

[64] Compl. ¶ 180.

14

violated the CFPA by substantially assisting the Debt Collectors' unfair and deceptive conduct. The CFPA provides that it is unlawful for:

> any person to knowingly or recklessly provide substantial assistance to a covered person or service provider in violation of the provisions of section 5531, [and]…the provider of such substantial assistance shall be deemed to be in violation of that section to the same extent as the person to whom such assistance is provided.[65]

### 1. The Court has found the Bureau is likely to succeed in its primary CFPA claims against the Debt Collectors.

The Payment Processors do not dispute the existence of the Debt Collectors' primary violations of unfair and deceptive conduct. Indeed, the Court has found the Bureau is likely to succeed on the merits of its claims against the Debt Collectors for violations of the FDPCA and CFPA.[66] At issue, then, is whether the Bureau has sufficiently pleaded that (a) the Payment Processors acted "knowingly or recklessly" in providing (b) "substantial assistance" to the Debt Collectors' primary violations.

### 2. The Payment Processors knew of or were reckless about their role in the illegal debt collection scheme.

No court has yet applied the substantial assistance provision of the CFPA, which was promulgated as part of the 2010 Dodd-Frank Wall Street Reform and Consumer Financial Protection Act ("Dodd-Frank Act").[67] As a result, the

---

[65] 12 U.S.C. § 5536(a)(3) (2010).
[66] DE 16.
[67] Pub. L. 111-203, 12 U.S.C. §§ 5301-5641 (2010).

Payment Processors' motions to dismiss rely heavily on precedent involving claims of aiding and abetting securities fraud brought under section 20(e) of the Securities Exchange Act of 1934 to inform what constitutes "knowing" or "reckless" conduct. However, many of the opinions cited by the defendants apply outdated standards that preceded the Dodd-Frank Act's amendment of section 20(e) of the Exchange Act to prohibit reckless as well as knowing substantial assistance. As a result, the motions seek to impose on the Bureau a pleading burden more rigorous than that required by the plain language of the CFPA.

The term "reckless" has a well-established meaning in the context of civil law. As the Restatement (Third) of Torts explains, a person acts recklessly in engaging in conduct if:

> (a) the person knows of the risk of harm created by the conduct or knows facts that make the risk obvious to another in the person's situation, and
> (b) the precaution that would eliminate or reduce the risk involves burdens that are so slight relative to the magnitude of the risk as to render the person's failure to adopt the precaution a demonstration of the person's indifference to the risk.[68]

Although some courts applying the aiding and abetting provision of the pre-2010 Exchange Act have interpreted "knowing" substantial assistance to encompass assistance that is "severely" reckless, Congress amended the

---

[68] Restatement (Third) Torts § 2; *see also Farmer v. Brennan*, 511 U.S. 825, 836 (1994) ("The civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.").

substantial assistance standard in the Dodd-Frank Act to prohibit conduct that was merely "reckless." The Court should presume that Congress was aware of the prevailing "severely reckless" standard inferred from the "knowing" element in prior case law and consciously omitted the modifier "severely" from the amended Exchange Act and CFPA standards.[69]

The 11th Circuit's recent decision in *SEC v. Big Apple Consulting USA*,[70] is not to the contrary. There, the court held that the Dodd-Frank Act's amendment of the Exchange Act did not overrule circuit precedent that "severe" recklessness could already satisfy the scienter requirement for substantial assistance claims. The court did not address the question of whether, after the Dodd-Frank Act, traditional recklessness could also satisfy that requirement.

No matter how the Exchange Act is interpreted, the CFPA standard means what it says: It requires recklessness, not "severe" recklessness. Regardless of whether the Court applies a "knowing," "severely reckless," or plain "reckless" standard in this action, however, the Bureau's complaint alleges sufficient facts to defeat the defendants' motions to dismiss the substantial assistance claims.

The complaint asserts that the Payment Processors acted knowingly or

[69] *See, e.g., Lindley v. FDIC*, 733 F.3d 1043, 1055-56 (11th Cir. 2013) ("Congress is presumed to know the content of existing, relevant law, and where Congress knows how to say something but chooses not to, its silence is controlling.") (internal citations omitted).
[70] 783 F.3d 786, 801 (11th Cir. 2015).

17

recklessly "by approving merchant applications from the Debt Collectors … that were replete with indicia of fraud and ignoring warnings from industry and consumers that the Payment Processors' clients were engaged in a scheme to defraud consumers."[71] The complaint also alleges that the Payment Processors knew the risk of processing payments for merchants without proper underwriting and, specifically, that they knew the dangers of processing for merchants, like the Debt Collectors, who fell into categories that the Payment Processors themselves deemed "high risk" or "prohibited."[72] Indeed, because of such risks, the Payment Processors were required to follow specific policies and procedures to identify fraud. For example, and as alleged in the complaint, Global's agreement with its sponsor bank imposed on Global the duty to handle and investigate chargebacks.[73] Frontline adopted and implemented Global's credit policy.[74] Pathfinder had a duty to monitor merchants' processing activity to detect fraud and risk issues.[75]

The complaint describes a system of processing chargebacks from which the Court could readily conclude that each Payment Processor knew of the

---

[71] Compl. ¶ 329.
[72] Compl. ¶¶ 152-163.
[73] Compl. ¶¶ 220, 221.
[74] DE 97-2, Third Amendment to Merchant Services Agreement between Global and Frontline, June 20, 2008. For reasons unknown to the Bureau, Frontline's exhibit includes only two of the Third Amendment's eleven pages.
[75] DE 93-4, Exh. 1.

unlawful debt collection.[76] Each Payment Processor possessed – and had a duty to investigate – consumer complaints that alerted the Payment Processors to their role in unlawful debt collection.[77] These complaints included sworn consumer narratives that consistently described the Debt Collectors' unlawful debt collection scheme.[78] The consumer complaints also described factoring, which Global expressly prohibited.[79]

Knowing assistance and severe recklessness, let alone plain recklessness, may be inferred from atypical business actions,[80] and the Payment Processors' departures from their written underwriting policies were well outside the standards applicable to the Payment Processors' operations. As alleged in the complaint and stated above, Global's underwriting policy deemed collection agencies to be "prohibited merchants", subject to Global's approval and subject to final review and approval by the "member sponsor institution."[81] Global required enhanced scrutiny of card-not-present merchants, like the Debt Collectors.[82] Pathfinder's policy purported to include a review for criminal activity, associates, verification of addresses, business filing or corporate affiliations, and

---

[76] Compl. ¶¶ 219-224.
[77] Compl. ¶ 246.
[78] Compl. ¶¶225-244.
[79] Compl. ¶¶ 160, 177.
[80] *Woods*, 765 F.2d at 1012.
[81] Compl. ¶ 157; DE 93-5, Exh. 3, 18.
[82] Compl. ¶ 163.

creditworthiness of principals.[83] Yet Pathfinder and Global approved the Debt

Collectors' applications that showed recent criminal activity by an officer,[84] a

business address that indicated an illegitimate business,[85] and a principal with

no verifiable source of income and a subprime credit score.[86]

Also as alleged in the complaint, Frontline's underwriting policy

emphasized the importance of ensuring the proper merchant category code was

assigned to a merchant,[87] yet Frontline designated the debt collectors as "Family

Clothing Stores."[88] Frontline and Global approved the Debt Collectors'

applications, which were faxed from a FedEx store and identified a false address

or a post office box as a legal and physical address.[89] Frontline's policy stated the

importance of verifying the information contained in an application, including a

customer service phone number, "to ensure the business is legitimate."[90] But

Frontline and Global approved applications that did not even include customer

service phone numbers.[91]

> ### 3. The Payment Processors knowingly or recklessly substantially assisted the illegal debt collection scheme.

---

[83] Compl. ¶¶ 166, 174.
[84] Compl. ¶ 167.
[85] Compl. ¶ 171.
[86] Compl. ¶ 173.
[87] Compl. ¶ 203.
[88] Compl. ¶ 204.
[89] Compl. ¶¶ 200-202.
[90] Compl. ¶ 213.
[91] Compl. ¶ 215.

Global acknowledges that there is no case law interpreting 12 U.S.C. § 5536(a)(3)'s use of the term "substantial assistance." Relying primarily on Exchange Act precedent applying pre-Dodd-Frank Act standards, both Global and Frontline argue that there must be a substantial causal link between the conduct of the "assister" and the resulting harm.[92] But courts analyzing aiding and abetting liability under the Exchange Act, even prior to the Dodd-Frank Act's expansion of that liability to include reckless behavior, have held that the degree of the defendant's knowledge of underlying bad conduct can lessen the burden of "proving substantial assistance."[93] As the Second Circuit's opinion in *Apuzzo* acknowledges, "[a]lmost by definition, the activities of an aider and abettor are rarely the direct cause of the injury brought about by the fraud, however much they may contribute to the success of the scheme."[94] Accordingly, an aider and abettor need not have proximately caused the primary violation.[95] Even a "merely ministerial" act may constitute aiding and abetting where the

---

[92] DE 93-1, 21; DE 97-1, 15.

[93] *See, e.g., SEC v. Apuzzo*, 689 F.3d 204, 215 (2d Cir. 2012) ("a high degree of knowledge may lessen the … burden in proving substantial assistance, just as a high degree of substantial assistance may lessen the … burden in proving *scienter*").

[94] *Apuzzo*, 689 F.3d at 213.

[95] *Id.*

abettor ignores red flags of illegal conduct.[96]

Regardless of the lower burden warranted by the Payment Processors' high degree of knowledge or recklessness asserted by the Bureau, the complaint adequately alleges that the Payment Processors played a more significant role in perpetrating the Debt Collectors' unfair conduct than is required to establish substantial assistance under the CFPA. In fact, the Bureau has alleged that the Payment Processors did proximately cause consumer harm by taking consumers' money. For example, the Debt Collectors' unfair and deceptive conduct was not fulfilled until they took consumers' money, which was possible only with the assistance of the Payment Processors.[97] This was the foreseeable result of the Payment Processors' failure to properly underwrite or monitor the Debt Collectors' accounts.[98] The Payment Processors enabled the Debt Collectors to reach into consumers' bank accounts without even obtaining a consumer's authorization.[99] The Payment Processors, and the service they provided, allowed the Debt Collectors to accept payment by bank card, to process payments

---

[96] *Graham v. SEC*, 222 F.3d 994, 1004-7 (D.C. Cir. 2004) (finding broker's executing trades was substantial assistance subjecting her to aiding and abetting liability when she failed to investigate suggestions of irregularity).

[97]  Compl. ¶¶ 126, 134, 137, 140, 146, 164, 175, 216.

[98] *See Apuzzo*, 689 F.3d at 215 ("The primary violator will often be the one to take the final actions necessary to consummate the fraud, and a primary violator's *foreseeable* acts are not superseding and intervening causes of the fraud.") (emphasis in original).

[99] Compl. ¶¶ 228, 244.

efficiently and conveniently, and provided the Debt Collectors with an "enhanced business image" and air of legitimacy.[100] The lengths to which the Debt Collectors went to maintain multiple processing accounts indicates the critical role the Payment Processors played in taking consumers' money. Mohan Bagga maintained multiple accounts,[101] while Varinderjit Bagga and Khan created entities for the purpose of opening payment processing accounts.[102] In Mohan Bagga's own words, recommending Frontline, the payment processor was "extremely helpful in jump starting my business for many reasons."[103] The Payment Processors took the known risk that they would facilitate unlawful conduct when they ignored their own underwriting policies. When, foreseeably, their conduct led to consumer harm, they knowingly or recklessly continued to assist the Debt Collectors' unlawful scheme.

### D. Although the Bureau's statutory claims should not be required to meet Rule 9(b)'s heightened pleading standard, the complaint includes sufficient factual allegations to satisfy Rule 9(b).

Global argues that the Court should apply Rule 9(b)'s heightened pleading standard to the Bureau's substantial assistance claim, because the Bureau describes the Debt Collectors' underlying conduct as fraud.[104] Global does not

---

[100] Compl. ¶¶ 4, 5, 145.
[101] Compl. ¶ 127.
[102] Compl. ¶¶ 137, 139, 142.
[103] Compl. ¶¶ 217-218.
[104] DE 93-1, 26-31.

appear to argue, and does not cite any cases to suggest, that 9(b) should apply to the Bureau's unfairness claim against Global.[105]

There is a split in authority over whether deception claims brought under the FTC Act require Rule 9(b)'s heightened pleading standard.[106] But the stronger rationale is with those courts holding that 9(b) does not apply to statutory deception claims such as those brought by the Bureau and the FTC, because, unlike common law fraud, the Bureau "need not prove scienter, reliance, or injury to establish a . . . violation."[107]

But even if the Court applies 9(b)'s heightened pleading standard, the Bureau has pled sufficient facts to meet it.[108] Satisfying the Eleventh Circuit's Rule 9(b) standard,[109] the complaint sets forth: (1) the precise misrepresentations made,[110] (2) the time and place of[111] and persons responsible for the

---

[105] DE 93-1, 29 ("The Complaint does not plead Global's facilitation of the fraud with particularity.")

[106] *Compare FTC v. Freedom Commc'ns, Inc.*, 401 F.3d 1192, 1203 n.7 (10th Cir. 2005) (noting that an FTC Act claim "simply is not a claim of fraud as that term is commonly understood or as contemplated by Rule 9(b)") *and FTC v. Sterling Precious Metals, LLC*, No. 12-80597-CIV, 2013 WL 595713, at *3 (S.D. Fla. Feb. 15, 2013), *with FTC v. Lights of Am., Inc.*, 760 F. Supp. 2d 848, 852-54 (C.D. Cal. 2010) (holding the opposite).

[107] *Sterling*, 2013 WL 595713 at *3.

[108] *See* Compl. ¶¶ 165-218.

[109] *W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 Fed. Appx. 81, 86 (11th Cir. 2008).

[110] Compl. ¶¶ 107-119; 225-245.

[111] Compl. ¶¶ 107-119; 225-245.

24

statements,[112] (3) the content and manner in which the statements mislead consumers,[113] and (4) what the Debt Collectors gained by the fraudulent scheme.[114]

The complaint also sets forth Global's role in facilitating the scheme in detail, explaining how Global "gave the Debt Collectors an air of legitimacy and allowed the Debt Collectors to efficiently process a high volume of collections."[115] The Bureau's complaint does not resemble those that were the subjects in the cases Global cites where the parties "failed to allege any facts" drawing the connection[116] between the underlying fraud and the aiding and abetting conduct, or did so only with "conclusory statements."[117]

## III.   Conclusion

For the reasons discussed above, the Court should deny the motions to dismiss brought by Global, Pathfinder, and Frontline.

Dated: June 5, 2015                 Respectfully Submitted,

Attorneys for Plaintiff

Consumer Financial Protection Bureau:

---

[112] Compl. ¶¶ 120-143.
[113] Compl. ¶¶ 107-119; 225-245.
[114] Compl. ¶ 3.
[115] Compl. ¶¶ 5; 144-246.
[116] *See Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1064-65 (11th Cir. 2007).
[117] *US v. Chow*, 841 F. Supp. 1286, 1290 (Ct. Int'l Trade 1993).

ANTHONY ALEXIS
Enforcement Director

DAVID RUBENSTEIN
Deputy Enforcement Director for Litigation

FRANK KULBASKI
Assistant Deputy Enforcement Director for
Litigation

*/s/ Jonathan B. Engel*
_____
JONATHAN B. ENGEL (MA bar #664518)
DAVID DUDLEY (WI Bar #1062812)
ENFORCEMENT ATTORNEYS
1700 G Street NW
Washington, DC 20552
Phone (Engel): 202-435-9037
Phone (Dudley): 202-435-9284
Email: *Jonathan.Engel@cfpb.gov*
Email: *David.Dudley@cfpb.gov*
Fax: 202-435-7722

And

Local Counsel
JOHN A. HORN
ACTING UNITED STATES ATTORNEY

LENA AMANTI
ASSISTANT U.S. ATTORNEY
Georgia Bar No. 666825
600 Richard B. Russell Federal Bldg.
75 Spring Street, S.W.
Atlanta, GA 30303
Telephone: (404) 581-6225
Facsimile: (404) 581-6163
Email: lena.amanti@usdoj.gov

## CERTIFICATE OF COMPLIANCE

The undersigned attorney hereby certifies, pursuant to LR 7.1.D, that the foregoing Motion was prepared in Century Schoolbook 13 point font.


*/s/ Jonathan B. Engel*
_____                    Dated:         June 5, 2015
Jonathan B. Engel
Enforcement Attorney



## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on this day a true and correct copy of Plaintiff's Consolidated Opposition to Pathfinder, Global Payments, and Frontline's Motions to Dismiss was filed with the clerk of court using the CM/ECF system which will automatically send email notification of the filing to all attorneys of record.

*/s/ Jonathan B. Engel*
_____                    Dated:         June 5, 2015
Jonathan B. Engel
Enforcement Attorney