**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| CONSUMER FINANCIAL ) <br> PROTECTION BUREAU, ) <br> ) <br>       Plaintiff, ) <br> v. ) <br> ) <br> UNIVERSAL DEBT & PAYMENT ) <br> SOLUTIONS, LLC; *et al.*, ) <br> ) <br>       Defendants. ) <br> ) | Civil Action No. <br> 1:15-cv-0859-RWS |

**FRONTLINE PROCESSING CORPORATION'S REPLY MEMORANDUM
IN SUPPORT OF MOTION TO DISMISS COMPLAINT WITH
PREJUDICE**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1
ARGUMENT ..........................................................................................................2
    I.      The CFPB's Reliance on Group Pleading Is Impermissible and Fails Both Rule 8 *Plausibility* and Rule 9 *Particularity* Requirements. ...................................................................................2
    II.     Count VII: The CFPB Fails To State A Substantial Assistance Claim. ................................................................................................4
          A.      Frontline Did Not *Substantially Assist* the Debt Collectors. ........................................................................................4
          B.      The CFPB Alleges No Facts to Support that Frontline *Knowingly* or *Recklessly* Provided Substantial Assistance to the Fraud. ...............................................................6
          C.      Frontline Did Not Provide Any Assistance *to the Debt Collectors*. ...................................................................................9
    III.    Count IX: The CFPB Fails To State An Unfair Practices Claim. ..............................................................................................10
          A.      Frontline Is Not a "Covered Person." .......................................10
          B.      Frontline Is Not A "Service Provider." .....................................11
          C.      The Complaint Does Not Allege That Frontline Engaged In Any Unfair Consumer Practice. ...........................13
CONCLUSION .....................................................................................................15
CERTIFICATE OF COMPLIANCE ....................................................................17
CERTIFICATE OF SERVICE .............................................................................18

# **INTRODUCTION**

Frontline did not assist UDPS or Credit Power in any way, not substantially, not insignificantly—and most definitely not in the perpetration of a consumer phantom-debt scheme. Frontline did not engage in any independent unfair acts that caused injury to consumers. And CFPB pleads no manner by which Frontline "substantially assisted" Global in its payment processing. The following allegations and concessions confirm the limited (if not nominal) role of Frontline and compel dismissal of the purported claims against Frontline:

- Frontline did not process payments, did not access consumer bank accounts, and did "not interact directly with consumers." (Compl. ¶¶ 144, 175, 216 & 84, 196-215.)

- Frontline's limited merchant prescreening activities—the sole alleged basis of Frontline's liability—were not performed for the benefit of UDPS or Credit Power, were always subject to Global's ultimate acceptance or rejection, and submission of the applications to Global occurred well after Global had a long history with the same merchants. (Compl. ¶ 84; Doc. 97-2 at § A.; Doc. 97-2 at § P.(6) & First Amendment § 4; Compl. ¶ 207; Compl. ¶¶ 165-168.)

- Frontline was not a party to the contracts with UDPS or Credit Power. (Doc. 97-3 & 97-4 at Terms & Conditions § 1.)

- Frontline had no alleged knowledge of a phantom-debt scheme. (*See* Doc. 97-1 at 11 (addressing allegations).)

- Unlike Pathfinder, Frontline had no duty to monitor accounts. (*Compare* Doc. 93-3, at § A *with* Doc. 97-2 at § A). Global, not Frontline, undertook a duty to "provide ongoing credit review," and Global, not Frontline, handled all chargebacks. (Doc. 97-2 at §§ B.1 & B.2; Compl. ¶¶ 220-244.)

1

# ARGUMENT

## I. The CFPB's Reliance on Group Pleading Is Impermissible and Fails Both Rule 8 *Plausibility* and Rule 9 *Particularity* Requirements.

The shotgun pleading and approach to this case does not work post-*Iqbal/Twombly* because "generalized allegations lumping multiple defendants together are insufficient." *West Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F. App'x 81, 86 (11th Cir. 2008); *see also Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) (same). The CFPB's Consolidated Opposition emphasizes the CFPB's impermissible group pleading and litigation strategy in this case by summarily lumping Defendants Global, Pathfinder, and Frontline together as "Payment Processors." (Doc. 114 at 2 n.6, 4, 7, 11, 19, 22.)

In its Consolidated Opposition, the CFPB does not even attempt to justify its improper group pleading or acknowledge the unique roles the ISOs, particularly Frontline, had with respect to UDPS and Credit Power. Global, Pathfinder, and Frontline: (i) have fundamentally different roles; (ii) have materially different connections (or lack of connections) to UDPS and Credit Power; and (iii) possess distinct rights and responsibilities under separate and independent contracts. Unlike the Pathfinder-Global MSA, the Frontline-Global MSA does *not* impose a duty of underwriting or a duty of account-monitoring on Frontline (*compare* Doc. 93-3 at § A *with* Doc. 97-2 at § A), making the CFPB's collective allegation, for

example, that the "Payment Processors . . . failed to reasonably monitor [the UDPS and Credit Power] accounts" improper and without a factual basis as against Frontline. (Compl. ¶ 164.) Significantly more is required to state a *plausible* claim against Frontline in light of its limited role, contractual obligations, and separate knowledge that cannot be compared to the lengthier history between Global, Pathfinder and the merchants. The CFPB should not be permitted to hide behind group pleading that lumps multiple defendants together and glosses over critical factual differences that the CFPB is well aware of.

The CFPB's allegations equally fail Rule 9(b)'s requirements, which apply when the gravamen of a complaint sounds in fraud—as the CFPB's claims do. *Belmont Holdings Corp. v. SunTrust Banks, Inc.*, 896 F. Supp. 2d 1210, 1218 (N.D. Ga. 2012) (Rule 9 applies to all claims that sound in fraud, even if not all elements of common law fraud are required); *see also In re AFC Enters., Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1377 (N.D. Ga. 2004) (claims sounding in fraud require heightened pleading). The CFPB does not dispute that its substantial assistance claim must be pled with particularity. Even the CFPB's "Unfair Acts or Practices" claim alleges, in substance, that Frontline "facilitated the Debt Collectors' large-scale fraud." (*See* Compl. ¶¶ 4, 323-324.) That claim, too, must satisfy Rule 9(b). It does not. No claim does. Dismissal is therefore warranted.

3

## II.     Count VII: The CFPB Fails To State A Substantial Assistance Claim.

### A.     Frontline Did Not *Substantially Assist* the Debt Collectors.

To rise to the level of "[s]ubstantial assistance," conduct must be a "substantial causal factor" in bringing about and furthering the underlying fraud. *SEC v. K.W. Brown & Co.*, 555 F. Supp. 2d 1275, 1307 (S.D. Fla. 2007) (*quoting Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1013 (11th Cir. 1985)). This Court need not engage in linguistic machinations—as the CFPB is forced to do—or go beyond common sense. Substantial means "considerable in quantity; significantly great."[1] Similarly, aiding and abetting activity must also "proximately cause" the wrongful conduct to constitute "substantial assistance." *In re Comptronix Sec. Litig.*, 831 F. Supp. 1563, 1572 (N.D. Ala. 1993).

The CFPB argues that other courts have held that a showing of proximate cause is not a part of proving a substantial assistance claim. (Doc. 114 at 21.) But that does not alter that a plausible allegation of "substantial assistance" is required. And even if true, the *SEC v. Apuzzo* case on which the CFPB relies requires that the alleged aider and abettor knowingly

> associated himself with the venture, . . . participated in it as something that he wished to bring about, and . . . sought by his actions to make [the underlying fraud] succeed.

---

[1] *Merriam-Webster's Dictionary*, www.merriam-webster.com/dictionary/substantial (last visited on June 24, 2015).

4

689 F.3d 204, 212-13 (2d Cir. 2012) (internal quotations omitted).  The CFPB has no such allegations of knowing and fraudulent association, participation, or purpose between Frontline and the merchant accounts.  Frontline's limited prescreening activities and submission of merchants to Global for approval is not "assistance" given to the Debt Collectors.  Frontline did not assist UDPS or Credit Power in any fashion.  CFPB alleges nothing to the contrary.

The CFPB argues that the "Payment Processors" (again, collectively) played a "significant role in perpetrating" the alleged phantom-debt scheme, asserting that the "Payment Processors . . . proximately cause[d] consumer harm by taking consumers' money." (Doc. 114 at 22.)  But as the CFPB alleges, Frontline did not process payments, move money or access consumer bank accounts.  Global did. (*See* Compl. ¶¶ 84 (Frontline's limited role), ¶¶ 196-215 (failing to allege that Frontline processed payments), ¶¶ 144, 175, 216 (Global processed payments).) Under the MSA, Frontline had "no authority to accept business on behalf of [Global]" and "[b]usiness referred by [Frontline to Global] shall be considered an offer from a prospective customer, subject to [Global's] acceptance or rejection." (Doc. 97-2 at § P.(6) & First Amendment § 4.)

Finally, to the extent the CFPB insinuates that Frontline's liability stems from activity post-dating its preliminary approval of the applications, Global

5

undertook the duty to "provide on-going credit review for all Merchants," not Frontline. (Doc. 97-2 at § B.1.) Regardless, insinuations do not suffice to state a claim. Global (not Frontline) handled charge-backs. (*See* Compl. ¶¶ 220, 220-244, 84). And Global (not Frontline) held the "right, in its reasonable, sole discretion, to terminate, suspend or otherwise close any Merchant in the event of Merchant fraud or impropriety." (Doc. 97-2 at § F.2.) The limited activities of Frontline did not contribute to, or assist, the Debt Collectors' perpetration of a fraud in any form. The CFPB has yet to articulate or plead a factual basis of how Frontline (as opposed to Global or Pathfinder) "assisted" a fraud.

### B. The CFPB Alleges No Facts to Support that Frontline *Knowingly* or *Recklessly* Provided Substantial Assistance to the Fraud.

The CFPB suggests that the "severe recklessness" scienter standard adopted by the Eleventh Circuit in the context of aiding-and-abetting claims under § 20(e) of the Securities Exchange Act is "outdated" and inapplicable based on the Dodd Frank Act. The CFPB is wrong. Prior to passage of the Dodd Frank Act in 2010, courts disagreed on whether the SEC could satisfy the knowledge element of an aiding-and-abetting claim by proving recklessness. Accordingly, "[t]he amendment to § 20(e) was intended to correct the holding of 'a growing number of courts' who concluded 'that knowingly means actual knowledge, rather than recklessness.'" *SEC v. Big Apple Consulting USA Inc.*, 783 F.3d 786, 801 (11th

Cir. 2015) (*quoting* H.R. Rep. No. 111-687(I), at 80 (2010)).  Congress passed the Dodd Frank Act and expressly codified the "recklessness" standard at 15 U.S.C. § 78t(e), and in doing so standardized the aiding and abetting scienter requirement to conform with the Eleventh Circuit's recklessness standard.  *SEC v. Big Apple Consulting USA, Inc.*, No. 6:09-cv-1963, 2011 WL 3753581, *10 & n.12 (M.D. Fla. Aug. 25, 2011).

The CFPB's argument that by using the word "recklessly" instead of "severe recklessness" Congress intended to codify a recklessness standard lower than the Eleventh Circuit's formulation is based on the incorrect premise that the amendment was drafted to respond to the Eleventh Circuit's characterization.  In substance, however, the Eleventh Circuit's "definition of severe recklessness is identical to that used by other courts to describe what conduct they considered reckless."  *Id*. at *10, n.11 (*citing Woods,* 765 F.2d at 1009).  Thus, the amendment expressly incorporated into the statute the recklessness formulation used by most federal courts, which is substantively the same as what the Eleventh Circuit characterized as "severe recklessness."  Tellingly, the CFPB cites no decision from any court in the country holding that Congress, in the Dodd Frank Act, intended to alter how courts interpret recklessness in the securities-claim context.  (Doc. 114 at 17.)  To allege "recklessness" under the Eleventh Circuit standard, the CFPB must

7

allege facts to support that Frontline engaged in highly unreasonable conduct that was an extreme departure from the standards of ordinary care. *See, e.g., SEC v. Imperiali, Inc.*, 594 F. App'x 957, 960 (11th Cir. Dec. 2, 2014). The CFPB does not come close to meeting this high standard.

As to Frontline, the CFPB relies on a handful of innocuous facts that in no way amount to unreasonable conduct or an extreme departure from the standards of ordinary care. In an attempt to plead recklessness, the CFPB relies heavily on an *internal* Frontline document that designated UDPS under a merchant category for "Family Clothing Stores." (*Id.* at 20.) But Frontline undisputedly knew and advised Global that UDPS and Credit Power were in the debt collection business— a fact that was clearly disclosed on the applications and is conceded in the CFPB's allegations given the history and number of years that Global conducted payment processing for both merchants prior to Frontline's involvement. (Doc. 97-3 at FLP1, FLP13 & Doc. 97-4 at FLP104, 117.) Frontline hid nothing.

The scant other factual allegations emphasized by the CFPB fare no better. The fact that the merchant applications were faxed from a FedEx location did not signal that the merchants were conducting a phantom-debt fraud. And while the CFPB now makes much of the allegation that UDPS never occupied space at an address listed on its application, the CFPB does not allege, nor could it allege, that

8

Frontline knew or should have known UDPS did not use the space.  (Compl. ¶¶ 200-201.)   Finally, Frontline did not deem debt collection, which is not *per se* wrongful, to be a prohibited business model.  (*Id.* ¶ 158.)   In fact, Frontline accurately identified the business model as "restricted" (*id.* ¶ 205), and Global retained the right to accept or reject the merchant.  (Doc. 97-2 at § P.(6) & First Amendment § 4.)

Accumulating all of the facts identified by the CFPB, the Complaint does not plausibly allege that Frontline knowingly engaged in unreasonable conduct or an extreme departure from the standards of ordinary care in prescreening UDPS and Credit Power and submitting those applications to Global.

C. <u>Frontline Did Not Provide Any Assistance *to the Debt Collectors*.</u>

Nowhere does the CFPB allege or argue that Frontline provided substantial assistance *to the Debt Collectors*, a required element of the claim.  The limited prescreening activities Frontline performed were for Global's benefit and undertaken pursuant to Frontline's MSA with Global.  (Compl. ¶ 84 (alleging that Frontline's prescreening was done pursuant to the MSA); Doc. 97-2 at § A.)  The receipt of merchant applications from, and prescreening of, UDPS and Credit Power does not equate to assistance given to the Debt Collectors.  Frontline never assisted the Debt Collectors or processed payments for the Debt Collectors.

9

Frontline was not a party to the contracts with UDPS or Credit Power, under which Global was identified as "the sole and exclusive provider of all card services." (Doc. 97-3 & 97-4 at Terms & Conditions § 1.)  The CFPB does not even respond to this basis for dismissal of the substantial-assistance claim against Frontline.

### III.   Count IX: The CFPB Fails To State An Unfair Practices Claim.

#### A.   Frontline Is Not a "Covered Person."

The CFPB summarily argues that Frontline "provide[s] payments or other financial data processing products or services *to . . . consumer[s] . . . .* including through any payments systems or network used for processing payments data." (Doc. 114 at 5 (emphasis added).)  But Frontline, which provided limited services *to Global*, does not offer any products or services for use by consumers, and, therefore, cannot be a "covered person."   The CFPB admits that Frontline does "not interact directly with consumers." (*Id.*)  But it nevertheless argues that Frontline should be a "covered person" because it "play[s] a key role in the consumer payment banking network." (*Id.*)  Even if it were true (and it is not), this is plainly not the standard under § 5481(6), and the CFPB's proposed revision of the definition of "covered person" to include any person that purportedly plays a "key role in the consumer banking network" would obliterate the express limitation

10

established by Congress. The CFPB cannot re-write the statutory elements to retroactively fit the facts of the cases it blindly sued out.

B.  Frontline Is Not A "Service Provider."

Neither is Frontline a "service provider." The CFPB argues that Frontline is a "service provider" under 12 U.S.C. § 5481(26) because it provided material services to the Debt Collectors. (Doc. 114 at 7; Compl. ¶¶ 85 & 332.) Frontline did no such thing. The only Frontline-specific allegations the CFPB can point to is paragraphs 196 and 206, (Doc. 114 at 7 n.29), but these allegations state merely that Frontline received and approved the UDPS and Credit Power applications. The allegations do not establish that Frontline provided material services to the Debt Collectors. The CFPB does not dispute, and in fact alleges, that the limited prescreening activities Frontline undertook were for the benefit of Global, not the Debt Collectors. (Compl. ¶ 84.) And the receipt and preliminary approval of the applications can not have been the provision of "material" services to the Debt Collectors because Global retained ultimate authority to accept or reject Credit Power and UDPS for payment processing—approval Global had previously given. (Doc. 97-2 at §§ P.(6), F.2., & First Amendment § 4; Compl. ¶ 174.)

The CFPB suggests as a fallback position that Frontline is a "service provider" because it provided material services to Global. (Doc. 114 at 7.) This

11

argument fails because the Complaint's allegations that Frontline is a "service provider" are confined to Frontline's alleged provision of services "to . . . *the Debt Collectors*." (Compl. ¶ 85 (emphasis added); *see id.* ¶ 332 (same).) Regardless, the limited activities Frontline is alleged to have performed for Global do not bring Frontline within the definition of "service provider" for several reasons. First, Frontline does not meet either enumerated statutory example of a "service provider." 12 U.S.C. 5481(26)(i) & (ii). The CFPB does not argue or allege that Frontline "participate[d] in designing, operating, or maintaining" a consumer financial product or service. It did not. Likewise, Frontline does not "process[] transactions relating to the consumer financial product or service." *Id.*

Second, even if Global were a "covered person," any limited services Frontline provided to Global cannot constitute "material service . . . in connection with [Global's] offering or provision . . . of a consumer financial product or service . . . ." 12 U.S.C. § 5481(26). Frontline's services to Global, in relation to UDPS and Credit Power in particular, were not material and were defined by the MSA. All Frontline is alleged to have done was provide preliminary prescreening and approval for the UDPS and Credit Power applications. (Compl. ¶¶ 84, 196.) Global's approval of UDPS and Credit Power here was *after* Global had been processing for UDPS and Credit Power for more than a year and *after* Global had

12

information regarding Credit Power and UDPS that was not known by Frontline. (*See id.* ¶¶ 165-168.)  Furthermore, Global retained ultimate authority to approve, reject, and later terminate these merchants.  (Doc. 97-1 at §§ P.(6),  F.2, and First Amendment § 4; Compl. ¶ 84.)  Frontline's limited services to Global under these circumstances were not "material" to Global as required by 12 U.S.C. § 5481(26).

Third, even if Frontline's prescreening activities could be said to have been material in some general way, they certainly were not important "in connection with [Global's] . . . provision . . . of a consumer financial product or service."  *Id.* The limited marketing and prescreening activities that form the alleged basis of Frontline's liability are wholly independent of, and prior to, the actual provision of payment processing services, which Frontline had no involvement with. Frontline's limited services did not assist Global in the provision of processing services and do not convert Frontline into a "service provider."  *Id.*

  C. <u>The Complaint Does Not Allege That Frontline Engaged In Any Unfair Consumer Practice.</u>

The CFPB's unfair-practices claim also fails because the CFPB does not allege that Frontline proximately caused any consumer injury.  *See CFPB v. ITT Educ. Servs., Inc.*, No. 1:14-CV-292, 2015 WL 1013508, at *30 n.34 (S.D. Ind. Mar. 6, 2015) ("proximate cause" is an element of a claim under 12 U.S.C. §§ 5531 & 5536); *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S.

Ct. 1377, 1390 (2014) (addressing presumed incorporation of proximate cause principles into statutory causes of action). The CFPB argues that the "Payment Processors" "process[ed] payments," "operated a system that allowed the Debt Collectors to . . . accept payments by . . . bank card," and "[took] millions of dollars from the consumers' accounts." (Doc. 114 at 10-11.) CFPB wholly fails to account for Frontline's actual role—the minimal role acknowledged in the pleadings. Frontline did not process payments, and did not take, debit, credit, or move money. Frontline was many steps removed from any injured consumer—and even further removed than Global. There are no allegations that Frontline communicated with consumers, provided services to consumers, received money from consumers, accessed consumer accounts, advertised to consumers, or made disclosures to consumers. The CFPB admits that Frontline had no such connection to consumers. (Doc. 114 at 5.)

Each case cited by the CFPB is readily distinguishable from the limited involvement alleged against Frontline. In *FTC v. Neovi, Inc.*, 604 F.3d 1150 (9th Cir. 2010), the Ninth Circuit concluded that the defendant website-operator caused direct consumer harm as a result of providing a web service that "creat[ed] and deliver[ed] unverified checks," allowing fraudsters to create and draw fraudulent checks on accounts that were not their own. *Id.* at 1157. In *FTC v. Wells*, 385 F.

14

App'x 712 (9th Cir. 2010), the Ninth Circuit concluded that "[o]verwhelming and undisputed evidence show[ed] that Appellant's role in facilitating [a] Pharmacy Cards program resulted in unauthorized transactions" and observed that "Wells received immediate reports of fraud . . . ." *Id.* at 713.  And unlike *FTC v. Windward Marketing, Inc.*—where the defendant deposited unauthorized bank drafts on consumers' accounts into bank accounts that the defendant knowingly opened in the names of fictitious magazines—Frontline played no part in effectuating the alleged phantom-debt fraud or the transfer of any money in connection thereto.  1997 WL 33642380, at *12 (N.D. Ga. Sept. 30, 1997).  Nor is Frontline similarly situated to the defendant in *FTC v. Global Marketing Group, Inc.*, which processed consumer transactions, reviewed the telemarketers' deceptive sales scripts, and handled law enforcement inquiries regarding the scheme.  594 F. Supp. 2d 1281, 1288 (M.D. Fla. 2008).

## CONCLUSION

Frontline respectfully requests that this Court dismiss the CFPB's claims against Frontline with prejudice.

Respectfully submitted this 29th day of June, 2015.

**LINDQUIST & VENNUM LLP**

*/s/ Bryan R. Freeman*
Bryan R. Freeman

Appearing *pro hac vice*
Kirstin D. Kanski
Appearing *pro hac vice*
4200 IDS Center
80 S. 8th Street
Minneapolis, MN 55402
(612) 752-1076
(612) 371-3207 Facsimile
kkanski@lindquist.com
bfreeman@lindquist.com

-with-

**PARKER, HUDSON, RAINER & DOBBS, LLP**
William J. Holley, II
Georgia Bar No. 362310
Scott E. Zweigel
Georgia Bar No. 786616
Tiffany R. Johnson
Georgia Bar No. 638051
1500 Marquis Two Tower
285 Peachtree Center Ave., N.E.
Atlanta, Georgia 30303
(404) 523-5300
(404) 522-8409 Facsimile
wjh@phrd.com
sez@phrd.com
trj@phrd.com

*Counsel for Defendant Frontline Processing Corporation*

## **CERTIFICATE OF COMPLIANCE**

In compliance with Local Rule 7.1(D), I certify that the foregoing brief has been prepared in conformity with Local Rule 5.1. This memorandum was prepared with Times New Roman (14 point) type, with a top margin of one and one-half (1 ½) inches and a left margin of one (1) inch.

This 29th day of June, 2015.

                                  Respectfully submitted,

                                  */s/ Scott E. Zweigel*
                                  Scott E. Zweigel

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2015, I electronically filed the foregoing REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS COMPLAINT WITH PREJUDICE with the Clerk of Court using the CM/ECF system, which will send notifications of such filings to all counsel of record in this action.

This 29th day of June, 2015.

Respectfully submitted,

*/s/ Scott E. Zweigel*
Scott E. Zweigel