```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
 2                        ATLANTA DIVISION

 3

 4

 5

 6   CONSUMER FINANCIAL            )
     PROTECTION BUREAU,            )
 7                                 )
              Plaintiff,           )
 8                                 ) Civil Action
     -vs-                          ) No. 1:15-CV-0859-RWS
 9                                 )
     UNIVERSAL DEBT & PAYMENT      )
10   SOLUTIONS, LLC, et al.,       )
                                   )
11            Defendants.          )

12

13

14

                  Transcript of the Motions Proceedings
15            Before the Honorable Richard W. Story
                 United States District Court Judge
16                        July 30, 2015
                         Atlanta, Georgia
17

18

19

20

21

22
     Reported stenographically by:
23   Amanda Lohnaas, RMR, CRR
     Official Court Reporter
24   United States District Court
     Atlanta, Georgia
25   (404) 215-1546
```

1
<u>APPEARANCES OF COUNSEL:</u>

2

3   On behalf of
    the Plaintiff:              Jonathan B. Engel, Esq.
4                               David Dudley, Esq.
                                Lena Amanti, Esq.
5

6   On behalf of Defendant
    Global Payments, Inc.:      James Douglas Baldridge, Esq.
7                               Michael A. Caplan, Esq.
                                Michael Patrick Bracken, Esq.
8                               Leonard L. Gordon, Esq.

9   On behalf of Defendant
    Pathfinder Payment
10  Solutions, Inc.:            John Da Grosa Smith, Esq.

11  On behalf of Defendant
    Frontline Processing
12  Corp.:                      Kirstin D. Kanski, Esq.
                                Scott Eric Zweigel, Esq.
13
    On behalf of Defendant
14  Francis David Corp.:        Shira Adler Crittendon, Esq.
                                Benjamin Ockner, Esq.
15
    On behalf of Defendant
16  Global Connect, LLC:        Timothy Jerome Burson, Esq.

17  On behalf of Defendant
    Marcus Brown:               Linda Heary Joseph, Esq.
18

19

20

21

22

23

24

25

1          (Thursday, July 30, 2015, 11:00 a.m.)

2          THE COURTROOM DEPUTY:  Court calls the case of Consumer

3    Financial Protection Bureau versus Universal Debt & Payment

4    Solutions, et al., Civil Case Number 1:15-CV-859.

5          THE COURT:  Good morning.  We will proceed first on the

6    request on behalf of Mr. Brown for a modification to the

7    preliminary injunction to allow him access to some income

8    and, Ms. Joseph, I'll hear from you at this time.

9          MS. JOSEPH:  Thank you, Your Honor.

10          First of all, I would like to thank the Court for

11    permitting me to file a late reply and for admitting me

12    pro hac and it's nice to be here in Georgia.  So thank you.

13          I'd like to begin with a little background, Your Honor,

14    to place what I'm going to say in context.

15          Mr. Brown prevailed upon me to assist him with his

16    motion to modify the injunction because due to the asset

17    freeze necessarily he is without any -- and the business

18    shutdown that necessarily flows from that -- unable to

19    support his family and to retain counsel.

20          My firm is a small women's business enterprise.  I do

21    have a background in this sort of subject area.  I was a

22    former special assistant to the general counsel of the

23    Federal Trade Commission and I've also done a fair amount of

24    debt collection practices work in the Buffalo area and in

25    Arizona as well and I think that's why he came to me.

1          He borrowed funds to hire me.  That was -- and actually,

2     they were very limited.  And so I find myself here in a kind

3     of an unusual situation because I need to tell the Court

4     ahead of time that even if successful, now that I've gotten

5     into this and I've seen what the revenues are on the six

6     properties, I really doubt that I will be able to continue

7     because my firm is so small and it will be a huge financial

8     burden.  Nonetheless, I do hope that I'm able to assist him

9     at least by way of this motion to help him to get some

10    financial wherewithal to be able to both defend himself in

11    some fashion and to support his family.

12         Before reaching the merits of the motion I'd like to

13    touch upon my concerns here as to the due process issues

14    raised by what I've learned in the short time that I've been

15    in this case, and I really have to emphasize it's a very

16    short time that I've been involved.

17         I think it's important, particularly since I cannot

18    remain in this litigation for the duration, to make the Court

19    aware of several what I consider to be troubling events that

20    I think have occurred here.

21         One of them relates to service of process.  I was told

22    by my client that there were threats of contempt unless --

23    and that, you know, there were allegations made that he had

24    been personally served that weren't correct and he agreed

25    then, because he was concerned about contempt of court, to go

1  forward with his deposition and he was actually served by the

2  marshal at the deposition.  The deposition was interrupted or

3  this happened beforehand.

4        And I went back and looked at the record because, you

5  know, I wondered about that and I thought, well, maybe there

6  had been an attorney who had accepted service of process in

7  his behalf and I actually found that the only affidavit of

8  service was on May 14th, the day of his deposition.

9        The second thing that I found to be really troubling,

10  and again this goes to the due process issue and, you know,

11  in terms of representation by counsel, related to a couple of

12  things.

13        One was the insistence on the right to the rentals in

14  these properties that I'm going to be speaking about because

15  in my experience in working for the government previously,

16  the information that these properties were purchased long

17  before any of the events that are the allegations of the

18  complaint are publicly available information.  I was able to

19  get it fairly quickly and, as you saw, Your Honor, I attached

20  the evidence to the affidavit.  So I found that troubling as

21  well.

22        And then the final thing that I found troubling revolves

23  around this issue of the $9500 attorney fee that I believe my

24  client paid to a lawyer who subsequently had to withdraw due

25  to a conflict.  And that that's not been returned.

1      Initially I had understood that the lawyer had kept it

2   because of services that were provided and there was some

3   confusion on this on my part.  But I have learned since, and

4   I think now based on conversations with plaintiff's counsel,

5   I believe that this did not occur and that the funds are in

6   fact available and weren't applied to services because of the

7   conflict, there weren't any services delivered.

8      And I understand that the CFPB has taken the place that

9   because this is derived, you know -- in my view this is cash.

10   I've informed the plaintiff's counsel that this is cash from

11   these same properties that was collected as rent.  Yes, it

12   was before the issuance of the preliminary injunction, but

13   yet it really has nothing to do with the litigation.

14      And I even thought we might be able to reach an

15   agreement on this.  But then I was told that an affidavit

16   setting forth these facts, that this was cash, would only --

17   would not be sufficient because it would be a self-serving

18   affidavit.

19      And I really felt that, you know, my client needs this

20   money to be represented and to have due process honored.  And

21   I really was rather shocked at the fact that a sworn

22   affidavit wasn't sufficient.  And this is not something

23   addressed in my reply papers because I, as I said, I had

24   originally thought that the money went to the prior attorney,

25   but I have brought along an affidavit from my client which is

1    signed under oath and notarized by me, it was signed in my

2    presence, and it does explain this, that this is cash from

3    these same rental properties.

4         So I'd like to be able to address that as well and, you

5    know, I even wonder if, given what I know about the

6    enforcement programs that the FTC and the CFPB have underway

7    right now across the country, and I know that some of these

8    programs are leading toward criminal prosecution, you know,

9    because these are very serious allegations and whether

10   they're correct or they're wrong, I mean I just do not know

11   the facts here, but I do believe very sincerely, Your Honor,

12   that these defendants are entitled to a defense, particularly

13   if what I believe is going to be in the offing as possible

14   criminal prosecution, that perhaps there should be a public

15   defender status accorded or something done to make sure that

16   these individuals are accorded due process.

17        Having said all of that, I would like to now turn to the

18   substance of my motion, which is really very simple and

19   really involves only two things.

20        And I do -- is it possible for me to hand up to the

21   Court today this affidavit on the $9500?

22        THE COURT:  Yes.

23        MS. JOSEPH:  I brought along extra copies for counsel.

24   I'm afraid I don't have too many.

25        It's just a minor point that this affidavit makes, which

1   simply is that the money, the $9500 that was paid to the

2   attorney came from cash rentals collected from tenants on the

3   same six properties that I'm discussing today.  And that I

4   really don't -- I realize that the order as it's written

5   takes a different position with regard to property that

6   predates the injunction and postdates the injunction.

7        And in my view, because this has nothing to do with, or

8   is not tainted, so to speak, that this money should be made

9   available to Mr. Brown, both for defense and/or supporting

10  his family.  He has nothing right now.

11       The second point of my argument is with respect to the

12  six properties, and I think the papers are very clear on

13  this.  I mean, we showed the documentation that these

14  properties were purchased long before any of the events that

15  are at issue here.  We provided copies of the deeds, the

16  dates, and so forth.  And so therefore, even under the terms

17  of Your Honor's order, the rent from those properties

18  certainly should be released.

19       It's not going to be a tremendous amount of money after

20  the taxes and the water and all the rest of this.  And these

21  properties are on the east side of Buffalo.  They are in

22  some -- they are properties that are, shall we say, not the

23  best properties in town.  They are difficult properties to

24  maintain.  Mr. Brown's a minority person and he is, I

25  believe, doing a service to the community by providing homes

1    to these people.

2         And it's not an easy job.  In the winter in Buffalo you

3    have to remove the snow.  Previously these were maintained

4    when Mr. Brown was in business; now he's doing this work

5    himself.

6         And I really -- the other thing I learned just

7    yesterday, or I think it was during conversations with

8    opposing counsel, which we tried to resolve this but weren't

9    able to, was that there's a list of properties that relate to

10   the corporate entities.  And I really wasn't aware of those.

11   I did a search under Mr. Brown's name to find the six

12   properties that I've put before the Court but I also think

13   that it's possible -- those properties I would presume are,

14   you know, I believe they belong to his sister because these

15   corporations -- the corporation that was involved was, at

16   least one of them was, I know it was his sister's, it wasn't

17   his.  They may not be in his name but I suspect given the

18   family relationship that he's going to be doing the

19   maintenance and keeping these properties going.

20        I'm just thinking -- in fact, this occurred to me last

21   night as I was traveling down here -- that maybe we should

22   have been, and maybe I should have been addressing that issue

23   as well.  But as I said, I wasn't familiar with those.

24        But I do want to make the Court aware of that, that

25   there is probably rental income there because opposing

1    counsel asked me to obtain documentation with regard to the

2    income and so forth.  And that's post-income.  And, again,

3    it's on real property; it has nothing to do with debt

4    collection.

5        I understand their position that perhaps the property

6    itself was paid for in some way by proceeds of the debt

7    collection business but I just wanted to make the Court aware

8    of that.

9        And, you know, to me the rental income on the six

10   properties is absolutely clear.  I think the $9500 is

11   absolutely clear.  I also think that if he has to maintain

12   and do the work to keep those properties going, I don't think

13   that, with all due deference, that opposing counsel is going

14   to want to come to Buffalo and deal with these properties; I

15   think he should be compensated for it in some fashion if not

16   able to keep the rent, or at least his sister keep the rent.

17       So that's really what I wanted to say to you this

18   morning, Your Honor.  Thank you.

19       THE COURT:  So essentially at this point what you're

20   asking for is the income from these six properties, that he

21   be permitted to use that income for such purposes as family

22   expenses or attorneys' fees or that that be income that he's

23   entitled to, and you're requesting that the attorneys who

24   were paid the $9500 be released to turn those funds back over

25   to him?

1      MS. JOSEPH:  That's right, Your Honor.  And I mentioned

2  the other properties because I think we should keep that

3  issue open.  It only came to my attention yesterday when they

4  sent me a chart of those properties.  Thank you.

5      THE COURT:  I'll hear from plaintiff.

6      MR. DUDLEY:  Good morning, Your Honor.

7      THE COURT:  Good morning.

8      MR. DUDLEY:  As Your Honor is no doubt aware, this case

9  involves very serious allegations of a phantom debt

10  collection scheme.

11      As set out in the complaint, as well as the supporting

12  papers the CFPB filed in support of the temporary restraining

13  order and in support of the preliminary injunction, it's our

14  contention that Mr. Brown and the debt collectors coerced

15  very vulnerable consumers to pay millions of dollars on debts

16  that they did not owe.

17      Now, we've managed to freeze some assets and locate some

18  assets but those assets pale in comparison to the amount that

19  we have identified that was taken from consumers.  We

20  estimate over $3 million was taken from these very vulnerable

21  consumers and we've managed to trace and freeze approximately

22  $350,000.

23      So it's undisputed that the $9,500 retainer fee relates

24  to proceeds that Mr. Brown obtained, or the debt collectors,

25  rather, obtained before the issuance of the preliminary

1    injunction.  So therefore under the terms of the preliminary

2    injunction it would fall clearly under the asset freeze.

3        Also under the case cited by the CFPB in our response

4    brief, *FTC v. IAB Marketing*, and that's 746 F.3d at 1228, the

5    proper consideration is the amount of consumer harm as

6    compared to the amount of assets frozen.  And so here there's

7    a vast disparity between the approximately 350,000 that's

8    frozen and over 3 million in consumer harm.

9        Also, with respect to the $9,500, it doesn't appear to

10   actually be Mr. Brown's money.  Looking at the financial

11   disclosure statements, this would be Document 16 filed for

12   WNY Account Solutions, Universal Debt Solutions, on page 10

13   the $9,500 retainer fee is listed as cash held by those debt

14   collection entities, not Marcus Brown.

15       So the description is name and address of financial

16   institution, it says Baker Donelson.  Account number says

17   retainer and current balance, $9,500.  So that appears on

18   that financial disclosure statement, not on Mr. Brown's

19   personal financial disclosure statement.

20       With respect to the six properties at issue, the Bureau

21   does not object to Mr. Brown receiving rents for those

22   five properties -- for five of the six properties on an

23   ongoing basis going forward.

24       One of the properties is held by his wife, Tasha

25   Pratcher.  She has not moved for a modification of the

1   preliminary injunction and we don't believe it's proper for

2   Mr. Brown to take rents for her property, especially when

3   she's represented by separate counsel and recently filed an

4   answer of her own in this matter.  If she wants to bring that

5   up, then she can do that through her counsel to us.

6        With respect to those five properties, as I said, the

7   Bureau does not object to Mr. Brown receiving those rents on

8   an ongoing basis going forward.  We do, however, wish to

9   reserve the right to potentially seek those rents in arrears

10  and to seek those properties as part of the overall estate

11  used to compensate harmed consumers if we're successful

12  ultimately in our claims.

13       THE COURT:  Which is the property that you're excluding

14  from the list?

15       MR. DUDLEY:  237 Dartmouth, Your Honor.

16       THE COURT:  Okay, thank you.

17       MR. DUDLEY:  Also, with respect to the rents on an

18  ongoing basis, we would request that Your Honor issue an

19  order requiring Mr. Brown to file monthly statements with the

20  Bureau indicating all the rents coming in and also

21  documenting all expenses going out, and also providing

22  verification for those expenses, such as receipts, invoices,

23  bills, things to verify that these are legitimate expenses.

24       In addition we believe that the properties held by WNY

25  Account Solutions and Universal Debt Solutions, there are

1    approximately 15 properties, I believe, held by those two

2    entities, that those remain subject to the asset freeze

3    because those were so intertwined with the debt collection

4    scheme that they can't properly be segregated and would not

5    be subject under the plain language of the preliminary

6    injunction to be lifted.

7         But we would also request that, to the extent there are

8    still expenses coming in and expenses going out for those

9    other properties, that Mr. Brown and the debt collectors

10   provide verification of those amounts and monthly statements

11   for those rents and expenses.

12        THE COURT:  How is that being handled now?

13        MR. DUDLEY:  We are not aware of how it's being handled,

14   Your Honor.  We're not receiving any information about them

15   and it's unclear to us what's happening with those

16   properties.

17        Finally, the other issue I'd like to raise with the

18   Court today is the incomplete nature of the financial

19   disclosure statements that have already been filed.

20        So just to point out a few of the deficiencies, again

21   turning to one of the financial disclosure statements, this

22   one is Document ECF Number 16, so this would be the financial

23   disclosure statement for WNY Account Solutions and Universal

24   Debt Solutions.

25        First of all, this is a joint financial disclosure

1   statement; there should be separate financial disclosure

2   statements for each entity.  Also there are just many

3   implausible things about this on its face.

4        So these entities recognized a million dollars in

5   revenue in both 2014 and 2013, but they had no expenses other

6   than a hundred thousand dollars in consulting fees to Marcus

7   Brown and they list no employees.  This is just not

8   plausible.

9        During the immediate access to the debt collectors'

10  premises we found a very sophisticated boiler room operation

11  with multiple employees making dunning calls, sending dunning

12  letters.  None of that appears in this financial disclosure

13  statement or any of the other financial disclosure

14  statements.

15       Also these financial disclosure statements don't list

16  any related entities.  We know that the debt collectors

17  operated a very complex and tangled web of corporate entities

18  and it would be helpful for us to be able to sort that out if

19  they were included in the financial disclosure statements.

20       Similarly, the financial disclosure statement ECF

21  Number 5, so this would be Universal Debt & Payment

22  Solutions, shows 1.2 million in revenues in 2013, and also

23  1.2 million in expenses.  So it almost entirely cancels out.

24  The expenses is not just aggregated at all, so we're not able

25  to tell what of that 1.2 million went to wages, to salaries,

1    what went to rent.  It's a completely opaque figure and is

2    relatively meaningless as a financial disclosure.

3         So in sum, Your Honor, we would -- we do not oppose Your

4    Honor issuing an order allowing Mr. Brown to collect rents on

5    the properties that belong to real estate of distinction.  We

6    would take exception with his collecting rent at 237

7    Dartmouth because that's a property owned by Tasha Pratcher,

8    a separate defendant with separate counsel in this matter.

9    But we would request that Mr. Brown and the debt collection

10   entities provide monthly statements for those properties and

11   for all the other properties held, and also submit new

12   financial disclosure statements that are complete, truthful,

13   and accurate, and allow us a meaningful basis to assess their

14   financial position and trace any remaining assets.

15        THE COURT:  Have you conferred with the parties about

16   the financial statements on those that you've just mentioned

17   to me?  Has there been contact with counsel stating what you

18   feel are the shortcomings requesting the additional

19   information?

20        MR. DUDLEY:  We've had some initial discussions about

21   that, Your Honor.  But since Ms. Joseph is relatively,

22   Attorney Joseph is relatively recent to the case we haven't

23   had a chance to go further down that road.

24        And also, sorry, I believe it's Attorney Joseph's

25   position that she only represents Marcus Brown, not the other

1    debt collection entities, so that she doesn't have any

2    authority to make that agreement with us.

3         THE COURT:  As far as that goes, obviously my

4    expectation is that the plaintiff would have some

5    communication with any party whose disclosures are not

6    adequate and give them an opportunity and then bring it to

7    the Court, as opposed to -- I'm hesitant to just issue a

8    blanket order that says give them everything they want.

9    There needs to be some discussion and if they're not doing

10   what I've required them to do in this order let me know and

11   then we jump in and take care of it at that point.  But until

12   then that would be my expectation, that there at least be an

13   overture, either to counsel or to the party, so that there's

14   an opportunity for them to address that.  Okay?  Thank you.

15        MR. DUDLEY:  Thank you, Your Honor.

16        THE COURT:  Ms. Joseph, do you wish to respond?

17        MS. JOSEPH:  Yes, I would like to briefly, Your Honor.

18        One thing that I overlooked mentioning was with regard

19   to deposits, this reference to the 9500, we addressed that in

20   our reply papers and we made the point that, yes, there were

21   at times deposits of rent made in to but that was actually,

22   you know, those -- that those funds were actually balanced

23   out.  And I still think that because this is cash that came

24   from these rental properties, and given the need for due

25   process here and also for this man to represent his -- you

1    know, to take care of his family, that I think that equity
2    suggests that the $9500 should be released.
3         As to the five out of six, if Your Honor looks at the
4    deed to Exhibit A, which is that particular -- it's Exhibit A
5    to the affidavit, Marcus Brown is the person who bought it.
6    He transferred the title over to his wife in 2005, and he
7    initially purchased this property.
8         And it is his wife.  I mean, to say under these
9    circumstances that they should make a separate application,
10   particularly given the financial circumstances of this
11   family, I think is a bit overreaching and overbearing.
12        As to the incomplete nature of the disclosures, again,
13   there's been pressure placed on me to do this.  Yesterday I
14   asked for the disclosures because my client didn't even have
15   the financial disclosures.  And plaintiff's counsel directed
16   me to go to someone else to get those documents.  They've
17   never been even sent to me or discussed with me.
18        And obviously, you know, there is no indication, as far
19   as I know, of ownership by Mr. Brown of these two companies
20   that they want further disclosures.  We're willing to assist
21   in any way but we need to be able to protect his rights.  I
22   mean, as I understand it Mr. Bagga owns one of the two
23   companies and was ill and I've explained all of that to
24   opposing counsel.
25        But I really appreciate Your Honor's recognition that

1    this is, you know, a more complex issue that needs to be

2    addressed separately.  Thank you.

3         THE COURT:  All right.  I am going to order that

4    Mr. Brown can receive the rental incomes from five of the six

5    properties.  And I appreciate what you're saying about he

6    bought it, but he transferred it to his wife, she's a

7    separate party here.  She may want that money; I'm not going

8    to give him her money.

9         MS. JOSEPH:  Understood, Your Honor.

10        THE COURT:  I quit doing that when I left superior court

11   so I'm not going down that road.  So five of the six I will

12   allow, I will provide that he may receive those proceeds.

13        In all honesty, I'm going to require him to keep the

14   Bureau advised of the income.  I appreciate why you want to

15   have the expenses but the reality is we're talking about such

16   a small amount of money, if he wants to buy his groceries

17   with it I don't want him to give you the Publix bill.  You

18   need to know how much is coming in so that if it changes

19   significantly you folks need to know that.  So he will be

20   required to advise you of the income; I'm not going to

21   require him to keep books on the expenses related to that.

22        As to the $9500, I am extremely sensitive to the fact

23   that the allegations about the losses that were suffered here

24   are astronomical as opposed to what assets you've been able

25   to seize at this point and so I'm very sensitive to that

 1   issue.

 2        I'm also sensitive to the nature of the allegations and

 3   the possible criminal repercussions that can flow from what's

 4   alleged here.

 5        Under the circumstances and based on what's submitted

 6   here, I am inclined to allow him to use that $9500 to retain

 7   counsel.  At the same time, it's a little unfair to you folks

 8   that you get hit with this without a chance to offer

 9   something.  If you wish to offer further objection I will

10   give you seven days to offer that in writing to me and I will

11   take it under consideration.

12        So the order on the $9500 is held in abeyance for seven

13   days so that if the plaintiff wishes to be heard I'll hear

14   their argument on that and not make that ruling final for

15   seven days; but as of today we'll allow him to have the

16   income from this point forward derived from the rental

17   properties.

18        MS. JOSEPH:  Thank you, Your Honor.

19        THE COURT:  We had also, I think, set down the motions

20   to dismiss that have been filed.  Let me preface this by

21   saying I've read your briefs and, quite honestly, I don't

22   want to take a long time with this because I thought the

23   briefs were excellent on both sides and I think draw into

24   focus where the issues lie.  I think there are some somewhat

25   novel issues, particularly, I think, where we're plowing new

1    ground, arguably, in terms of the standard concerning whether

2    you're knowingly or recklessly providing substantial

3    assistance and what terms, how that's going to be defined

4    here.

5         So I'm happy to hear whatever you want to say but in a

6    very limited format, but that's where I think that's where my

7    greatest interest lies in terms of where you might offer me

8    something new, having now had the chance to see each other's

9    briefs.  So that's an area that I suggest to you but if there

10   are others that you think you would want to highlight for me

11   to make sure I didn't miss it in the reading of the briefs

12   I'm happy to hear that as well.

13        So I'll hear from the movants first and then I'll hear

14   from the plaintiff.

15        MR. BALDRIDGE:  Good morning, Your Honor, Doug Baldridge

16   from Venable on behalf of Global Payments.

17        Keeping in mind that we want to keep this rather

18   truncated, as you just stated, I'm going to try to jump right

19   to it.  But I do want to thank you for, you know, going with

20   the procedure of allowing us a little oral argument on this

21   because I think as far as a commercial case goes, there's

22   some pretty important things in front of you.

23        The two critical issues that concern me in the context

24   within which we are dealing with this 12(b)(6) motion are

25   that, as you've said, you're going to have to figure out what

1    the legal standard is going to be that we apply to completely

2    legitimate and honest companies like Global Payments, a

3    publicly traded company, and how you're going to hold them

4    responsible, if at all, for the acts of others.  A company in

5    this context that has no contact with consumers, which I

6    think is an important part of this.

7          The second thing I think we're going to have to figure

8    out, it's important to me, is to what extent in deciding this

9    standard are you going to allow the CFPB to, in my view, push

10   its regulatory duties and its policing duties on clients like

11   mine that are four times removed from consumers, essentially

12   what we call and what we've said to be making us insurers and

13   guarantors of what merchants do in a sea of literally

14   millions of merchants that are processing hundreds of

15   thousands, if not millions, of transactions every month,

16   every year.

17         So those are the big issues before you and they're the

18   ones that I think justify a little oral argument.

19         Now, what happens when you ultimately decide what the

20   standard is and how we're going to go with this is going to

21   have an impact.  Everything you do has some impact,

22   hopefully.

23         And in this situation the Bureau charged with protecting

24   consumers, if we adopt their standard, I can tell you right

25   now that that's going to add enormous cost to what is largely

1   an automated system and those costs are ultimately going to

2   be borne by consumers.  That's where it goes because we

3   aren't the ones out there dealing with the consumers.  We,

4   Global, are the ones providing that technology platform, that

5   infrastructure, as they've alleged in their complaint, to

6   make this pipeline work to get payment.

7        Moving to the issues, you know who we are, we've been in

8   here before.  But to give it a little context, we process 6.5

9   billion in payments a year.  We've got 1.5 million merchants.

10  In this case we're talking about two very small merchants,

11  there are six in the case but two that my client processed

12  for, and it is in a sea of other merchants.

13       As I've already said, we are four times removed from the

14  consumer.  You've got the consumer at the base level, then

15  you've got the merchants, then you've got our particular way

16  of doing business with independent service organizations,

17  then you've got Global up here at the top, which is

18  performing this automated function of providing the

19  technology platform.

20       There's no dispute about that, the complaint makes it

21  fairly clear that they know we have no consumer or even

22  merchant contact, for that matter.

23       Now, Rule 12(b)(6) and getting to the standards.  We

24  moved to dismiss on Count XIII and Count IX.  Let's take them

25  in that order.

1        Starting with Count XIII, in summary, as you well know,

2    they allege that Global knowingly or recklessly provided

3    substantial assistance in connection with this phantom debt

4    scheme that the merchants allegedly were involved in.  That's

5    paragraph 327 of the complaint.

6        What's before you is what in heck does "recklessness"

7    mean in this context.  And everybody agrees on both sides

8    that there is no case law addressing 5536 or 12 U.S.C.

9    5536(a)(3), so we've got to find that guidance somewhere.  So

10   where do we go?

11       The way we briefed it, as you know, is we went to what

12   we thought was the most developed area of law, and that was

13   under the Securities and Exchange Act of 1934.  And that act

14   says to be reckless the courts, at least in this circuit,

15   have held you've got to plead facts that shows an extreme

16   departure from the standard of ordinary care under

17   circumstances that were so obvious that the defendant must

18   have been aware of the fraud.  That's the *Mizzaro Home Depot*

19   case that we've cited in our memo on page 18.

20       Now, we said that's the standard, Judge, that we want

21   you to apply because that's the developed law in this area.

22       What does the CFPB say back?  They haven't debated that.

23   What they said is, Oh, that's pre-Dodd-Frank so it's

24   different now, it's different after Dodd-Frank and there is

25   no case post-Dodd-Frank.  And they cite the *SEC v. Apple* case

1   and say they didn't decide the issue but they didn't do

2   anything really either way.

3       Well, I would suggest to you if you look in the reply

4   brief, and while certainly not binding on you, the *Subaye*

5   decision out of the Southern District of New York in fact

6   applies the extreme departure standard and the so obvious

7   standard post-Dodd-Frank.  We still think it is the most

8   reliable precedent for you to look at in deciding what

9   recklessness means.

10      Now, in this case I believe that if you apply that

11  standard, the ones that we would adopt from the SEC case law,

12  that you are going to find that there is no extreme departure

13  in situations that were so obvious that my client must have

14  been aware that there was ongoing fraud.  I think the

15  complaint falls way short of that.  It falls way short of

16  that in a number of ways.

17      THE COURT:  Let me ask you this.  The argument is made

18  that, while you may be correct these are issues that a jury

19  ultimately -- that it's too early to make those decisions at

20  a motion to dismiss, perhaps not at a trial but perhaps at

21  summary judgment with the development of a record that

22  supports the arguments that you make, but at least at the

23  motion to dismiss stage they have alleged that you were

24  reckless and that you had knowledge and that these other

25  events occurred and therefore I shouldn't throw it out at

 1    this point; if you're going to prevail it should happen at

 2    the summary judgment stage or ultimately at trial.

 3         MR. BALDRIDGE:  That's an interesting question but it's

 4    interesting to me because, having practiced for 30 years,

 5    that's what everybody always says when they're defending

 6    against a Rule 12(b)(6) motion:  Oh, wait for summary

 7    judgment, there's more there.

 8         Well, let's look at that, though, let's look at what

 9    they say in this situation.  And I want to direct you to

10    paragraph 328 of the complaint.

11         First of all -- and this is an issue we'll get to

12    separately at the end that I want to bring to your

13    attention -- the allegation is against the payment

14    processors.  It's not against Global, it's not about conduct

15    of Global Payments; it's about the payment processors.

16         And I've spoken with each of the payment processors'

17    counsel and I think each of us is more than willing to defend

18    our clients' actions, but we have a right after over a year

19    investigation by the federal government to know specifically

20    what they say we did so we can defend against it.  The

21    complaint is deficient in that regard standing alone because

22    it lumps us together.

23         Then 328 says, well, Global, because they're one of the

24    payment processors, enabled merchants to accept debit or

25    credit cards.  Well, somewhere four times removed, I suppose

1    there may be some truth to that.  Is allowing merchants to

2    accept debit and credit cards even a plausible allegation of

3    an extreme departure so obvious that the fraud must have been

4    known?  No, it's not.

5        Two, they say we legitimized the merchants.  Well, you

6    know what?  If you're a landlord and you give a merchant a

7    building that's going to be there day after day, you've

8    legitimized the merchant.  To me, that is not an extreme

9    departure type of allegation, right on the face of the

10   complaint.

11       We make transactions easy.  So does cash.  Cash makes

12   transactions easy.  It's not an extreme departure.

13       And we enabled merchants to accept payments from

14   consumers.  That's what we do.  We don't deny that somewhere

15   in this long chain of people that's exactly what we do.  But

16   none of this comes even close to establishing an extreme

17   departure from the standard of ordinary care.

18       Now, this leads us, though, into the second question

19   you're asking, and that's really the Rule 9(b) stuff.  And

20   it's an interesting thing because I'm sure you're well aware

21   in the *Hanna* decision your fellow judge Totenberg had looked

22   at the issue and said that Rule 9(b) doesn't really apply

23   here.

24       There's two problems with what she did and why I would

25   encourage you to look at this a little differently.  And the

1    first one is really not a problem.

2        If you go to pages 53 and 54 of her opinion, she

3    analyzes the situations in which Rule 9(b) apply and it's

4    basically about protecting reputations when fraud allegations

5    are made such that a party should be entitled to more clarity

6    as to what they allegedly did.

7        But in the *Hanna* decision Judge Totenberg did not have a

8    situation where there were allegations right on the face of

9    the complaint of fraud.  She had the situation where there

10   was what I would call a mortgage foreclosure mill that wasn't

11   really disclosing that they were not looking behind the

12   content of affidavits or perhaps lawyers were not pursuing

13   it, and she said that's not a fraud situation and that

14   doesn't meet the eight-part standard of *Wright & Miller* for

15   deciding whether Rule 9(b) should apply, which is on -- in

16   her opinion.

17       The second point I would say is then she leaps and she

18   says -- and this is where I think it was a problem -- that

19   there's been no circuit that's actually applied Rule 9(b) in

20   the Consumer Protection Act scenario.

21       Well, respectfully to the judge, she's just wrong.

22   *Kearns v. Ford Motor*, 567 F.3d 1120, in the very

23   consumer-friendly Ninth Circuit in 2009, applied Rule 9(b)

24   standard, admittedly to a state Consumer Protection Act

25   situation.  And then you also have *Spaulding v. Wells Fargo*,

1    714 F.3d 769, Fourth Circuit, 2013, that does the same.

2    Those cases weren't briefed.

3         Now, what I wanted to tell you here is it's not all

4    about the particularity like we often see in fraud cases, the

5    who, what, when, and where.  To me, as we cut through all the

6    briefing and the lawyers going back and forth, it really

7    boils down to lumping.  You've got a lot of people in this

8    tent, including some people that are pretty far removed from

9    the actual conduct, including my fellow, the ISOs and us.

10        What is it that they think we did?  Rather than putting

11   us all three together, we have a right to respond and say

12   what facts do you have?  What plausible allegations can you

13   make against us under *Iqbal* and *Twombly* such that we can

14   defend, rather than just generally saying you legitimized

15   these guys, you have a right to see chargebacks, without even

16   explaining what chargeback we saw and rejected.

17        You have policies.  Well, what policy did we violate?

18   You know, we have a right to know that.

19        So taking *Hanna*, both acknowledging that *Hanna* was not a

20   fraud case and that truly the couple of cases were missed in

21   making that broad, sweeping statement, I think at a minimum

22   they've got to replead under 9(b) and let us know what we did

23   and delump, if you will, or unlump the various payment

24   processors.

25        Now, quickly getting to substantial assistance, which is

1   a second part of the 5536 claim, what is substantial

2   assistance?  Well, it really means there's got to be a

3   substantial link between the assister, if you will, and the

4   resulting harm.  Whether or not proximate cause is required,

5   nobody seems to know; it goes back and forth.

6        Now, what we do know, though, is if we apply the *Apuzzo*

7   decision, again borrowing from the SEC case law, that one

8   element of what constitutes substantial assistance is grossly

9   missing from the pleading in this case, and that is that the

10  assister must participate in something that it wished to

11  bring about.  That it wished to bring about, that's pages 212

12  and 213 of *Apuzzo.*

13       No one is ever going to allege that Global Payments

14  intended to bring about what allegedly happened to these

15  consumers as a result of the conduct of the merchants.  That

16  in and of itself, if you adopt the SEC standards, means

17  substantial assistance has not been alleged.

18       What does the CFPB say back?  Well, he says, well, these

19  folks -- lumping them all together again -- they played a key

20  role.  That's what they say, they say they played a key role,

21  and that's on page 14 of the opposition.

22       Well, there's no such thing as the key role standard and

23  they're certainly not -- that's certainly not alleged in the

24  complaint itself, which is what you have to focus on as

25  opposed to what they say in the briefs.

1        So for those two reasons, taking the 5536, the bottom

2   line is if you apply the SEC case law the pleading fails; it

3   does not plead sufficiently what we did.  You add to it

4   Rule 9(b), it lumps us together so we don't know what we did

5   in a situation where fraud is definitely alleged, unlike in

6   the *Hanna* case.

7        Very quickly on unfair acts and practices, which is

8   Count IX, the whole issue here really boils down to did we

9   inflict some substantial consumer injury.

10       Now, you have to decide whether there's plausible

11  allegations with this many links between the consumer and

12  Global Payments, performing a largely automated process,

13  whether there's sufficient allegations of substantial

14  consumer injury caused by our conduct.

15       I would suggest that when you're four parties removed,

16  when you're providing an automated technology platform, when

17  there's no evidence whatsoever, or even an allegation, I

18  should say, that we knew of the fraud, I really don't know

19  how you could establish substantial consumer injury that

20  remote on the face of this pleading.

21       Do you have any questions?

22       THE COURT:  No, sir.  Thank you.

23       MR. BALDRIDGE:  Thank you very much for your time.

24       THE COURT:  All right.  Let me hear from the plaintiff

25  and then I'll do the other defendants and we'll move it that

1    way so that you can directly address the issues raised.

2        MR. ENGEL:  Thank you, Your Honor.  Good morning,

3    Jonathan Engel on behalf of the Bureau, Your Honor.

4        In April, as you know, this Court found that the

5    Consumer Financial Protection Bureau is likely to succeed on

6    the merits of its claims against certain individuals and

7    entities for their role in a phantom debt collection scheme.

8        And we alleged that these debt collectors took millions

9    of dollars from consumers, money to which they had no

10   legitimate claim, based on threats they used to obtain

11   authority or without obtaining consumers' authority at all.

12   They were able to access these consumers' bank accounts

13   because they had the help of Frontline, Pathfinder, and

14   Global.

15       I want to touch on the unfairness piece just because

16   that's that what was left lingering first and then, of

17   course, I'll address their concerns with regard to

18   substantial assistance.

19       We've alleged that Frontline, Pathfinder, and Global

20   each knew of the risk of processing for debt collectors.

21   These debt collectors fell into three categories that

22   required heightened scrutiny:  A, they were debt collectors;

23   B, they were aggregators; and, C, they were card-not-present

24   merchants.

25       Despite falling into each of these three categories,

1    Frontline, Pathfinder, and Global ignored their policies and

2    procedures at the underwriting stage and at the monitoring

3    stage and allowed them entry into the payment processing

4    system and then allowed them to access consumers' bank

5    accounts.

6         And their failure, Frontline, Pathfinder, and Global's

7    failure to adequately or meaningful underwrite and monitor

8    these accounts amounts to an unfair act and we also allege

9    that it substantially assisted the debt collectors' primary

10   violations.

11        THE COURT:  Let me ask you, because you have put

12   Frontline, Pathfinder, and Global together in your discussion

13   here, and as counsel pointed out, that lumping gives him

14   pause, and I know from their briefing they suggest that there

15   should be a very clear demarcation between them and those two

16   entities, that you've gone another step up the chain, I

17   guess, when you get to them and they have, as I recall from

18   their briefing, there were things in place that caused them

19   to believe Frontline and Pathfinder would provide some

20   protection for them from crossing over lines.  And so you've

21   said they knew they were dealing with debt collectors and so

22   forth.

23        While you've alleged that, you've alleged against the

24   group and the suggestion is made if you broke it out into the

25   individual defendants, I hear Global arguing you couldn't

1   allege that as to us legitimately.  How would you respond to

2   that?

3       MR. ENGEL:  So we have broken out with respect -- and

4   the count indeed does group the payment processors together.

5   But the body of the complaint, the substance of the

6   allegations, breaks out each, Frontline, Pathfinder, and

7   Global, and sets forth their particular role in the scheme.

8   And I can go through if you would like just to highlight a

9   couple of the paragraphs or the facts that we've alleged that

10  we believe establishes that Global had actual knowledge and

11  we can infer that Frontline and Pathfinder had actual

12  knowledge as well.

13      Most importantly, Your Honor, Global possessed and

14  had -- and we allege processed -- and had a duty to

15  investigate chargeback complaints.  And we set forth in our

16  complaint a handful of those allegations and those -- rather,

17  those complaints.  And those complaints are sworn affidavits

18  from consumers that describe a fraudulent scheme in great

19  detail and in great consistency and in a very similar fashion

20  to which it's alleged in our complaint.

21      So we've also alleged that Global had -- in effect the

22  ISOs had a duty to identify fraud and investigate consumer

23  chargebacks.

24      So Global either fulfilled that duty, investigated these

25  chargebacks, and recognized that there was fraud; or they

 1    fulfilled -- or they didn't fulfill that duty and

 2    demonstrated an extreme departure from the ordinary standard

 3    of care and were therefore extremely reckless.  And I'll get

 4    to the recklessness piece in a minute.  But we have

 5    sufficiently alleged, we believe, that they had actual

 6    knowledge or at least extreme recklessness.

 7        With respect to Frontline and Pathfinder, this Court can

 8    infer from atypical business transactions that an entity had

 9    actual knowledge or was extremely reckless.  And we allege

10    that the departures from the underwriting standard by

11    Frontline and Pathfinder, and indeed by Global as well, show

12    an extreme departure from a standard of care.

13        Each of these entities, Frontline, Pathfinder, and

14    Global, recognized the extreme risk that they were

15    undertaking here and each of them ignored those policies and

16    procedures or consciously avoided the knowledge that was

17    acquired when they did follow those procedures, and that

18    demonstrates extreme recklessness and knowledge.

19        And that's just at the underwriting stage.  At the

20    monitoring stage -- now, Global says in its brief that it was

21    the ISOs and not Global that were closest to and ultimately

22    responsible for the behavior of the merchants, including

23    these debt collector merchants.  Frontline says it was

24    Global, not Frontline, that undertook a duty to provide

25    ongoing credit review and to handle chargebacks.

1     The Bureau has alleged that Pathfinder and Global

2 identified that Universal, for example, was processing

3 payments for another debt collector.  Global notified

4 Pathfinder that various card networks were terminating these

5 merchants, yet Global and Pathfinder continued to process

6 payments for those merchants.

7     We've alleged that Pathfinder received an industry fraud

8 alert.  We've also alleged that Global and Frontline were

9 required to consult that same network that provided the alert

10 and therefore we could infer that they had the same

11 knowledge.

12     We've alleged that Global and Pathfinder ignored high

13 chargeback rates that by their own admission signaled

14 suspicious activity.

15     But, again, most importantly, we allege that Global

16 possessed these consumer complaints that described this

17 fraudulent scheme which Global had a duty to investigate and

18 either investigated and identified the fraud and ignored it,

19 or they didn't fulfill their duty to investigate and

20 demonstrated an extreme departure from the standard of

21 ordinary care.

22     I want to address more directly your questions about

23 substantial assistance and the appropriate standard here.

24 And as I said, we believe that we have satisfactorily alleged

25 knowing or extreme recklessness.

1       But we also argue that that is not the appropriate

2   standard here.  The Dodd-Frank Act specifically uses the term

3   "recklessness."  And we have to presume that Congress knew

4   the content of existing law and where they know how to say

5   something but choose not to, their silence is controlling.

6   They could have very easily said "severely reckless"; they

7   chose the term "recklessness" and that is the term that

8   controls or should control this Court's interpretation of the

9   statute.

10      We clearly satisfy the recklessness standard.  And the

11  conventional understanding of recklessness is a known risk of

12  harm and a precaution -- and the precaution that would

13  eliminate the risk involves a slight burden relative to the

14  risk such that failure to adopt that precaution demonstrates

15  an indifference from the risk.  And that at least is what we

16  have here.

17      Again, these debt collectors were subject to a

18  heightened or a -- a heightened level of scrutiny all along

19  the way by Frontline, Pathfinder, and Global; yet, they were

20  allowed to access, they were allowed through the gateway into

21  the payment processing network and they were allowed to stick

22  their hands into consumers' bank accounts, which is

23  effectively what happened here.

24      We've alleged certain instances where consumers

25  expressly denied authorizing the debt collectors access to

1    their accounts, and certainly in those instances these debt

2    collectors couldn't have taken money from consumers absent

3    the substantial assistance of these payment processors.

4         And Global seems to confuse the three prongs, if you

5    will, of the substantial assistance standard.  We have that

6    it's unlawful for a person to knowingly or recklessly provide

7    substantial assistance, so we have to have a primary

8    violation.  And this Court has already found the likelihood

9    of success on the merits of the primary violation.  There

10   seems to be no dispute about that piece, at least for our

11   purposes here today.

12        The second piece is the knowing or reckless piece.  And

13   as I've said, we believe we satisfactorily met the pleading

14   standard for each of those pieces.

15        And Global says that the fact that we enabled merchants

16   demonstrate -- doesn't demonstrate an extreme departure from

17   a standard of care, but that isn't what we've alleged.  We've

18   alleged that they had knowledge and that they're enabling

19   merchants to access consumers' bank accounts and that's

20   substantial assistance.  So we have to look at their

21   knowledge and their assistance separately.

22        And with respect to the application of *Apuzzo*, which

23   seems to be the standard, it's a case that all parties have

24   cited and it's certainly relevant to the questions before the

25   Court today, but it's, of course, a Second Circuit case that

1  applies a standard to securities fraud that predates the

2  amendment of the Dodd-Frank Act.  So it's of minimal

3  controlling value.  With that said, we agree that it is

4  relevant.

5      We also maintain that we've met the three-prong

6  substantial assistance standard set forth in *Apuzzo*, that is

7  that Frontline, Pathfinder, and Global in some sort

8  associated themselves with a venture and they did that by

9  taking on these merchants as clients and to do that they

10 ignored their own underwriting standards, again to take on

11 these merchants as clients.

12     They also participated in this -- in the transaction as

13 something they wished to bring about.  And we don't suggest

14 that a big company, a big legitimate company like Global

15 intended consumer harm here.  But we do allege that Global,

16 Frontline, and Pathfinder wished for these debt collectors to

17 be successful clients of theirs.  They wanted these merchants

18 to succeed and they were indifferent to the fact that that

19 success may harm consumers.

20     They ignored signs and categorized merchants in a way

21 that would allow them access to the system, where if they had

22 followed their own policies and procedures that would not

23 have happened.  They sent them gift baskets.  They allowed

24 them to continue processing despite red flags all along the

25 way that they were facilitating suspicious activity.

1          But the *Apuzzo* standard does not control and the reason

2     that it doesn't control is that it applies a criminal

3     liability standard that requires a level of specific intent

4     that is incongruent with a substantial assistance

5     recklessness standard.  One cannot recklessly wish to assist

6     a fraud.

7          Recklessness, again, is the term that Congress chose to

8     use and the courts that have applied a severe reckless

9     standard have applied it as a substitute for knowledge, not

10    as a substitute for reckless.  No court has yet applied

11    recklessness.  No court has applied any substantial

12    assistance law under Dodd-Frank -- or rather the CFPA, but

13    under the Exchange Act or the CFPA no court has applied a

14    recklessness standard and discussed whether mere or simple

15    recklessness suffices to establish substantial assistance.

16    So we don't believe that standard applies here.

17          With respect to the 9(b) pleading standard, I want to

18    note that even under a 9(b) standard, knowledge may be there

19    generally and we feel like we've exceeded that standard.

20          I also note that while Global argues that we haven't

21    identified the chargebacks and the policies that were

22    violated, to the contrary, we've specifically identified

23    chargebacks and in fact quoted those chargebacks in the

24    complaint and we specifically identified policies, namely the

25    policy to investigate chargebacks.  Those are the facts that

1   we specifically alleged, among others, that satisfy the 9(b)

2   pleading standard.

3        THE COURT:  Is it your view that the 9(b) standard is

4   the proper standard to apply to the fraud claim?

5        MR. ENGEL:  It is not, Your Honor.  We think that the

6   reasoning in the *Hanna* court, among other courts that have

7   applied the CFPA, because this is a Consumer Protection Act,

8   which is not securities fraud we're talking about here, our

9   goal here is to protect the least sophisticated consumer, not

10   the reasonable investor, and for those reasons, along with

11   those cited by *Hanna,* we believe that 9(b) is not the proper

12   standard.  Nonetheless, we do believe that we've met that

13   9(b) standard.

14        THE COURT:  Okay.

15        MR. ENGEL:  If the Court has no further questions let me

16   just say in closing that it is our position that Frontline,

17   Pathfinder, and Global each knew the risk of taking on these

18   debt collector clients and they now seek impunity, despite

19   the fact that this foreseeable risk has resulted in

20   foreseeable harm for thousands of consumers.  And for that

21   reason we ask that you deny the motions, Your Honor.

22        THE COURT:  Thank you.  I'll give you about three

23   minutes.

24        MR. BALDRIDGE:  Very briefly, Your Honor.

25        I was confused because counsel encouraged you to not

1    consider *Apuzzo* out of the Second Circuit, but *Apuzzo* is the

2    standard they cited in their TRO proceedings that he started

3    his presentation with.  So I think it's pretty clear that the

4    parties, when it serves their interest, like the *Apuzzo*

5    decision.  And incidentally, that TRO, of course, has no

6    impact on Global.  We weren't subject to that; the Court made

7    no findings about Global.

8        Getting to the Rule 9(b) issue very quickly, counsel

9    told you that, well, when you get to the body of the

10   complaint we give you specifics, and he mentioned some of the

11   things he said.

12       Well, if you start on page 26, even the title lumps the

13   payment processors together.  Almost every paragraph starts

14   with "The payment processors did this" or "The payment

15   processors did that."

16       Then you get to 151, which is the most important

17   paragraph of this section, quote:  "By granting access by the

18   debt collectors and other persons who collect debt to this

19   payment processing infrastructure, the payment processors

20   enabled them to quickly, conveniently, and efficiently

21   collect consumer payments."

22       Well, what do we do?  They're clearly lumped all the way

23   through this pleading.

24       And then when you get to the issue of approval of

25   applications, again they lump the payment processors

1    together, saying certain applications were approved through

2    these merchants with whom we do not have a commercial

3    relationship.  And I would like to know if they can even

4    identify one that we approved.  That's 164, if you look at

5    paragraph 164:  "Although the payment processors classify the

6    debt collectors as high risk, the payment processors approve

7    debt collectors' numerous applications."  Name one.

8        This is a Rule 9(b) issue, they are saying we are part

9    of a phantom debt collection fraud situation.

10       Okay.  Counsel started out that we knew the risk of

11   processing for the debt collectors.  Well, there's no

12   allegation that we knew who the merchants were.  There's no

13   allegation that we knew there was a fraudulent scheme.  In

14   fact, counsel already said we didn't intend to bring about

15   this harm.  That's right, we're four times removed from it

16   and we're providing this infrastructure.

17       Chargebacks, very carefully, there's got to be plausible

18   allegations about the chargebacks.

19       Duty to investigate a chargeback.  A chargeback when it

20   comes, and we send down the pipeline to the merchant, if the

21   merchant doesn't contest that chargeback there's nothing to

22   investigate.  Our duty is not to investigate fraud; our duty

23   is to make sure the consumer gets their money back through

24   the pipeline.

25       These merchants never challenged a chargeback.  There's

1   no allegation that a chargeback was ever challenged.  So the

2   duty to investigate, it is not our job to become the CFPB and

3   do their job for them.  No consumer lost in the situation of

4   a chargeback because the merchants, for whatever reason, were

5   smart enough not to challenge those when they came back down

6   the line.

7        So in closing, we would really like to know what it is

8   they think we did.  We think Rule 9(b) does apply and we

9   think after a year and a half of spending taxpayers' money to

10  investigate this thing that we ought to get a complaint that

11  says Global did this, Frontline did this, Pathfinder did

12  this, so we can figure out what the allegations are.  Thank

13  you.

14       THE COURT:  Certainly to the extent they apply to your

15  argument I'll allow you to adopt, you don't have to replow

16  ground, I'll allow you to adopt any arguments that have been

17  made, but I'll hear from you in addition.

18       MS. KANSKI:  Thank you, Your Honor.  Kirstin Kanski on

19  behalf of Frontline Processing.

20       As you know, Frontline is one of the independent sales

21  organizations along with Pathfinder, and therefore I intend

22  to just limit my remarks to the ISOs because it is a

23  significant distinguishment.

24       And I agree with everything Mr. Baldridge said on behalf

25  of Global.  One of the fatal flaws, if not the fatal flaw, to

1   the way the CFPB chose to plead its claims was its complete

2   disregard of the various roles of Global and its ISOs.

3       And I'll direct the Court's attention to paragraph 84 of

4   the complaint where the CFPB acknowledges that with respect

5   to Frontline, my client, an ISO, under its MSA with Global,

6   Frontline agreed to market services and prescreen merchants

7   for compliance.  And that's it.

8       Otherwise, Your Honor, with respect to the rest of the

9   complaint and the allegations there are no specific

10  allegations that would have put Frontline on notice of any of

11  the fraudulent activity.  At most, at the absolute most with

12  respect to Frontline, paragraphs 196 to 218, detail two

13  merchant applications that are in the record that Frontline

14  received prescreened and forwarded on.

15      There is no allegation that would put Frontline on

16  notice of fraudulent conduct or any wide-reaching phantom

17  debt operation at the time it received those applications.

18      I also want to specifically call the Court's attention

19  to the difference in time because Global and Pathfinder were

20  operating with these merchants for more than two years before

21  Frontline even came into the picture.  So that might be one

22  plausible reason why there's simply no specific factual

23  reference of any indication of fraud that Frontline could

24  possibly have been on notice of.

25      I also want to just specifically highlight a few

1    critical distinctions with respect to my client, Frontline,

2    as an ISO.  Its relationship is only with Global.  The

3    services it provided were to Global pursuant to a contract.

4    It was marketing Global's payment processing services to

5    merchants, to commercial entities.

6         There is no connection to consumers directly.  And if

7    Global is four times removed from the actual consumers and

8    the payment processing and the consumer transactions, the

9    ISOs, as sales representatives of Global, are just as much,

10   if not more removed from the actual consumer transactions

11   themselves.

12        And with respect to violations of policy, because the

13   CFPB keeps coming back to this point, I want to be sure the

14   Court is clear, because the record and the complaint is,

15   Frontline did not violate any policy because Frontline --

16   debt collection was never a prohibited practice for Frontline

17   and the CFPB acknowledges as much.  So there's no allegation

18   that Frontline violated any policy with respect to its own

19   underwriting or Global's.

20        With respect to the chargeback process, that process was

21   handled entirely and its alleged entirely to be within

22   Global, the payment processing transactions are by Global.

23   And, again, Frontline, as simply a sales representative of

24   Global, is outside of that process entirely.

25        So to the extent counsel for the CFPB has emphasized the

1    scant facts it has come up with that would put any of these

2    three parties on notice of any fraud, Frontline is outside of

3    that box entirely.

4         With respect to the distinctions between Pathfinder and

5    Frontline's MSAs, we've extensively briefed those so I don't

6    plan to spend much time on those at all today.  But the two

7    main distinctions was, number one, Frontline has no

8    contractual obligation to monitor.  Under the Frontline MSA

9    that was not Frontline's role, that was not Frontline's

10   obligation.

11        And with a substantial -- with respect to the 530 --

12   5336 claim and substantial assistance, I think that a

13   critical point, Your Honor, is that the statute plainly reads

14   "knowingly or recklessness provides substantial assistance in

15   violation of 5531."

16        The *Apuzzo* case in the Second Circuit standard and Judge

17   Hand's standard are the most applicable.

18        And when the Court looks to the actual fraud that is

19   alleged to have occurred here, it is detailed at 94 to 143 of

20   the complaint, the actual fraudulent conduct by the debt

21   collectors that is alleged has nothing to do with the

22   submission of the application to be approved by Global or

23   Frontline to be able to participate in the system.  So there

24   is simply no pleaded connection by Frontline with the

25   involvement of any of the underlying fraud.

1      And lastly, with respect to the unfair practices, Your

2  Honor, again, telling in the CFPB's opposition paper, we have

3  detailed to the Court why the ISOs are not covered persons or

4  service providers.  The only response is this phrase we

5  "played a key role in the network."

6      Well, that falls fall short, doesn't even come close to

7  meeting the statutory criteria to be subject to liability.

8      And with respect to an unfair practice committed by

9  Frontline, I would just join in the arguments that

10  Mr. Baldridge has eloquently stated.

11      And unless there's further questions with respect to

12  Frontline or the ISOs --

13      THE COURT:  Thank you.

14      MS. KANSKI:  Okay, thank you.

15      MR. BALDRIDGE:  I believe I left some paper behind.

16      THE COURT:  Do you want to respond now or do you want to

17  wait?

18      MR. ENGEL:  I think it would be easier if I just wait.

19      THE COURT:  Okay.

20      MR. SMITH:  Good morning, Your Honor, John Smith on

21  behalf of Pathfinder.

22      Your Honor, I think it makes sense to maybe start with a

23  little bit of an understanding of what actually happened and

24  I think my colleagues have provided a good analysis of some

25  of the legal standards and requirements that apply, but I

1    think it's important that maybe the Court understand a little

2    bit about what actually happens on the street in real life

3    with these transactions.

4         First of all, the complaint at two defines, the second

5    page, defines Global, Pathfinder, and Frontline, and calls

6    them payment processors.

7         I submit to the Court that there is only one payment

8    processor in the room right now and that's Global.

9    Pathfinder does not process payments for anybody.  Pathfinder

10   does not process anything.

11        Pathfinder is an ISO, which is an independent sales

12   organization, that currently has eight employees full time.

13   The ISO has an agreement and a contract with Global and that

14   agreement provides that the ISO, in this instance Pathfinder,

15   will market Global's merchant processing services.  So

16   Pathfinder will market the services of the payment processor;

17   it's not actually a payment processor.

18        Pathfinder then often has independent sales agents, a

19   step below Pathfinder.  So Pathfinder works through

20   independent sales agent to go out and find merchants that

21   might need the assistance of running a credit card, for

22   example.

23        The sales agents then identify merchants.  So Your Honor

24   may think that the sales agent could see a new flower shop

25   that opens, think that that flower shop may want to take

1   credit cards, knock on the door, go in and see if that's

2   something they would like to do; and, if it is, then the

3   individual sales agent will then have paperwork that gets

4   filled out by the potential merchant.  That paperwork is then

5   given back to Pathfinder.  Pathfinder does some checks.

6         And I think it's important when the Court hears the CFPB

7   talk about these duties, these duties, we need to know where

8   they're coming from.  They have a duty to do this and a duty

9   to do that.  Where is that duty coming from?  Is it coming

10  from a statute?  Is it coming from the case law?  Where is

11  it?

12        Well, I can tell the Court that with respect to

13  Pathfinder and Global, there is a contract.  So we can point

14  to that, at least, for what the obligation is.  And what does

15  Pathfinder do?

16        Well, Pathfinder prescreens and underwrites for credit

17  purposes for Global's benefit.  So the merchant fills out the

18  paperwork and Global prescreens that and underwrites it for

19  the benefit of Global.

20        So what are the types of things that Pathfinder looks at

21  with a company of eight employees?  Well, they look to make

22  sure that the merchant has a business license, for example.

23  So in this instance, the state of Georgia would have issued a

24  business license for a flower shop and Pathfinder would rely

25  on the fact that there's a business license issued for this

1   flower shop in this example.

2       They also want to make sure that the flower shop would

3   have a business account.  So they'd get some submission that

4   shows we have a bank account and it's in the name of the

5   flower shop.

6       They'd want to make sure that if they described it as a

7   flower shop on the application, that the thing is indeed a

8   flower shop and not selling doughnuts.  So they check and

9   make sure, okay, it is in fact a flower shop.

10      Then they may do a background check on some of the

11  individuals and they're basically determining

12  creditworthiness.

13      They're not a regulatory body.  They're not going in to

14  the flower shop to determine if when they sell roses they're

15  really selling tulips.  They don't have that power and they

16  don't have that capacity; they can't do that.  They can look

17  at the documents and the materials that I just identified and

18  at that point if Pathfinder determines, okay, well, they have

19  a business license, they have a business bank account, it

20  says flower shop, it is a flower shop, and you've looked at

21  their transaction volume, we think we're going to go ahead

22  and recommend that to Global.

23      And that's the other piece of it, Your Honor.

24  Pathfinder doesn't set this in stone.  Pathfinder then

25  submits the package to Global.  And if Global accepts it --

1 for which Global has the right solely in its discretion to

2 reject any merchant that Pathfinder would provide.  Well,

3 Global can look at the application, and in this instance of

4 the flower shop we talked about, but in this instance what

5 we're here about today, they would see that it is a debt

6 collector and they would see all the details that were laid

7 out in the application and then Global would evaluate that.

8   And if Global looks at that and decides, you know what,

9 I think we're going to accept this as a merchant, so

10 according to the merchant services agreement between

11 Pathfinder and Global, if Global accepts that it becomes a

12 merchant.

13   So, again, when we're looking at duties, we're looking

14 at duties flowing from statutes and from law and maybe from

15 contracts.

16   Well, so far we've identified one contract and that's

17 the merchant services agreement between Global and

18 Pathfinder.  Well, if Global reviews it and decides, you know

19 what, we're going to accept it, Global enters into a contract

20 directly with the merchant.  That contract does not involve

21 Pathfinder or any of the ISOs.  Pathfinder is not a party to

22 the agreement.

23   So in this instance, if Global accepted the flower shop,

24 Global would have a new contract and that contract would be

25 between Global and the flower shop.

```
 1        So at that point the ISO, the independent sales
 2    organization, has completed the front end of its
 3    responsibilities.  It had a sales agent go out, knock on the
 4    door of a prospective business, determine that they may need
 5    some credit card processing, ask them to fill out an
 6    application, did some checks that an eight-employee company
 7    could do, such as looking and making sure they have a
 8    business license and they have bank accounts, provided that
 9    to Global, which is the, you know, the -- processes 400
10    billion transactions worldwide and has all the
11    infrastructure.  Global approves it; Global enters into a
12    transaction with the merchant.
13        The merchant then, when customers come and present their
14    credit card or they call them with a credit card number, the
15    merchant then swipes that number through some portal and then
16    that information and data gets sent directly to Global.
17        Pathfinder was an independent sales organization; it
18    sold the product.  And now when -- the point of sale, credit
19    cards come in, all that goes directly to Global.  So this is
20    all between Global and the merchant.
21        Now, Pathfinder's done its job.  It did the
22    underwriting, it provided it, it got approved, and then
23    Pathfinder will make a fee off of the transactions generated.
24    And Pathfinder, of course, has to pay a commission to the
25    sales agent that knocked on the door of the flower shop and
```

1    then Pathfinder gets to keep a little bit more and then

2    Global keeps the rest and that's how the actual transactions

3    work.

4        In this instance Pathfinder, other than the front-end

5    obligation, Pathfinder had an obligation to monitor the

6    merchant process.  So Pathfinder had, as between Pathfinder

7    and Global, there was a separate relationship defined in that

8    same agreement, the merchant services agreement.  So

9    Pathfinder had in the merchant services agreement a duty to

10   Global to monitor merchant processing activity to detect

11   fraud and risk issues.

12       Well, what was it looking at?  Well, Pathfinder doesn't

13   have Global's infrastructure.  The transactions aren't going

14   anywhere with Pathfinder; the transactions are going between

15   the merchant and Global.

16       Well, Pathfinder has limited access to Global's systems

17   for the purposes of looking at certain things.  Like, for,

18   example, chargebacks.  And if there was a, you know, a huge

19   amount of chargebacks there are certain lists that the

20   merchant could get placed on, because, as the Court can

21   understand and is seen in the briefing, if you have 1 percent

22   or 2 percent of chargebacks over time with thousands of

23   transactions and suddenly you only have ten transactions and

24   two chargebacks, you go, oh, my gosh, it's 20 percent, you

25   guys should have gone out and investigated the flower shop.

1   Well, that's because there was ten transactions, not

2   thousands, and that's why the banks, Visa and Master Card,

3   they have certain different rules and requirements that could

4   get people put on lists if there's problems.

5       So Global and Pathfinder at that point, Pathfinder would

6   look and if they see something that's unusual they would

7   either bring it to Global's attention or take steps to do

8   something about it, because if there are chargebacks that

9   don't get paid, in this relationship Pathfinder's obligated.

10      So what is Pathfinder doing?  It's assessing the credit

11  risk up front and making sure then that it sends up an

12  application that's completed for Global to approve.  And then

13  as the processing goes on, with Pathfinder's limited access

14  to Global's systems, it can actually look and see if there's

15  chargebacks and other things that might cause concern or

16  other reporting agencies, and then if it's so let them know.

17      And Pathfinder has an interest in doing that because if

18  there are chargebacks that aren't paid they're going to be

19  liable for it at the end and they have to pay for it.  That's

20  it.

21      So with that obligation of this eight-person company and

22  one contract, which is a contract between Global and

23  Pathfinder, and then Pathfinder's independent sales folks

24  that have gone out knocking on doors, the agreement between

25  the merchant and Global, and then Pathfinder's limited

1    obligation to Global to follow up and see if there were any

2    issues that could cause credit problems, the CFPB would seek

3    to take that agreement between Pathfinder and Global and

4    impose on Pathfinder a superregulatory obligation to

5    investigate and root out fraud at the merchant level.

6         So I would submit to the Court that if this was the

7    flower shop, if the flower shop was selling flowers that it

8    represented were from some country but they were from

9    another, how would Pathfinder know that?

10        And if customers started returning some of those

11   flowers, but as Mr. Baldridge pointed out, the merchant

12   returned the money, how would it know if anything was a

13   problem?

14        So it really causes one to think that if in fact

15   Pathfinder had a duty to go and find out what was going on in

16   this business, having simply sold, acted as a sales agent for

17   Global, it had a duty to follow up and make sure that what

18   was going on was legitimate, and if it doesn't it could be on

19   the hook for everything that somebody else did, just to me

20   doesn't seem right, Your Honor.

21        And realistically when you're looking at actually how

22   these entities work, it wouldn't be possible for an

23   eight-person ISO to do that.  It can't.

24        So then you say to yourself, well, I understand that

25   maybe practically speaking, but if the law says that, then

1    the law says that.

2         Well, I think we all can seek some solace in the fact

3    that the law doesn't actually say that.  When you read the

4    statutes and you see the exceptions about people that are

5    processing things in the regular course and people that

6    knowingly recklessly provide substantial assistance, when you

7    see those standards you understand you don't fall into this

8    obligation by mistake.

9         You know, we're in a federal courthouse with the

10   government down from Washington for a company that went out

11   and had a merchant and submitted a sales application to

12   Global.  And so you say, well, the cost, the expense to do

13   this -- and I submit to you, Your Honor, that *Apuzzo* was

14   decided in 2012.  In 2010 was the Dodd-Frank Act.  And in the

15   Dodd-Frank Act in the same spot where they had the

16   substantial assistance as it relates to the CFPA, they added

17   the substantial assistance in the security section.  And in

18   our brief we at least argued that the concept of *in pari*

19   *materia* would say that if you have a standard that's in one

20   portion of the Act and you also have a standard in the other

21   portion of the Act, that those standards should be

22   interpreted the same.

23        And the Second Circuit case in *Apuzzo*, that standard has

24   been followed by other courts, as laid out in our brief, and

25   if the Court were to apply a different standard, then the

1   same language that was added in one section of the Dodd-Frank
2   Act would have a standard less or different than the standard
3   added in the other section of the Act.
4       And we submit to the Court that there's, looking at the
5   Act, there's no reason to believe that the Court would
6   deviate from the concept of *in pari materia* and treat those
7   two sections any different.
8       So then when you take a look and say, well, what does
9   *Apuzzo* say?  Well, *Apuzzo* talks about aiding and abetting and
10  that's what the Act talks about, aiding and abetting, because
11  no one is contending that Pathfinder was actually calling
12  consumers or doing anything.
13      What it seems the CFPB is saying is that Pathfinder
14  should be on the hook for it.
15      Well, what does *Apuzzo* say?  *Apuzzo* says that in order
16  to do that the defendant in some sort associated itself with
17  the venture, participated in it as something it wished to
18  bring about, and it sought by its action to make it succeed,
19  689 F.3d 204, Second Circuit, 2012.
20      Well, when you look at that standard and you've looked
21  at the concern that I suggested with the fact pattern, it
22  makes sense because if Pathfinder assisted the debt
23  collectors with the venture, participated in it as something
24  they wanted to bring about, and sought by its actions to make
25  it succeed, well, that would seem to make sense that if they

1    could allege that that maybe there should be some aiding and

2    abetting liability.  But they can't allege that and they

3    didn't.

4         So you look at the standard that's in *Apuzzo* and say

5    that Pathfinder did not actually work with or in conjunction

6    with to make this happen.  What happens in the arguments and

7    what happens in the briefing is that we then move to, well,

8    you shouldn't use *Apuzzo*, you should use a different

9    standard.

10        Well, I would note for the Court that in the CFPB's

11   opposition paper there is no discussion about *Apuzzo* with

12   respect to that definition.  There is discussion about some

13   of the reckless language and whether the reckless language is

14   using a severe reckless and whether severe reckless was

15   before the Dodd-Frank Act, and then if Eleventh Circuit said

16   severe and then the Dodd-Frank said reckless, does that mean

17   it meant severe or didn't mean reckless?

18        But there's no argument in its opposition paper with

19   that definition that was determined by the Second Circuit as

20   it relates to substantial assistance.  And we submit to the

21   Court that that is the appropriate standard and it's already

22   been determined and therefore Count VIII as it relates to

23   Pathfinder as pled cannot stand.

24        In addition, Count IX talks about unfair acts or

25   practices.  Well, Pathfinder did not engage in any act or

 1    practice in connection with any transaction with a consumer.

 2    Pathfinder did not deal directly with the consumer.

 3    Pathfinder didn't call a consumer.  Pathfinder didn't sell

 4    anything to a consumer.  All Pathfinder did was send out an

 5    independent sales agent to knock on the door of the flower

 6    shop, get an application, return that application to Global,

 7    and then Global entered into an agreement directly with the

 8    merchant where -- in which it processed transactions that

 9    were run with the merchant.

10        So by definition there was no consumer transaction, no

11    processing of payments, no offering of a consumer financial

12    product.  And in addition, there's no aiding and abetting

13    liability for that particular section in Count IX.  And we

14    included law in our paper that shows that if there's not

15    aiding and abetting liability in a particular statutory

16    section, that the United States Supreme Court said that the

17    Court can engraft that in there.

18        So the Count IX is kind of a collapse of two different

19    sections but the idea of the unfair practice doesn't have an

20    aiding and abetting piece.

21        So we submit to the Court that there's no unfair

22    practice by Pathfinder because it wasn't involved in any

23    consumer transactions.

24        In closing, Your Honor, I just submit that the Court, as

25    it noted at the beginning, has before it issues of first

1   impression.  And in this case -- and the Court had asked a

2   question earlier at the beginning about why would we not wait

3   for summary judgment.  Well, to us this is kind of the gate

4   issue and if the standard allows the gates to go past this

5   phase it will be crushing to eight-person companies to have

6   to go through the discovery in a federal court and go through

7   all that process.

8        And if the Court were to determine that the standard is

9   such that merely doing what Pathfinder did as described, or

10  as the CFPB may argue, is enough, then the punishment is

11  happening.  The punishment is the process.

12       And in this instance, Your Honor, as it relates to the

13  question about summary judgment, Pathfinder already produced

14  over 21,000 pages of documents before we got here today and

15  submitted the depositions before we got here today.  So the

16  CFPB had a whole host of information to plead a case, where a

17  lot of times the government doesn't have that kind of

18  information to plead, a lot of times most plaintiffs or

19  litigants don't have that kind of detail.  But they had a

20  massive amount of discovery before they even filed in this

21  court.

22       So we'd submit to the Court that it's reasonable to

23  infer that whatever is in their complaint is what they've got

24  and I think that now is the time for the Court to decide

25  whether or not the standards are actually met by what was

1   pled.

2           THE COURT:  Thank you.

3           MR. SMITH:  Thank you.

4           MR. BALDRIDGE:  Your Honor, can I just literally have 15

5   seconds so Mr. Engel can respond all at once?

6           THE COURT:  If you can do it in 15 seconds --

7           MR. BALDRIDGE:  I promise you.

8           THE COURT:  -- but no more.

9           MR. BALDRIDGE:  Number one, we don't get all the money.

10  The card brands are involved.  I just want to take issue with

11  that comment that the majority of the money goes to us, just

12  so the Court doesn't have a misimpression.

13          Secondly, all we heard from both of them was who did

14  what, who does what.  That's why you can't lump people

15  together as payment processors under Rule 9(b), because

16  there's vast disagreement over who did what and does what.

17  Thank you.

18          THE COURT:  I'm not going to rule today so I'm going to

19  ask you to be brief because I've got folks who have been

20  waiting since 11:30 for their hearing that was set for 11:30.

21          MR. ENGEL:  I understand, I'll try to tick off some

22  points, Your Honor.

23          That last one first with respect to the group pleading,

24  where we've alleged that payment processors -- and we've

25  identified that term -- where we've alleged that payment

1    processors did certain acts, we've alleged that each of those

2    payment processors has done that act.

3         Where we've used Frontline, Pathfinder, and Global and

4    alleged facts as to that particular entity, in that case only

5    that entity we've alleged engaged in the alleged conduct.

6         With respect to the sky-is-falling, doomsday scenario

7    and how could we possibly have known what was going on here,

8    I'd like to point out, and I'll stick to the pleadings here,

9    paragraph 180 of the complaint which identifies a specific

10   instance that resulted in this MATCH alert where another

11   payment processor identified that Universal was engaging --

12   after their own investigation -- that they were engaging in

13   factoring in excessive chargebacks and that payment processor

14   terminated these merchants.  So I would point that out to the

15   Court for the point that it is in fact possible for them to

16   follow the policies and procedures to good effect.

17        And finally, I just want to address I guess generally a

18   causation question.  With respect to substantial assistance,

19   the courts, at least as best as I can recall, are consistent

20   and I know that *Apuzzo* and *Subaye* are consistent in finding

21   that for a substantial assistance claim proximate cause is

22   not required and the primary violators' foreseeable acts are

23   not superseding causes of fraud.

24        And I'll add to that as briefly as I can that numerous

25   courts, in addressing consumer protection law under the FTC

1   Act, have found the conduct similar to that we've alleged

2   here has caused consumer harm.

3        And I'll end with a quote that:  "One who places in the

4   hands of another a means of consummating fraud is himself

5   guilty."

6        THE COURT:  In terms of the standards, the argument was

7   made that their duties, the duties arise under a contract;

8   your argument would be that a duty also arises where?

9        MR. ENGEL:  That's the source of those duties, Your

10  Honor.  And we argue that those are not necessarily duties

11  that are owed to consumers but those duties establish a

12  standard of care.

13       THE COURT:  Thank you.

14       MR. ENGEL:  Thank you.

15       THE COURT:  Anything further?

16       MS. KANSKI:  No, Your Honor.

17       MR. BALDRIDGE:  No, Your Honor.

18       MR. SMITH:  No, Your Honor.

19       THE COURT:  Thank you all very much.  This has been

20  helpful to the Court and I appreciate your efforts of being

21  brief with those because I know you all could have said lots

22  more if given the opportunity.  I will take these matters

23  understand advisement.  We will be issuing an order after

24  we've studied it thoroughly.  You won't get an order in the

25  next week because I do think these are complex issues and I

1    do recognize that we're addressing some new issues and we

2    want to make sure that we get it right.  So we're going to

3    take the time we need to do that but we will be proceeding

4    with it.  It will be on a front burner because I like to do

5    it, when I've had an argument like this, while it's still

6    fresh with me, so we will be proceeding with these issues.

7         Thank you all for being here.  Those who traveled from

8    afar be safe going home.

9         (Proceedings concluded at 12:30 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT:

5    NORTHERN DISTRICT OF GEORGIA:

6

7              I hereby certify that the foregoing pages, 1

8    through 65, are a true and correct copy of the proceedings in

9    the case aforesaid.

10             This the 14th day of August, 2015.

11

12

                              /s/ *Amanda Lohnaas*
13                           ——————————————————————————

14                           Amanda Lohnaas, CCR-B-580, RMR, CRR
                             Official Court Reporter
15                           United States District Court

16

17

18

19

20

21

22

23

24

25