# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

CONSUMER FINANCIAL : 
PROTECTION BUREAU, : 
  : 
    Plaintiff, : 
  :   CIVIL ACTION NO.
v. :   1:15-CV-00859-RWS
  : 
UNIVERSAL DEBT & : 
PAYMENT SOLUTIONS, LLC, *et* : 
*al.*, : 
  : 
    Defendants. : 

## ORDER

This case comes before the Court on Defendant Pathfinder Payment

Solutions, Inc.'s Motion to Dismiss [89], Defendant Global Payments, Inc.'s

Motion to Dismiss [93], and Defendant Frontline Processing Corp.'s Motion to

Dismiss [97]. After reviewing the record and with the benefit of oral argument,

the Court enters the following Order.

## Background

The Consumer Financial Protection Bureau ("CFPB") brings this action

against numerous individuals and entities in connection with a massive debt-

collection scheme. The CFPB alleges violations of the Fair Debt Collection

AO 72A
(Rev.8/82)

Practices Act ("FDCPA"), 15 U.S.C. §§ 1692–1692p, and the Consumer

Financial Protection Act ("CFPA"), 12 U.S.C. §§ 5531, 5536(a).  According to

the CFPB, several individuals created limited liability companies in Georgia

and New York to perpetrate a debt-collection scheme targeting millions of

consumers.  These companies included, among others, Defendants Universal

Debt and Payment Solutions, LLC ("UDPS") and Credit Power, LLC ("Credit

Power"), both organized by Defendant Mohan Bagga (collectively, "Debt

Collectors").  (Compl., Dkt. [1] ¶¶ 13, 37.)

## I.  The Debt-Collection Scheme

The Debt Collectors made millions of collection calls to consumers in

attempts to collect debts the Debt Collectors were not in fact owed.  (Id. ¶ 94.)

The Debt Collectors threatened litigation and told consumers they needed to

settle the debt to avoid a restraining order or criminal prosecution.  (Id. ¶¶ 96-

97.)  When asked for information about the purported debts, the Debt

Collectors refused to identify the lenders but, by reciting the consumers'

personal information, including Social Security number, date of birth, and

place of employment, convinced consumers the debts were legitimate and were

owed to them.  (Id. ¶ 98.)  The Debt Collectors purchased that identifying

2

information from debt and data brokers.  (Id. ¶ 101.)  When consumers

provided their payment information, the Debt Collectors used payment

processors to withdraw funds from the consumers' accounts.  (Id. ¶ 100.)

Defendant Global Payments, Inc. ("Global Payments" or "Global") is a

payment processor that processed transactions for the Debt Collectors.

Payment processors "enable merchants to accept check, card, and electronic

payments at a point of sale."  (Id. ¶ 144.)  During a transaction, the card

information is captured by a point-of-sale terminal card reader and transmitted

to a payment network.  (Id. ¶ 147.)  Payment processors are sponsored by an

acquiring bank that is registered with one or more card associations, such as

Visa or MasterCard.  (Id. ¶ 148.)  They are also subject to the rules and credit

risk policies of the card associations.  (Id. ¶ 149.)

Two other companies, Defendants Pathfinder Payment Solutions, Inc.

("Pathfinder") and Frontline Processing Corp. ("Frontline") are independent

sales organizations ("ISOs") that entered into merchant services agreements

with a Global Payments subsidiary to market Global Payments' processing

services to merchants.  (Id. ¶¶ 80, 84.)  Pathfinder also agreed to review

potential merchants' creditworthiness, to underwrite the merchants, to monitor

3

processing activity to detect fraud and risk, and to advise Global Payments accordingly.  (Id. ¶ 80.)  Frontline agreed to prescreen merchants for compliance with Global Payments' credit criteria.  (Id. ¶ 84.)

The CFPB accuses Global Payments, Pathfinder, and Frontline (collectively, "Payment Processors")[1] of providing substantial assistance to the Debt Collectors' unfair or deceptive conduct (Count VIII) and of engaging in unfair acts or practices (Count IX).  The CFPB asserts that the Payment Processors "enabled [the Debt Collectors] to efficiently accept payments and convince consumers that they were credible merchants."  (Id. ¶ 146.) Moreover, these Defendants were required to follow policies and procedures to evaluate merchant creditworthiness and identify fraud.  (Id. ¶ 155.)  This is because payment processors face credit exposure given that merchants are paid quickly, while consumers' payments are provisional and may be reversed if a consumer disputes a charge, resulting in a "chargeback."  (Id. ¶¶ 152-53.)  If a merchant is unwilling or unable to fund the reversed transaction, the payment

---

[1]  Pathfinder and Frontline point out that ISOs do not actually process payments.  Keeping this distinction in mind, the Court nevertheless uses this term because the CFPB uses it in its Complaint to refer to Global Payments, Pathfinder, and Frontline.  The Court uses this term only as shorthand to refer to these three Defendants alleged to be involved in facilitating payment processing.

4

processor is responsible for the chargeback.  (<u>Id.</u> ¶ 154.)

Global Payments' credit policy, like the card networks' policies, identifies collection agencies as "prohibited merchants" that the ISOs were not to solicit and which required Global Payments' approval.  (<u>Id.</u> ¶ 157.)  Global Payments also prohibited "Aggregators," which are merchants who use their processing account to process payments for other merchants—a practice called "factoring."  (<u>Id.</u> ¶ 160.)  Defendants considered collection agencies to be high-risk merchants because they processed only "card-not-present" transactions. (<u>Id.</u> ¶ 162.)  Thus, Global Payments' policies required more scrutiny of card-not-present merchants.  (<u>Id.</u> ¶ 163.)  The CFPB alleges, however, that Global Payments, Pathfinder, and Frontline all failed to monitor the Debt Collectors' accounts for signs of unlawful conduct and thus "knowingly or recklessly provided substantial assistance" to the Debt Collectors' scheme.  12 U.S.C. § 5536(a)(3).  Furthermore, the CFPB alleges that this conduct amounted to unfair acts or practices.  12 U.S.C. §§ 5531(a), (c)(1), 5536(a)(1)(B).  Because the parties' arguments turn on the ISOs' and Global Payments' levels of knowledge and respective culpabilities, the Court recounts the specific allegations as to each Defendant below.

5

## II.     Pathfinder's Underwriting and Risk Monitoring

The CFPB alleges that Pathfinder failed to follow up on a number of red flags in the Debt Collectors' applications for Global Payments processing accounts.  In February 2011, Defendant Bagga submitted an application on behalf of Credit Power.  (Id. ¶ 165.)  Pathfinder's underwriting process was supposed to include a review for criminal activity, associates, verification of addresses, business filings, and corporate affiliations.  (Id. ¶ 166.)  Credit Power's chief executive officer had recently completed a sentence for drug trafficking and shared an address with Mr. Bagga, but Pathfinder and Global Payments approved the application.  (Id. ¶ 167.)

Mr. Bagga applied for a second account with Pathfinder, this time on behalf of UDPS.  (Id. ¶ 168)  Mr. Bagga listed the same address on the application for both his residence and UDPS.  (Id. ¶ 170.)  Pathfinder's vice president for compliance recognized that a merchant operating out of his home indicated the business may not be legitimate.  (Id. ¶ 171.)  Moreover, when Pathfinder conducted a site survey of UDPS's business premises—also Mr. Bagga's residence—Pathfinder recorded that the premises was leased, and "the amount of inventory and merchandise on the shelves and floor appear to be

consistent with the type of business." (Id. ¶ 172.)  The UDPS application further showed that Mr. Bagga had minimal income and had a subprime credit score.  (Id. ¶ 173.)  Yet even though Global Payment's risk policy stated that creditworthiness was critical to the underwriting decision, Pathfinder and Global Payments approved the application.  (Id. ¶ 174.)

The CFPB next alleges that when Credit Power and UDPS began processing transactions, Global and Pathfinder continued to ignore indicators that the collectors were committing fraud.  In January 2012, for instance, Pathfinder recognized that UDPS was processing payments for another merchant called RSB Equity Group, LLC ("RSB").  (Id. ¶ 177.)  Even though Global Payments' policy prohibits the practice of factoring, it allowed UDPS and Credit Power to continue processing payments for RSB.  (Id.)

Then, in November 2012, Pathfinder received an alert for UDPS and RSB from MasterCard's "Member Alert to Control High-Risk Merchants," or "MATCH," system to identify and prevent fraud.  (Id. ¶¶ 178-79.)  Global Payments, Pathfinder, and Frontline were all required to consult the MATCH system under MasterCard and Global Payments' rules.  (Id. ¶ 179.)  According to the MATCH alert, another processor had terminated affiliates of UDPS and

RSB after investigating and finding factoring and an excessive chargeback volume.  (Id. ¶ 180.)

In March 2013, Global Payments notified Pathfinder that Visa had prohibited Credit Power from processing payments using its network.  (Id. ¶ 182.)  Then, on July 8, 2013, Global Payments notified Pathfinder that Discover was requiring it to close UDPS's account due to "prohibited business practices."  (Id. ¶ 184.)  Global Payments and Pathfinder continued to allow Credit Power and UDPS to process payments with MasterCard for almost another year.  (Id. ¶ 185.)

Communication with the Debt Collectors was also a problem that the CFPB alleges should have served as a warning signal.  Pathfinder had difficulty contacting representatives of UDPS and Credit Power because mail was often returned and voicemail boxes were full.  (Id. ¶¶ 186-87.)  And when Pathfinder called UDPS customer service, the owner of RSB answered the phone.  (Id. ¶ 188.)  The CFPB alleges that these communication problems "should have caused the ISO to more closely monitor or terminate the Debt Collectors."  (Id. ¶ 189.)  By August 2013, UDPS changed its address to that of a UPS store.  (Id. ¶ 193.)

AO 72A
(Rev.8/82)

Another issue was the high chargeback rate.  Pathfinder considered any chargeback rate greater than zero to be a sign of suspicious activity.  (Id. ¶ 190.)  Still, Pathfinder took no action when it got data from Global Payments showing that Credit Power's chargeback rate in July 2013 was 28.5%, and UDPS's chargeback rate in August 2013 was 31%.  (Id. ¶ 191.)  The CFPB asserts that these high rates should have caused both Pathfinder and Global Payments to investigate the Debt Collectors' business practices or terminate their accounts.  (Id. ¶ 192.)

**III.    Frontline's Underwriting and Risk Monitoring**

The CFPB alleges that Frontline similarly ignored red flags in its underwriting process.  In March 2013, Mr. Bagga applied for payment processing accounts on behalf of UDPS and Credit Power.  (Id. ¶ 196.)  Frontline does not include debt collectors on its list of prohibited merchants.  (Id. ¶ 197.)  Still, the CFPB contends the Debt Collectors' merchant-processing applications were "replete with indicators of fraudulent activity."  (Id. ¶ 199.)  For example, on its application UDPS identified an address it never occupied.  (Id. ¶¶ 200-01.)  It was also apparent that Mr. Bagga faxed the application from a FedEx Office location, and the address on the voided check UDPS provided

9

along with its application belonged to another collection agency.  (Id. ¶ 202.)

UDPS stated in its application that it was in the debt-collection business. (Id. ¶ 204.)  Frontline, however, identified UDPS with a merchant category code for "Family Clothing Stores" even though Frontline's own underwriting manual emphasized the importance of using the correct merchant category codes "for activity tracking, reporting, and risk management purposes."  (Id. ¶¶ 203-04.)  On its underwriting summary, Frontline noted that UDPS was a prohibited business under Global Payments' credit guidelines.  (Id. ¶ 205.)  But both Frontline and Global approved the application.  (Id. ¶¶ 206-07.)

Weeks later, on March 23, 2013, Mr. Bagga submitted another application on behalf of Credit Power.  (Id. ¶ 208.)  The address for Credit Power was a UPS store, and the application was also faxed from the same FedEx Office as the UDPS application.  (Id. ¶¶ 209-10.)  The underwriting package included a Better Business Bureau ("BBB") review of Credit Power showing that it was rated "F" and identified Credit Power's principal as an ex-felon.  (Id. ¶¶ 211-12.)

According to Frontline's underwriting policy, it is responsible for verifying information contained in the application, like the customer service

10

number, to ensure that the business is legitimate.  (<u>Id.</u> ¶ 213.)  Neither UDPS nor Credit Power included a customer service number in their applications at all.  (<u>Id.</u> ¶ 215.)  Frontline and Global Payments approved these applications, and the latter began processing payments for UDPS and Credit Power.  (<u>Id.</u> ¶¶ 206-07, 216.)

## IV.    Global Payments' Monitoring of the UDPS and Credit Power Accounts

Global Payments—as the actual payment processor—was responsible for handling all chargebacks under its agreement with its sponsor bank.  (<u>Id.</u> ¶ 220.)  In that regard, the CFPB alleges that Global Payments failed to investigate suspicious chargeback activity related to UDPS and Credit Power's accounts.  Because chargebacks occur, for example, when a charge was unauthorized, merchandise was not received, or the consumer was victimized by fraud, Global Payments' agreement with its bank required it to "[p]erform standard investigations of chargeback transactions" and "provide documentation to the merchant as 'case documentation' supporting an adjustment."  (<u>Id.</u> ¶¶ 219, 221.)  So, when a consumer disputed a charge that Global Payments processed, Global Payments received the chargeback

11

complaint from the issuing bank.  (Id. ¶ 222.)  Next, it created a "chargeback advice," which contained card information, transaction information, and a narrative of the consumer's dispute.  (Id. ¶ 223.)  Global Payments then mailed the chargeback advice to the merchant, and if the merchant disputed the chargeback, it could submit its own documentation to Global Payments.  (Id. ¶ 222.)

The CFPB declares that Global Payments processed numerous chargebacks related to the Debt Collectors that contained significant red flags. One consumer in Texas disputed a transaction from September 16, 2013, when the consumer said she received a call from LRS Litigations.  (Id. ¶¶ 225-26.) The caller said the consumer owed money to LRS and even had her Social Security number.  (Id. ¶ 227.)  Although the consumer did not provide her debit card information or authorize a charge, Credit Power withdrew $500 from her account.  (Id. ¶ 228.)

Another consumer received a threatening call wherein the caller claimed that he had "a restraining order against [the consumer] to appear in court if [he] didn't settle with them."  (Id. ¶¶ 229-30.)  The caller further threatened that the consumer had 24 hours to pay $500 on a $1,600 debt owed to Bank of

12

America, or the caller would "contact [the consumer's] employer to levy [his] wage, and they were also contacting the local police to serve papers against [the consumer]." (Id. ¶ 231.)  The consumer gave over his bank card information because he was scared, but after he made the payment, his wife told him they had never done business with Bank of America.  (Id. ¶¶ 232-33.)

A consumer in Pennsylvania complained that he received a call on January 30, 2014, from a collection agency telling him he had to pay two payments of $250 to settle a $3,000 MasterCard debt or he would be "forced to go to court and pay further fees such as court costs, settlement fees, etc." (Id. ¶ 235.)  Because the consumer was scared of paying more fees and having to go to court (as he was already paying a collection agency for his credit card debt), he gave over his debit card number.  (Id. ¶ 236.)  After hanging up, he realized that his only credit card was a Visa.  (Id. ¶ 238.)  The caller also promised to send a receipt by e-mail, but it never arrived.  (Id. ¶ 237.)

A consumer in Oregon disputed a $600 payment to UDPS and complained that a caller claimed to have lost the consumer's payment information because of a computer server outage.  (Id. ¶¶ 239-40.)  But the consumer had never given his payment information to the agency the caller

13

purported to represent.  (Id. ¶ 241.)  The caller also promised to send a

settlement agreement before charging the consumer's card, but he did not.  (Id.

¶ 242.)  According to the consumer's complaint, "They lied about who they

were, they lied about what they were doing, and they lied about providing

documentation."  (Id. ¶ 243.)

Even more consumers disputed charges by UDPS and Credit Power

when they were unable to reach the merchant, payments were not applied to

debt, the consumer did not receive a verification of debt, or the charge was not

authorized.  (Id. ¶ 244.)  Many of these complaints mentioned LRS Litigations

or IRS Equity, which the CFPB alleges should have at least alerted Defendants

to factoring.  (Id. ¶ 245.)

Global Payments and the ISOs move for dismissal of both claims against

them pursuant to Federal Rule of Civil Procedure 12(b)(6), asserting that the

Complaint fails to state a claim upon which relief can be granted.

## Discussion

## I.    Motion to Dismiss Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a

"short and plain statement of the claim showing that the pleader is entitled to

relief." While this pleading standard does not require "detailed factual allegations," mere labels and conclusions or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In order to withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Id. (quoting Twombly, 550 U.S. at 570).  A complaint is plausible on its face when the plaintiff pleads factual content necessary for the court to draw the reasonable inference that the defendant is liable for the conduct alleged.  Id.

    "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999).  However, the same does not apply to legal conclusions set forth in the complaint.  See Iqbal, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id.  Furthermore, the court does not "accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555.

**II.    Count VIII: Providing Substantial Assistance to the Debt Collectors**

15

The CFPB alleges that Global Payments, Pathfinder, and Frontline substantially assisted unlawful debt-collection activity.  The CFPB brings this claim under a provision of the 2010 Dodd–Frank Wall Street Reform and Consumer Financial Protection Act ("Dodd–Frank Act").[2]  Pub. L. No. 111-203.  According to 12 U.S.C. § 5536(a)(3), it is unlawful for "any person to knowingly or recklessly provide substantial assistance to a covered person or service provider in violation of section 5531 of this title [prohibiting unfair, deceptive, or abusive acts or practices]."  The Payment Processors move to dismiss on grounds that the CFPB does not adequately allege knowledge or recklessness, or that the Payment Processors provided substantial assistance to the Debt Collectors.

A.    The Scienter Requirement

There is not yet any case law interpreting the substantial-assistance provision of the Dodd–Frank Act, and the parties dispute how the Court should interpret the scienter requirement under this statute.  Defendants argue that the Court should look to a similar substantial-assistance provision in § 20(e) of the

---

[2]  The CFPA, under which the CFPB brings this action, was enacted as part of Dodd–Frank.

16

Securities and Exchange Act of 1934 for the definition of recklessness, while the CFPB urges a more general definition of recklessness based on the 2010 amendment to § 20(e).

Much like § 5536, § 20(e) establishes liability for "any person that knowingly or recklessly provides substantial assistance to another person in violation of [securities laws]." 15 U.S.C. § 78t(e). Defendants note that the Eleventh Circuit has found "severe recklessness" satisfies § 20(e)'s scienter requirement. According to the Eleventh Circuit:

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

Woods v. Barnett Bank of Ft. Lauderdale, 765 F.2d 1004, 1010 (11th Cir. 1985) (quoting Broad v. Rockwell Int'l Corp., 642 F.2d 929, 961-62 (5th Cir. 1981)); see also SEC v. Big Apple Consulting USA, Inc., 783 F.3d 786, 800 (11th Cir. 2015) (confirming that "severe recklessness" meets the scienter requirement in an aiding and abetting case).

The CFPB responds that before passage of the Dodd–Frank Act, § 20(e)

17

required a person to "knowingly provide substantial assistance," and the

Dodd–Frank Act amended the statute by adding the words "or recklessly" after

"knowingly."  Pub. L. No. 111-203, § 929o.  Thus, the CFPB notes that many

of Defendants' cases were interpreting § 20(e)'s pre-2010 requirement of

knowing substantial assistance in holding that severe recklessness would

suffice.  (See CFPB's Resp., Dkt. [114] at 22-23.)  Now, according to the

CFPB, Congress's addition of the words "or recklessly" shows it meant to

lower the scienter requirement for aiding and abetting liability.  Furthermore,

the CFPB argues that Congress should be presumed to know the Eleventh

Circuit's "prevailing 'severely reckless' standard inferred from the 'knowing'

element in prior case law and consciously omitted the modifier 'severely' from

the amended Exchange Act and the CFPA standards."  (Id.)  Essentially, the

parties differ on whether recklessness in this context should be afforded its

general meaning in the context of civil law (as found in the Restatement

(Third) of Torts,[3] for example) or whether the severe recklessness formulation

---

[3]  Under the Restatement, a person acts recklessly if:

(a) the person knows of the risk of harm created by the conduct or knows facts that make the risk obvious to another in the person's situation, and

should govern.

Although at first glance it appears that Congress's addition of the words "or recklessly" demonstrates it intended something less than severe recklessness, the Court finds the Payment Processors' interpretation persuasive. Before the enactment of the Dodd–Frank Act in 2010, many courts applied the same scienter standard as the Eleventh Circuit under § 20(e). See Woods, 765 F.2d at 1010 n.9 (collecting cases). The Eleventh Circuit, it appears, called this standard "severe recklessness," but the standard "is identical to that used by other courts to describe what conduct they considered reckless."[4] Id. Evidently, the Eleventh Circuit uses the modifier "severe" to characterize the kind of reckless conduct that can satisfy the scienter requirement. Id.; see also

---

> (b) the precaution that would eliminate or reduce the risk involves burdens that are so slight relative to the magnitude of the risk as to render the person's failure to adopt the precaution a demonstration of the person's indifference to the risk.

Restatement (Third) of Torts: Physical & Emotional Harm § 2 (Am. Law Inst. 2010).

[4] The Second Circuit, for example, defines "reckless conduct" as: "at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000) (quoting Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir. 1978)); see also Sanders v. John Nuveen & Co., 554 F.2d 790, 793 (7th Cir. 1977).

AO 72A
(Rev.8/82)

Bryant, 187 F.3d at 1282 n.18.  In holding that severe recklessness can meet the requirement that a defendant "knowingly provide substantial assistance," these courts indicated that actual knowledge is not required to establish liability under § 20(e).

In SEC v. Big Apple Consulting USA, Inc., the Eleventh Circuit affirmed that actual knowledge is not required to constitute acting knowingly under the statute.  783 F.3d at 801.  The conduct in that case took place before 2010, and so the Dodd–Frank amendment did not apply.  But the court discussed the amendment because the defendants argued that the addition of the phrase "or recklessly" showed that actual knowledge was required before Dodd–Frank.  Id. at 800.  The Eleventh Circuit disagreed and characterized the amendment as a clarification of the law, not a substantive change.  Id. at 801. Citing legislative history, the court explained:

> The amendment to § 20(e) was intended to correct the holding of "[a] growing number of courts" who concluded "that knowingly means actual knowledge, rather than recklessness."  H.R. Rep. No. 111-687(I), at 80 (2010).  The amendment "clarif[ies] that recklessness is sufficient for bringing an aiding and abetting action."  Id.; see also H.R. Rep. No. 111-517, at 870 (2010) (Conf. Rep.) (stating that the amendment to § 20(e) "makes clear that the intent standard in SEC enforcement actions for aiding and abetting is recklessness").

AO 72A
(Rev.8/82)

Id.

As the Court explained above, the severe recklessness formulation the Eleventh Circuit uses is substantively the same as those in other circuits, which simply call it recklessness.  When enacting legislation, "Congress is presumed to know the content of existing, relevant law."  Griffith v. United States, 206 F.3d 1389, 1394 (2000).  Therefore, the Court presumes that Congress used the term "reckless" here intending to adopt the prevailing definition of recklessness defined in case law interpreting § 20(e).  While the Eleventh Circuit added the modifier "severe," other courts did not, and so the Court finds the omission of that modifier insignificant.  As a result, to show that a defendant knowingly provided substantial assistance in committing securities violations, the SEC must show that the defendant acted with the level of recklessness defined by the Eleventh Circuit as "severe recklessness."

Furthermore, because the CFPA was enacted as part of the Dodd–Frank Act, the Court agrees that it should look to cases interpreting § 20(e) for guidance in interpreting § 5536.  According to the canon of statutory construction *in pari materia*, statutes relating to the same subject matter should

21

"be construed 'as if they were one law.' " <u>Erlenbaugh v. United States</u>, 409

U.S. 239, 243 (1972) (quoting <u>United States v. Freeman</u>, 3 How. 556, 564

(1845)).  Under this canon, courts recognize that "a legislative body generally

uses a particular word with a consistent meaning in a given context."  <u>Id.</u>

"[T]he rule's application certainly makes the most sense when the statutes were

enacted by the same legislative body at the same time."  <u>Id.</u>  Because of the

similar structure of § 20(e) and § 5536, and because Dodd–Frank added the

term "recklessly" to § 20(e) at the same time it enacted § 5536, the Court

applies the same recklessness standard to the CFPB's substantial-assistance

claim in the consumer protection context.  In sum, to survive dismissal the

CFPB must allege acts satisfying the Eleventh Circuit's formulation of severe

recklessness against each Defendant:

> Severe recklessness is limited to those highly unreasonable
> omissions or misrepresentations that involve not merely simple or
> even inexcusable negligence, but an extreme departure from the
> standards of ordinary care, and that present a danger of misleading
> buyers or sellers which is either known to the defendant or is so
> obvious that the defendant must have been aware of it.

<u>Woods</u>, 765 F.2d at 1010.

   *1.*   *Global Payments*

The Court first addresses Global Payments' characterization of the allegations against it before analyzing whether these allegations adequately provide a factual basis for recklessness.  Global Payments emphasizes that it had limited involvement with the Debt Collectors.  It notes that the ISOs were responsible for prescreening and underwriting merchants under the merchant services agreements.  (See Global Payments' Br., Dkt. [93-1] at 8-11.) Pathfinder was also obligated to provide an ongoing review of merchants to detect fraud.  (Id. at 10; Pathfinder MSA, Dkt. [93-3] at 3.)  Thus, Global Payments argues that it "relied on those ISOs to make certain that merchants that were brought to Global's pipeline were legitimate, lawful, and complied with Global's credit policy and those of the card networks."  (Global Payments' Br., Dkt. [93-1] at 10-11.)

Global Payments further cites the Visa and MasterCard chargeback policies in arguing that its "role in processing and investigating chargebacks is to transmit the chargeback through the payment chain from the issuing bank to the merchant and then transmit any dispute of the chargeback by the merchant back through the payment chain."  (Id. at 14.)  Global Payments describes this role as "clerical and focused on confirming that the chargeback and any

response meet the formatting and other requirements of the card network."

(Id.)

The cited provisions in the Visa and MasterCard chargeback policies[5]

provide little substantive information and do not refute the CFPB's allegation

that Global Payments had to conduct a "standard investigation" of chargebacks.

(Compl., Dkt. [1] ¶ 221.)  Visa's policy includes a diagram illustrating its

dispute-resolution process.  See Chargeback Mgmt. Guidelines for Visa

Merchants at 12, *available at* http://usa.visa.com/download/merchants/

chargeback-management-guidelines-for-visa-merchants.pdf (2014).  This

---

[5] "The district court generally must convert a motion to dismiss into a motion for summary judgment if it considers materials outside the complaint." D.L. Day v. Taylor, 400 F.3d 1272, 1275-76 (11th Cir. 2005); see also Fed. R. Civ. P. 12(d).  But at the motion to dismiss phase, the Court may consider "a document attached to a motion to dismiss . . . if the attached document is (1) central to the plaintiff's claim and (2) undisputed." Id. (citing Horsley v. Feldt, 304 F.3d 1125, 1134 (11th Cir. 2002)).  " 'Undisputed' means that the authenticity of the document is not challenged." Id.  While these documents are available online, a plaintiff must concede a document's authenticity if it contradicts the allegations in a complaint.  See e.g., Saunders v. Duke, 766 F.3d 1262, 1270 (11th Cir. 2014) (holding it is improper for defendants to simply "attach [documents] referenced in a . . . complaint to their motions to dismiss and ask courts to consider the contents of those [documents when] they contradict[] the allegations of [a] complaint").  Defendants also reference a number of other documents not attached to the Complaint and not conceded by Plaintiff as authentic.  While the Court questions whether it is proper to cite these documents, the Court nevertheless finds these documents do not compel dismissal, as explained herein.

manual says nothing directly about Global Payments' duties with respect to its sponsor bank.  But in the Complaint, Plaintiff alleges Global undertook responsibility for chargebacks under its agreement with the sponsor bank (Compl., Dkt. [1] ¶ 220.)  The diagram states that following a dispute, the merchant bank[6] (or here, Global, under its agreement with the bank) "receives the chargeback and has the option of resolving the issue or forwarding it to the merchant."  Chargeback Mgmt. Guidelines for Visa Merchants at 12, *available at* http://usa.visa.com/download/merchants/chargeback-management-guidelines-for-visa-merchants.pdf (2014).  The merchant then either accepts the chargeback or "addresses the chargeback issue and resubmits the item to the merchant bank."  Id.  At that point, Global reviews the merchant's information, and if it agrees that the merchant addresses the chargeback, the card issuer "may submit an arbitration case for a financial liability decision."  Id.  On a motion to dismiss, where the Court must draw all reasonable factual inferences in the CFPB's favor, the Court cannot conclude that Global Payments' role in the chargebacks was merely clerical.

---

[6] Visa uses the term "Acquirer," which refers to the merchant bank or merchant's financial institution.  Chargeback Cycle, *available at* http://usa.visa.com/merchants/merchant-support/dispute-resolution/chargeback-cycle.jsp.

AO 72A
(Rev.8/82)

Next, Global Payments takes issue with the CFPB's allegations that Credit Power and UDPS's high chargeback rates in July and August 2013 were red flags. Global Payments asserts that those rates were artificially high due to a low transaction volume. (See Global Payments' Br., Dkt. [93-1] at 15.) But the Court must take the allegations in the Complaint as true, and as such cannot consider that contention on a motion to dismiss. Global further asserts that the Visa and Discover notifications Global received, which are referenced in the Complaint, did not alert it to fraudulent conduct because Visa merely stated it did not process payments from debt collection agencies. The notice listed 26 merchants, including Credit Power and UDPS, who may have been debt collectors. (Id. at 17; Visa Letter, Dkt. [93-6] at 2.) But construing this letter in the CFPB's favor, it does not necessarily contradict the Complaint, for it informed Global's sponsor bank that it may be violating Visa's regulations "as a result of improper Visa card acceptance practices of your merchants." (Visa Letter, Dkt. [93-6] at 2.)

Turning to the recklessness standard, the Court finds that the CFPB alleges facts which, taken as true, plausibly allege that Global Payments was "highly unreasonable" in ignoring obvious signs of debt-collection fraud

26

amounting to "an extreme departure from the standards of ordinary care," thus presenting an obvious danger of debt-collection fraud to consumers of which Global must have been aware.  See Woods, 765 F.2d at 1010.  First, while Global Payments asserts that the ISOs were responsible for screening and underwriting merchants, Global's own policies state that ISOs were not to solicit collection agencies because they were high risk and collection agencies required Global's approval.  (See Compl., Dkt. [1] ¶¶ 157, 164; Global's ISO Credit Policy Manual, Dkt. [93-5] at 18.)  The Court recognizes that "prohibited" merchants did not mean their activity was unlawful.  But the policies indicate that Global considered collection agencies suspect.  In fact, after listing "Collection Agencies" on its list of prohibited merchants, Global noted that "collection of charged off or bad debt is against card regulations." (Id. at 19.)  So, while the ISOs provided the initial screening and underwriting, the Court infers that Global Payments would have scrutinized those applications considering Global's approval was required.  And as explained in more detail *infra* with respect to the ISOs, the Debt Collectors' applications to the ISOs lacked certain information or contained red flags, such as Mr. Bagga's subprime credit score and his association with an ex-felon.

27

Perhaps most significantly, Global Payments also received a number of alarming chargeback narratives describing what appeared to be debt-collection fraud.  The CFPB alleges that Global received these narratives as part of the chargeback process and was required to perform a standard investigation of the transactions, which included communicating with the merchant.  As described in the Background section, *supra*, these consumer complaints showed that UDPS and Credit Power were engaging in factoring, misrepresenting who they were, and attempting to collect debt not owed to them.  In addition, while Global insists that the ISOs were solely responsible for underwriting and monitoring the Debt Collectors, at this stage Plaintiff has met its burden.  The CFPB has plausibly alleged that Global was receiving the suspicious information about the Debt Collectors, could have investigated the activity, and indeed had a duty to handle chargebacks under its agreement with its sponsor bank.

Global cites Mizzaro v. Home Depot, Inc., 544 F.3d 1230 (11th Cir. 2008), for the proposition that "even allegations of highly unusual chargeback activity occurring rampantly throughout Home Depot stores were insufficient to meet the pleading standard for recklessness."  (Global Payments' Br., Dkt.

[93-1] at 22.)  In <u>Mizzaro</u>, the Eleventh Circuit dismissed a securities fraud

class action investors filed against Home Depot and several of its officers and

directors.  544 F.3d at 1235.  The plaintiffs alleged primary securities

violations against the individual defendants under § 10(b) of the Exchange Act,

as well as derivative liability under § 20(a).  <u>Id.</u> at 1235-36.  The court did not,

however, analyze substantial-assistance liability under § 20(e) of the Exchange

Act.

The <u>Mizzaro</u> plaintiffs alleged that Home Depot officers and directors

knew about a scheme to process chargebacks for defective merchandise which,

in short, artificially inflated Home Depot's earnings and profit margins.  <u>See id.</u>

at 1240-41.  Under the pleading standard relevant to securities fraud class

actions, the court held that plaintiffs must "plead with particularity facts giving

rise to a strong inference that the defendants either intended to defraud

investors or were severely reckless when they made the allegedly materially

false or incomplete statements."  <u>Id.</u> at 1238 (internal quotation marks omitted).

The court went on to explain that a "strong inference" of scienter "must be

cogent and compelling, thus strong in light of other explanations."  <u>Id.</u> at 1239

(quoting <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 324

AO 72A
(Rev.8/82)

(2007)).

In that light, the court noted that the plaintiffs relied exclusively on the widespread nature of the alleged fraud to establish a strong inference that Home Depot officials acted with the requisite scienter. Id. at 1247. But the court found no allegations related to any of the individual defendants' knowledge of fraudulent chargebacks. See id. at 1249-55. In fact, there were no "accounting red flags," and Home Depot's financial statements did not reveal suspicious activity, so senior officials could not have detected the fraud. Id. at 1252.

Mizarro is distinguishable from this case because, first, the pleading standard for securities fraud class actions does not apply to this case. The Court need not find a strong inference of recklessness in light of other explanations. Moreover, the plaintiffs in Mizzaro relied exclusively on the widespread nature of the fraud without actually alleging how high-level officials could have learned about it. Here, the CFPB alleges that Global Payments knew about the high rate of chargebacks–the very activity that raised suspicions about the Debt Collectors. What is more, the chargeback reports contained specific information about the nature of the charges and the

fraudulent activity.  Here the allegations in the Complaint plausibly show that Global, unlike Home Depot in Mizarro, knew, would have known, or acted recklessly to a high risk that its merchants were engaged in a debt-collection scheme.

In addition to the above allegations, the CFPB alleges that Global Payments saw other warning signs of fraudulent debt-collection activity.  For example, (1) Global Payments was required to consult the MATCH system, which alerted payment processors that another processor found the Debt Collectors were engaged in factoring and had an excessive chargeback volume; (2) Visa required closure of Credit Power's account; and (3) Discover required closure of UDPS's account due to prohibited business practices.  Taking all the above allegations together, the Complaint plausibly alleges severe recklessness on Global's part.

### 2.    *Pathfinder*

With respect to Count VIII, Pathfinder focuses mostly on "substantial assistance" (discussed *infra* Part II.B.), not whether Pathfinder was knowing or reckless.  Still, Pathfinder contends that the CFPB merely alleges that it was knowing or reckless because merchant applications "were 'replete with indicia

of fraud' and because 'industry and consumers' provided 'warnings' of fraudulent activity." (Pathfinder's Br., Dkt. [89] at 13.)

The Court finds that the Complaint plausibly alleges Pathfinder knowingly or recklessly acted with respect to the Debt Collectors. First, Pathfinder agreed under the merchant services agreement with Global to "market Global's merchant processing services to merchants." (Pathfinder's MSA, Dkt. [93-3] at 2.) Pathfinder further agreed "to use its best efforts not to accept any merchant application which does not meet Global's credit policy." (Id.) It agreed to underwrite the merchants, collect and maintain all relevant information to the prescreening, and provide the information to Global upon request. (Id.) In addition to conducting a credit review, Pathfinder agreed to monitor the merchants' processing activity to detect fraud and risk issues. (Id. at 3.) The agreement stated that Pathfinder was required to monitor the MATCH service, which it could access through Global. (Id.) Based on these allegations, the Court infers that Pathfinder knew of the risk of fraud that debt collectors posed generally.

According to the allegations in the Complaint, Pathfinder approved Mr. Bagga's applications for Credit Power and UDPS—which it knew were debt

collectors—even though the applications did not meet Global Payments' credit requirements.  For instance, Mr. Bagga had subprime credit, and one of the Debt Collectors's chief executive officers had a drug trafficking conviction. Other signs that the Debt Collectors were not operating a legitimate business included Mr. Bagga listing the same address on the application for both his residence and UDPS, which Pathfinder acknowledges is a sign the business may not be legitimate.  (Compl., Dkt. [1] ¶ 171.)  In addition, Pathfinder even had trouble contacting UDPS and Credit Power; one time Pathfinder reached a representative of RSB when it tried to call UDPS customer service, again indicating that UDPS provided false information and might be a fraudulent business.

Pathfinder also knew about the high rate of chargebacks, and it considered any chargeback activity suspicious.  It was aware that other merchants were processing payments through the UDPS and Credit Power accounts in violation of Global's policies.  Like Global, Pathfinder received a MATCH alert concerning UDPS and Credit Power, and it knew that Visa and Discover terminated their accounts.  Because Pathfinder was obligated to determine UDPS and Credit Power's creditworthiness and to continue

33

monitoring for risk, the CFPB's allegations plausibly show that Pathfinder was

at least severely reckless in approving the applications and failing to heed signs

of fraudulent activity.

> 3.    *Frontline*

Frontline contends that the facts alleged against it do not support a

plausible inference that it engaged in an extreme departure from the ordinary

standard of care.  (Frontline's Br., Dkt. [97-1] at 24.)  Frontline points out that

it is not alleged to have known about the chargebacks.  In fact, Frontline says it

was not responsible for continuing to monitor for risk like Pathfinder was.  (Id.

at 18-19; see also Frontline MSA, Dkt. [93-4] at 2-3.)

The Court agrees that the most relevant allegations against Frontline

pertain to the merchant applications.  But, assuming the truth of the

Complaint's allegations, Mr. Bagga's merchant applications not only lacked

required information, but also contained indicators that he ran illegitimate

collection agencies.  While Frontline was responsible for verifying applicant

information, the address UDPS provided was never occupied by UDPS, and

Mr. Bagga failed to list customer service number on either application even

though Frontline considered that information important in verifying a business

is legitimate.  Frontline even had a BBB report for Credit Power giving it a rating of "F."

Frontline stresses that it did not have responsibility under the merchant services agreement to monitor for risk.  Still, the Complaint alleges that Frontline and other ISOs were required to consult MATCH alerts, so the Court can infer that Frontline received the MATCH alert concerning factoring and excessive chargeback rates.  (<u>See</u> Compl., Dkt. [1] ¶¶ 179-80.)

The Court acknowledges that Frontline's level of knowledge or recklessness is a closer question given it may have had less involvement in monitoring the merchants.  But at the motion to dismiss stage, the allegations in the Complaint show Frontline knew Global Payments considered debt collectors high risk and were generally prohibited.  Despite being responsible for screening and underwriting merchant applications for payment processing accounts, Frontline approved UDPS and Credit Power's applications containing numerous warning signs they were not legitimate businesses. Taking these allegations as true, the CFPB plausibly alleges that Frontline was at least severely reckless in screening and underwriting the merchant applications.

B.      Substantial Assistance

The Payment Processors contend that even if they acted knowingly or
recklessly, they still did not provide substantial assistance under the allegations
in the Complaint.  The CFPB alleges the Payment Processors provided
substantial assistance "by enabling them to accept payment by credit and debit
card, legitimizing the Debt Collectors' business, making transactions easy for
consumers and the Debt Collectors, enabling the Debt Collectors to accept
payment from consumers with insufficient cash, and facilitating the Debt
Collectors' efficient collection of consumers' funds."  (Compl., Dkt. [1] ¶ 328.)

Global Payments argues that it merely provided payment processing
services to the Debt Collectors and that there are no allegations plausibly
showing that there is a substantial causal connection between Global's conduct
and harm to consumers.  (Global Payments' Br., Dkt. [93-1] at 25.)  Pathfinder
too asserts it cannot be held liable for substantial assistance because it provided
services to the Debt Collectors in the routine course of business just like any
other business would.  (Pathfinder's Br., Dkt. [89] at 13-16.)  Frontline insists
that it only had a limited screening function before forwarding potential
merchant applications to Global, that it did not have the responsibility to

36

monitor for risk, and that in any event Global had already been processing

transactions for UDPS and Credit Power for over a year before Frontline

submitted their applications.  (Frontline's Br., Dkt. [97-1] at 21-22.)

 According to the Payment Processors, the Court should look to SEC v.

Apuzzo, 689 F.3d 204 (2d Cir. 2012), for guidance on the substantial-

assistance question.  The CFPB agrees that Apuzzo is relevant to this case.  In

Apuzzo, the Second Circuit addressed substantial-assistance liability under §

20(e) of the Exchange Act.  Id. at 211.  The court held that "the SEC is not

required to plead or prove that an aider and abettor proximately caused the

primary securities law violation."  Id. at 213.  The court explained that § 20(e)

was passed "precisely to allow the SEC to pursue aiders and abettors who . . .

were not . . . themselves involved in the making of the false statements that

proximately caused the plaintiffs' injuries."  Id.  In fact, "many if not most

aiders and abettors would escape all liability if such a proximate cause

requirement were imposed, since, almost by definition, the activities of an aider

and abettor are rarely the direct cause of the injury brought about by the fraud,

however much they may contribute to the success of the scheme."  Id.

 The Second Circuit adopted the standard used in criminal aider and

AO 72A
(Rev.8/82)

abettor actions for aider and abettor liability in securities fraud cases.  Id. at

212.  Thus, to plead substantial assistance against a defendant, the SEC must

allege "that he in some sort associated himself with the venture, that the

defendant participated in it as in something that he wished to bring about, and

that he sought by his action to make it succeed."  Id. (quoting United States v.

Peoni, 100 F.2d 401, 402 (2d Cir. 1938)) (internal quotation marks and

alterations omitted).

The Apuzzo court recognized that proximate cause is relevant to

identifying substantial assistance, but it is not a distinct element of an aiding

and abetting claim.  Id. at 213 n.11.  While acknowledging Apuzzo's standard,

Global Payments and Frontline argue that proximate cause or at least a

substantial causal connection should be required to establish substantial

assistance.  (Global Payments' Br., Dkt. [93-1] at 25-26; Frontline's Br., Dkt.

[97-1] at 21.)  The Court finds, however, that proximate cause is relevant but

not required and adopts Apuzzo's standard.[7]

---

[7]  While the Court emphasizes that Second Circuit case law does not bind this
Court, it acknowledges that court's special expertise in the area of securities.  See,
e.g., Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247, 276 (2010) (citing Blue
Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 762 (1975) (Blackmun, J.,
dissenting)) (describing the Second Circuit Court of Appeals as the " 'Mother Court'

Finally, the parties note the Second Circuit found that a party's level of knowledge impacts the substantial-assistance analysis.  Thus, if a defendant has "a high degree of actual knowledge, this lessens the burden [the SEC] must meet in alleging substantial assistance."  Apuzzo, 689 F.3d at 214.  Conversely, a high degree of substantial assistance may lessen the burden of showing scienter.  Id. at 215.

### 1.    *Global Payments*

Global emphasizes its limited and routine role as a payment processor: "Global simply provided a technology platform to process payments," and the processing of payments was simply " 'the daily grist of the mill' for payment processors like Global."  (Global Payments' Br., Dkt. [93-1] at 27-28.)

Considering Global's conduct within the framework of the language in Apuzzo, the Court finds that the CFPB has adequately alleged that Global did in some sort associate itself with the venture, participate in it as something it wished to bring about, and seek to make it succeed by approving the Debt Collectors' applications and processing payments.  See Appuzzo, 689 F.3d at 206.  While payment processing is in many ways routine, the processing of

_____

of securities law").

39

consumer bank cards was far from an incidental part of the Debt Collectors'
scheme.  The entire purpose of the abusive phone calls was to bully and harass
consumers into turning over their bank card information, a scheme made
possible only by the approval of a payment processing account that enabled the
Debt Collectors to process card-not-present transactions.

Global cites Woods v. Barnett Bank of Ft. Lauderdale, which stated that
"knowing assistance can be inferred from atypical business actions."  765 F.2d
at 1012.  According to Global, nothing about processing payments is atypical.
But Woods further explained that a common practice for a bank, such as
writing a reference for one of its customers, "can hardly be regarded as 'the
daily grist of the mill' " in the context of a securities fraud case when the letter
"contain[s] statements of which the writer has no knowledge, [and is issued]
without even minimal investigation to determine whether its contents are
accurate, solely for the purpose of 'currying favor' with a good client."  Id.
Woods therefore suggests that common business practices could nevertheless
substantially assist unlawful conduct if there are "atypical" factors involved in
the common practice.  Here, the CFPB alleges the warning signs of fraud—like
high rates of chargebacks containing alarming consumer narratives, along with

AO 72A
(Rev.8/82)

MATCH alerts and deficient applications—demonstrate that Global's payment

processing was not merely the typical grist of the mill.[8]

Global Payments expresses its concern that holding it liable would

"impose on Global a strict liability standard for every transaction it processes"

and consequently upend the entire payments industry.  (Global Payments' Br.,

Dkt. [93-1] at 8.)  The Court notes that the elements of substantial assistance

"cannot be considered in isolation from one another."  Apuzzo, 689 F.3d at 214

(quoting SEC v. DiBella, 587 F.3d 553, 566 (2d Cir. 2009)).  So, innocuous

business practices in one context could amount to substantial assistance to

unfair, deceptive, and abusive practices in another, as long as the aider or

abettor knows of or is reckless to the risk of the primary violation.  Taking the

extensive allegations of warning signs that the Debt Collectors were defrauding

consumers along with Global Payments' own credit policy requiring that it

---

[8]  Another case Global Payments cites, Perfect 10, Inc. v. Visa Int'l Serv.
Ass'n, 494 F.3d 788, 796 (9th Cir. 2007), found that "credit card companies cannot be
said to materially contribute to [copyright] infringement . . . because they have no
direct connection to that infringement."  That case is distinguishable from this one
because the court went on to observe that in contrast to websites like Amazon.com
and services like Napster or Grokster, "the services provided by the credit card
companies do not help locate and are not used to distribute the infringing images."  Id.
By contrast, Global Payments did help the Debt Collectors obtain money they were
not owed by processing consumer's bank card numbers.

AO 72A
(Rev.8/82)

approve collection agencies (and thus more closely scrutinize them), at this stage the Court finds that the CFPB alleges facts that plausibly support a finding that Global Payments knowingly or recklessly provided substantial assistance to the Debt Collectors.

       *2.*     *Pathfinder*

Pathfinder similarly argues that it cannot be liable for substantial assistance based on such routine business practices.  It analogizes its services to those any business needs to operate, like cleaning services, business checking accounts, mail services, and internet access.  For many of the same reasons stated above, the Court rejects Pathfinder's argument.  Pathfinder's alleged assistance was substantial *in this context* because UDPS and Credit Power had to apply to ISOs like Pathfinder to obtain an account with Global Payments.  Once approved, Pathfinder was responsible for risk monitoring and received numerous warning signs of suspicious debt-collection practices, including high chargeback rates, Visa and Discover's termination of the Debt Collectors, and the like.  But Pathfinder did not take action to investigate that activity, thus allowing the Debt Collectors to continue their scheme.  Even though Pathfinder itself did not process payments, it approved deficient

applications of high-risk merchants and subsequently failed to act in the face of

obvious warning signs of a debt-collection scheme.  For that reason, it is

plausible that Pathfinder associated itself with the venture, participated in it as

something it wished to bring about, and sought by its action to make it succeed.

### 3.    *Frontline*

For its part, Frontline says it "only received, prescreened, and forwarded

potential merchant applications to Global for Global's acceptance or rejection.

Frontline clearly maintains no authority over the approval of a merchant for

processing."  (Frontline's Br., Dkt. [97-1] at 22.)  Moreover, these activities

cannot amount to substantial assistance because Global had been processing

transactions for the Debt Collectors for more than a year by the time Frontline

processed the applications.  (Id.)  And in any event, Frontline states that any

substantial assistance it provided was to Global, not the Debt Collectors.  (Id. at

25.)

Based on the allegations in the Complaint, however, it is plausible that

Frontline provided substantial assistance to the Debt Collectors.  While

Frontline may not have had final authority to approve merchants for payment

processing accounts, Global contracted with Frontline to serve as an ISO, and

Frontline had the responsibility of underwriting merchants—certainly a crucial step for the Debt Collectors in ultimately securing payment processing accounts.  Moreover, even if Frontline's contract was with Global Payments, its approval of merchant applications benefitted merchants because it enabled them to process bank card transactions.  In addition, as for Frontline's argument that Global was already processing the Debt Collectors' transactions when they applied to Frontline, the Complaint nonetheless alleges Frontline screened the applications and consequently had the opportunity to recognize and investigate signs the Debt Collectors were illegitimate.  By approving the Debt Collectors' applications and failing to investigate obvious red flags, Frontline did in some way associate itself with the scheme and help to make it succeed.  Consequently, at this stage the CFPB plausibly alleges substantial assistance against Frontline.

## III.    Count IX: Unfair Acts or Practices

The CFPB alleges the Payment Processors' independent violations of the CFPA for engaging in unfair acts or practices as the next basis for liability.  Under the CFPA, it is unlawful for "any covered person or service provider . . . to engage in any unfair, deceptive, or abusive act or practice." 12 U.S.C. §

5536(a)(1)(B).  Pathfinder and Frontline deny they are either covered persons or service providers under the statute.  Global Payments denies it is a covered person but does not dispute that it is a service provider.  All assert they did not engage in unfair acts or practices.

The CFPB responds that the Payment Processors committed primary violations of the CFPA because they are covered persons or service providers, and they "committed unfair acts or practices by ignoring clear signs of illegal conduct while collecting consumers' payments for the Debt Collectors." (CFPB's Resp., Dkt. [114] at 14.)

A.   Covered Persons

Each Payment Processor argues it is not a covered person.  A covered person includes:

> (A) any person that engages in offering or providing a consumer financial product or service; and

> (B) any affiliate of a person described in subparagraph (A) if such affiliate acts as a service provider to such person.

12 U.S.C. § 5481(6).  The statute in turn defines a "consumer financial product or service" as a financial product or service that "is offered or provided for use by consumers primarily for personal, family, or household purposes."  Id. §

5481(5).  The statute defines a financial product or service by listing eleven

categories of services, one of which is "providing payments or other financial

data processing products or services *to a consumer* by any technological

means, including . . . through any payments systems or network used for

processing payments data."  Id. § 5481(15) (emphasis added).

The Payment Processors contend they did not offer their services to

consumers but to merchants (and/or to Global, in the case of the ISOs).  Nor are

they affiliates of covered persons.  In the paragraphs of the Complaint where

the CFPB alleges Global Payments is a covered person and a service provider,

it does not allege Global provides financial services to consumers, only to the

Debt Collectors.  (Compl., Dkt. [1] ¶ 77.)  The same is true for Pathfinder and

Frontline.  (Id. ¶¶ 81, 85.)  But, even if the Payment Processors are not covered

persons, they could still be subject to liability for unfair acts or practices if they

are service providers.  See 12 U.S.C. § 5536(a).  As explained below, they are.

### B.   Service Providers

The CFPA defines a "service provider" as:

> any person that provides a material service to a covered person in
> connection with the offering or provision by such covered person
> of a consumer financial product or service, including a person

that--

(i) participates in designing, operating, or maintaining the consumer financial product or service; or

(ii) processes transactions relating to the consumer financial product or service (other than knowingly or incidentally transmitting or processing financial data in a manner that such data is undifferentiated from other types of data of the same form as the person transmits or processes).

12 U.S.C. § 5481(26)(A).  Global Payments does not argue that it is not a

service provider.  Pathfinder contends that it meets express exceptions to the

definition, (Pathfinder's Br., Dkt. [89] at 23), while Frontline disputes that it

provided material services to the Debt Collectors.  (Frontline's Br., Dkt. [97-1]

at 28-29.)

     *1.*    *Pathfinder*

One of the exceptions to the definition of "service provider" is as

follows:

The term "service provider" does not include a person solely by virtue of such person offering or providing to a covered person–

(i) a support service of a type provided to businesses generally or a similar ministerial service . . . .

12 U.S.C. § 5481(26)(B).

47

Pathfinder states it is exempt because it unknowingly or incidentally transmitted financial data and provided a ministerial support service to merchants, the covered persons under the statute.  First, the main definition of "service provider" includes a person that "processes transactions relating to the consumer financial product or service (other than knowingly or incidentally transmitting or processing financial data in a manner that such data is undifferentiated from other types of data of the same form as the person transmits or processes)."  12 U.S.C. § 5481(26)(A).  Pathfinder bases one of its exception arguments on this caveat.  But the CFPB alleges that Pathfinder provided services other than processing transactions, such as underwriting merchants, approving applications, and monitoring for risk.  Therefore the statutory language does not exempt Pathfinder.

Pathfinder's second argument is that it fits into the exemption under 12 U.S.C. § 5481(26)(B) as "a support service of a type provided to businesses generally or a similar ministerial service."  Yet while ISOs (and payment processors) provide services to many types of businesses, an ISO's services are not ministerial.  The plain meaning of the term "ministerial" describes "an act that involves obedience to instructions or laws instead of discretion, judgment,

or skill." *Ministerial*, <u>Black's Law Dictionary</u> 1086 (9th ed. 2009).  Pathfinder

performed underwriting and screening services and was supposed to monitor

for risk after Pathfinder and Global approved merchant accounts.  Pathfinder's

duties involved discretion, judgment, and skill because it had to evaluate

creditworthiness and make judgments about merchants' risk levels.

The Court finds that Pathfinder is not covered by the exemptions it

identifies.  Furthermore, the Court finds that the allegations adequately state

Pathfinder is a service provider.  Pathfinder processed the Debt Collectors'

applications and enabled them to obtain accounts with Global Payments.

Without the ability to obtain payment processing accounts, the Debt Collectors

could not have succeeded in their scheme.  Thus, Pathfinder provided material

services to the Debt Collectors.  Because the Payment Processors do not

challenge that the Debt Collectors are covered persons, Pathfinder provided

material services to a covered person and is a service provider as defined in

§ 5481(26).

### 2.    *Frontline*

Frontline similarly disputes that it provided material services, and it

asserts that it provided services for the benefit of Global, not the Debt

49

Collectors.  Although Frontline may have contracted with Global to serve as an ISO, the Court finds that the CFPB plausibly alleges Frontline provided services to the Debt Collectors by processing their applications and assisting them in obtaining payment processing accounts.  Again, these services were material because the Debt Collectors could not have processed consumer credit cards without a Global account.  Even though Global had final approval, as an ISO Frontline provided a screening function the merchants had to pass before obtaining a payment processing account.  The Court finds that the Complaint adequately alleges that Frontline provided material services to a covered person and consequently is a service provider.

C.     Unfair Acts or Practices Causing Substantial Consumer Injury

To state a claim for an unfair act or practice, the CFPB must allege that, in connection with a transaction with a consumer for a consumer financial product or service, "[1] the act or practice causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers; and [3] such substantial injury is not outweighed by countervailing benefits to consumers or to competition."  12 U.S.C. § 5531(c)(1).  The Payment Processors do not dispute whether any injury to consumers was

substantial, reasonably avoidable, or outweighed by countervailing benefits to consumers or to competition.

### 1.   *Global Payments*

According to Global, the Complaint plainly fails to show that Global caused substantial injury to consumers.  (Global Payments' Br., Dkt. [93-1] at 28-30.)  Global cites the general rule that proximate cause is required to hold a defendant liable for injury.  See, e.g., Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1390 (2014) ("[W]e generally presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute.").  Moreover, Global points out that a district court observed, citing Lexmark, that proximate cause is a necessary element of liability in a case brought under § 5531.  CFPB v. ITT Educ. Servs., Inc., — F. Supp. 3d —, No. 1:14-cv-0292-SEB-TAB, 2015 WL 1013508, at *30 n.34 (S.D. Ind. Mar. 6, 2015).  In Lexmark, the Supreme Court explained that the "[p]roximate-cause analysis is controlled by the nature of the statutory cause of action.  The question it presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits."  134 S. Ct. at 1390.

The CFPB does not dispute that proximate cause is required.  It cites several cases in which the Federal Trade Commission ("FTC") brought enforcement actions to prevent the use of "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a)(1).  These cases, the CFPB asserts, should guide the Court's interpretation of the unfair practices provision of the CFPA.

In FTC v. Neovi, Inc., 604 F.3d 1150, 1153 (9th Cir. 2010), a company called Qchex marketed software programs that allowed users to create and send checks by post or email.  In short,

> The Qchex system was highly vulnerable to con artists and fraudsters.  Because the information necessary to set up an account was relatively public and easy to come by, it was a simple matter for unscrupulous opportunists to obtain identity information and draw checks from accounts that were not their own.

Id. at 1154.  In fact, over a six-year period, Qchex had to freeze over 13,750 accounts for fraud.  Id.  The accounts were responsible for nearly 155,000 checks using more than 37,350 bank accounts drawing over $402 million.  Id.  Qchex received thousands of complaints from consumers, banks, and even law enforcement agencies, yet it argued it "was attuned to the risk of fraud from the outset" and took multiple steps to monitor and reduce fraud.  Id.

52

The Ninth Circuit found that Qchex caused consumer harm, even though Qchex itself did not set out to defraud consumers, because it "created and controlled a system that facilitated fraud," and it "was on notice as to the high fraud rate." Id. at 1155.  The court noted "that businesses can cause direct consumer harm as contemplated by the FTC Act in a variety of ways." Id. at 1156.  Importantly, actual knowledge of the harm is not required, and "the absence of deceit is not dispositive." Id.  The court further explained:

> Courts have long held that consumers are injured for purposes of the Act not solely through the machinations of those with ill intentions, but also through the actions of those whose practices facilitate, or contribute to, ill intentioned schemes if the injury was a predictable consequence of those actions.

Id.[9]

What is more, "Qchex had reason to believe that a vast number of checks were being drawn on unauthorized accounts—checks that it legitimized in the eyes of consumers." Id. at 1157.  It even expected its software would be used for fraudulent purposes from the start and "continued to create and deliver checks without proper verification." Id.

---

[9]  The court clarified that Qchex was liable for "engag[ing] in behavior that was, *itself*, injurious to consumers." Neovi, 604 F.3d at 1157.  So, its liability was direct and did not need to be based on a theory of aiding and abetting. Id.

For the most part, the parties here focus their arguments on causation. The Payment Processors distinguish <u>Neovi</u> by arguing that the defendant's service was intended to facilitate fraudulent transfers and received thousands of complaints about unauthorized checks, so the fraud in that case was vast and better known.  (Pathfinder's Reply, Dkt. [128] at 22; Global Payments' Reply, Dkt. [130] at 14.)  But even if the evidence in <u>Neovi</u> is more compelling, that case was on summary judgment and benefitted from discovery.  Here Plaintiff need only state a plausible claim.  And in any case, <u>Neovi</u> stands for the proposition that a defendant may be liable for actions that "facilitate, or contribute to, ill intentioned schemes if the injury was a predictable consequence of those actions."  604 F.3d at 1156; <u>see also</u> <u>FTC v. Windward Mktg., Inc.</u>, No. Civ. A. 1:96-CV-615F, 1997 WL 33642380, at *13 (N.D. Ga. Sept. 30, 1997) (finding that a defendant engaged in the unfair practice of issuing bank drafts on consumers' accounts without authorization when it "was on notice of a high probability of fraud and/or unfairness and consciously avoided learning the truth").

In this case, the CFPB plausibly alleges that Global Payments was the proximate cause of consumer injury.  The CFPB alleges that Global "ignored

warnings from industry and consumers that the Payment Processors' clients

were engaged in a scheme to defraud consumers." (Compl., Dkt. [1] ¶ 333.) It

alleges facts to support the inference that Global knew the risks debt collectors

pose, had a duty to investigate suspicious activity, and in the face of numerous

warning signs of a debt-collection scheme permitted the Debt Collectors to

continue to process payments anyway. In this way it facilitated the Debt

Collectors' unlawful acts by giving them the tools they needed to use bank card

information to draw on consumers' accounts—predictable consequences of

ignoring consumer complaints about unauthorized charges and signs the debt-

collection merchants were not legitimate businesses. At this stage, the Court

finds that these acts or practices, in the words of § 5531(c)(1)(A), caused or

were likely to cause substantial injury to consumers. There is thus a

sufficiently close connection between Global ignoring signs of abusive

practices and the harm that resulted such that the claim survives a motion to

dismiss.

  ##### 2.    *Pathfinder*

  Pathfinder denies that it could have committed a primary violation of the

unfair practices provision because the CFPB does not allege Pathfinder

AO 72A
(Rev.8/82)

"entered into 'a transaction with a consumer for a consumer financial product or service or the offering of a consumer financial product or service.' " (Pathfinder's Br., Dkt. [89] at 16-17.)  Instead, Pathfinder says it "does business with other businesses."  (Id. at 17.)  But § 5531(c)(1) forbids a "service provider from committing or engaging in an unfair . . . act or practice under Federal law *in connection with* any transaction with a consumer for a financial product or service."  12 U.S.C. § 5531(c)(1) (emphasis added).  As a result, the service provider need not engage directly with the consumer.  The standard is broader, and the CFPB has adequately alleged Pathfinder's actions were acts performed in connection with debt collection, as Pathfinder helped the Debt Collectors obtain and keep payment-processing accounts with Global Payments.

### 3. *Frontline*

Frontline contends that the CFPB fails to allege Frontline itself committed any unfair acts.  (Frontline's Br., Dkt. [97-1] at 29-31.)  Like Pathfinder, Frontline insists it did not provide direct services to consumers, communicate with them, or otherwise interact with them.  More to the point, it argues that it could not have proximately caused injury to consumers when

AO 72A
(Rev.8/82)

Global Payments had already been processing the Debt Collectors' payments for more than a year when Frontline approved their applications.  However, the Court has explained that Frontline provided services to merchants despite its contractual relationship with Global.  The Court also finds it plausible that Frontline could have proximately caused consumer injury because Frontline is alleged to have been in a position to screen and thus identify illegitimate businesses and credit risks.  Frontline knew debt collectors posed a risk but failed to adhere to its duties in evaluating UDPS and Credit Power's applications.  A plausible consequence of the failure to investigate warning signs that debt collectors are illegitimate businesses is that they use their payment processing accounts to process unauthorized transactions.  For that reason, for the purposes of a motion to dismiss, the CFPB adequately alleges that Frontline engaged in acts that proximately caused consumer injury.

## IV.    Pleading under Rule 9(b)

Finally, the Court briefly addresses Defendants' arguments that the Court should apply a heightened pleading standard under Federal Rule of Civil Procedure 9(b) because the CFPB alleges claims sounding in fraud.  Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances

57

constituting fraud or mistake.  Malice, intent, knowledge, and other conditions

of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  The

Eleventh Circuit has explained:

> Rule 9(b) is satisfied if the complaint sets forth (1) precisely what
> statements were made in what documents or oral representations
> or what omissions were made, and (2) the time and place of each
> such statement and the person responsible for making (or, in the
> case of omissions, not making) same, and (3) the content of such
> statements and the manner in which they misled the plaintiff, and
> (4) what the defendants obtained as a consequence of the fraud.

Tello v. Dean Witter Reynolds, Inc., 494 F.3d 956, 972 (11th Cir. 2007).

The Court does not decide whether a heightened pleading standard is

appropriate under 12 U.S.C. § 5536.  Instead, the Court finds that if a

heightened pleading standard is appropriate, the Complaint complies with Rule

9(b).  The CFPB levels extensive allegations against Defendants.  It alleges the

particular red flags contained in the Debt Collector's applications, the sources

of the duties the Payment Processors had under the merchant services

agreements and Global Payments' agreement with its sponsor bank.  Moreover,

the CFPB explained how the chargeback rates and narratives should have put

the Payment Processors on notice the Debt Collectors were engaged in

unlawful activity harming consumers.  There are even examples of particular

58

consumer complaints.

Lastly, the allegations are not deficient based on the CFPB's "lumping" of the Payment Processors together.  Although the Complaint does lump them together for the purposes of Counts VIII and IX, the Complaint further contains particular allegations as to each Defendant, as extensively summarized in the Background section.  For that reason, Defendants are on notice as to which allegations pertain to them and what conduct was allegedly unlawful.

In sum, at this stage the Court finds that the CFPB has alleged allegations against each Payment Processor sufficient to survive a motion to dismiss.

## Conclusion

For the foregoing reasons, Defendant Pathfinder Payment Solutions, Inc.'s Motion to Dismiss [89], Defendant Global Payments, Inc.'s Motion to Dismiss [93], and Defendant Frontline Processing Corp.'s Motion to Dismiss [97] are **DENIED**.

**SO ORDERED**, this 1st day of September, 2015.

**RICHARD W. STORY**
United States District Judge

59