**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA,**
**ATLANTA DIVISION**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSAL DEBT & PAYMENT SOLUTIONS, LLC; *et al.*<br><br>Defendants. | Civil Action No. 1:15-CV-0859-RWS |

**CONSUMER FINANCIAL PROTECTION BUREAU'S RESPONSE IN OPPOSITION TO FRONTLINE'S MOTION FOR RECONSIDERATION**

The Consumer Financial Protection Bureau responds to the Motion for Reconsideration (Motion) of Defendant Frontline Processing Corp. (Frontline) as follows:

## I. PRELIMINARY STATEMENT

The Bureau's case against Frontline stems from Frontline's shoddy underwriting and monitoring of merchants it knew or should have known were fraudsters. The merchant underwriting and monitoring standards Frontline had a duty to follow—but nevertheless ignored—serve to protect consumers from fraud. Frontline's failure to adhere to these standards predictably resulted in consumer harm. The Bureau brings this case to obtain

redress on behalf of the consumers Frontline victimized and to prevent Frontline from exposing future consumers to harm because of its underwriting and monitoring malfeasance.

Based on the Bureau's complaint, this Court found it plausible that Frontline knew the debt collector defendants posed a risk of harm to consumers but failed to adhere to its duties when it evaluated the UDPS and Credit Power merchant applications. The Court also found that at least one plausible consequence of Frontline's underwriting failures is that the debt collectors would use their payment processing accounts to process illegal transactions. Thus, the Court concluded, the Bureau adequately pleaded that Frontline engaged in acts that proximately caused consumer injury. [1] The Supreme Court's recent decision in *Bank of America v. Miami* provides no basis for the Court to reconsider that conclusion. Frontline's Motion should therefore be denied.

## II. SUMMARY OF ARGUMENTS

- **Neither the holding in *Bank of America v. Miami* nor the reasoning underlying it applies to whether the Bureau stated a claim that Frontline violated the CFPA.** The CFPA's prohibition on unfair acts and practices has a longstanding meaning that is unaffected by the interpretation of when a plaintiff's damages are proximately caused by a violation of the Fair Housing Act.

[1] *See* ECF No. 149 at 57.

- **The plain text of the unfairness standard prohibits both acts or practices that cause substantial injury and those that are "likely to cause" substantial injury to consumers.** Courts have interpreted the parallel unfairness standard in the FTC Act to prohibit the sort of conduct the Bureau alleged Frontline engaged in. Consistent with congressional intent, the CFPA's unfairness standard should be interpreted the same way.

- **Regardless of the causation standard that applies to its unfairness claim, the Bureau's pleaded facts and the discovery record establish a close connection between Frontline's conduct and consumer harm.** At the time it allowed them access to the payments system, Frontline knew or should have known that the debt collector merchants were engaged in a scheme to defraud consumers. And after allowing them access, Frontline ignored numerous red flags that the debt collectors were, in fact, defrauding consumers. Frontline's underwriting and monitoring failures, which the CFPA prohibits, predictably resulted in consumer harm.

## III. ARGUMENTS & AUTHORITIES

### A. *Bank of America v. Miami* is not "an intervening development or change in controlling law" that warrants reconsideration of the Court's order.

Motions for reconsideration "shall not be filed as a matter of routine practice," and should only be filed when "a party or attorney for a party believes it is absolutely necessary."[2] A motion for reconsideration is only absolutely necessary "where there is: (1) newly discovered evidence; (2) an

---

[2] LR7.2(E).

intervening development or change in controlling law; or (3) a need to correct a clear error of law or fact."[3]

Due to the limited circumstances in which a court may reconsider a prior order, it is improper to use a motion for reconsideration as "a vehicle to present new arguments or evidence that should have been raised earlier, introduce novel legal theories, or repackage familiar arguments to test whether the Court will change its mind."[4] Frontline's Motion merely repackages rejected arguments and improperly introduces – and mischaracterizes – deposition testimony. Under this guise, Frontline tries to show that the Supreme Court's opinion in *Bank of America v. Miami*[5]—a case addressing, among other things, the causation standard for discrimination claims under the Fair Housing Act—effects a sea change in more than 80 years of jurisprudence under the unfairness doctrine. That effort fails.

*Miami* is about whether the city of Miami had standing to sue under the Fair Housing Act (FHA) based on a reduction in property tax revenue stemming from discriminatory lending practices. The Court held that while the city had standing to sue under the FHA, in order to recover damages the

---

[3] *Bryan v. Murphy*, 246 F. Supp. 2d 1256, 1258-59 (N.D. Ga. 2003).

[4] *Brogdon v. Nat'l Healthcare Corp.*, 103 F. Supp. 2d 1322, 1338 (N.D. Ga. 2000).

[5] 581 U.S. ___ (2017) (slip op.).

city must establish that the discriminatory lending practices at issue were the proximate cause of the reduction in property tax revenue. Without defining the proximate-cause standard for FHA claims, the Court stated, "[p]roximate-cause analysis is controlled by the nature of the statutory cause of action. The question it presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits."[6]

In order to establish proximate cause to recover under the FHA, the Court continued, the city "must do more than show that its injuries foreseeably flowed from the alleged statutory violation."[7] The Court observed that because the housing market is interconnected with economic and social life, a violation of the FHA may be expected "to cause ripples of harm to flow far beyond the defendant's misconduct."[8]

As discussed below, the Bureau's unfairness claim against Frontline presents no similar risk of recovery for the ripple effects of a remote cause of harm. Further, the *Miami* Court's holding is limited to claims arising under the FHA, and its reasoning is limited in application to "damages claim[s]"

---

[6] *Id.* (slip op. at 10) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1390)).

[7] *Id.* at 3.

[8] *Id.* at 11.

under federal causes of action with "common-law foundations."[9] Whether the Bureau has stated a claim for unfairness and whether the plaintiff in *Miami* could show that it suffered damages proximately caused by violations of the FHA both involve federal statutes, but the similarities end there.

### B. *Bank of America v. Miami* did not change the long-standing meaning of unfairness.

#### 1. The plain text of the unfairness standard prohibits acts or practices that cause or are *likely to cause* substantial injury.

*Miami* did not re-write the CFPA's unfairness standard. The plain text of the CFPA's unfairness standard prohibits both acts or practices that cause substantial injury and those that are "likely to cause" substantial injury to consumers.[10] This immediately distinguishes the question of how to interpret unfairness under the CFPA from the question of whether the plaintiff in *Miami* could pursue its private damages suit under the FHA by showing that its injuries were proximately caused by the defendants' alleged discriminatory conduct. Indeed, many courts have held that unfairness (and deception) claims don't require proof of proximate causation at all because

---

[9] *Id.* at 11-12 (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006)).

[10] 12 U.S.C. § 5531(c)(1)(A).

the plain language of those prohibitions refer to acts that are "likely to cause" injury and representations that are "likely to mislead" consumers.[11]

Frontline ignores the plain text of the unfairness standard when it argues "the Debt Collectors themselves serve as an intervening cause of the consumer injury."[12] In *FTC v. Wyndham Worldwide Corp.*,[13] the Third Circuit rejected an almost identical argument. In *Wyndham*, the FTC brought an unfairness claim against a group of businesses that failed to implement reasonable data security practices.[14] The district court denied the defendant's motion to dismiss the FTC's unfairness and deception claims and certified its ruling on the unfairness claim to the Third Circuit on interlocutory appeal.[15] On appeal, the defendant argued that it could not be held liable under the

---

[11] *See, e.g., In re Wellbutrin Antitrust Litig.*, 133 F.Supp.3d 734, 764 (E.D. Pa. 2015) ("Because the FTC's causation requirement [under the unfairness standard] is broader and more relaxed than the Clayton Act's, no showing of proximate cause is required."); *FTC v. Hope Now Modifications, LLC,* No. 09 1204 (JBS/JS), 2010 WL 1463008, at *1 (D.N.J. Apr. 12, 2010) (striking defendant's affirmative defense that they were not the proximate cause of any damage to any consumer, reasoning that the "FTC is not obligated to show that the defendants' conduct proximately caused harm to consumers") (collecting cases).

[12] ECF No. 409 at 6.

[13] 799 F.3d 236 (3d Cir. 2015).

[14] *Id.* at 240.

[15] *Id.* at 242.

unfairness standard for data breaches because it was "*itself* victimized by criminals."[16] The court rejected that argument for two reasons.

First, the court reasoned, "although unfairness claims usually involve actual and completed harms, they may also be brought on the basis of likely rather than actual injury."[17] In other words, the defendant's conduct could be unfair in its own right before the criminal conduct of third parties harmed consumers. Second, the court opined, "that a company's conduct was not *the most* proximate cause of an injury generally does not immunize [it] from liability from foreseeable harms."[18] Because cyberattacks were a foreseeable consequence of the defendant's failure to implement adequate cybersecurity measures, the court concluded, it could be held liable for unfair acts or practices for the harm those cyberattacks caused.[19]

*Wyndham* is instructive because the inadequate cybersecurity measures at issue in that case are functionally similar to Frontline's deficient underwriting and monitoring practices. In *Wyndham*, robust cybersecurity policies could have protected consumers from harm at the hands of unscrupulous hackers. Here, the industry underwriting and monitoring

---

[16] *Id.* at 246 (emphasis in original).

[17] *Id.*

[18] *Id.* (emphasis in original).

[19] *Id.*

standards Frontline had a duty to follow—but nevertheless ignored—could have protected cardholders from harm at the hands of the phantom debt collectors.

### 2. ***Miami* does not abrogate *Wyndham* or other cases upholding unfairness claims against defendants whose malfeasance exposes consumers to harm at the hands of third parties.**

As the *Miami* Court explained, the causation analysis is controlled by the nature of the statutory cause of action.[20] Therefore, the unfairness cases on which the Court relied in denying Frontline's motion to dismiss, which have since been validated by *Wyndham*, remain authoritative. Indeed, those cases (and decades of similar cases) interpreting what constitutes unfairness under the FTC Act must guide the Court's interpretation of the CFPA's parallel prohibition on unfair acts and practices. This is because where "judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well."[21]

---

[20] *See supra* n. 6.

[21] *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 590 (2010) (quotation marks and alterations omitted).

In *FTC v. Neovi*,[22] the defendants operated a website that allowed consumers to "create and send checks by post or email."[23] The service was popular with fraudsters, who used consumers' information to draw checks on accounts that were not their own.[24] The defendants argued that they "did not 'obtain, input, or direct' the delivery of consumer information nor facilitate the theft."[25] The Ninth Circuit rejected that argument, finding that the defendants "created and controlled a system that facilitated fraud and that the company was on notice as to the high fraud rate."[26] It concluded that processing payments when the party has reason to know the underlying transactions are illegal "is behavior that [is], *itself*, injurious to consumers."[27]

In *FTC v. Wells*,[28] the Ninth Circuit affirmed a district court judgment that the defendants "engaged in unfair trade practices by 'processing debit transactions to consumers' bank accounts, while knowing or consciously

---

[22] 604 F.3d 1150 (9th Cir. 2010).

[23] *Id.* at 1152.

[24] *Id.* at 1154.

[25] *Id.* at 1155.

[26] *Id.*

[27] *Id.* at 1157 (emphasis in original).

[28] 385 Fed. Appx. 712 (9th Cir. 2010) (mem.).

avoiding knowing that those debit transactions were unauthorized . . . ."[29] The court noted that defendants failed to conduct adequate due diligence and "knew or consciously avoided knowing that they were facilitating unauthorized transactions" after receiving reports of fraud and evidence of high chargeback rates.[30]

District courts in the Eleventh Circuit have also found that processing payments for fraudsters is an unfair practice in its own right. In *FTC v. Windward Marketing, Inc.*,[31] the court granted summary judgment to the FTC against a defendant who engaged in the "unfair practice of issuing bank drafts on consumers' accounts without the consumers' authorization."[32] The court relied on the payment processor's high chargeback rate and its receipt of a warning letter from a bank as relevant factors in inferring its recklessness.[33] Yet another court held that processing payments for

---

[29] *Id.* at 713.

[30] *See id.*

[31] No. 1:96-cv-615F, 1997 WL 33642380 (N.D. Ga. Sept. 30, 1997).

[32] *Id.* at *13.

[33] *Id.* at *12.

companies it knew or should have known were violating the telemarketing sales rule was an unfair practice.[34]

As these cases interpreting the FTC Act's prohibition on unfair acts and practices show, Congress intended for the CFPA's parallel unfairness prohibition to apply in cases like this one where a person processes payments in furtherance of a third party's fraudulent scheme. Nothing in *Miami* suggests that the Supreme Court intended its decision regarding private causes of action under the FHA to displace the longstanding judicial interpretation of when a person engages in an unfair act or practice.

Moreover, even if the "directness principles" of causation announced in *Miami* applied here—and they do not—the foregoing cases demonstrate that the Bureau has still stated a claim for unfair practices because Frontline's deficient underwriting and monitoring were harmful to consumers in their own right. As the Ninth Circuit recognized in *Neovi*, processing payments when the party has reason to know the underlying transactions are illegal is "behavior that [is], *itself*, injurious to consumers."[35]

### 3. Congress did not intend the unfairness standard to be limited by the common law.

---

[34] *FTC v. Global Mkt'g Grp., Inc.*, 594 F. Supp. 2d 1281, 1288-89 (M.D. Fla. 2008) (finding defendant "engaged in unfair acts and practices by withdrawing funds from consumers' bank accounts").

[35] *Neovi*, 604 F.3d at 1157 (emphasis in original).

Unlike the FHA claim at issue in *Miami*, the elements of the Bureau's unfairness claim are not limited by the common law. The CFPA's unfairness standard originates in the Federal Trade Commission Act (FTC Act). In Section 5 of the FTC Act, Congress prohibited "unfair or deceptive acts or practices in or affecting commerce." Courts have held that this prohibition reaches conduct that was not unlawful in the common law.[36] When it enacted this prohibition, Congress relaxed the strict standards of proof that governed common-law claims for fraud (or deceit), which made consumer recovery very difficult to obtain.[37] Courts have repeatedly acknowledged that the

[36] *See FTC v. R.F. Keppel & Bro.*, 291 U.S. 304, 310 (1934) (noting, with respect to original prohibition of unfair methods of competition, that "[n]either the language nor the history of the [FTC Act] suggests that Congress intended to confine the forbidden methods to fixed and unyielding categories" and observing that "[i]t would not have been a difficult feat of draftsmanship to have restricted the operation of the [FTC Act] to those methods of competition in interstate commerce which are forbidden at common law . . . if that had been the purpose of the legislation"); *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239-40 (1972) ("When Congress created the Federal Trade Commission in 1914 and charted its power and responsibility under s 5, it explicitly considered, and rejected, the notion that it reduce the ambiguity of the phrase 'unfair methods of competition' by tying the concept of unfairness to a common-law or statutory standard or by enumerating the particular practices to which it was intended to apply.").

[37] *FTC v. Std. Educ. Soc.*, 86 F.2d 692, 696 (2d Cir. 1936) (Hand, J.) ("The common-law was not over-solicitous to protect an unwary buyer; but there can be no doubt that such statements give a competitive advantage to the less scrupulous seller and that they not only add nothing to the buyer's opportunities to buy wisely, but hold out to him false inducements. The [FTC] has a wide latitude in such matters; its powers are not confined to such practices as would be unlawful before it acted; they are more than

prohibition is remedial in nature and serves a public purpose, making strict proof of intent to harm, consumer reliance, or actual damages unnecessary.[38]

So, whereas common-law fraud claims required consumers to prove that the defendant had an intent to deceive and harm, unfairness and deception claims require neither proof of intent to deceive nor proof of intent to harm consumers.[39] Whereas common-law fraud claims required consumers to demonstrate justifiable reliance on the intentional misrepresentation at issue, unfairness and deception claims don't require individualized proof of

---

procedural; its duty in part at any rate, is to discover and make explicit those unexpressed standards of fair dealing which the conscience of the community may progressively develop.").

[38] *See infra* notes 39 – 40.

[39] *See, e.g., FTC v. Neovi*, 604 F.3d 1150, 1156 (9th Cir. 2010) (holding actual knowledge of harm not required to prove unfairness claim) (citing *FTC v. Winsted Hosiery Co.*, 258 U.S. 483, 494 (1922) (holding that "[t]he honest manufacturer's business may suffer, not merely through a competitor's deceiving his direct customer, the retailer, but also through the competitor's putting into the hands of the retailer an unlawful instrument . . . ."; *R.F. Keppel & Bro*, 291 U.S. at 314 (holding candy retailer liable for unfair practices although manufacturer was responsible for the element of chance that made the practices unfair); *and Regina Corp. v. FTC*, 322 F.2d 765, 768 (3d Cir. 1963) (explaining that "[w]ith respect to those instances where petitioner did not contribute to the [misleading act], it is settled that [o]ne who places in the hands of another a means of consummating a fraud or competing unfairly in violation of the [FTC Act] is himself guilty of a violation of the Act") (internal citations and quotations omitted)); *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202 (10th Cir. 2005) ("Because the primary purpose of § 5 [FTC Act's prohibition of unfair or deceptive practices] is to protect the consumer public rather than punish the wrongdoer, the intent to deceive the consumer is not an element of a § 5 violation.").

reliance to obtain consumer redress.[40] And whereas common-law fraud claims required consumers to prove actual injury as a result of the defendant's conduct, unfairness and deception claims don't require proof of actual injury.[41]

Claims of unfairness under the CFPA do not sound in common-law fraud or any other theory of private recovery. There is no legal or logical basis to believe that Congress intended to replace longstanding interpretations of unfairness with a strict common-law standard of proof, whether or not such a standard might be appropriate for certain unrelated damages claims. Indeed, Congress empowered the FTC and the Bureau to bring unfairness claims in order to open avenues of relief that were closed in the common law.

**4. The CFPA's public purpose, jurisdictional reach, substantive prohibitions, and remedial provisions provide further evidence that Congress intended unfairness to be interpreted liberally.**

The CFPA's stated purpose is to ensure that all consumers have access to markets for consumer financial products and services that are fair,

---

[40] *See Freecom*, 401 F.3d at 1203 n.7 (finding proof of reliance not necessary to state a deception claim and observing, "[t]he FTC's action . . . was not a private or common law fraud action designed to remedy a singular harm, but a government action brought to deter deceptive acts and practices aimed at the public and to obtain redress on behalf of a large class of third-party consumers . . . .") (collecting cases).

[41] *See* 12 U.SC. § 5531(c)(1)(A) (defining unfair practices to include practices that are "likely to cause" substantial injury to consumers).

transparent, and competitive.[42] To this end, the Bureau is empowered to take action to "prevent a covered person or service providers from committing or engaging in" unfair, deceptive, or abusive acts or practices.[43] The Bureau has supervisory and rulemaking authority, as well as authority to take enforcement action to protect consumers from financial products or services that threaten their financial safety and welfare.[44] The Act is subject only to public enforcement, as the Bureau shares enforcement authority with state attorneys general and regulators.[45]

The CFPA also provides for remedies that include not only monetary relief to rectify actual injuries, but also, critically, injunctive relief to prevent consumer injury before it happens.[46] The Bureau thus has authority to enjoin and prevent: (a) unfair practices that are "likely to cause" substantial injury to consumers; (b) deceptive practices that are "likely to mislead" consumers; and (c) abusive practices that take unreasonable advantage of consumers or materially interfere with their ability to understand a financial product or

[42] 12 U.S.C. § 5511.

[43] 12 U.S.C. § 5531(a).

[44] 12 U.S.C. §§ 5512, 5515, 5564.

[45] 12 U.S.C. § 5552.

[46] 12 U.S.C. § 5565.

service.[47] Indeed, in its case against Frontline, the Bureau seeks injunctive relief that would stop Frontline from harming consumers through its deficient underwriting and monitoring practices.[48]

Further, because *Miami*'s proximate-cause analysis was rooted in "the nature of the statutory cause of action" at issue, it bears emphasizing that the CFPA protects consumers from both fraudsters and their enablers. The CFPA imposes liability – including, under certain circumstances, individual liability – on enablers in multiple ways. The Act makes it unlawful for covered persons to "offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law."[49] The Act also makes it unlawful for a "covered person or service provider" to "engage in any unfair, deceptive, or abusive act or practice."[50]

---

[47] 12 U.S.C. § 5531.

[48] ECF No. 1 at 62.

[49] 12 U.S.C. § 5536.

[50] *Id.* To "engage" means "to involve oneself or become occupied," to "participate." *See* Am. Heritage Dictionary. Engaging in the act thus denotes a broader set of conduct than personally committing the act or practice oneself. It includes not just doing the act at issue, but also participating in a scheme that someone else might carry out.

The CFPA broadly defines "covered persons" and "service providers," too. Covered persons include "any person who engages in offering or providing a consumer financial product or service."[51] Service providers include "any person who provides a material service to a covered person" in connection with the covered person's offering or provision of a consumer financial product or service.[52] Covered persons also include "related person[s]," which is defined to include any person with managerial responsibility for the covered person, as well as any other person who materially participated in the conduct of the covered person's affairs.[53] Additionally, the CFPA makes it unlawful for "any person to knowingly or recklessly provide substantial assistance to a covered person or service provider" in violation of the CFPA's UDAAP prohibitions, and imposes coextensive liability for persons who substantially assist primary violations.[54]

The scope and reach of these provisions, like the Act's public purpose and remedial character, counsels against applying a strict version of proximate cause to the Bureau's unfairness claim. By its own express terms, the CFPA creates liability that would be considered well beyond the "first

[51] 12 U.S.C. § 5481(6).

[52] 12 U.S.C. § 5481(26).

[53] 12 U.S.C. § 5481(25).

[54] 12 U.S.C. § 5536(a)(3).

step" of the causal chain in a standard tort case[55] and provides remedies absent proof of actual injury, which renders the reasoning in *Miami* inapplicable here.

**C. Regardless of the causation standard that applies, the Bureau's pleaded allegations and the discovery record establish a close connection between Frontline's prohibited conduct and the alleged consumer harm.**

The Bureau alleges that Frontline violated the CFPA when it failed to meaningfully underwrite or monitor the debt collector merchants. Although Frontline's stated underwriting policy was to "look for ways to say YES," most industry participants recognize their duty to ensure their merchants are operating lawful businesses. For example:

- "Before signing a Merchant Agreement, each Acquirer must verify that the Merchant from which it intends to acquire Transactions is a valid business." (MasterCard Security Rules and Procedures, § 7.1);
- "Before entering into, extending, or renewing a Merchant Agreement, an Acquirer must verify that the Merchant from which it intends to acquire Transactions is a bona fide business… complies with applicable laws, and that each Transaction will reflect bona fide business between the Merchant or Sub-merchant and a Cardholder." (MasterCard Rules, §5.1.1);
- Before entering a merchant agreement, an acquirer must determine that the prospective merchant is financially responsible and ensure that the merchant will comply with the substance of the Visa Operating Regulations and applicable law. (Visa's International Operating Regulations);

[55] *See* 581 U.S. ___ (2017) (slip op. at 11-12).

- "Visa wants to protect the integrity of the payment system and protect the integrity of the shopping experience for its consumers and cardholders and, you know, ensuring [merchant's] compliance with applicable law is one of those foundational things..." (Deposition Testimony of Visa's Head of Global Brand Protection, 41:6-11);

- Payment professionals must avoid bad merchants that harm cardholders due to the business practices they engage in. (Wells Fargo Bank's "Deceptive Practices and Prohibited Industry Categories" bulletin); and

- "Above all, ETA Members should strive to ensure that they are not providing payments acceptance for merchants or ISOs that engage in fraudulent acts or practices that harm consumers and, ultimately, the card acceptance ecosystem." (Electronic Transaction Association Operating Guidelines).

Frontline, in particular, should have been aware of its duty to ensure its merchants were operating lawfully.[56] Moreover, Frontline knew that the debt collectors posed a high risk of harming consumers.[57] It should hardly surprise Frontline, then, that its failure to follow industry standards designed to prevent fraud did, in fact, result in fraud.

---

[56] *See Gucci v. Frontline Processing Corp.*, 721 F.Supp.2d 228, 251-2 (S.D. N.Y. 2010) (where Frontline allegedly provided services to seller of counterfeit merchandise, finding manufacturer stated claim against Frontline for trademark infringement; rejecting Frontline's claim that it was merely a middleman).

[57] *See, e.g., FTC v. Broadway Global Master, Inc.*, No. 2:12-cv-855-JAM-GCH, (E.D. Cal. Apr. 5, 2012) (issuing temporary restraining order against Frontline merchant based on violations of FTC Act, 15 U.S.C. § 45(a), and Fair Debt Collection Practices Act, §§ 1692-1692p.)

Frontline's acts and omissions directly, and inevitably, caused harm to consumers. Not only did Frontline enable the debt collectors to access consumers' bank accounts, but Frontline encouraged the debt collectors' threats and harassment of consumers by making such conduct profitable. Frontline's shoddy underwriting and monitoring thus directly caused two types of consumer harm: (1) the receipt of threatening, harassing, and otherwise illegal phones calls from the debt collectors; and (2) for those consumers who made a payment in response to these threats, the loss of money from their bank accounts.

Moreover, regardless of whether consumers suffered actual injury from the debt collectors' fraudulent scheme, Frontline's deficient underwriting and monitoring was, at a minimum, "likely to cause" such injury. The Bureau need not identify which particular consumers paid the debt collectors in response to which particular threat. Industry underwriting and monitoring standards that Frontline was required to follow—but nevertheless flouted—exist precisely because allowing fraudsters to accept payment is likely to cause consumers harm. The probability of such malfeasance was not remote, but rather anticipated by the industry standards designed to prevent it.

## IV. CONCLUSION

Frontline asks this Court to reconsider its nearly two-year-old decision denying Frontline's motion to dismiss the Bureau's unfairness claims based

on a recent case interpreting the Fair Housing Act. But while *Miami* offered no guidance as to what the appropriate causation standard under the FHA should be, it was clear that the appropriate standard is determined by the nature of the statutory cause of action. The Bureau's action under the CFPA relies on the well-settled causation standard for unfairness claims. Nothing in the *Miami* decision suggests the Supreme Court meant to displace long-standing judicial interpretations of the unfairness standard. The Court should deny Frontline's Motion.

Dated: June 23, 2017

Respectfully Submitted,

Attorneys for Plaintiff
Consumer Financial Protection Bureau:

ANTHONY ALEXIS
Enforcement Director

DAVID RUBENSTEIN
Deputy Enforcement Director for Litigation

*/s/ Jonathan B. Engel*

Jonathan B. Engel (MA bar #664518)
Mary K. Warren (NY bar #2557684)
John Thompson (NM bar #139788)
ENFORCEMENT ATTORNEYS
1700 G Street NW
Washington, DC 20552
Phone (Engel): 202-435-9037
Phone (Warren): 202-435-9284
Phone (Thompson): 202-435-7270

Email: *Jonathan.Engel@cfpb.gov*
Email: *Mary.Warren@cfpb.gov*
Email: *John.Thompson@cfpb.gov*
Fax: 202-435-7722

And

Local Counsel
JOHN A. HORN
UNITED STATES ATTORNEY

LENA AMANTI
ASSISTANT U.S. ATTORNEY
Georgia Bar No. 666825
600 Richard B. Russell Federal Bldg.
75 Spring Street, S.W.
Atlanta, GA 30303
Telephone: (404) 581-6225
Facsimile: (404) 581-6163
Email: lena.amanti@usdoj.gov

## CERTIFICATE OF COMPLIANCE

The undersigned attorney hereby certifies, pursuant to LR 7.1.D, that the foregoing memorandum was prepared in Century Schoolbook 13 point font.

*/s/ Jonathan B. Engel*
___________________________ Dated: June 23, 2017
Jonathan B. Engel
Enforcement Attorney

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on this day a true and correct copy of Consumer Financial Protection Bureau's Response in Opposition to Frontline's Motion for Reconsideration was filed with the clerk of court using the CM/ECF system, which will automatically send email notification of the filing to all attorneys of record.

*/s/ Jonathan B. Engel*

______________________________ Dated: June 23, 2017

Jonathan B. Engel
Enforcement Attorney