**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA,**
**ATLANTA DIVISION**

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff,

v.

UNIVERSAL DEBT & PAYMENT SOLUTIONS, LLC; *et al.*

Defendants.

Civil Action No. 1:15-CV-0859-RWS

**PLAINTIFF CONSUMER FINANCIAL PROTECTION BUREAU'S BRIEF IN OPPOSITION TO DEFENDANTS SUMANT KHAN AND S PAYMENT PROCESSING & SOLUTIONS, LLC'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I. Introduction ........................................................................ 1

II. Argument ........................................................................ 4

A. Khan and SPPS were key participants in the illegal debt collection scheme and Khan knew the source of the funds processed through the SPPS merchant accounts. ........................ 4

1. The Defendants' debt collection practices ........................ 4

2. Khan's and SPPS's roles in Defendants' illegal debt collection business ........................................................ 7

B. The undisputed evidence establishes that SPPS and Khan are "debt collectors" under the FDCPA. ........................................ 14

C. Movants' reliance on others in the scheme to contact consumers does not exempt movants from FDCPA liability ........................ 20

III. Conclusion ........................................................................ 21

TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................... 4

*Janetos v. Fulton Friedman & Gullace, LLP*, 825 F.3d 317
(7th Cir. 2016) ........................................................................... 20

*Munoz v. Pipestone Financial*, LLC, 397 F. Supp. 2d 1129 (D. Minn. 2005).. 21

*Obester v. Lucas Assocs., Inc.*, No. 1:08–CV–03491–MHS–AJB,
2010 WL 8292401 (N.D. Ga. Aug 2, 2010)............................................. 4

*Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379 (3d Cir. 2000) .................... 21

*Scott v. Harris*, 550 U.S. 372 (2007) ..................................................... 4

*U.S. v. Hornaday*, 392 F.3d 1306 (11th Cir. 2004)....................................... 19

*U.S. v. Panfil*, 338 F.3d 1299 (11th Cir. 2003) ........................................... 19

**Statutes**

12 U.S.C. § 5531 ........................................................................... 2

12 U.S.C. § 5536 ........................................................................... 2

15 U.S.C. § 1692a(6) ................................................................. 12, 18

15 U.S.C. §§ 1692-1692p ................................................................. 2

**Rules**

Local Rule 56.1(B)(2)(a) ................................................................. 3

Local Rule 56.1.(B)(2)(b) ................................................................. 3

## I. INTRODUCTION

Plaintiff, the Consumer Financial Protection Bureau (the Bureau), hereby submits this Brief in Opposition to Defendants Sumant Khan and S Payment Processing & Solutions, LLC's Motion for Summary Judgment (Motion).

As set forth in detail in the Bureau's Brief in Support of Its Motion for Summary Judgment filed on November 15, 2017 (ECF No. 451-1), submitted simultaneously with the Plaintiff's Motion for Summary Judgment (ECF No. 451), the Bureau brought this action to shut down an unlawful debt collection enterprise that took more than $5 million from consumers throughout the country through the use of deception and harassment. The Defendants in this action are five individuals (Individual Defendants),[1] including Movant Sumant Khan (Khan), and seven limited liability companies (LLC Defendants),[2] including Movant S Payment Processing & Solutions (SPPS),

[1] The Individual Defendants are: Marcus Brown (Brown), Mohan Bagga (Bagga), Sumant Khan (Khan), Sarita Brown (S. Brown), and Tasha Pratcher (Pratcher).

[2] The LLC Defendants are: Check & Credit Recovery, LLC, Credit Power, LLC, S Payment Processing & Solutions, LLC (SPPS), Universal Debt & Payment Solutions, LLC (UDPS), Universal Debt Solutions (UDS), WNY Account Solutions, LLC (WNYAS), and WNY Solutions Group, LLC (WNYSG). SPPS and WNYAS are the only two LLC Defendants that have not defaulted.

formed by the Individual Defendants for the purposes of the debt collection scheme.

In their Memorandum of Law (ECF No. 450-1) (Movants' Brief or Mov. Br.) submitted with the Motion, Movants ask this Court to grant them Summary Judgment on Counts I, II, and III of the Bureau's Complaint, which allege violations of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692-1692p (FDCPA).[3] Despite the hundreds of thousands of pages of documents produced and testimony elicited during the two years of discovery in this litigation, including Khan's own testimony and SPPS's files, Movants base their Motion entirely on one newly-created document: Khan's declaration submitted with the Motion (ECF No. 450-1) (Khan Declaration or Khan Decl.). This document also forms the complete basis of Movants' statement of material undisputed facts (ECF No. 450-3) (Mov. Stmt.). Relying on the Khan declaration, Movants argue that they are not subject to the FDCPA because (i) SPPS was only a "middle man" that "processed transactions for a fee," Mov. Br. 3, (ii) Khan allegedly did not know the source of the funds flowing into SPPS, *id.*, and (iii) Khan and SPPS allegedly did not "directly participate" in debt collection activities, Mov. Br. 6-7. Movants further argue that, even if Khan and SPPS were debt collectors under the

[3] Khan and SPPS did not move for summary judgment on Counts IV – VII of the Bureau's complaint, which allege violations of the Consumer Financial Protection Act, 12 U.S.C. §§ 5531, 5536.

FDCPA, there is no evidence that they engaged in any conduct that violated the FDCPA. Mov. Br. 7-8.

The Court should disregard the Khan declaration. As fully discussed below, the statements in Khan's declaration on which Movants rely are not corroborated by the evidentiary record. To the contrary, they are completely contradicted by the extensive evidence, including SPPS's documents and Khan's prior testimony, which is described in the Bureau's Response to Movants' Statement of Material Undisputed Facts, filed pursuant to Local Rule 56.1(B)(2)(a), and the Bureau's Additional Statement of Material Undisputed Facts, filed pursuant to Local Rule 56.1.(B)(2)(b).

That evidence, which also forms the basis of the Bureau's Motion for Summary Judgment against Khan and SPPS, remains undisputed. It shows that Khan and SPPS played integral roles in the illegal debt collection enterprise, including providing critical assistance to other Defendants that sustained their scheme and allowed them to extract payments from numerous consumers. It further shows that Khan knew the source of the funds flowing into SPPS, that he organized SPPS specifically to enable Brown and others to collect purported debt payments from consumers, and that he personally directed the distribution of funds taken from consumers to Brown and himself (rather than to paying off consumer debts, as would occur in a legitimate debt collection business). Where, as here, "opposing parties tell two

different stories, one of which is blatantly contradicted by the record . . . a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)); *Obester v. Lucas Assocs., Inc.*, No. 1:08–CV–03491–MHS–AJB, 2010 WL 8292401, at *9 (N.D. Ga. Aug 2, 2010). Accordingly, the Court should deny the Motion and instead hold that the undisputed facts support the Bureau's claims against Movants.

## II. ARGUMENT

### A. Khan and SPPS were key participants in the illegal debt collection scheme and Khan knew the source of the funds collected through the SPPS merchant accounts.

#### 1. The Defendants' debt collection practices

The record evidence shows that SPPS and Khan were key participants in an unlawful debt collection enterprise in which the Individual Defendants formed and operated the LLC Defendants to collect debts that did not exist or that the LLC Defendants were not authorized to collect. Under the control of the Individual Defendants, the LLC Defendants purchased financial and contact information of consumers. SJ 26 at 166:19-170:6; SJ 14 ¶ 16 and attachments; SJ 123; SJ 124; SJ 125; SJ 171; SJ 200; SJ 201; SJ 202; SJ 203. The LLC Defendants opened accounts with CBC Innovis, a skip tracing

service, to obtain updated consumer contact information. SJ 59 at 155:9-158:18; SJ 129.

The LLC Defendants also opened accounts with a telephone broadcasting company, Global Connect LLC, that enabled them to robo-call millions of consumers nationwide. SJ 23; SJ 159; SJ 143; SJ 46; *see generally* SJ 2. In the robocalls, the LLC Defendants threatened consumers with legal action, accused them of bank or check fraud, and suggested that they would contact consumers' employers about their alleged debt unless consumers called the phone number given in the robocall message. SJ 138; SJ 46. When consumers called back, the LLC Defendants' debt collection callers continued to threaten them with legal or employment action unless they paid the alleged debt. SJ 1 ¶¶ 9,13 (a), (b), (d), (f), (g), 22, 22 (a), (d), (e), (f), (g), 26(b); SJ 5 ¶ 4-5; SJ 7 ¶¶ 4-5; SJ 8 ¶ 4; SJ 9 ¶2, 4; SJ 11 ¶2. In addition, the LLC Defendants called consumers' relatives and employers to harass them about the consumers' alleged debt. SJ 1 ¶¶ 11, 26(a).

However, Brown could not identify any entity that had authorized him or any of the LLC Defendants to collect debt on its behalf. SJ 69 at 39-44. The LLC Defendants did not employ lawyers and did not bring lawsuits to collect debts. SJ 59 at 127:1-24; SJ 14 ¶ 21. There is no evidence the LLC Defendants had any authority to bring criminal actions against consumers or any basis to accuse them of fraud. The LLC Defendants' debt collection

callers used false identities such as "LRS Litigation" when speaking with consumers. SJ ¶20. The LLC Defendants' employees used training scripts that instructed them to mislead consumers, including by "add[ing] $1,000" to whatever amount the consumer purportedly owed. SJ 19 at 996.

Consumers nationwide have complained about Defendants' debt collection practices. *See generally* SJ 1; SJ 5; SJ 6; SJ 7; SJ 8; SJ 9; SJ 10; SJ 11; SJ 12. Their complaints are further evidence that Defendants collected on debt that was not owed or that they had no authority to collect; that Defendants made unlawful accusations and threats of legal action to consumers to intimidate them into paying; that Defendants contacted third parties such as family members concerning consumers' alleged debt as additional harassment; and that Defendants failed to validate the alleged debt.

The LLC Defendants opened merchant processing accounts so that they could collect payments from consumers by credit and debit card during phone calls. The merchant processing accounts opened by Credit Power, UDPS, WNYAS, UDS, and SPPS, beginning in March 2011, were used to accept consumer bank card payments on alleged debt. SJ 4 ¶¶ 12-17 and Attach. A-K; SJ 27 at 147:7-18; SJ 59 at 168:15-169:25, 175:20-176:1; SJ 21 at 572-575; SJ 72; SJ 144; SJ 44 at 462-465, 496-500; SJ 93; SJ 54; SJ 50; SJ 10; SJ 175; SJ 161; SJ 53; SJ 139; SJ 170; SJ 15. During the period when SPPS was

operating, the LLC Defendants took in net payments of at least $1,539,858 from consumers, including more than $630,000 through SPPS's accounts.[4] SJ 4 ¶¶ 36-38. The Individual Defendants then spent the money they collected from consumers to pay for personal expenses. SJ 180 at 104:5-107:17,109:3-111:15; SJ 184 at 3-4; SJ 185 at 2-3; SJ 186 at 4-6. Movants have pointed to no evidence in the record that any of the consumers' money went toward paying off any consumer debts.

### 2. Khan's and SPPS's roles in Defendants' illegal debt collection business

Individual Defendant Marcus Brown was the ringleader of the enterprise and Khan assisted Brown in the debt collection business. SJ 24 ¶¶ 1 & 3; SJ 72; SJ 26 at 210:24-211:3; SJ 29; SJ 30; SJ 8 at 69:19-71:5; SJ 27 at 77:6-22; 147:7-159:11; 182:18-188:16, 189:23-190:6, 195:9-13; SJ 104; SJ 82; SJ 105; SJ 106; SJ 84; SJ 85 at 3, 7, 29; SJ 46 at 019-023; SJ 86 ay 30:22-31:1, 47:25-49:9; 82:24-83:13; SJ 42' SJ 94; SJ 96; SJ 97; SJ 98; SJ 39; SJ 40 at 6; SJ 48 at 522-523, ¶ 2; SJ 48 at 525-527; SJ 54 at 106. Among other important roles, Khan opened merchant processing accounts that enabled the enterprise to collect payments from consumers' credit and debit cards. SJ 55

---

[4] During this period, Defendants collected consumer payments through the SPPS merchant accounts with EMS and PaidSuite; the UDS merchant account with MerchantWorthy (which was closed by the end of May 2014); the WNYAS merchant account with PaidSuite; and the MC Processing account with EMS. SJ 4 ¶¶ 26-32.

¶ 3; SJ 48 at 525-527; SJ 180 at 63:7-24; SJ 54 at 109, 111; SJ 50 at 528, 530, 532. Brown used SPPS's merchant processing accounts to reap more than $660,000 in payments from consumers. SJ 4 ¶¶ 16, 29, 30, 32.

Movants claim that allowing Brown to use the SPPS merchant accounts to submit consumer payments for processing was the only role that Khan and SPPS played in the debt collection enterprise; further, they assert that Khan had "no knowledge of the source of the funds that Brown processed through the [SPPS] merchant accounts." Mov. Stmt ¶¶ 4-5; Mov. Br. 3. Those claims are utterly belied by the contemporaneous documentary evidence. First, Khan knew that the funds collected through SPPS's merchant processing accounts and sent to SPPS's bank account were purported debt payments from consumers. For example, in SPPS's merchant application to Francis David Corp. d/b/a EMS (EMS), Khan described SPPS's business as "collections." SJ 54 at 106. And SPPS's contract with Brown, which was signed by Khan, specified that the SPPS merchant processing account would be used for "debt payments" for "debt collection practice companies." SJ 48 at 525, preamble and sec. 2. Khan was the only person authorized to access or use the SPPS bank account, he received the account's bank statements at his home address, and he knew that payments were coming into that account through SPPS's merchant processing accounts. SJ 180 at 41:23-42:7; SJ 157; SJ 181; SJ 182; SJ 183; SJ 184; SJ 185.

Second, the record is replete with evidence that, even before Khan formed SPPS and applied for merchant processing accounts for Brown's use, he was well aware of the debt collection scheme being operated by Brown and Bagga and had been actively involved in helping it succeed. Notably, neither Khan's Declaration nor Movant's Brief addresses, or even mentions, the following additional activities of Khan that furthered the debt collection enterprise before he formed SPPS. In November 2011, Khan assisted Bagga in applying for a merchant processing account for LLC Defendant UDS by submitting a letter (Nov. 2011 Letter) to the payment processor Pathfinder Payment Solutions, Inc. (PPS) to describe UDS's debt collection business and its need for a merchant processing account separate from the two accounts that the debt collection enterprise had already opened with PPS. SJ 31. Khan used faked law firm letterhead and claimed he had a law degree from Emory University, even though he was not barred in the United States. SJ 31; SJ 180 at 9:18-10:7. He also claimed in the Nov. 2011 Letter that he "represents Universal Debt Solutions regarding consideration for another merchant processing account." SJ 31. Khan went on to describe the "exhaustive" and "aggressive" collection activity conducted by UDS. *Id.* Khan further represented that UDS and LLC Defendant Credit Power had allegedly entered into a debt sale agreement concerning "over six million dollars which is traded to [UDS] on a contingency basis and otherwise." *Id.*

In January 2012, Bagga listed Khan as a reference on LLC Defendant UDPS's application for an account with CBC Innovis, a skip tracing service. SJ 22 at 014. The phone number and email address listed for Khan in the application match those disclosed in the Financial Disclosure Statement that Khan submitted in this matter. *Id.*; SJ 150 at 1. The CBC Innovis internal notes summarizing its call with Khan indicate that he was with the "Smith White Law Firm," that he "[p]rovides them [UDPS] with corporate support," that "[h]e incorporated them with the state" and that "[h]e has only been working with them for the last few months but they are in good standing." SJ 151 at 249

On March 12, 2014, the Bureau served a Civil Investigative Demand (CID) on UDPS concerning its debt collection activities. SJ 178. Khan actively participated in responding to the CID on UDPS's behalf. In late March and early April of 2014, Khan communicated directly with Bureau attorneys on behalf of UDPS to coordinate the scheduling of investigational hearings related to the CID. SJ 179. In response to the Bureau's CID, UDPS produced a spreadsheet authored by "Sumant" that contained a list of approximately 9500 consumers, their social security numbers, their contact information, and details of their alleged debts. SJ 14 ¶ 16. Further, Khan testified that he was aware in May 2014 that the Bureau had issued Civil

Investigative Demands (CIDs) to other entities associated with Brown and Bagga relating to their debt collection activities. SJ 180 at 113:17-114:1.

Thus, in April 2014, at a time when he was helping UDPS, Brown, and Bagga respond to the Bureau's CID and was therefore aware that they were under regulatory scrutiny as to their debt collection activities, Khan decided to form SPPS and open merchant processing accounts with payment processors for the express purpose of allowing Brown and his associates to submit transactions for payment processing through those accounts. Khan Decl. ¶4; SJ 47; SJ 48 at 525-527; SJ 49; SJ 50; SJ 55 at 517 ¶ 3. And as noted above, at the same time, he also entered into a contract with Brown that allowed Brown and any "debt collection practice companies" affiliated with or represented by Brown to use the SPPS merchant processing accounts to accept "debt payments." Khan Decl. ¶ 5; SJ 48 at 525-527. Moreover, Khan misrepresented the facts about his new enterprise right out of the gate: in SPPS's application to EMS for a merchant processing account, Khan provided a letter purportedly from PNC Bank stating that the balance in SPPS's account with PNC Bank was $9,999,999.00 on April 29, 2014. SJ 54 at 111. The actual balance in SPPS's account with PNC Bank on April 29, 2014 was $2,500.00. SJ 181 at 1.

Third, the record evidence shows that Khan continued to assist the collection enterprise in other ways after establishing SPPS and granting

Brown unfettered access to its merchant processing accounts. For example, in July 2014, Khan emailed Brown a PowerPoint deck summarizing "Debt Collection laws in 50 states and alternative strategies of communication." SJ 153. Khan also promised Brown he would provide "more when I meet with you." *Id.* And in October 2014, Khan sent Brown additional information on the bonding and licensing requirements for debt collectors in North Carolina. SJ 152.

Additionally, the contract between Brown and SPPS required Brown to submit monthly reports directly to Khan detailing "the debt payments being processed through the company's gateway and through the company's merchant account." SJ 48 at 525, ¶ 2. The contract also provided that "Sumant Khan's demand for a written report on a weekly basis will be complied with by Marcus Brown or any of his affiliated companies or companies where he could potentially be involved in the management of debt collection practice." *Id.* Yet Khan testified that Brown never provided those reports to him, and despite Brown's failure to comply with his obligation to disclose what types of payments were being submitted for processing and collection, Khan did not do anything to stop Brown from using the merchant processing accounts. SJ 180. at 49:8-49:16, 115:5-13.

Finally, despite being aware that the money being collected through the SPPS merchant accounts and transmitted to the SPPS bank account

consisted entirely of payments from consumers that were supposed to go towards paying off their debts, Khan oversaw the distribution of that money to the various participants in the scam. For example, he wrote more than $200,000 in checks to Brown and WNYAS from the SPPS bank account. SJ 180 at 106:18-24; SJ 3 ¶¶ 8, 22.

On July 24, 2014, the Bureau served Khan with a CID relating to the debt collection activities of Khan and SPPS. Thereafter, Khan used the SPPS bank account as his personal piggy bank. He admitted to using the SPPS debit card to pay for thousands of dollars in personal expenses including: five plane tickets for personal flights to India totaling nearly $7,000, rent and renter's insurance for his residence; designer clothing; electronics; personal auto and health insurance premiums; and his cable bill. SJ 180 at 104:5-107:17; 108:23-111:15; SJ 186; SJ 185; SJ 184; SJ 183; SJ 182; SJ 181. The vast majority of these purchases were made after July 24, 2014, the date Khan was served with the Bureau's CID. SJ 180 at 108:23-109:9; SJ 188.

Khan would have the Court believe that he and SPPS had no role in the illegal debt collection enterprise other than allowing Brown to submit transactions for processing and that he had no knowledge of Brown's business or what kind of transactions Brown was submitting through the SPPS merchant processing account. The undisputed facts show that claim as untrue and not to be credited.

### B. The undisputed evidence establishes that SPPS and Khan are "debt collectors" under the FDCPA.

Movants claim that they are not subject to the FDCPA because neither is a "debt collector" as defined by the FDCPA. Mov. Br. at 5-7. But this claim cannot be squared with the evidence, which clearly establishes that SPPS and Khan are each "debt collectors" under the FDCPA. 15 U.S.C. § 1692a(6) (defining "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.").

For example, Movants claim that SPPS was a "merchant payment processing company," rather than a debt collector, Mov. Stmt. ¶ 1, but the application that SPPS submitted to EMS to obtain its merchant processing account which was signed by Khan, contradicts that assertion. In that application, SPPS identified the type of goods sold as "Collections." SJ 54 at 106.

In addition, Khan's claim that he formed SPPS "to enter into contracts with vendors or service providers to process their payment card transactions," Mov. Stmt. ¶ 3, describes a practice that is specifically prohibited by the payment processing and bank card industries and explicitly

prohibited by SPPS's merchant agreements with PaidSuite and EMS. The practice by which a merchant acts as an intermediary by allowing other entities to submit their transactions for processing through the merchant's account with a payment processor is known as "factoring" or "aggregating." SJ 191 at 950; SJ 192 at 21, 51; SJ 193 at 69:3-24; SJ 194 at 5-1. Factoring is prohibited in the payment processing industry because it is a form of laundering. SJ 191 at 950; SJ 192 at 21, 51; SJ 193 at 69:3-15. Factoring allows merchants to circumvent the screening process and obtain access to the payment processing system even when they could not obtain their own merchant account. SJ 195 at 104:1-21.

Consistent with industry practice, SPPS's merchant agreements with PaidSuite and EMS specifically prohibited SPPS from submitting transactions for processing for entities other than itself. The PaidSuite agreement provides: "Sub-merchant shall only complete sales transactions produced as the direct result of bona fide sales made by Sub-merchant to cardholders, and is expressly prohibited from presenting sales transactions which are produced as a result of sales made by any person or entity other than Sub-merchant . . ." SJ 196 at 149. The EMS Merchant Agreement required SPPS to warrant that: "(a) it is engaged in the lawful business shown on the front of the Application . . . (j) Merchant uses both the name and address shown on the front of the Agreement on all sales drafts and does

not use any other name . . . (l) no Transaction is between a cardholder and an entity other than Merchant." SJ 197 at 108, ¶ 13. Thus, while Khan portrays SPPS as a "merchant payment processing company" whose business was to generally provide payment processing services to various clients in any industry, Khan Decl. ¶ 4, that purported business model was prohibited by SPPS's contracts and industry rules.

In reality, SPPS's only "clients" were Brown and his "affiliated companies," and SPPS's merchant processing accounts were used only in the debt collection business. Despite the prohibitions in its agreements with EMS and PaidSuite, SPPS entered into a contract with Brown that allowed him and the LLC Defendants to use SPPS's merchant processing accounts to submit credit and debit card transactions for payment. SJ 48 at 525-527; SJ 55 ¶ 3. The contract between SPPS and Brown specifically states that the SPPS merchant accounts will be used to "process payments for debt collection practice companies," in particular "debt payments". SJ 48 at 525, preamble and sec. 2. The contract seeks to indemnify SPPS for any violations of the FDCPA committed by Brown. SJ 48 at 526, sec. 4. The contract allows Brown to submit transactions for payment through SPPS on behalf of himself and "any of his affiliated represented companies" or "the company managed by his family member". *Id.* at 525, sec. 1; SJ 180. at 63:7 – 63:24.

Khan admitted that he created SPPS after Brown informed Khan that he needed access to a merchant processing account, and that SPPS opened such accounts promptly. SJ 55 at 3 (Resp. to Int. No. 10). Khan also admitted that he was compensated by LLC Defendant WNYAS, SJ 55 at 1 (Resp. to Int. No. 4), which was a debt collector, and that Brown used WNYAS to pay SPPS funds that constituted a "reserve" for consumer chargebacks. SJ 180 93:20-95:10. Accepting funds from a debt collection company as a reserve for consumer chargebacks further demonstrates that SPPS was in the debt collection business.

In addition, SPPS supported, and was supported by, the other LLC Defendants engaged in collection of purported debt. As noted above, SPPS paid large sums of money to WNYAS. SJ 3 ¶¶ 8, 22. WNYAS funded payroll for the LLC Defendants' debt collection agents. SJ 3 ¶ 23. SPPS operated out of the same shared office premises at 1401 Peachtree Street, Atlanta, Georgia, as did UDPS, Credit Power, and WNYAS. SJ 17 at 975; SJ 85 at 3, 6; SJ 20 at 001; SJ 169 at 495. Brown signed the lease for those premises, and Bagga was the guarantor on the lease. SJ 149 at 27 (pdf p. 29), D-1 (pdf p. 35), last page (pdf p. 41). WNYAS made rent payments for that office space on behalf of SPPS and the other LLC Defendants operating out of 1401 Peachtree Street. SJ 149 at 1 (pdf p. 2) (showing name of landlord is Midtown

Two Tso, LLC); SJ 50 at 529 (SPPS's landlord identified as "Mid Tso")' SJ 3 ¶ 27.

Finally, consumer debt payments submitted through the SPPS merchant accounts were paid directly into the bank account that Khan opened for SPPS, and not to any other entity. SJ 4 ¶¶ 29-30 and Atts. I, J; SJ 182 at 2; SJ 183 at 2; SJ 184 at 2-3; SJ 185 at 2; SJ 186 at 2-3; SJ 19 at 827-828; 908-909. Movants claim that SPPS "remitted . . . payments back to Brown," Mov. Stmt. ¶ 7. First the record shows that SPPS "remitted" only a fraction of what consumers paid to it, as SPPS took in $633,710 from consumers after chargebacks, SJ 4 ¶¶ 16, 29, 30, 32, but only wrote approximately $200,000 in checks to Brown and WNYAS. SJ 3 ¶¶ 8, 22. Second, that SPPS wrote some checks to Brown and WNYAS does not change the fact that SPPS directly collected the purported debt payments that other Defendants extracted from consumers. SPPS simply conveyed some of the fruits of the illegal scheme — *i.e.*, the payments collected from consumers — to Brown and WNYAS.

The evidence described above indisputably establishes that SPPS and Khan are "debt collectors" under the FDCPA. They each engaged in a business the principal purpose of which is the collection of debts. The principal business of SPPS itself was debt collection, but also, all of the Defendants collectively operated a debt collection business, and SPPS and

Khan played essential roles that business. And there is no genuine dispute that SPPS and Khan used instrumentalities of interstate commerce or the mails – most notably telephone and internet services, which were necessary components of maintaining a merchant processing account, as well as mail services[5] – in the debt collection business operated by SPPS and other Defendants. SPPS and Khan are also "debt collectors" under the FDCPA

---

[5] Khan incorrectly claims that Movants did not use "any instrumentality of interstate commerce or the mails" in the debt collection business. Khan Decl. ¶ 8. First, in its application to EMS for a merchant processing account, Khan specifically identified SPPS's business as 100% "Telephone Order," SJ 54 at 106. In SPPS's contract with PaidSuite, Khan represented that its business was 100% "Mail/Phone." SJ 196 at 151. Thus, he admits that SPPS used mail service. It is also well established that telephone wires are an instrumentality of interstate commerce. Second, the Eleventh Circuit has held "[t]he internet is an instrumentality of interstate commerce." *U.S. v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004); *U.S. v. Panfil*, 338 F.3d 1299, 1300 (11th Cir. 2003). SPPS also used the internet in its business. SPPS used an internet "gateway" to submit consumer bank card transactions for processing and payment. SJ 180 at 17:14-19, 19:1-6, 50:1-3, 63:7-12, 94:3-7, 95:24-96:1 (wherein Khan discusses using a "gateway"); SJ 48 at 525 (contract with Brown referring to a "gateway"); SJ 198 at 2. The EMS website explains that gateways are "online payment systems [which] can help you run your business from a storefront, online, over the phone, a truck, or wherever your customers go!" SJ 198, at 2. EMS provided its merchants with access to a Virtual Terminal, which is a "web-based, real time credit card payment" system that enables merchants to "process and manage payment card transactions quickly and easily in a back office, phone, or billing environment." SJ 199 at 1.

because they regularly collected the payments on debts due or asserted to be owed or due to another.

### C. Movants' Reliance on Others in the Scheme to Contact Consumers Does Not Exempt Movants From FDCPA Liability.

Movants argue that even if they were debt collectors under the FDCPA, they could not have violated the FDCPA because they allegedly never "made any representation to anyone in connection with the collection of debt." Mov. Br. 7-8, and were not required to validate any debts. Mov. Br. 8. In other words, they claim that it is not an FDCPA violation to collect hundreds of thousands of dollars from consumers into their own bank accounts, on debts that did not exist or were not theirs to collect, provided someone else makes the threatening and false calls that precipitated those payments.

Movants' unsupported argument contradicts the plain language of the FDCPA, which defines "debt collector" to include a person who "regularly collects or attempts to collect, directly *or indirectly*." 15 U.S.C. § 1692a(6). Their argument also contradicts well-established FDCPA precedent holding that debt collectors are liable under the FDCPA even if they outsource certain functions to third parties, including communicating with consumers. *E.g.*, *Janetos v. Fulton Friedman & Gullace, LLP*, 825 F.3d 317, 325 (7th Cir. 2016) ("A debt collector should not be able to avoid liability for unlawful debt collection practices simply by contracting with another company to do what

the law does not allow it to do itself."); *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 405 (3d Cir. 2000) ("an entity that is itself a 'debt collector'—and hence subject to the FDCPA—should bear the burden of monitoring the activities of those it enlists to collect debts on its behalf"). For example, in *Munoz v. Pipestone Financial*, LLC, 397 F. Supp. 2d 1129, 1133 (D. Minn. 2005), the court found the debt collector liable even though it did not itself communicate with the consumer; its contractor did.

Here, it is undisputed that Khan and SPPS contracted with Marcus Brown to make the debt collection calls that filled SPPS's bank accounts with consumer payments. On the same day that he organized SPPS, Khan entered into a contract with Brown that allowed Brown and any companies affiliated with or represented by Brown to use the SPPS merchant accounts to submit "debt payments" for processing. Khan Decl. ¶ 5; SJ 48 at 525-527. Under that contract, Brown was an "independent contractor" for SPPS. Movants cannot circumvent the prohibitions of the FDCPA by using such an arrangement and then feigning ignorance about it.

## III. CONCLUSION

For the foregoing reasons, Movants Khan and SPPS have failed to show that they are entitled to judgment as a matter of law, and their Motion for Summary Judgment on Counts I, II, and III of the Complaint should therefore be denied.

Dated: December 14, 2017

Respectfully Submitted,

Attorneys for Plaintiff
Consumer Financial Protection Bureau:

KRISTEN DONOGHUE
Enforcement Director

DAVID RUBENSTEIN
Deputy Enforcement Director

THOMAS KIM
Assistant Deputy Enforcement Director

*/s/ Mary K. Warren*

Mary K. Warren (NY bar #2557684)
John Thompson (NM bar #139788)
Rebecca Coleman (MD)
Maureen McOwen (DC bar # 976749)
ENFORCEMENT ATTORNEYS
1700 G Street NW
Washington, DC 20552
Phone (Warren): 202-435-9284
Phone (Thompson): 202-435-7270
Phone (Coleman): 202-435-7541
Phone (McOwen): 202-435-9553
Email: Mary.Warren@cfpb.gov
Email: John.Thompson@cfpb.gov
Email: Rebecca.Coleman@cfpb.gov
Email: Maureen.Mcowen@cfpb.gov
Fax: 202-435-7722

And

Local Counsel

KURT ERSKINE, FIRST ASSISTANT
U.S. ATTORNEY

LENA AMANTI
ASSISTANT U.S. ATTORNEY
Georgia Bar No. 666825
600 Richard B. Russell Federal Bldg.
75 Spring Street, S.W.
Atlanta, GA 30303
Telephone: (404) 581-6225
Facsimile: (404) 581-6163
Email: lena.amanti@usdoj.gov

CERTIFICATE OF COMPLIANCE

The undersigned attorney hereby certifies, pursuant to LR 7.1.D, that the foregoing document was prepared in Century Schoolbook 13 point font.

*/s/ Mary K. Warren*
____________________________ Dated: December 14, 2017
Mary K. Warren
Enforcement Attorney

CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on this day a true and correct copy of the foregoing document was filed with the clerk of court using the CM/ECF system, which will automatically send email notification of the filing to all attorneys of record, and was mailed by United Parcel Service to the following defendants that do not have access to the CM/ECF system:

Mohan Bagga
6375 Whitestone Place
Duluth, GA 30097

Sarita Brown
1440 Jefferson Ave., #233
Buffalo, NY 14208-1827

Tasha Pratcher
142 Stratford Avenue
Buffalo, NY 14216

*/s/ Mary K. Warren*
____________________________ Dated: December 14, 2017
Mary K. Warren
Enforcement Attorney