**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| CONSUMER FINANCIAL | : | |
| PROTECTION BUREAU, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 1:15-CV-0859-RWS |
| | : | |
| UNIVERSAL DEBT & | : | |
| PAYMENT SOLUTIONS, LLC, *et* | : | |
| *al.*, | : | |
| | : | |
| Defendants. | : | |

## <u>ORDER</u>

The Consumer Financial Protection Bureau ("CFPB") brings this suit

against numerous individuals and entities in connection with a massive debt-

collection scheme.  According to the CFPB, several individuals created limited

liability companies in Georgia and New York to perpetrate a debt-collection

scheme targeting millions of consumers.  All said, through that operation, they

collected more than $5 million in false or inflated debts.

After nearly four years, the case is now at summary judgment.  Currently

before the Court are Defendants Sumant Khan and S Payment Processing

Solutions, LLC's Motion for Summary Judgment [450]; the CFPB's Motion for

Summary Judgment [451]; and Defendant Tasha Pratcher's Motion for

Permission to File an Answer Out of Time to the CFPB's Motion [547].  After

reviewing the record, the Court enters the following Order.

## Background[1]

## I.    Factual Background

The Defendants in this case are a set of individuals and limited liability

companies that the CFPB accuses of working together in a fraudulent scheme

to collect debts from consumers that did not exist or that Defendants were not

entitled to collect.  Defendants are best organized into two groups: (1) the LLC

Defendants and (2) the Individual Defendants.

### A.    The LLC Defendants

The LLC Defendants include: (1) Universal Debt & Payment Solutions

("UDPS"); (2) Universal Debt Solutions; (3) WNY Account Solutions and

WNY Solutions Group, LLC ; (4) Check & Credit Recovery, LLC; (5) Credit

---

[1]  Unless otherwise noted, these facts are taken from the CFPB's Statement of
Material Facts, (Dkt. [452].)  At summary judgment the Court construes the facts in
the light most favorable to the nonmoving party.  However, where as here, many of
the Defendants did not respond to the CFPB's Statement of Material Facts (either at
all or in a manner contemplated by the Court's Local Rules), those facts, as far as they
concern those Defendants, will be deemed admitted.  See LR 56.1B(2) NDGa.

AO 72A
(Rev.8/82)

Power, LLC; and (6) S Payment Processing & Solutions, LLC ("S Payment").

UDPS, Check & Credit Recovery, Credit Power, and S Payment are all Georgia

companies. Meanwhile, Universal Debt Solutions, WNY Solutions Group, and

WNY Account Solutions were based out of New York.

According to the CFPB, each of the LLC Defendants played a part in the

debt-collection scheme. At least three of them—UDPS, WNY Account

Solutions , and Credit Power[2]—did so from an office located at 1401 Peachtree

Street in Atlanta.

For its part, UDPS—a company that operated with no

employees—compiled the telephone numbers and addresses of people with

debts through an account with CBC Innovis, and also broadcast automated

collection calls using a separate account with Global Connect. UDPS

maintained merchant processing accounts as well, which allowed it to take

payments from consumers who used their bankcards.

Similarly, WNY Account Solutions (which also operated under the

fictitious name, "WNY Account Solutions Group" and self-identified as a debt-

---

[2] The CFPB also alleges that S Payment operated from this office, but that fact is in dispute.

collection agency) used a Global Connect account to broadcast automated collection calls to consumers. Credit Power did the same, and also paid for WNY Account Solutions' account with Global Connect, as well as a similar account held by Check & Credit Recovery. And, like UDPS, Credit Power opened an account with CBC Innovis to "track Debtor's [sic] addresses and phone numbers." (Dkt. [454-16].)

The other companies engaged in similar conduct. For instance, WNY Solutions Group operated as a collection agency in Buffalo, while Universal Debt Solutions' operations have been characterized as "collect[ing] aggressively from third parties (debtors)," both from its own "significant debt collection portfolio" and also on behalf of Credit Power on a contingency basis. (Dkt. [454-6].) Universal Debt Solutions did so using a variety of names, including "Payday Loans & More" and "Worldwide Requisition." It also took funds from the debt-collection scheme to purchase real property and generate rental income.

S Payment, on the other hand, was organized later than the other LLC Defendants, in April 2014. The same day, S Payment executed a contract with Marcus Brown that permitted Brown and his affiliated companies to process

4

debt-collection payments using S Payment's merchant processing account.  In

return, S Payment received a 5% commission.

B.      The Individual Defendants

The Individual Defendants are: Marcus Brown, Mohan Bagga, Sumant

Khan, Sarita Brown, and Tasha Pratcher.  Each of them was affiliated with one

or more of the LLC Defendants.  Marcus Brown, though, was in one way or

another associated with them all.

1.      *Marcus Brown*

From 1991 to 2005—years before the events giving rise to this

lawsuit—Marcus Brown held jobs at multiple collection agencies.  In 2005, he

pleaded guilty in New York to grand larceny, scheme to defraud, and identity

theft.  Among other things, the State charged Brown with committing credit

card fraud.

Years later, Brown began traveling between Buffalo and Atlanta to help

the LLC Defendants collect consumer debts.  Brown was an owner, officer, or

registered agent of nearly all the LLC Defendants.  Notably, he organized

Universal Debt Solutions then advised the company's clients on how to

organize a debt-collection business.  Brown also taught WNY Solutions Group

5

how to improve collectors' performances and drafted collection letters.

Similarly, when asked to help set up a debt-collection business in Atlanta,

Brown provided Credit Power with what he called the "Brown Doctrine." It

included call scripts and recommendations on how to motivate debt collectors

to increase productivity. Later, Brown took control of Credit Power, along

with Mohan Bagga. Furthermore, Brown purchased and sold debt for WNY

Account Solutions. He also paid the bills for its merchant processing and

Global Connect accounts. And he used S Payment's merchant processing

accounts as well.

In addition to the advice he provided, Brown also drafted scripts that the

LLC Defendants's employees used when making collection calls, as well as

demand letters that were sent to consumers. He also recruited employees for

the LLC Defendants, owned or controlled nearly half of the 70 phone numbers

the debt collectors used, and opened Global Connect accounts for three LLC

Defendants—UDPS, WNY Account Solutions, and Check & Credit

Recovery—which they used to broadcast collection calls. Brown further

compiled information about consumers by purchasing payday loan leads and

alleged debt portfolios and performing skip tracing. He also facilitated the

6

collection of debts by using payment processing accounts "to take and process consumers' credit and debit card payments." In the end, Brown received $321,492.00 in checks from the LLC Defendants. That does not include cash payments or personal expenses Brown paid using the LLC Defendants' corporate accounts.

### 2. The Other Individual Defendants

• <u>Mohan Bagga</u>: Mohan Bagga was mainly affiliated with Credit Power and UDPS. Mr. Bagga filed the articles of organization and served as an officer and manager for both companies. He also controlled their bank accounts and handled the accounting for UDPS. As for the debt-collection scheme, Mr. Bagga's primary role was opening merchant payment processing accounts. Although, he also opened an account with CBC Innovis for Credit Power to "track Debtor[s'] addresses and phone numbers," and another for UDPS to "obtain current telephone number[s] and address[es] of debtors." Mr. Bagga received $22,730.00 in checks from the LLC Defendants.

• <u>Sumant Khan</u>: Sumant Khan is a licensed attorney in India. In 2014, he organized S Payment. Mr. Khan was S Payment's only officer. As a result, he had control over the company's two payment processing accounts—one

with Electronic Merchant Services ("EMS") and another with PaidSuite—and

he signed the contract giving Marcus Brown access to those accounts. A total

of $22,750.00 in checks were made out to Mr. Khan by WNY Account

Solutions and UDPS.

• <u>Sarita Brown:</u>  Sarita Brown is Marcus Brown's sister. She served as

an officer of UDPS and WNY Account Solutions, and also a manager of

Universal Debt Solutions. At Marcus Brown's direction, Ms. Brown opened

bank accounts for Universal Debt Solutions and WNY Account Solutions.

Then she signed blank checks from those accounts over to Marcus Brown.

And she gave him permission to sign her name on documents "whenever he

needed it." When she did these things, Ms. Brown was aware of her brother's

recent criminal history and that it was related to credit card fraud.

• <u>Tasha Pratcher:</u>  Tasha Pratcher is Marcus Brown's estranged wife. In

2005, Ms. Pratcher entered a guilty plea for one count of petit larceny for her

part in the identity theft scheme that Brown also pleaded guilty to. Seven years

later, Ms. Pratcher organized UDPS, together with Brown. Ms. Pratcher also

owns a business called RX Office Solutions. That company never made money

or had any expenses. Rather, Ms. Pratcher used RX Office Solution's bank

8

account as a personal account where she deposited money that Brown gave her. Altogether, checks were written to Ms. Pratcher from WNY Account Solutions totaling $122,910.00. Ms. Pratcher used that money, in part, to pay rent for the 1401 Peachtree Street office. She also helped Credit Power by drafting a "Cease and Desist" letter to rival companies instructing them to stop using consumer information they took from Credit Power, and later a form termination letter for Credit Power employees.

### C. The Debt-Collection Scheme [3]

From 2011 to 2015 Defendants were responsible for millions of collection calls to consumers seeking to collect debts that were not owed or that Defendants were not authorized to collect. They acquired consumers' contact information in two ways. First, Marcus Brown purchased debt portfolios and payday loan leads, which gave them access to names, addresses, places of employment, Social Security numbers, telephone numbers, and bank account information. Second, Defendants performed "skip tracing" to verify and

---

[3] In this section, the Court provides an overview of the debt-collection scheme. For simplicity, the Court often refers to the activities of "Defendants." This is not to say, however, that each Defendant necessarily participated in or even knew about every facet of the operation. Each Defendants' individual involvement—in addition to what the Court already described—will be discussed below.

update existing contact information.

Defendants then used this information to place automated calls to consumers. They opened accounts with Global Connect LLC, a telephone broadcasting service, and furnished robo-call scripts that Global Connect recorded and broadcast to tens of thousands of consumers nationwide. The robo-call messages told consumers that they were accused of bank fraud or that a legal claim had been filed against them and that they must call a specified phone number to avoid legal action.[4] If a consumer called back or pressed "9" during the message, they were directed to one of 70 different phone numbers linked to Defendants' Global Connect accounts.

Eventually, consumers were connected to a member of the debt-collection staff. Those staff members often falsely identified themselves as litigators and threatened legal action or even arrest if the consumer did not pay up immediately. They had scripts and guides telling them how to respond when asked specific types of questions. And if the employee speaking to the consumer—referred to as a "litigator"—obtained a verbal commitment to pay,

---

[4] The Court has attached transcripts of these broadcast messages as Appendix A.

10

then the employee would transfer the consumer to an "auditor" who took the consumer's payment information. As stated previously, Defendants had multiple payment processing accounts, which allowed them to take payments from consumers through credit or debit card transactions.

As for the purported debts, Defendants misrepresented the amount owed, misrepresented their authority to collect on the purported debt, and took more in credit or debit card payments than the consumers authorized. None of the money collected actually went towards paying off any debt. Instead, Defendants took it for themselves. They used the collections to purchase properties, pay personal bills, and cover other expenses.

### D.    Damage to Consumers

Hundreds of consumers complained about Defendants' debt-collection practices. They lodged complains with the Better Business Bureau and in the form of chargebacks—*i.e.*, by disputing credit or debit card transactions. The CFPB has also produced sworn declarations from eight consumers who were personally affected. In brief, consumers reported: (a) frequent robo-calls; (b) debt collectors contacting third parties such as employers and family members; (c) threats of legal action or arrest; (d) use of fake identities; (e)

11

misrepresentations about debts being owed or the caller's right to collect; and (f) failure to provide written confirmation of the amount of the debt and the name of the creditor to whom the debt was owed.

Overall, a total of $5,554,285.00 was processed through the various LLC Defendants' merchant processing accounts. Only $292,801.00 was ever refunded to consumers through chargebacks. Accordingly, Defendants collected at least $5,261,484.00 from the debt-collection scheme.

## II.    The CFPB's Claims

The CFPB is an independent agency of the United States responsible for protecting consumers through the enforcement of federal consumer financial laws. 12 U.S.C. § 5491(a). It brought this action on behalf of the consumers injured as a result of Defendants' debt-collection practices.

The CFPB alleges violations of the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. §§ 5531, 5536(a), and the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692–1692p. The Complaint includes seven counts based on the conduct described above:

(1) that Defendants' concealment and failure to meaningfully disclose their identities to consumers during collection calls, along with their use of

threats and making of false allegations, all had the "natural consequence" of harassing, oppressing, or abusing consumers in violation of the FDCPA, 15 U.S.C. § 1692d (Count I);

(2) that Defendants' misrepresentations to consumers were "false, deceptive, [and] misleading" under the FDCPA, 15 U.S.C. § 1692e (Count II);

(3) that by failing to provide consumers a written notice within five days of their initial communication, Defendants violated the FDCPA's requirement that debts be validated, 15 U.S.C. § 1692g (Count III);

(4) that Defendants' violations of the FDCPA also constitute violations of the CFPA, 12 U.S.C. § 5536(a)(1)(A) (Count IV);

(5) that Defendants' misrepresentations to consumers qualify as both "deceptive" (Count V) and "unfair" (Count VI) practices under the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1)(B); and

(6) that the Individual Defendants knowingly or recklessly provided "substantial assistance" to the LLC Defendants' unfair or deceptive conduct in violation of the CFPA, 12 U.S.C. § 5536(a)(3) (Count VII).

## II.    Procedural History

The CFPB filed this lawsuit on March 26, 2015. The landscape has

AO 72A
(Rev.8/82)

changed dramatically since then.

A.    Dismissed Parties

Originally, there were 18 named Defendants.  In addition to the Individual and LLC Defendants named above, the CFPB asserted claims against four payment processors—Global Payments, Inc.; Pathfinder Payment Solutions, Inc.; Frontline Processing Corp.; and EMS—as well as Global Connect.  However, those parties moved for sanctions under Rule 37 of the Federal Rules of Civil Procedure.  Ultimately, the Court granted those motions, finding that the CFPB had failed to produce a knowledgeable witness for a deposition under Rule 30(b)(6) and blatantly disregarded the Court's instructions about certain objections.   The Court therefore struck Counts VIII, IX, X, and XI of the Complaint, which left no claims against the four payment processors and Global Connect.  So, those Defendants were dismissed from the case.  (See Dkt. [436].)

Separately, the CFPB named Varinderjit "Veena" Bagga as a Defendant, alleging that she participated in the debt-collection scheme.  But the CFPB later moved to dismiss M. Bagga, with prejudice, (Dkt. [449]).  Shortly after that, she was dismissed from the case.

14

B.     Parties In Default

A number of the LLC Defendants have defaulted.  In fact, only two have

not—S Payment and WNY Account Solutions.  As for the others, the CFPB

moved for an entry of default against Universal Debt Solutions, WNY

Solutions Group, Check & Credit Recovery, and Credit Power on September 2,

2015, after those parties failed to file answers or motions to dismiss, (Dkt.

[150]).  Before that, counsel for UDPS withdrew, (Dkt. [122]).  So, the Court

ordered UDPS to show cause why its Answers should not be sticken, given that

corporations cannot proceed *pro se* in federal court, (Dkt. [177]).  UDPS did

not respond, however.  And as a result, on November 24, 2015, the Court

struck its Answers and directed the Clerk to enter default against UDPS, (Dkt.

[199]).

Accordingly, the pending motions relate only to S Payment, WNY

Account Solutions, and the Individual Defendants.

**Discussion**

Before reaching the merits of the case, the Court provides a brief

overview of the two statutes involved in this lawsuit: the CFPA and the

FDCPA.

15

## I.  Statutory Overview

### A.  CFPA

The CFPA was enacted as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376.  In addition to establishing the CFPB, the CFPA also vests the CFPB with broad authority to enforce its terms.   12 U.S.C. §§ 5491(a), 5511(a), 5481(12), (14).  Generally speaking, the CFPA prohibits "covered person[s]" from engaging in "unfair, deceptive, or abusive act[s] or practice[s] under Federal law," and also makes it unlawful to provide "substantial assistance" to those committing such acts.  12 U.S.C. §§ 5531(a), 5536(a).  A "covered person" is an individual or entity "that engages in offering or providing a consumer financial product or service." § 5481(6)(A), (19).  Any debt-collection activity is considered a "[c]onsumer financial product or service."  § 5481(5), (15)(A)(x).

> #### 1.  *Unfair, Deceptive, and Abusive Acts or Practices Under the CFPA*

The CFPB is authorized to use the extent of its enforcement powers to "prevent" certain acts or practices that are "unfair," "deceptive," or "abusive." 12 U.S.C. § 5531(a).  For an unfair act or practice, the CFPB must show that

16

"[1] the act or practice causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers; and [3] such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1). Similarly, an act or practice is "abusive" if it:

> (1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or
> (2) takes unreasonable advantage of–
>> (A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service;
>> (B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or
>> (C) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer.

12 U.S.C. § 5531(d).

The term "deceptive," on the other hand, is not defined in the CFPA. However, the CFPB argues—and no party disputes—that the term should carry the same meaning as it does in § 5(a) of the Federal Trade Commission Act ("FTC Act"), an analogous provision making "unfair or deceptive acts or practices in or affecting commerce" unlawful. 15 U.S.C. § 45(a)(1). The Court

17

agrees. So, as with § 5, to establish liability for a deceptive act or practice under the CFPA, the CFPB must prove: "(1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material." F.T.C. v. Tashman, 318 F.3d 1273, 1277 (11th Cir. 2003).

    *2.    Substantial Assistance Liability Under the CFPA*

    According to 12 U.S.C. § 5536(a)(3), it is unlawful for "any person to knowingly or recklessly provide substantial assistance to a covered person or service provider in violation of section 5531 of this title [prohibiting unfair, deceptive, or abusive acts or practices]." This Court interpreted that provision in a previous Order, (Dkt. [149]). There, the Court drew on a similar substantial-assistance provision in § 20(e) of the Securities and Exchange Act of 1934 to analyze the requirements for liability under 12 U.S.C. § 5536(a)(3). See 15 U.S.C. § 78t(e) (imposing liability on "any person that knowingly or recklessly provides substantial assistance to another person in violation of [securities laws]"). Like § 20(e), the Court concluded that in order to prove substantial assistance against a defendant, the CFPB must establish "that he in some sort associated himself with the venture, that the defendant participated in

18

it as in something that he wished to bring about, and that he sought by his action to make it succeed." SEC v. Apuzzo, 689 F.3d 204, 212 (2d Cir. 2012) (adopting the standard used in criminal aider and abettor actions for aider and abettor liability in securities fraud cases) (alterations omitted)).

The CFPB must also satisfy a scienter requirement, which tracks the Eleventh Circuit's formulation of severe recklessness:

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

Woods v. Barnett Bank of Ft. Lauderdale, 765 F.2d 1004, 1010 (11th Cir. 1985). If a defendant has "a high degree of actual knowledge, this lessens the burden [the CFPB] must meet in [establishing] substantial assistance." Apuzzo, 689 F.3d at 214. And conversely, a high degree of substantial assistance may lessen the burden of showing scienter. Id. at 215.

## B.   FDCPA

The FDCPA aims to remedy abusive, deceptive, and unfair debt collection practices by imposing civil liability on "debt collectors" who engage

19

in certain prohibited conduct.  See 15 U.S.C. § 1692(e), *et seq.*; LeBlanc v.

Unifund CCR Partners, 601 F.3d 1185, 1190 (11th Cir.2010).  Among other

things, the FDCPA prohibits debt collectors from engaging in actions likely to

"harass, oppress, or abuse any person."  § 1692d.  This includes making threats

designed to harm that person or that person's reputation, and also making

phone calls without meaningfully disclosing the caller's identity. §§ 1692d(1),

(5).

These prohibitions are enforced through administrative action and

private lawsuits.  Ultimately, to prevail on a claim under the FDCPA, a plaintiff

must establish:

> (1) [he or she] [has] been the object of collection activity arising
> from a consumer debt; (2) the defendant attempting to collect the
> debt qualifies as a "debt collector" under the Act; and (3) the
> defendant has engaged in a prohibited act or has failed to perform
> a requirement imposed by the FDCPA.

Frazier v. Absolute Collection Serv., Inc., 767 F. Supp. 2d 1354, 1363 (N.D.

Ga. 2011).[5]  The CFPB may bring such claims on behalf of consumers as part

---

[5]  Unique to the claims against the Individual Defendants, there is a split among
Circuit Courts on the issue of whether and how members of a limited liability
company can be held personally liable under the FDCPA.  Compare Kistner v. Law
Offices of Michael P. Margelefsky, LLC, 518 F.3d 433, 435–38 (6th Cir. 2008)
(holding that the sole member of an LLC may be individually liable for FDCPA

of its directive to "enforce Federal consumer financial law."  12 U.S.C.

§§ 5511, 5564; 15 U.S.C. § 1692l(b)(6).

## II.   Motion for Summary Judgment Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be

granted "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  "The moving

party bears 'the initial responsibility of informing the . . . court of the basis for

its motion, and identifying those portions of the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits,

if any, which it believes demonstrate the absence of a genuine issue of material

fact.'"  Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir.

2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Where the

---

violations, without piercing the corporate veil, so long as that individual is a "debt
collector"), with Pettit v. Retrieval Masters Creditor Bureau, Inc., 211 F.3d 1057,
1059 (7th Cir. 2000) ("Because such individuals do not become 'debt collectors'
simply by working for or owning stock in debt collection companies, . . . the Act does
not contemplate personal liability for shareholders or employees of debt collection
companies who act on behalf of those companies, except perhaps in limited
circumstances where the corporate veil is pierced.").  The Eleventh Circuit is yet to
weigh in on the matter.  But, in at least one other instance, a district court in this
Circuit elected to follow the Sixth Circuit's reasoning in Kistner.  See Legg v. HK
Craig & Assocs., LLC, No. CV 14-60562-CIV, 2014 WL 12603172, at *1 (S.D. Fla.
July 9, 2014).  This Court, like that one, finds Kistner persuasive.

moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

The applicable substantive law identifies which facts are material.  Id. at 248.  A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law.  Id.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

Furthermore, in resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).  But, the court is bound only to draw those inferences that are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  "If the evidence is merely colorable, or is not significantly probative,

22

summary judgment may be granted." <u>Anderson</u>, 477 U.S. at 249–50 (internal citations omitted); <u>see also</u> <u>Matsushita</u>, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

Finally, where there are cross-motions for summary judgment, the standard of review does not differ from that applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. <u>Am. Bankers Ins. Group v. United States</u>, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. <u>Id.</u>

## III. Motions For Summary Judgment

The CFPB moves for summary judgment on all of its claims against the remaining LLC Defendants not in default—S Payment and WNY Account Solutions—and all of the Individual Defendants. Several of these parties have failed to respond, however.

A.    Non-Responding Defendants

The following Defendants did not file responses to the CFPB's motion: Marcus Brown, Sarita Brown, and WNY Account Solutions. Likewise, Tasha Pratcher failed to timely respond; however, on July 9, 2018, she asked the Court for permission file a response on the basis that she was unaware of the existence of the CFPB's motion. (Dkt. [547].) Ms. Pratcher's position is dubious at best, but either way, she has not included a proposed response with her motion, so there is nothing for the Court to consider. Ms. Pratcher's motion is, therefore, **DENIED**.

In light of the foregoing, the CFPB's arguments as to Ms. Pratcher, Mr. Brown, Ms. Brown, and WNY Account Solutions are deemed unopposed. See LR 7.1(B), NDGa ("Failure to file a response shall indicate that there is no opposition to the motion."). Nonetheless, the Court will review those arguments on the merits, see U.S. v. One Piece of Real Property Located at 5800 SW 74th Ave., Miami, Fla., 363 F.3d 1099, 1101 (11th Cir. 2004) ("[T]he district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion."), but in doing so the Court accepts the CFPB's material facts as true

so long as they are properly supported by the record.

        1.     *WNY Account Solutions*[6]

The CFPB argues that WNY Account Solutions' role in the debt-collection scheme makes it subject to and in violation of both the CFPA and FDCPA. The Court agrees.

As to the CFPA, the Court finds that WNY Account Solutions is subject to the terms and restrictions of the CFPA because it self-identified and operated as a "Debt Collection Agency" with the primary objective of collecting debts from consumers. See 12 U.S.C. §§ 5481(6), (26). It is also undisputed that WNY Account Solutions used its account with Global Connect to broadcast automated collection calls to consumers to collect false or inflated debts; that it used a fictitious name, "WNY Account Solutions Group"; and that more than $883,000 in consumer payments were processed through the company's accounts. Therefore, WNY Account Solutions played a pivotal role in the debt-collection scheme, and thereby engaged in unlawful practices in violation

---

[6] At the outset, the Court notes that WNY Account Solutions is without an attorney. It is well established that a corporation cannot appear *pro se* and instead must be represented by counsel. See, e.g., Palazzo v. Gulf Oil Corp., 764 F.2d 1381, 1385 (11th Cir. 1985).

25

of the CFPA.  12 U.S.C. § 5536(1)(1)(B).

For those reasons and others, WNY Account Solutions also violated the FDCPA.  First, WNY Account Solutions qualifies as a "debt collector" under the FDCPA because it "regularly collect[ed] or attempt[ed] to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  15 U.S.C. § 1692a(6).  The FDCPA prohibits debt collectors from "engag[ing] in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt" and using "any false, deceptive, or misleading representation[s] . . . in connection with the collection of any debt."  §§ 1692d, 1692e.  Further, under § 1692g(a), "[w]ithin five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall . . . send the consumer a written notice containing" the amount of the debt, the name of the creditor to whom the debt is owed, and a number of statements regarding debt validation, unless that information was already supplied.  See § 1692g(a)(1)–(5).

Here, WNY Account Solution was involved in transmitting robo-calls to consumers across the country that falsely represented the nature or amount of purported debts, and misled consumers about the potential consequences of

26

failing to pay.  There is also no suggestion in the record that WNY Account Solutions validated the purported debts in the initial phone call, or at any time thereafter.  There are, on the other hand, numerous complaints from consumers who never received the mandatory disclosures.  Such behavior is plainly prohibited by the FDCPA.  §§ 1692d(6); 1692e(2)(a), (4), (5), (7), (10), (14); 1692g.

Accordingly, the CFPB is entitled to summary judgment on its claims against WNY Account Solutions (Counts I–VI).

> 2.    *Marcus Brown*

Based on the undisputed facts before the Court, Marcus Brown qualifies as a "covered person" under the CFPA and a "debt collector" under the FDCPA.  He also violated those statutes.

Brown was the ringleader of the debt-collection scheme.  He not only knew about the deceptive and harassing nature of the collection activities, but was largely responsible for their development and implementation.  He "provided advice on debt collection techniques, and drafted call scripts for the LLC Defendants' employees to use when dealing with consumers, job listings to recruit employees, and demand letters for the LLC Defendants to send to

27

consumers." (Pl.'s SOF, Dkt. [452] ¶ 109.) Brown also organized or served as an officer or agent for most of the LLC Defendants[7] and recruited Individual Defendants to do the same, and Brown exercised control over the LLC Defendants' debt collection and payment processing activities. In fact, he leased an office space that many of the LLC Defendants used and paid much of the LLC Defendants' expenses. Furthermore, Brown obtained information about consumers through various channels, including payday loan leads and skip tracing accounts. And Brown owned or controlled nearly half of the phone numbers used to contact consumers. He also opened or controlled numerous accounts connected to the telephone broadcasting services, which broadcast robo-calls to consumers millions of times. Brown even wrote the automated call scripts that were used. And those scripts threatened consumers with legal action and allegations of fraud. Additionally, Brown used several LLC Defendants "to take and process consumers' credit and debit card payments." (Id. ¶ 128.) In all, Brown paid himself $321,492.00 in checks through the LLC Defendants, not including cash payments.

---

[7] Based on the record, it is undisputed that Brown was involved (at varying levels) with all of the LLC Defendants, except for S Payment Solutions, which disputes the nature and extent of its relationship with Brown.

AO 72A
(Rev.8/82)

Based on these undisputed facts, the CFPB is entitled to summary judgment on its CFPA and FDCPA claims against Marcus Brown (Counts I–VII).

### 3. Sarita Brown

The CFPB argues Sarita Brown violated the CFPA by "knowingly or recklessly provid[ing] substantial assistance to" other Defendants in connection with the debt-collection scheme—specifically, UDPS, Universal Debt Solutions, WNY Account Solutions, and Marcus Brown—all of whom are "covered persons" under the Act. (Pl.'s MSJ Br., Dkt. [45-1] at 35 (quoting 12 U.S.C. § 5536(a)(3).) For her part, Ms. Brown served in key positions or identified herself as serving in such a role, for all three LLC Defendants. At the direction of her brother, Marcus Brown, Ms. Brown filed the articles of organization for UDPS in New York and opened bank accounts for the other two LLC Defendants. She then used those "bank accounts to pay personal and business expenses for the Defendants." (Pl.'s SOF, Dkt. [452] ¶ 202.) Ms. Brown also provided Mr. Brown access to the companies' bank accounts by, among other things, signing a number of blank checks for him. And she gave Mr. Brown permission to forge her name on documents "whenever he needed

29

it." (Id. ¶¶ 193–94, 197–98, 199.)  Ms. Brown did all of this, despite knowing

that her brother had been recently incarcerated for offenses related to credit

card misuse.

Based on these undisputed facts, the Court finds that Ms. Brown

provided substantial assistance to Mr. Brown and the LLC Defendants in

committing unfair, abusive, and deceptive acts, in violation of 12 U.S.C.

§ 5536(a)(3).  The CFPB is, therefore, entitled to summary judgment on its

CFPA claim against Ms. Brown (Count VII).

4.    *Tasha Pratcher*

Like Ms. Brown, the CFPB seeks to hold Tasha Pratcher liable for

providing substantial assistance to other Defendants in perpetrating the debt-

collection scheme.  Ms. Pratcher is Marcus Brown's estranged wife.  In 2005,

she entered a guilty plea for her involvement in an identity theft scheme

coordinated by Mr. Brown.  Eight years later, Ms. Pratcher organized Universal

Debt Solutions together with Mr. Brown.  Ms. Pratcher also organized and

operated RX Office Solutions, a company with no earnings and no expenses

that was used to process payments and funnel money from the debt-collection

scheme.  Ms. Pratcher spent this money supporting the scheme by paying rent

30

for the office space out of which a majority of the enterprise's operations took place.  She received $122,910.00 in checks from WNY Account Solutions.

This constitutes substantial assistance to Mr. Brown and Universal Debt Solutions in their commission of acts prohibited under the CFPA.  And, at the very least, Ms. Pratcher provided such assistance recklessly, given her history with Mr. Brown.  Accordingly, the Court finds that Ms. Pratcher violated 12 U.S.C. § 5536(a)(3).  The CFPB is, therefore, entitled to summary judgment on its claim against Ms. Pratcher (Count VII).

> **B.**      Sumant Kahn and S Payment Solutions

The CFPB alleges that Sumant Kahn and S Payment violated the CFPA and FDCPA.  As to the CFPA claims, Mr. Kahn and S Payment respond that issues of material fact preclude summary judgment; as to the FDCPA claims, Mr. Kahn and S Payment argue that they (not the CFPB) are entitled to summary judgment because those claims fail as a matter of law.  The Court will reach these contentions shortly, but must first address objections raised by the CFPB as the rulings on those objections could affect the evidence before the Court on the pending summary judgment motions.

> *1.      The CFPB's Objections*

31

The CFPB filed a Notice of Objections [531] in conjunction with its summary judgment reply. The CFPB asks the Court to strike, or in the alternative disregard, two declarations relied on by Mr. Khan and S Payment—one of which is attached to their motion for summary judgment, (Dkt. [450-1]), and the other to their response to the CFPB's motion for summary judgment, (Dkt. [498-1]). The CFPB seeks the same fate for a submission entitled "Defendants Sumant Khan and S Payment Processing & Solutions LLC's Statement of Material Facts Presenting a Genuine Issue for Trial," (Dkt. [513]).

### a.    Declarations

Both of the declarations at issue are Mr. Khan's. The CFPB argues they fail to comply with 28 U.S.C. § 1746. That provision allows an unsworn declaration to be considered at summary judgment with the same force and effect as an affidavit so long as it is signed and dated and includes language in substantially the following form: "I declare (or certify, verify, or state) under penalty of perjury . . . that the foregoing is true and correct. Executed on (date). (Signature)." 28 U.S.C. § 1746.

Here, Mr. Khan's declarations include (basically) the language spelled

out in § 1746, but end with Mr. Khan's electronic signature, rather than a written one.  According to the CFPB, the typed signature of a non-attorney is insufficient.  And the CFPB has cited numerous cases—albeit, most of them outside this Circuit—in which judges struck or refused to consider declarations that were electronically signed.  (See Dkt. [531] at 4–5.)  But other courts have come out differently.  See, e.g., Hale v. Emporia State Univ., No. 16-4182-DDC-TJJ, 2018 WL 5884543, at *2 (D. Kan. Nov. 9, 2018) (declaration with electronic signature complied with § 1746).  And this Court previously declined to strike a declaration that was not attested to by the declarant but still substantially satisfied the conditions of § 1746.  See, e.g., Lipscomb v. Llanas, No. 2:11-CV-00078-RWS, 2013 WL 5312552, at *4 (N.D. Ga. Sept. 20, 2013); see also Tishcon Corp. v. Soundview Commc'ns, Inc., No. 1:04-CV-524-JEC, 2005 WL 6038743, at *3 (N.D. Ga. Feb. 15, 2005) (declaration with electronic signature but including the phrase "under penalty of perjury" was sufficient to satisfy § 1746).  Furthermore, while the Eleventh Circuit has instructed us that "[u]nsworn statements do[ ] not meet the requirements of Fed. Rule Civ. Proc. 56(e) and cannot be considered by a district court in ruling on a summary judgment motion," Carr v. Tatangelo, 338

33

F.3d 1259, 1273 n.26 (11th Cir. 2003) (internal quotations and citation

omitted), the CFPB has not provided any binding precedent obligating the

Court to disregard an electronically-signed declaration that otherwise complies

with § 1746. The Court is, therefore, not inclined to do so here. Through his

typewritten signature, Mr. Khan "has evinced his intention to submit sworn

declarations, which the Court will accept as such and treat as affidavits for

purposes of ruling on summary judgment." Tishcon Corp., 2005 WL 6038743,

at *4.[8]

### b.    Supplemental Statement of Disputed Facts

The CFPB argues the Court should strike or disregard Mr. Khan and S

Payment's statement of disputed facts because they were filed 25 days after the

deadline for their response to the CFPB's motion for summary judgment. The

Court disagrees. Although late, the statement of disputed facts still predated

---

[8] The Court is aware that this ruling could be interpreted to conflict with a prior decision in this case to disregard an un-signed declaration submitted by Mohan Bagga, (Dkt. [558] at 2–3). But, to be clear, Mr. Bagga's declaration lacked *any* form of signature that could be interpreted to bind him to the contents of the document (it merely had a blank signature line), whereas Mr. Khan's declarations include the following: "/s/Sumant Khan." To the Court, this distinction is an important one as Mr. Khan's typewritten signature is the product of a calculated act through which Mr. Khan attested to the truthfulness of his statements.

the CFPB's reply by 22 days. Thus the CFPB had ample time to respond.

Accordingly, the CFPB's objections are **OVERRULED**. And with that settled, the Court turns its attention to the CFPB's substantive claims against Mr. Khan and S Payment.

 2. *FDCPA Claims*

The CFPB alleges that Mr. Khan and S Payment used harassing and abusive methods in violation of 15 U.S.C. § 1692d, made false or misleading representations in violation of § 1692e, and failed to validate debts under § 1692g. Mr. Khan and S Payment seek summary judgment on these claims. They argue: (1) the FDCPA does not apply because neither Mr. Khan nor S Payment is a "debt collector" as defined in § 1692a, and (2) there is no evidence of Mr. Khan or S Payment engaging in the conduct alleged by the CFPB. The Court takes these arguments in turn.

 a. **Whether Mr. Khan and S Payment Qualify as "Debt Collectors"**

The FDCPA's prohibitions only apply to "debt collectors." 15 U.S.C. § 1692, *et seq*. Thus, "whether an individual or entity is a 'debt collector' is determinative of liability under the FDCPA." <u>Birster v. Am. Home Mortg.</u>

Servicing, Inc., 481 F. App'x 579, 582 (11th Cir. 2012). The FDCPA defines a debt collector as one who "uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." § 1692a(6). Mr. Khan and S Payment argue they do not meet this definition because the principal purpose of their business was not collecting debts, but rather processing credit and debit card transactions. The gist of the CFPB's response is that S Payment's only clients were Marcus Brown and his affiliates, and they used S Payment's merchant processing accounts to collect debt payments.

In the way of the CFPB's reasoning, though, is the statutory verbiage, "collects." To collect is "[t]o call for and obtain payment of," or "[t]o recover control of." *Collect*, AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2006). An obvious example of someone who collects debt is the proverbial "repo man"—or the one who actually reclaims the property from a defaulted debtor. Henson v. Santander Consumer USA Inc., 137 S. Ct. 1718, 1720 (2017). And in this case, the "repo man" (or men) would be Brown and his affiliates. Indeed, while the evidence before the Court shows that S

36

Payment might have contributed to the overarching scheme by providing the collectors a means to process credit and debit card payments, there is no evidence that S Payment actually *collected* any debts itself.

Of course, the statute goes on to say that one may be a debt collector, even if his collecting is done indirectly. But there is no reason to suppose that the inclusion of "indirectly" broadens the definition of "debt collector" so far as to encompass persons as detached from the actual collection process as S Payment was. Instead, it seems to the Court that one who indirectly collects a debt must nonetheless take part in the initial securing of the debt—for example, a principal who hires an agent to send collection letters. Janetos v. Fulton Friedman & Gullace, LLP, 825 F.3d 317, 325 (7th Cir. 2016) ("A *debt collector* should not be able to avoid liability for unlawful debt collection practices simply by contracting with another company to do what the law does not allow it to do itself." (emphasis added)). Either way, the CFPB has not cited, nor is the Court aware of any case likening the *processing* of debt payments to the *collecting* of a debt.

That said, there is at least one piece of evidence obstructing the way to summary judgment for S Payment. In S Payment's application for a merchant

37

processing account, the "type of goods sold" is described as "collections." (Dkt. [456-5] at 1.) While a company's own description of its operations might not be conclusive evidence of debt collecting, see Prickett v. BAC Home Loans, 946 F. Supp. 2d 1236, 1249 (N.D. Ala. 2013) ("[T]he relevant test of whether an entity is a debt collector under the FDCPA is whether the statutory definition applies, not whether the entity has ever stated in a document that it is a debt collector."), it is still highly relevant, see Reese v. Ellis, Painter, Ratterree & Adams, LLP, 678 F.3d 1211, 1217 (11th Cir. 2012) (finding the defendant would qualify as a debt collector "[i]n light of all th[e] language stating that the law firm is attempting to collect a debt"). Accordingly, the Court finds that at least one issue of material fact—how S Payment held itself out to consumers—precludes summary judgment on the question of whether or not S Payment was collecting debts.

The Court also cannot say as a matter of law, if Mr. Khan was or was not a debt collector. Of course, if S Payment was engaged in debt collection, then so was Mr. Khan. See Kistner v. Law Offices of Michael P. Margelefsky, LLC, 518 F.3d 433, 438, 441–42 (6th Cir. 2008) (finding that the sole member of a law office—and one of its only two attorneys—could be personally liable for a

38

form collection letter that allegedly violated the FDCPA even without evidence that he actually mailed the letter, but remanding the case to determine whether the letter was in fact "deceptive" under the FDCPA).  But the converse is also true: "vicarious liability [can]not be imposed [if] the company itself d[oes] not meet the definition of 'debt collector'[.]"  Pollice v. Nat'l Tax Funding, L.P., 225 F.3d 379, 404 (3d Cir. 2000).  So, because the undisputed evidence does not confirm or refute S Payment's status as a debt collector, the Court cannot say that Mr. Khan was or was not engaged in debt collecting by virtue of his role at the company.

However, the CFPB also accuses Mr. Khan of being a debt collector before he organized S Payment.  The CFPB points to conduct such as (1) sending a letter to Pathfinder on behalf of Marcus Brown to obtain a merchant processing account for Universal Debt Solutions, (2) being listed as a reference on UDPS's application for a merchant processing account to CBC Innovis, (3) helping UDPS respond to the CFPB's civil investigative demand, and (4) advising Brown on debt collection laws in all 50 states.  But none of these things actually constitutes collecting a debt.  At most, they raise an issue of fact about Mr. Khan's connection to the other Defendants' and their activities.  This

39

uncertainty is amplified by Mr. Khan's allegations of forgery. Accordingly, the Court finds that summary judgment would be improper.

### b. Whether the CFPB has Produced Evidence Establishing FDCPA Violations

That issues of fact remain as to whether Mr. Khan and S Payment are "debt collectors" subject to the FDCPA does not end the inquiry for the purposes of Mr. Khan and S Payment's motion for summary judgment. And that is because, to avoid summary judgment, the CFPB must also present evidence that Mr. Khan and S Payment actually violated the FDCPA.

By and large, the CFPB attempts to tie Mr. Khan and S Payment to the debt collection activities of the other Defendants. In doing so, the CFPB makes sweeping allegations like labeling Mr. Khan and S Payment "key participants" in the "debt collection enterprise." But in reality, the evidence against Mr. Khan and S Payment specifically (as opposed to the enterprise generally) is quite thin.

Nevertheless, there remains uncertainty as to the nature of Marcus Brown's relationship with S Payment. Throughout its briefing, the CFPB describes Brown as an "agent" or "independent contractor" of S Payment.

(See, e.g., Dkt. [489] at 21; see also Dkt. [456-7] at 4 (interrogatory describing Brown as an independent contractor of S Payment).)  And in S Payment's merchant processing account application, Brown's phone number is listed as an alternative contact, and next to it is the word "manager."  (Pl.'s SOF ¶ 106; Dkt. [456-5] at 1.)  As alluded to earlier, there is authority suggesting that a principal can be held vicariously liable for the FDCPA violations of its agent.[9] E.g., Janetos, 825 F.3d at 325; Pollice, 225 F.3d at 404–06; Fox v. Citicorp Credit Servs., Inc., 15 F.3d 1507, 1516 (9th Cir.1994).  Thus, if Brown was acting as S Payment's agent when he carried out any—of the many—unlawful collection activities that the CFPB has already proved, then S Payment could also be held responsible for those infractions.  And by extension, so could Mr. Khan as S Payment's owner.  Kistner, 518 F.3d 433, 437–38; see also LeBlanc v. Unifund CCR Partners, 601 F.3d 1185, 1201–02 (11th Cir. 2010).

---

[9]  The role that the principal must play, however, is less clear.  See, e.g., Clark v. Capital Credit & Collection Servs., Inc., 460 F.3d 1162, 1173 (9th Cir. 2006) ("[T]o be liable for the actions of another, the 'principal' must exercise control over the conduct or activities of the 'agent.'" (citing RESTATEMENT (SECOND) OF AGENCY § 1 (1958))); Okyere v. Palisades Collection, LLC, 961 F. Supp. 2d 508, 517 (S.D.N.Y. 2013) ("[T]raditional vicarious liability rules ordinarily make principals liable for acts of their agents merely when the agents act in the scope of their authority." (internal quotations omitted) (quoting Meyer v. Holley, 537 U.S. 280, 285 (2003))).  But that is not a question the Court need grapple with for present purposes.

41

Accordingly, the Court finds there are issues of material fact concerning S

Payment's relationship with Brown and, hence, the extent of its and Mr. Khan's

collection-related activities.

### 3. *CFPA Claims*

The CFPB alleges that Mr. Khan and S Payment violated the CFPA by

employing acts or practices that were deceptive and unfair, 12 U.S.C.

§§ 5531(a), 5536(a)(1)(B), and that Mr. Khan provided substantial assistance

to the other Defendants as they engaged in unfair or deceptive conduct,

§ 5536(a)(3). The CFPB also argues that Mr. Khan and S Payment are liable

under the CFPA by virtue of their violating the FDCPA, 12 U.S.C.

§ 5536(a)(1)(A). While true that violations of the FDCPA are expressly

recognized as violations of the CFPA, 12 U.S.C. § 5536(a)(1)(A), in light of

the Court's previous findings, infra Part III.B.2, the CFPB is not entitled to

summary judgment on that basis. The Court will, however, proceed to address

whether summary judgment is warranted on any of the CFPB's other claims.

### a. **Common Enterprise Liability as to S Payment**

S Payment's liability under the CFPA stems, not necessarily from its

own actions, but rather the existence of a "common enterprise" among the LLC

Defendants.[10]  The common enterprise doctrine is typically applied in the

context of the FTC Act, and "operates to prevent individuals and companies

from using corporate structures to circumvent [that statue]." CFPB v. NDG

Fin. Corp., No. 15-CV-5211 (CM), 2016 WL 7188792, at *15 (S.D.N.Y. Dec.

2, 2016).  Whether the doctrine extends to the CFPA is unsettled.  But, in this

case, the CFPB advocates that it does, and the only response addressing the

issue—Mr. Khan and S Payment's—does not dispute the applicability of the

common enterprise doctrine.  Furthermore, the CFPA was designed, in many

ways, to parallel the FTC Act.  And as a result, time and again, courts have

embraced the meaning of words in the FTC Act when interpreting the CFPA.

See, e.g., CFPB v. Gordon, 819 F.3d 1179, 1193 (9th Cir. 2016) (using FTC

Act's definition of "deceptive"); CFPB v. ITT Educ. Servs., Inc., 219 F. Supp.

3d 878, 903–04 (S.D. Ind. 2015) (using FTC Act's definition of "unfair").

Thus, for the purposes of this Order, the Court finds it appropriate to rely on

the common enterprise doctrine and, in doing so, will assess whether the

liability of the other LLC Defendants can extend to S Payment.  See also NDG

---

[10]  To the extent the CFPB's motion is based on alleged violations of the CFPA by S Payment directly, the same issues of fact precluding summary judgment on the CFPB's FDCPA claims, also preclude summary judgment here.

Fin. Corp., 2016 WL 7188792, at *15–16 (applying common enterprise

liability under the CFPA); CFPB v. Think Fin., LLC, No.

CV-17-127-GF-BMM, 2018 WL 3707911, at *7 (D. Mont. Aug. 3, 2018)

(same).[11]

Where entities are found to be part of a common enterprise, "each may

be held liable for the deceptive acts and practices of the other." FTC v. Nat'l

Urological Grp., Inc.,645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008) (citation

omitted).  Factors courts consider in deciding whether a common enterprise

exists are "common control; the sharing of office space and officers; whether

business is transacted through a maze of interrelated companies; the

commingling of corporate funds and failure to maintain separation of

companies;" among others.  Id.

Looking to the undisputed facts in this case, the Court cannot say that a

common enterprise clearly existed between S Payment and the other LLC

_____

[11]  At least one court, however, declined to apply common enterprise liability
under the CFPA.  Pennsylvania v. Think Fin., Inc., No. 14 Civ 7139, 2016 WL
183289, at *26 (E.D. Pa. Jan. 14, 2016).  In this Court's opinion, the reasoning in
Think Finance is not particularly persuasive.  But for present purposes—where no
party contests the applicability of the common enterprise doctrine—the Court need not
wade further into the issue or make a decision, one way or the other.

44

Defendants. The primary link between S Payment and the debt-collection enterprise was Marcus Brown. But it was Mr. Khan, not Brown, who organized S Payment and served as its only officer. (Pl.'s SOF, Dkt. [452] ¶¶ 39–40.) And while it is undisputed that Brown contracted with S Payment to process consumers' bankcard payments, as described above, the extent of Brown's control over the company and its operations (if any) is disputed. See infra. Part III.B.2.b; (see also Resp. to SOF, Dkt. [499] ¶¶ 42–43, 48–49.) At the very least, though, Brown was not an officer of S Payment, nor was Mr. Khan an officer of any other LLC Defendant. Mr. Khan further denies the CFPB's claim that S Payment operated out of the same office space and utilized the same equipment as the other LLC Defendants. To his point, S Payment's corporate filings identify a different address—3008 Oak Park Circle—as its home office. (Pl.'s SOF, Dkt. [452] ¶ 41.) And Mr. Khan testified that he has never even been to the office at 1401 Peachtree Street. (2d Khan Decl., Dkt. [498-1] ¶ 5.) At the same time, the CFPB has produced several documents in which S Payment's business address is listed as 1401 Peachtree Street, including a screenshot of what appears to be S Payment's website. (Dkt. [456-1, 456-2, 456-3].) But each of them is in dispute. (Resp.

45

to SOF, Dkt. [499] ¶ 42; 2d Khan Decl., Dkt. [498-1] ¶¶ 4–5, 12 (disputing, among other things, giving anyone authorization to register a website for S Payment).) The final factor, commingling funds, is similarly disputed because the funds at issue appear to have been in separate bank accounts and, although S Payment and WNY Account Solutions transferred money to each other, Mr. Khan and S Payment argue those transfers were made pursuant to S Payment's contract with Brown and for legal services Mr. Khan provided.[12]

Thus, there are issues of material fact as to whether S Payment and the other LLC Defendants shared common control, facilities, and equipment, and whether they commingled funds. It cannot be said, then, as a matter of law, that S Payment was part of a common enterprise. And so, the CFPB is not entitled to summary judgment on its claims against S Payment. See F.T.C. v. Vantage Point Servs., LLC, 266 F. Supp. 3d 648, 657 (W.D.N.Y. 2017)

---

[12] The CFPB also provided evidence that Marcus Brown received $76,500 in checks written from S Payment's account. (Dkt. [452-3] ¶ 8(c).) As an initial matter, Mr. Khan and S Payment challenge the admissibility of that evidence. But that objection is misplaced because the document is an admissible summary of voluminous evidence under Fed. R. Evid. 1006. In re Int'l Mgmt. Assocs., LLC, 781 F.3d 1262, 1266 (11th Cir. 2015). Nevertheless, this fact alone is not sufficient to prove commingling of funds among S Payment and the other LLC Defendants, much less establish S Payment's involvement in a common enterprise.

AO 72A
(Rev.8/82)

(recognizing that although "many attributes of a common enterprise [exist] among many of the Defendants[,] . . . which Defendants and whether all Defendants are part of a common enterprise is a matter left open for trial" (citations and internal quotations omitted)).

### b.  Direct Liability as to Mr. Khan

Mr. Khan does not dispute that he is subject to the CFPA as either a "covered person" or "service provider."  Thus, the Court's focus is on whether the undisputed evidence—viewed in the light most favorable to Mr. Khan—establishes that he can be personally liable for engaging in unfair, deceptive, or abusive acts or practices.  The Court finds that it does not.

Some authority suggests that an individual may be held liable for a corporate entity's unfair, deceptive, or abusive acts or practices if that individual (1) "participated directly in the wrongful acts or practices or had the authority to control the corporate defendant who did, and (2) had some knowledge of the acts or practices."  <u>NDG Fin. Corp.</u>, 2016 WL 7188792, at *17 (applying the FTC Act's standard for individual liability) (internal quotations and citations omitted).  But at this stage, there are issues of fact as to whether S Payment violated the CFPA in the first instance, and so that theory

47

of liability cannot succeed against Mr. Khan.  Of course, in the alternative, the

CFPB could prove that Mr. Khan personally used unfair, abusive, or deceptive

acts or practices.  However, as described more fully above, while there is no

doubt that Mr. Khan helped the other Defendants as they violated the CFPA,

the CFPB has not demonstrated, as a matter of law, that Mr. Khan, himself,

ever engaged in such conduct.

### c.      Substantial Assistance Liability as to Mr. Khan

Substantial assistance liability requires (1) a primary violation, (2) a

culpable state of mind, and (3) substantial assistance.  FTC v. WV Universal

Mgmt., LLC, 877 F.3d 1234, 1241 (11th Cir. 2017) (citing SEC v. Big Apple

Consulting USA, Inc., 783 F.3d 786, 800 (11th Cir. 2015)).[13]  The first element

has already been established.  The CFPB has provided ample evidence that

Marcus Brown and other LLC Defendants engaged in unfair, deceptive, and

abusive acts or practices—namely, making calls to consumers to collect debts

---

[13]  This is also the test for aiding and abetting under securities law, 15 U.S.C. §
78t(e).  Recall that the Court looked to that law and the cases interpreting it for
guidance in interpreting 12 U.S.C. § 5536(a)(3), the CFPA's substantial assistance
provision.  (Dkt. [149].)  In doing so, the Court applied the above standard to
determine whether the CFPB's Complaint adequately pleaded a claim for substantial
assistance against the payment processors.  (Id.); see also CFPB v. RD Legal Funding,
LLC, 332 F. Supp. 3d 729, 772 (S.D.N.Y. 2018).

AO 72A
(Rev.8/82)

that were not owed or that they did not have authority to collect and using

threats of litigation and criminal prosecution to do it.

The next element—the knowledge requirement—is more difficult. The

CFPB must prove Mr. Khan and S Payment's "general awareness" of the roles

they were playing in the primary fraud and that they knowingly contributed to

it. Woods v. Barnett Bank of Ft. Lauderdale, 765 F.2d 1004, 1011 (11th Cir.

1985). To do so, the CFPB must at least demonstrate severe recklessness. Id.

"Recklessness sufficient to [meet this burden] involves conduct that is highly

unreasonable and represents an extreme departure from the standards of

ordinary care." SEC v. China N.E. Petroleum Holdings Ltd., 27 F. Supp. 3d

379, 389 (S.D.N.Y. 2014) (internal quotation marks and citation omitted). The

Eleventh Circuit has also described severe recklessness as a "close[] analog to

'consciously avoiding knowing.'" WV Universal Mgmt., 877 F.3d at 1241.

Mr. Khan argues the CFPB has failed to establish that he knew the other

Defendants were engaged in unlawful activities. In support, he cites the S

Payment contract with Brown. There, Brown certified that he would not use

the merchant processing accounts to do anything unlawful. Of course, the

agreement is also clear that Brown would be "process[ing] payments for debt

49

collection practice companies," and it provided recourse for Mr. Khan in the event Brown violated the law. (Dkt. [454-19] at 5.) But, to Mr. Khan's point, that does not necessarily mean that Brown's activities would actually be illegal.

However, the warning signs of fraudulent debt-collection activity were too numerous and too obvious for Mr. Khan not to have known that Brown was using S Payment to process wrongfully-collected debts. First, when Mr. Khan agreed to let Brown use S Payment's merchant processing accounts, he knew that one of Brown's affiliated companies—UDPS—was under investigation by the CFPB. (Dkt. [493-19].) In fact, during that investigation, a document authored by "Sumant" was produced with a list of approximately 9,500 consumers' names, including personal material like social security numbers and contact information, as well as details about debts those individuals owed. (Dkt. [489-10] ¶ 16; Dkt. [530-6].) Yet, Mr. Khan proceeded to execute a contract that did not specify or limit which of Brown's companies would be using the merchant accounts. The contract, itself, is also suspect because its principal purpose—allowing Brown and his companies to submit their transactions through S Payment for processing—is prohibited under S Payment's merchant agreements. And that is surely because the

50

practice—sometimes called "factoring" or "aggregating"—is essentially a form of laundering. So, at the very least, Mr. Khan knew from the start that Brown would be using S Payment's merchant accounts for improper means.

Finally and perhaps most significantly, the contract required Brown to submit monthly reports on the "debt payments being processed," but he never did. And Mr. Khan evidently took no action to inquire into Brown's activities. This is especially telling, given that oversight and the avoidance of unlawful conduct were such integral parts of Mr. Khan's agreement with Brown. That Mr. Khan could not only have looked into the nature of the payments being processed but was contractually entitled to such information gives way to only one explanation for his alleged ignorance: Mr. Khan consciously ignored obvious signs of fraud to avoid learning about Brown's unlawful debt-collection activities. In doing so Mr. Khan was "highly unreasonable," and such conduct amounts to "an extreme departure from the standards of ordinary care," thus presenting an obvious danger of debt-collection fraud to consumers of which Mr. Khan must have been aware. See Woods, 765 F.2d at 1010.

Still, the Court acknowledges that Mr. Khan's level of knowledge or recklessness is a close question based on the present record. But, the Court's

51

conclusion is bolstered by the high level of assistance Mr. Khan and S Payment

provided to the other Defendants' unlawful debt collection practices. S.E.C. v.

Apuzzo, 689 F.3d 204, 215 (2d Cir. 2012) (explaining that "a high degree of

substantial assistance may lessen the SEC's burden in proving *scienter*"

(emphasis in original)).

Indeed, there is no doubt that S Payment, and by extension Mr. Khan

(the company's only officer) provided material assistance to Marcus Brown and

his affiliated companies. They furnished access to merchant processing

accounts, which were used to process credit and debit card payments for

consumer debts. And there is no evidence suggesting that anyone other than

Brown and his affiliates ever used S Payment's accounts or that S Payment

engaged in any other type of legitimate business. As a result, the only

reasonable inference that can be drawn is that Mr. Khan formed S Payment and

opened its merchant processing accounts solely for the purpose of helping

Brown. (See also Dkt. [456-6] ("Initially, Marcus Brown contacted Sumant

Khan and mentioned that he needed a merchant processing account. As a

result, the account with Paid Suite was established. In order to formalize the

business relationship, a contract was drafted with Marcus Brown and WNY.").)

By doing so, Mr. Khan and S Payment facilitated the collection of roughly $630,000.  And so, while he might not have been directly involved in collection activities—such as gathering contact information and making calls—Mr. Khan nevertheless provided substantial assistance to the other Defendants in carrying out CFPA violations.  The CFPB is therefore entitled to summary judgment on its substantial assistance claims against Mr. Khan (Count VII).

C.    Mohan Bagga[14]

The CFPB argues Mohan Bagga is liable under the CFPA and FDCPA for engaging in unlawful debt collection practices and providing substantial assistance to other members of the enterprise as they perpetrated acts in violation of the CFPA.   In response, Mr. Bagga denies ever being involved in

---

[14] Mr. Bagga's response materials suggest they were filed on his behalf, as well as UDPS's.  As mentioned above, the CFPB has already obtained a default judgment against UDPS.  (Dkt. [200].)  Moreover, Mr. Bagga cannot represent UDPS *pro se*. See LR 83.1(E)(2)(b)(I), NDGa ("[A] corporation may only be represented in court by an attorney, [an] attorney must sign all pleadings submitted to the court, . . . a corporate officer may not represent the corporation in court unless that officer is also an attorney licensed to practice law in the state of Georgia, and . . . failure to comply with this rule could result in default being entered against the corporate party . . . .").  Thus, the Court considers these filings only as they pertain to Mr. Bagga.

AO 72A
(Rev.8/82)

debt collection activities and claims that Marcus Brown forged his signature on a number of documents relied on by the CFPB.

However, the facts conceded by Mr. Bagga, alone, support summary judgment for the CFPB's "substantial assistance" claim under the CFPA. Mr. Bagga admits nearly 200 of the 362 paragraphs in the CFPB's statement of undisputed material facts. (See generally Dkt. [540].) Those undisputed facts establish, at a minimum, that UDPS was a debt collector that engaged in conduct prohibited under the CFPA. Through Marcus Brown, it: (a) bought and sold debt portfolios and payday loan leads, (Dkt. [540] ¶ 265), (b) performed skip tracing to amass consumer contact information and keep that information up-to-date, (id. ¶ 124), and (c) broadcast automated telephone messages to consumers with false or misleading information about purported debts, including threats of legal action, (id. ¶¶ 112–17). Thus, UDPS violated the CFPA by using "unfair, deceptive, or abusive" tactics in an attempt to collect debts. 12 U.S.C. § 5531(a). And Mr. Bagga organized UDPS, then managed the company while serving as one its only two officers. (Id. ¶¶ 3, 138–39.) He also monitored and controlled UDPS's bank account and handled the company's accounting. (Id. ¶ 140.)

Given Mr. Bagga's critical role with UDPS—a debt-collection business engaged in unlawful collection activities—it cannot be said that his ongoing association with the company and the assistance he provided were products of mere "simple or even inexcusable negligence," but rather constitute "an extreme departure from the standards of ordinary care" where the threat of misleading consumers was "either known to [Mr. Bagga]" or was "so obvious that [Mr. Bagga] must have been aware of it." Woods v. Barnett Bank of Ft. Lauderdale, 765 F.2d 1004, 1010 (11th Cir. 1985). In fact, Mr. Bagga testified that on several occasions, he received complaints from the Better Business Bureau and even calls to his personal cell phone about money being improperly taken from accounts, validation letters that were never sent or received, and "[s]omeone [] collecting using [UDPS's] name and threatening them." (Dkt. [470] at 185–87, 229.) As a result, the undisputed facts establish that Mr. Bagga violated the CFPA, 12 U.S.C. § 5536(a)(3), by "knowingly or recklessly provid[ing] substantial assistance to a covered person" in its commission of unfair, deceptive, or abusive acts or practices.

It seems these facts are also sufficient to establish liability on the CFPB's remaining CFPA claims. Indeed, it is undisputed that Mr. Bagga is a "covered

55

person" under the statute. The CFPA treats as a "covered person" anyone who meets the definition of a "related person." 12 U.S.C. § 5481(25)(B). A "related person," in turn, includes any "director," "officer," "controlling shareholder," or "agent" of a covered person, as well as "any shareholder, consultant, joint venture partner, or other person" who "materially participates in the conduct of the affairs of [a] covered person." § 5481(25)(C)(i)-(ii). So, as a result of his affiliation with United Debt, Mr. Bagga is covered by the CFPA's prohibitions. And it also seems beyond doubt that Mr. Bagga violated those prohibitions by directly engaging in unfair, deceptive, and abusive acts or practices. Cf. Kistner v. Law Offices of Michael P. Margelefsky, LLC, 518 F.3d 433, 438, 441–42 (6th Cir. 2008) (finding that the sole member of a law office—and one of its only two attorneys—could be personally liable for a form collection letter that allegedly violated the FDCPA even without evidence that he actually mailed the letter, but remanding the case to determine whether the letter was in fact "deceptive" under the FDCPA); F.T.C. v. Verity Int'l, Ltd., 335 F. Supp. 2d 479, 494–97 (S.D.N.Y. 2004) (finding "deceptive" under the FTC Act defendants' practice of defendant's practice of "misrepresenting, or causing others to misrepresent, that [telephone] line subscribers were legally

obligated to pay for videotext services, irrespective of whether they used or authorized use of those services"). But even assuming the admitted facts do not establish such personal involvement in the debt collection enterprise, the Court finds that Mr. Bagga has failed to properly raise any triable issue of fact that would preclude summary judgment.

First, Mr. Bagga's forgery allegations are either refuted by his own prior testimony or wholly irrelevant. Mr. Bagga claims that, unbeknownst to him, Marcus Brown signed Mr. Bagga's name more than 80 times without permission. (Bagga Decl., Dkt. [540-2] ¶¶ 3–4.) Mr. Bagga, however, cites only 16 documents he alleges to fall into this category. (Id. ¶ 3; Bagga's Resp. to SOF, Dkt. [540] ¶¶ 4, 7, 36, 144, 153.) Five of them do not pertain to the CFPB's claims against Mr. Bagga or purport to have his signature, and another was not cited in the CFPB's motion. The remaining documents relate to merchant processing applications, the lease guarantee for the 1401 Peachtree Street office space, and the application for an account with Global Connect. As an initial matter, it is immaterial whether Mr. Bagga's name was forged on the lease documents; what matters is that Mr. Bagga knew UDPS was operating out of that space and so were collection agents. (Dkt. [470] at 77–78; Dkt.

57

[473] 207–08.)  Similarly, although Mr. Bagga alleges that Marcus Brown

forged his name on the merchant processing applications for Frontline and

EMS, he does not dispute personally opening UDPS's payment processing

account with Pathfinder.  (Dkt. [540] ¶ 149.)  Moreover, Mr. Bagga previously

testified that he authorized Brown to sign his name on the Frontline

application.  (Dkt. [473] at 154–58, 228.)  And Mr. Bagga even gave Brown his

birth date, social security number, and a copy of his driver's license to use in

the process. (Id. at 154–55, 165.)  The EMS application is therefore immaterial

for purposes of summary judgment since the CFPB otherwise established Mr.

Bagga's knowledge of UDPS's payment processing accounts and his role in

their procurement.  Johnson v. Louisville Ladder, No. CIV.A. 07-764-KD-M,

2008 WL 5122261, at *5 (S.D. Ala. Nov. 14, 2008) ("[A] party cannot create a

genuine issue of fact sufficient to survive summary judgment simply by filing

an affidavit contradicting earlier deposition testimony." (citing Tippens v.

Celotex Corp., 805 F.2d 949, 954–55 (11th Cir.1986))).

Second, Mr. Bagga's denial of personal involvement in debt collection is

legally deficient.  And that is because the statements amount to mere legal

conclusions based on Mr. Bagga's belief or speculation.  (Dkt. [540-2] ¶¶ 5, 8,

AO 72A
(Rev.8/82)

9); Ellis v. England, 432 F.3d 1321, 1327 (11th Cir. 2005) ("[M]ere conclusions and unsupported factual allegations, as well as affidavits based, in part, upon information and belief, rather than personal knowledge, are insufficient to withstand a motion for summary judgment."). The Court will not adopt legal conclusions drawn by a party in lieu of the Court's own analysis.

Mr. Bagga does, however, properly deny ever calling or harassing consumers. (Dkt. [540-2] ¶ 8.) But the CFPB has provided ample—and unrebutted—evidence establishing that Mr. Bagga was personally involved in the debt collection scheme in other ways. For instance, in addition to the activities described above, Mr. Bagga testified that he helped Marcus Brown "open[] a collection agency in the United States" by letting Brown use his name, bank account, and merchant account. (Dkt. [470] at 168–69.) And similarly, Mr. Bagga financed the launch of Credit Power—a business he repeatedly characterized as a "collection agency"—then took control of Credit Power's bank account and bought debt for the company to collect on. (Dkt. [473] at 46–56.) He also reopened Credit Power after it went out of business, and at that point, he was Credit Power's only officer. (Id. at 229.)

59

Recall that under a similar statutory scheme, the Eleventh Circuit has said that "[i]ndividuals may be liable for FTC Act violations committed by a corporate entity if the individual 'participated directly in the [deceptive] practices or acts or had authority to control them," F.T.C. v. IAB Mktg. Assocs., LP, 746 F.3d 1228, 1233 (11th Cir. 2014) (quoting FTC v. Amy Travel Serv., Inc., 875 F.2d 564, 573 (7th Cir.1989)), so long as the "individual [also] had some knowledge of the practices." Amy Travel Serv., 875 F.2d at 573.

The CFPB has met that standard here. The CFPB has offered evidence that Mr. Bagga was an officer of both Credit Power and UDPS, and that he knew those companies were calling consumers and collecting debts that were sometimes not owed and that Defendants were not entitled to collect. He received consumer chargeback advices and complaints. And he knew consumers were not receiving validation letters, which is required under the CFPA. What is more, Mr. Bagga controlled Credit Power and UDPS's bank accounts. He, therefore, cannot plausibly claim ignorance as to the illegal practices going on. Accordingly, the Court finds that Mr. Bagga is directly liable under the CFPA, and the CFPB is entitled to summary judgment on its

60

claims against him under that statute.  F.T.C. v. Gem Merch. Corp., 87 F.3d 466, 470 (11th Cir. 1996) (holding an individual liable under the FTC Act who "had direct control over the activities of [the company] and . . . was aware of the illegal practices").

For these same reasons the CFPB is also entitled to summary judgment on its FDCPA claims.  As an initial matter, Mr. Bagga is subject to the FDCPA. It is undisputed that he is a "debt collector" who sought to recover debts from consumers.  Indeed, by purchasing debts to collect, compiling information about consumers through skip tracing accounts, and opening an account used to broadcast collection calls, Mr. Bagga used an "instrumentality of interstate commerce" for "the principal purpose of" collecting debts.  15 U.S.C. § 1692a(6); see also id. (further defining a "debt collector" as one who "regularly collects or attempts to collect, directly or indirectly, [consumer] debts owed or due or asserted to be owed or due another").  And finally, by virtue of his affiliation with UDPS as well as Credit Power, the Court finds that Mr. Bagga violated the FDCPA.  F.T.C. v. Williams, Scott & Assocs., LLC, 679 F. App'x 836, 839 (11th Cir. 2017) (finding an individual liable under both the FTC Act and FDCPA "when he 'participated directly in the deceptive

practices or acts or had authority to control them.'" (quoting <u>IAB Mktg. Assocs,</u> 746 F.3d at 1233)).

Accordingly, the CFPB is entitled to summary judgment on its CFPA and FDCPA claims against Mohan Bagga (Counts I–VII).

## III.  Requested Relief

The CFPA authorizes courts to "grant any appropriate legal or equitable relief with respect to a violation of Federal consumer financial law, including a violation of a rule or order prescribed under a Federal consumer financial law." 12 U.S.C. § 5565(a)(1).  Such relief may include restitution, disgorgement or compensation for unjust enrichment, civil money penalties, and limits on the activities or functions of a person, among other things.  § 5565(a)(2).  The Act goes on to define three tiers of civil penalties, ranging from $5,000.00 to $1,000,000.00 for each day the violation continues, depending on the person's state of mind. § 5565(c)(2) (establishing separate penalties "any violation," reckless violations, and knowing violations).[15]

---

[15]  These amounts have been adjusted, <u>see</u> 12 C.F.R. § 1083.1, but only for "penalties assessed after January 31, 2019, whose associated violations occurred on or after November 2, 2015."  Because this lawsuit concerns activities that predate the filing of the Complaint on March 26, 2015, the increased civil penalties do not apply.

AO 72A
(Rev.8/82)

Here, the CFPB seeks a permanent injunction against all Defendants; restitution in the amount of $5,261,484 for which all of the non-defaulted Defendants would be jointly and severally liable; and civil money penalties against each Defendant, ranging from $50,000.00 up to $1.5 million.

The Court finds that a ruling on damages would be premature at this point. Instead, the Court finds it appropriate to proceed to trial on the remaining issues related to Sumant Khan and S Payment's liability. Then, the Court will hold a hearing, after which it will grant appropriate relief. The Court notes, however, that this is not an invitation for the parties to re-litigate summary judgment. For instance, the CFPB has already established that WNY Account Solutions, Marcus Brown, Sarita Brown, Tasha Pratcher, and Mohan Bagga are liable under the CFPA and FDCPA and that Sumant Khan is liable for providing substantial assistance to other Defendants in violation of the CFPA. Similarly, the CFPB has proved that Defendants collected at least $5,261,484.00 from the debt-collection scheme. See FTC. v. Williams, Scott & Assocs., LLC, 679 F. App'x 836, 839–40 (11th Cir. 2017) (explaining that the correct measure of unjust gains under section 13(b) of the FTC Act is "[t]he amount of net revenue (gross receipts minus refunds), rather than the amount of

AO 72A
(Rev.8/82)

profit (net revenue minus expenses)" (quoting <u>FTC v. Wash. Data Res., Inc.</u>,

704 F.3d 1323, 1327 (11th Cir. 2013))).  By contrast, issues yet to be resolved

include: whether each of the Defendants should be held jointly and severally

liable for that amount; whether injunctive relief is appropriate; the amount of

civil penalties to be awarded, and how those penalties should be calculated, as

well as any mitigating factors.  The court will not award damages in this case

until the parties have had the opportunity to be heard further on those issues

## Conclusion

As described above, the CFPB's Motion for Summary Judgment [451] is

**GRANTED in part** and **DENIED in part**.  Defendant Tasha Pratcher's

Motion for Permission to File an Answer Out of Time [547] is **DENIED**.

Defendants Sumant Khan and S Payment's Motion for Summary Judgment

[450] is likewise **DENIED**.

SO ORDERED, this 21st day of March, 2019.

_____
**RICHARD W. STORY**
United States District Judge

64

# **APPENDIX A**

RECORDED MESSAGE:  We are contacting, first name, last name, in reference to an allegation of check or bank fraud.  It is imperative that we speak to you regarding this allegation.  Our office has been mandated to contact your employer to verify your employment to issue paperwork for you to appear in court.

If you wish to stop said action, press 9, or call (202)417-2021.  Once again, contact (202)417-2021.  You have 'til the close of business today.

(The call was concluded.)
(The recording was concluded.)


RECORDED MESSAGE:  I am contacting, first name, last name, in reference to a complaint that is being filed against you where you have been named as a respondent.  Please be advised that the order to show cause contains a restraining order.  You or your attorney will have 24 to 48 hours to oppose this matter.  Failure to respond may lead to the execution of paperwork to your home or place of business.

If you wish to speak to a litigator, press 9, or call us at (216)287-1866.  Once again, press 9 if you wish to speak to a litigator, or call us at (216)287-1866.

(The call was concluded.)
(The recording was concluded.)

RECORDED MESSAGE:  This message is for, first name, last name.  I am contacting you in regards to a complaint that is being filed against you where you have been named as a respondent and may have to appear.  Please be advised that the order to show cause contains a restraining order.  You or your attorney have 24 to 48 hours to oppose this matter.

If you wish to speak to a litigator, please press nine, or feel free to contact our office at (770)347-7018.  Failure to respond will result in further action being processed against you.  Once again, our telephone number is (770)347-7018, or you may press nine to speak to a litigator now.

(The recording was concluded.)


RECORDED MESSAGE:  This message is for, first name, last name.  A claim has been filed against you for scheduled processing per your state and federal law.  Legal action may be necessary.  It is imperative that you press 9 to speak with a claims agent, or call 1-(302)342-8805.  Once again, our phone number is 1-(302)342-8805.

(The call was concluded.)

(The recording was concluded.)


RECORDED MESSAGE:  I am contacting, first name, last name, in reference to a complaint that is being filed against you where you have been named as a respondent.  Please be advised that the order to show cause contains a restraining order.  You or your attorney will have 24 to 48 hours to oppose this matter.  Failure to respond may lead to the execution of paperwork to your home or place of business.

If you wish to speak to a litigator, press 9, or call us at (216)287-1866.  Once again, press 9 if you wish to speak to a litigator, or call us at (216)287-1866.

(The call was concluded.)

(The recording was concluded.)

RECORDED MESSAGE:  We are contacting, first name, last name, in reference to an allegation of check or bank fraud.  It is imperative that we speak to -- regarding this allegation.  Our office has been mandated to contact your employer to verify your employment to issue paperwork for you to appear in court.

If you wish to stop said action, press 9, or call (214)550-5041.  Once again, contact us at (214)550-5041.  You have 'til the close of business today.

(The call was concluded.)

(The recording was concluded.)


RECORDED MESSAGE:  We are contacting, first name, last name, in reference to an allegation of check or bank fraud.  It is imperative that we speak to -- regarding this allegation.  Our office has been mandated to contact your employer to verify your employment to issue paperwork for you to appear in court.

If you wish to stop said action, press 9, or call (214)504-2986.  Once again, contact us at (214)504-2986.  You have 'til the close of business today.

(The call was concluded.)

(The recording was concluded.)


RECORDED MESSAGE:  This message is for, first name, last name, in reference to a complaint that has been filed against you.  You have four hours to contact us at (330)205-7460.  You have been named as a respondent and may have to appear in court.  The order to show cause contains a restraining order.  It is imperative that you or your attorney contact us immediately.  Failure to do so may result in contacting your employer to verify your employment to pursue a remedy against your wages.

If you wish to stop this action, press 9 to speak with a litigator, or contact us (330)205-7460.

(The call was concluded.)

(The recording was concluded.)

RECORDED MESSAGE:  This message is for, first name, last name.  You have been notified of a scheduled processing per your state and federal law.  Please contact your administrator for review, or press 9 to speak to a representative, or call us at (770)983-6747.  Once again, our phone number is (770)983-6747.

        (The call was concluded.)

        (The recording was concluded.)


RECORDED MESSAGE:  The message is for, first name, last name.  We have refrained from contacting your employer to protect your privacy.  This is in reference to a complaint that is being filed against you.  You have been named as a respondent and may have to appear.  The order to show cause contains a restraining order.  You or your attorney will have 24 to 48 hours to oppose this matter.  Failure to respond will result in the contacting your employee to verify your employment.

        Please contact us at (216)536-3460, or press 9 to speak to a litigator.  Once again, my phone number is (216)536-3460.

        (The call was concluded.)

        (The recording was concluded.)


RECORDED MESSAGE:  This message is for, first name, last name.  I am contacting you in regards to a complaint that is being filed against you where you have been named as a Respondent and may have to appear.  Please be advised that the order to show cause contains a restraining order.  You or your attorney have 24 to 48 hours to oppose this matter.

        If you wish to speak with a litigator, please press 9, or feel free to contact our office at (216)273-6143.  Failure to respond will result in further action being processed against you.  Once again, our telephone number is (216)273-6143.  Or you may press 9 to speak with a litigator now.

        (The call was concluded.)

        (The recording was concluded.)

RECORDED MESSAGE:  I am contacting, first name, last name, in reference to a complaint that is being filed against you where you have been named as a respondent.  Please be advised that the order to show cause contains a restraining order.  You or your attorney will have 24 to 48 hours to oppose this matter.  Failure to respond may lead to the execution of paperwork to your home or place of business.

If you wish to speak to a litigator, press 9, or call us at (216)287-1866.  Once again, press 9 if you wish to speak to a litigator, or call us at (216)287-1866.

(The call was concluded.)

(The recording was concluded.)