FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta
AUG 23 2019
JAMES N. HATTEN, Clerk
By: Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| **CONSUMER FINANCIAL PROTECTION BUREAU,**<br>**Plaintiff,**<br>**v.**<br>**UNIVERSAL DEBT & PAYMENT SOLUTIONS, LLC, *et al.*,**<br>**Defendants.** | **Civil Action No.**<br>**1:15-CV-0859-RWS** |

**DEFENDANT TASHA PRATCHER MOTION TO VACATE SUMMARY JUDGMENT ORDER**

# Rule 60 – Relief from a Judgment or Order

(a) **Corrections Based on Clerical Mistakes; Oversights and Omissions**. The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice. But after an appeal has been docketed in the appellate court and while it is pending, such a mistake may be corrected only with the appellate court's leave.
(b) **Grounds for Relief from a Final Judgment, Order, or Proceeding**. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

Under Rule 60 b I am seeking relief from judgment or order. The CFPB has stated that I provided substantial assistance to debt collectors that violated the CPA. The CFPB has stated that I received over an $120,000.00 from debt collectors. The CFPB has stated that I opened a merchant account (RX Office Solutions) that the debt collectors used to violate the law.

First, The Bureau argument that I received over $120,000.00 is unsupported by the presentation of check images and bank statements which should have been subject to discovery. The CFPB relies on an affidavit by Ryan Thomas to substantiate their claim. Ryan Thomas's affidavit has many deficiencies. In this motion I have chronicled some of those deficiencies. I do acknowledge the receipt of money from my husband for support and household bills to take care of my children. However, I didn't receive $120,000.00 from assisting debt collectors. Further, rents from my properties at 150 Parkridge Avenue, and 237 Dartmouth Avenue were deposited in the same WNY Account Solutions Bank account where the support money was deposited. I received a minimum of $1000.00 a month for rents (150 Parkridge and 237 Dartmouth). Over the four year span of this case (2011 to 2015), I received approximately

$50,000.00 in rental income. In other words, a large percentage of the money I received out of WNY Account Solutions bank account was my rental income. The other resources were support for me and my children from Marcus Brown who resided in Atlanta.

In addition, Marcus Brown received $3500.00 to $4000.00 in rental income monthly. Mr. Brown had given me $1500.00 monthly to support our children. The rental income he received came from properties that were purchased well before debt collection activity occurred in Atlanta. The Bureau assertion that I received over $120,000.00 from illegal debt collection is inflated and misrepresented.

Secondly, the CFPB claims that I setup a merchant account that was used by debt collectors to violate the law. The CFPB has misrepresented their case in at least two instances. (1) The CFPB has hid from the court that there were multiple users of the merchant accounts. This point is important because each debt collector had different consumer debt and collection tactics. I have chronicled who the multiple users are in this motion. In Lauren Black's Declaration (Exhibit C), she complies several complaints that debt collectors obtained, but none of the complaints came from RX Office Solutions merchant account, which was linked to the bank account I opened. This is an important point. The Bureau has asked the court for $5.2 million judgment without making any of the actual Users liable for their debt collection. The Bureau hasn't provided the court with consumer statements claiming loss from RX Office Solutions.

(2) The chargeback rates for RX Office Solutions are drastically different from those of Universal Debt and Payment Solutions and Credit Power LLC. This is a key indicator that there was a different user for RX Office Solutions merchant account. The Bureau made the case that the chargeback rates should have been an indicator to the Payment Processors that illegal activity was taken place. The CFPB failed to disclose the chargeback rates for RX Office Solutions. This omission is intentional.

The Bureau has also indicated that I assisted debt collectors with rent. The Bureau points to a check that was written for $4500.00. This act doesn't constitute severe recklessness. It is not illegal to help a third party with a debt. In fact, my obvious limited involvement in total doesn't constitute severe recklessness.

I am asking the court to reconsider its order. I have detailed in this motion that there were multiple users, and none of them have been made accountable for their debt collection. The Bureau has not provided the court with collection scripts, dialer usage, and collection accounts from Roy Mullman, Robert Whitaker, and Clinton Griffin. The focus has been on One User in an attempt to misrepresent the facts and overstate their claim.

I am asking the court to compare my conduct to that of Robert Whitaker, Roy Mullman, Lawrence Sessum, Jamarrow West, and Clinton Griffin. I am asking the court to compare my conduct to that of the Payment Processors. It is my firm belief that Jamarrow West, Roy Mullman, Robert Whitaker, Lawrence Sessum, Thermicia Charles and the Payment Processors had a greater role than myself. I am asking the court to ponder the question: Why weren't any of the Users of the merchant accounts subject to the Preliminary Injunction? I am asking to court to reconsider its order. I pray for relief.

Further, the court should consider the fact that the Preliminary Injunction Order was applied and administered in a discriminatory manner. The Preliminary Injunction afforded rights to some defendants that I was not given, although the circumstances were similar. I have outlined that argument in Part II of this motion. I pray for relief.

Sincerely, Tasha Pratcher

The Consumer Financial Protection Bureau at the beginning of this case has made a very profound claim. The Bureau's brings this claim under a provision of the 2010 Dodd Frank Wall Street Reform and the Consumer Financial Protection Act. According to 12 U.S.C. & 5536(a)(3), it is unlawful for "any person to knowingly or recklessly provide substantial assistance to a covered person or service provider in violation of section 5531 of this title (prohibiting unfair, deceptive, or abusive acts or practices)." Please pay special attention to the word recklessness. The CFPB believes that the court should define recklessness in a general way, while the Eleventh Circuit has found that severe recklessness satisfies the scienter requirement.

In other words, the CFPB has a liberal interpretation of recklessly, which has been used to bolster their claim that the Payment Processors should be held liable. On the other hand, the Eleventh Circuit has a more conservative interpretation. If the CFPB truly believes in its interpretation of the Dodd Frank law, then why weren't Robert Whitaker, Roy Mullman, Jamarrow West, and Lawrence Sessum made subject to the Preliminary Injunction?

I have labored to understand why four users of the merchant accounts were not made liable for their debt collection and yet the Consumer Financial Protection Bureau has asked the court for a summary judgment for $5.2 Million dollars. The four users are Robert Whitaker, Roy Mullman, Jamarrow West, and Lawrence Sessum.

## USER #1

Robert Whitaker was identified by the CFPB as a user of the merchant account (Credit Power). Please see pages 6,7,and 8 of Judge Story's order. I have labeled Judge Story's order as exhibit A.

**II. Pathfinder's Underwriting and Risk Monitoring**

The CFPB alleges that Pathfinder failed to follow up on a number of red flags in the Debt Collectors' applications for Global Payments processing accounts. In February 2011, Defendant Bagga submitted an application on behalf of Credit Power. (Id. ¶ 165.) Pathfinder's underwriting process was supposed to include a review for criminal activity, associates, verification of addresses, business filings, and corporate affiliations. (Id. ¶ 166.) Credit Power's chief executive officer had recently completed a sentence for drug trafficking and shared an address with Mr. Bagga, but Pathfinder and Global Payments approved the application. (Id. ¶ 167.)

Clearly, the Consumer Financial Protection Bureau used Robert Whitaker criminal background, his usage of the merchant account (Credit Power), and his relationship with Mr. Bagga as evidence, in an attempt to persuade the court to hold Pathfinder and Global Payments liable for debt collection.

Robert Whitaker usage of the merchant account served as evidence in the case against the Processors (Global Payments and Pathfinder). However, Robert Whitaker's usage of the merchant account wasn't used as evidence in the CFPB's 5.2 million dollar motion for summary judgment motion. Robert Whitaker wasn't made subject to the Preliminary Injunction.

Further, Mr. Bagga identified Robert Whitaker as a user of the merchant account (Credit Power). Please see page 157-158 of Mr. Bagga deposition. I have labeled Mr. Bagga deposition as Exhibit B. On page 158, Mr. Bagga clearly states that Robert Whitaker was the first person to have access to various pin codes to access merchant account and skip tracing tools.

In addition, what is perhaps even more compelling is that Robert Whitaker was mentioned in at least one of the complaints that was provided by CFPB employee Lauren Black. Please see page 12 complaint C. I have labeled Lauren Black declaration Exhibit C. I have labeled the full write-up on the complaint and Exihibit D. The excerpt from the complaint is listed below.

> I had authorized Credit Power LLC to take one payment out of my account in the amount of $100 on 3/28/11. They wanted to put me on a payment plan but I told them I was unable to due to the fact that I was on temp disability ... Once they took out the payment for $402.20 out of my account, I called to speak with the manager and spoke with Stan Black and Robert Whittaker both of them gave me the run away and was not able to help me. (Complaint dated 5/13/2011 from a consumer in Virginia, Attach. K.)

The above complaint was used by the CFPB to obtain summary judgment. My concern is How can the CFPB deem Robert Whitaker debt collection as privileged but use complaints that he and his collectors generated as evidence to obtain summary judgment. Robert Whitaker clearly had the ability to impact his collectors' conduct and received financial gain from debt collection. However, he was not subject to the preliminary injunction or summary judgment. If you apply the CFPB general interpretation of the word recklessness to satisfy the scienter requirement, Robert Whitaker should have been made a defendant in this case.

Moreover, Robert Whitaker indicated that he answered questions that were posed by CFPB representatives (Jonathan Engel). Unfortunately, however Mr. Whitaker statement was not revealed during discovery. Where is the statement from Lauren Black (CFPB employee who keeps custody of evidence)? Does Ms. Black only keep the evidence the helps the CFPB case?

In the final analysis, if the Bureau truly believed in its interpretation of the recklessness when applying the scienter requirement, there should be no doubt about Robert Whitaker potential liability.

# USER # 2

Roy Mullman and RSB Equity LLC was identified by the CFPB as a user of the merchant account (Universal Debt & Payment Solutions). Please see pages 7, 8, of Judge Story's order. I have labeled Judge Story's order as exhibit A. Below is an except from Judge Story's order:

The CFPB next alleges that when Credit Power and UDPS began processing transactions, Global and Pathfinder continued to ignore indicators that the collectors were committing fraud. In January 2012, for instance, Pathfinder recognized that UDPS was processing payments for another merchant called RSB Equity Group, LLC ("RSB"). (Id. ¶ 177.) Even though Global Payments' policy prohibits the practice of factoring, it allowed UDPS and Credit Power to continue processing payments for RSB. (Id.)

Then, in November 2012, Pathfinder received an alert for UDPS and RSB from MasterCard's "Member Alert to Control High-Risk Merchants," or "MATCH," system to identify and prevent fraud. (Id. ¶¶ 178-79.) Global Payments, Pathfinder, and Frontline were all required to consult the MATCH system under MasterCard and Global Payments' rules. (Id. ¶ 179.) According to the MATCH alert, another processor had terminated affiliates of UDPS and

RSB after investigating and finding factoring and an excessive chargeback volume. (Id. ¶ 180.) In March 2013, Global Payments notified Pathfinder that Visa had prohibited Credit Power from processing payments using its network. (Id. ¶ 182.) Then, on July 8, 2013, Global Payments notified Pathfinder that Discover was requiring it to close UDPS's account due to "prohibited business practices." (Id. ¶ 184.) Global Payments and Pathfinder continued to allow Credit Power and UDPS to process payments with MasterCard for almost another year. (Id. ¶ 185.)

Communication with the Debt Collectors was also a problem that the CFPB alleges should have served as a warning signal. Pathfinder had difficulty contacting representatives of UDPS and Credit Power because mail was often returned and voicemail boxes were full. (Id. ¶¶ 186-87.) And when Pathfinder called UDPS customer service, the owner of RSB answered the phone. (Id. ¶ 188.) The CFPB alleges that these communication problems "should have caused the ISO to more closely monitor or terminate the Debt Collectors." (Id. ¶ 189.) By August 2013, UDPS changed its address to that of a UPS store. (Id. ¶ 193.)



Clearly, the Consumer Financial Protection Bureau used the knowledge of RSB Equity (Roy Mullman) usages of the merchant account (UDPS) and Mr. Bagga's relationship with Roy Mullman as evidence, in an attempt to persuade the court to hold Pathfinder and Global Payments liable for debt collection.

In the final analysis, Roy Mullman usage of the merchant account served as evidence in the case against the Processors (Global Payments and Pathfinder). However, Roy Mullman usage of the merchant account wasn't used as evidence in the CFPB's 5.2 million dollar motion for summary judgment motion. Roy Mullman wasn't made subject to the Preliminary Injunction.

Further, in Mr. Bagga deposition Roy Mullman and RSB Equity was identified as a user of the merchant account. See pages 157-158. I have labeled Mr. Bagga deposition as Exhibit B. On page 158, Mr. Bagga identifies Roy Mullman as a person who had access to pin codes connected to the merchant account and skip trace tools.

In addition, what is perhaps even more compelling is that Roy Mullman's company RSB Equity received a complaint on 6/15/2012. Please see page 12 complaint B. Once again, I have labeled Lauren Black declaration Exhibit C. Below is an excerpt from the complaint:

(b) Universal Debt & Payment Solutions, LLC took $300 from my credit card saying it was a debt I owed. They told me if I didn't pay it right then that the police would come pick me up and I would go to jail for a payday loan I owed in 2005. Come to find out this company is a fraudulent company ... The place I owed the payday loan to said this money is not going towards what I owe them because they were fraud. Besides the payday loan place says I only owe 1 loan of $57.50 and that's all! (Complaint dated 7/15/12 from a consumer [state unknown], Attach. J.)

I have enclosed chargeback advice and labeled the Exhibit E. Please note that the address for the chargeback advice is an address associated with RSB Equity LLC.

That address 11175 CIERCO DRIVE IN ALPHARETTA, GA 30022. I have also enclosed a copy of the application for CBC Innovios. Please note that the address on the application listed on the application is 11175 Cierco Drive Alpharetta, Ga 30022. This address is a known address for RSB Equity LLC.

In short, both Robert Whitaker and Roy Mullman had access to the merchant accounts. Both Credit Power and UDPS respectively generated chargebacks and complaints. Both Robert Whitaker and Roy Mullman received a substantial financial benefit as well. However, neither were subject to the preliminary injunction and the 5.2 million dollar summary judgment motion/order. Here is where the intentional non-disclosure of all the checks from both Credit Power and UDPS plays a role. The CFPB can't ask the court for a $5.2 million dollar judgment and not name both Robet Whitaker and Roy Mullman as defendants.

The CFPB intentionally didn't make the check images apart of discovery or provide a detailed summary of the amount of money both RSB Equity LLC (Roy Mullman) and Robert Whitaker during discovery to hide their obvious liability. But more importantly, the CFPB didn't inform the court that there were multiple users of the merchant accounts because the Bureau would need affidavits from each person who made a payment with the merchant account to obtain a 5.2 million dollar judgement. Please note the Ryan Thomas's affidavit (Exhibit F) makes no mention of the resources that both Roy Mullman (RSB Equity) or Robert Whitaker (credit Power) received. This omission is intentional and reckless. Both Roy Mullman and Robert Whitaker violated the CPA and FDCPA. Even the CFPB doesn't believe that I or Sarita Brown violated the FDCPA. And yet both Sarita Brown and myself were named defendants. However, it is clear that both Roy Mullman and Robert Whitaker violated the CPA and the FDCPA but both weren't made subject to the Preliminary Injunction.

**USER # 3**

The third user has been identified as Jamarrow West. According to Ryan Thomas Affidavit (Exhibit F), Jamarrow West received $98,670 in checks made out to him. However, despite the large sum of money that Mr. West received, Mr. West was released from liability in this case. In the beginning of this case Mr. West was identified as a defendant.

According to the declaration made by Lauren Black, Mr. West was identified as the Owner of the debt collection agency. He was also identified as the trainer and the person who hired the employees. Mr. West was also identified as the individual that authored the script. Clearly, Mr. West violated the CPA and the FDCPA. Mr. West was intimately involved in the debt collection process. He had the power to change his employees conduct.

Several of the complaints are linked to Jamarrow West's debt collection, and yet he was not subject to the Preliminary Injunction. He also wasn't made subject to the summary judgment motion/order. That make no sense. How can the CFPB ask the court for 5.2 million dollar judgment and not make Jamarrow West, Robert Whitaker, and Roy Mullman subject to it. All three men violated the CPA AND FDCPA. All three men were in the room when debt collection was taking place. All three men had the power to change their employees practices.

**USER # 4**

The fourth user has been identified as Lawrence Sessum (Direct Processing). Direct Processing received: the following checks : $25000.00, $9000.00, $12000.00, $25000.00, $20000.00, $40000.00, $11,000.00, $15,000.00, $13000.00, $18000.00, $16000.00, $16000.00, $25000.00, $10000.00, $24500.00, $32,000.00, $25000.00, $20000.00, $40000.00, $20,000.00, $35,000.00, $20000.00, $5000.00, $5000.00.$5000.00, $3500.00, $5000.00, $13326.00, $8121.10, $12,000.00, $10,000.00, $35000.00, $20,000.00, $20,000.00, $5000.00, and $5000.00, I would like to mention that these checks are not mentioned in the affidavit by Ryan Thomas Regarding Cash Flow. The affidavit by Ryan Thomas has been identified as exhibit F. How can one company or entity do roughly a million dollars in processing and not be included in the affidavit by Ryan Thomas. This omission is intentional and reckless.

Lawrence Sessum (Direct Processing) had extensive communications with the CFPB by mail and over the phone. The details of those communications weren't made subject to discovery. These acts are intentional and reckless. The CFPB can't claim that these communications are privilege and make the remaining defendants accountable for Roy Mullman, Robert Whitaker, and Lawrence Sessum's debt collections. The CFPB claims of privilege seem to be similar to their claims of privilege that they (CFPB) used with the Payment Processors. The Bureau's intent was to hide the fact that there were multiple users of the merchant accounts. The CFPB doesn't have affidavit's from every person whose credit was charge. Thus the CFPB has no claim to a 5.2 million dollar judgment.

The CFPB has sought a summary judgment for 5.2 million dollars but didn't name Direct Processing or Lawrence Sessum as a defendant. Direct Processing (Lawrence Sessum) was not made subject to the Preliminary Injunction.

**The Declaration of Ryan Thomas Regarding Cash Flow**

(SEE EXHIBIT F)

The affidavit is grossly misleading at best. It doesn't give a detailed account to where 5.2 million dollars went. The affidavit intentionally leaves out the multiple users of the merchant accounts to give the court the impression that there was only one user (Jamarrow West). The affidavit fails to address the totality of the Cash Flow. The affidavit doesn't identify the source of non-debt collection related income (rental income). The affidavit serves as a reckless attempt by the CFPB to avoid making the check images from the defendant's bank accounts available during discovery. The CFPB subpoena all the check images and bank statements from the defendant's bank accounts but didn't make this information available during discovery. The Declaration by Ryan Thomas further perpetuates the false narrative that there was only one user of the merchant account.

The affidavit doesn't contain an accumulation of the money received by Robert Whitaker. The affidavit doesn't contain an accumulation of the money received by Roy Mullman (RSB Equity). The affidavit doesn't contain an accumulation of the money received by Laurence Sessum (Direct Processing). The affidavit doesn't contain the accumulation of money received by Clinton Griffin (5th User).

In the affidavit, Ryan Thomas fails to mention over 50 checks that were valued at $5000.00 or more. The omissions by the CFPB are intentional and reckless. These omissions are rooted in a policy adopted by the CFPB. This policy is called evidence spoliation. Both Ryan Thomas Declaration and Lauren Black Declaration have a common theme. The intent is to portray a false narrative. Ryan Thomas had access to the bank accounts in total. And yet he cherry picked the evidence (checks) to put in the affidavit. The same type of cherry picking (evidence spoliation) occurred with Lauren Black affidavit (Access 1775 Exchange) and Tabitha Wrights' interview. It is a CFPB policy to suppress evidence with affidavits to rewrite the narrative. There isn't a question of whether or not the Bureau suppressed evidence. The question is who authorized this type of conduct.

Ryan Thomas identifies himself as a CPA and as someone who investigates fraud, and yet he grossly misrepresents the facts with obvious omissions (debt collection activity of Robert Whitaker, Roy Mullman, Clinton Griffin, Lawrence Sessum). Ryan Thomas repeatedly ignored Debt Collection activity in Universal Debt and Payment Solutions. He then ignored debt collection activity in S-Payment Processing. He then ignored debt collection activity in both Universal Debt Solutions and Wny Account Solutions. I don't understand how he would fail to document obvious debt collection activity in 5 different bank accounts. How did Ryan Thomas make the same omission five different times? Ryan Thomas in his affidavit could have noted that there were millions of dollars in checks written to non-defendants (debt collectors).

On the other hand, Ryan Thomas takes the time to editorialize his affidavit in lines 29-33. (See exhibit F) The total from lines 29-33 add up to roughly $100,000.00. This number (100k) is a far cry from the millions of dollars not acknowledged in his affidavit. In line 29, he mentions Buffalo water. In line 30, he mentions the City of Buffalo. In line 31, he mentions Love to drive Motors. In line 32, he mentions New Birth (church). In line 33, he mentions St. Joseph Collegiate. But at no point does he mention the source of the resources that were deposited (rental income) in the account. Where did the rental income come from? How much rental income was deposited in the account? This omission is intentional as well.

The CFPB hasn't submitted affidavits from consumers detailing a loss of $5.2 million dollars. The fact that the CFPB failed to disclose that millions of dollars were received by Robert Whitaker, Roy Mullman, Laurence Sessum, and Clinton Griffin is a clear indicator of the CFPB intention to deceive the court into believing there was one user. There lies the CFPB fraud. The non-disclosure of chargeback rates is intentional. For four years, the CFPB misled the court to believe that they had an operational database (Microsoft Access) to show a link between the data purchased and its usage. Then the CFPB attempted to threaten Marcus Brown with an implied sanction in order to obtain a password. For four years, the CFPB misled the court to believe that there was only one user. This is illustrated in Ryan Thomas's deliberate omissions. If the Users and the resources they received is a non-material fact, then why didn't the CFPB disclose it. And why would the CFPB ask the court for a 5.2 million dollar judgment in light of their obvious non-disclosure?

At my deposition, I was told that emails should not be deleted from my personal email or I could be sanctioned. Conversely, I don't understand how the Bureau destroys and withholds evidence. Why the double standard?

In an effort to secure banks statements and check images Marcus Brown filed a motion to the court. Mr. Brown requested the bank statements and check images along with the Database and its Contents. Mr. Brown has yet to receive a response from the CFPB. If all the checks images and banks statements aren't subject to discovery, then CFPB should not be allowed to use any checks images and bank statements in their summary judgment motion. I am asking to vacate the order. I pray for relief.

PART II

In the first part of this motion I focused on the 4 four users and how ironically all four were not made subject to the Preliminary Injunction. The Preliminary Injunction Order has been used as a tool of discrimination by the CFPB. The Order itself was not applied to Robert Whitaker, Roy Mullman, Jamarrow West, Lawrence Sessum, Thermicia Charles, and Lawrence Sessum. All the individuals that I mentioned had a greater role than me. Additionally, the order precluded me from collecting rents on properties that were purchased before debt collection activity began in Atlanta.

The properties that I owned are:237 Dartmouth Buffalo, NY and 150 Parkridge Buffalo, Ny were purchased before debt collection began in Atlanta and yet I was precluded from collecting the rents for these properties.

Likewise, The Georgia Diner (Mrs. Bagga business) was purchased and operated before debt collection began in Atlanta.

Likewise, Marcus Brown had 5 properties that were purchased before debt collection began in Atlanta.

While Mr. Brown was allowed to collect rents and Mrs. Bagga was allowed to operate her business, I was precluded from collecting rents from 237 Dartmouth, Buffalo, Ny and 150 Parkridge. Buffalo, Ny. The CFPB is well aware of this fact. The inability to collect the rents over the past four and ½ years has been a hardship for me and my parents. The Preliminary Injunction in its application should have never precluded me from collecting rents. The Preliminary Injunction effectively took my properties from me. Secondly, when the modification was made with respect to Mr. Brown and Mrs. Bagga, a modification should have been in place for me as well.

I have enclosed a letter from the County of Erie indicating that the properties 237 Dartmouth Buffalo, Ny and 150 Parkridge Buffalo, Ny are due to be foreclosed on. I have labeled the letter from the County of Erie as Exhibit G. The rents I could have collected are well over $50,000 over the last 4 ½ years. It doesn't seem to make sense that I would be forced to pay $50,000.00 for my limited involvement after losing well over $50,000.00 in rents and lose the properties as well. The unfair application of the Preliminary Injunction which contributed to the significant loss of rents, along with the inevitable loss of my properties serve as my second reason to give the court cause to reconsider its decision and dismiss the complaint against me. I pray for relief.

Sincerely, Josha Patcho

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSAL DEBT & PAYMENT SOLUTIONS, LLC, *et al.*,<br><br>Defendants. | : | CIVIL ACTION NO. 1:15-CV-00859-RWS |

**ORDER**

This case comes before the Court on Defendant Pathfinder Payment Solutions, Inc.'s Motion to Dismiss [89], Defendant Global Payments, Inc.'s Motion to Dismiss [93], and Defendant Frontline Processing Corp.'s Motion to Dismiss [97]. After reviewing the record and with the benefit of oral argument, the Court enters the following Order.

**Background**

The Consumer Financial Protection Bureau ("CFPB") brings this action against numerous individuals and entities in connection with a massive debt-collection scheme. The CFPB alleges violations of the Fair Debt Collection

Case 1:15-cv-00859-RWS Document 149 Filed 09/01/15 Page 2 of 59

Practices Act ("FDCPA"), 15 U.S.C. §§ 1692–1692p, and the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. §§ 5531, 5536(a). According to the CFPB, several individuals created limited liability companies in Georgia and New York to perpetrate a debt-collection scheme targeting millions of consumers. These companies included, among others, Defendants Universal Debt and Payment Solutions, LLC ("UDPS") and Credit Power, LLC ("Credit Power"), both organized by Defendant Mohan Bagga (collectively, "Debt Collectors"). (Compl., Dkt. [1] ¶¶ 13, 37.)

## I. The Debt-Collection Scheme

The Debt Collectors made millions of collection calls to consumers in attempts to collect debts the Debt Collectors were not in fact owed. (Id. ¶ 94.) The Debt Collectors threatened litigation and told consumers they needed to settle the debt to avoid a restraining order or criminal prosecution. (Id. ¶¶ 96-97.) When asked for information about the purported debts, the Debt Collectors refused to identify the lenders but, by reciting the consumers' personal information, including Social Security number, date of birth, and place of employment, convinced consumers the debts were legitimate and were owed to them. (Id. ¶ 98.) The Debt Collectors purchased that identifying



AO 72A
(Rev.8/82)

Case 1:15-cv-00859-RWS Document 149 Filed 09/01/15 Page 3 of 39

information from debt and data brokers. (Id. ¶ 101.) When consumers provided their payment information, the Debt Collectors used payment processors to withdraw funds from the consumers' accounts. (Id. ¶ 100.)

Defendant Global Payments, Inc. ("Global Payments" or "Global") is a payment processor that processed transactions for the Debt Collectors. Payment processors "enable merchants to accept check, card, and electronic payments at a point of sale." (Id. ¶ 144.) During a transaction, the card information is captured by a point-of-sale terminal card reader and transmitted to a payment network. (Id. ¶ 147.) Payment processors are sponsored by an acquiring bank that is registered with one or more card associations, such as Visa or MasterCard. (Id. ¶ 148.) They are also subject to the rules and credit risk policies of the card associations. (Id. ¶ 149.)

Two other companies, Defendants Pathfinder Payment Solutions, Inc. ("Pathfinder") and Frontline Processing Corp. ("Frontline") are independent sales organizations ("ISOs") that entered into merchant services agreements with a Global Payments subsidiary to market Global Payments' processing services to merchants. (Id. ¶¶ 80, 84.) Pathfinder also agreed to review potential merchants' creditworthiness, to underwrite the merchants, to monitor



AO 72A
(Rev.8/82)

Case 1:15-cv-00859-RWS Document 149 Filed 09/01/15 Page 4 of 59

processing activity to detect fraud and risk, and to advise Global Payments accordingly. (Id. ¶ 80.) Frontline agreed to prescreen merchants for compliance with Global Payments' credit criteria. (Id. ¶ 84.)

The CFPB accuses Global Payments, Pathfinder, and Frontline (collectively, "Payment Processors")[1] of providing substantial assistance to the Debt Collectors' unfair or deceptive conduct (Count VIII) and of engaging in unfair acts or practices (Count IX). The CFPB asserts that the Payment Processors "enabled [the Debt Collectors] to efficiently accept payments and convince consumers that they were credible merchants." (Id. ¶ 146.) Moreover, these Defendants were required to follow policies and procedures to evaluate merchant creditworthiness and identify fraud. (Id. ¶ 155.) This is because payment processors face credit exposure given that merchants are paid quickly, while consumers' payments are provisional and may be reversed if a consumer disputes a charge, resulting in a "chargeback." (Id. ¶¶ 152-53.) If a merchant is unwilling or unable to fund the reversed transaction, the payment

[1] Pathfinder and Frontline point out that ISOs do not actually process payments. Keeping this distinction in mind, the Court nevertheless uses this term because the CFPB uses it in its Complaint to refer to Global Payments, Pathfinder, and Frontline. The Court uses this term only as shorthand to refer to these three Defendants alleged to be involved in facilitating payment processing.



AO 72A
(Rev.8/82)

Case 1:15-cv-00859-RWS Document 149 Filed 09/01/15 Page 5 of 59

processor is responsible for the chargeback. (Id. ¶ 154.)

Global Payments' credit policy, like the card networks' policies, identifies collection agencies as "prohibited merchants" that the ISOs were not to solicit and which required Global Payments' approval. (Id. ¶ 157.) Global Payments also prohibited "Aggregators," which are merchants who use their processing account to process payments for other merchants—a practice called "factoring." (Id. ¶ 160.) Defendants considered collection agencies to be high-risk merchants because they processed only "card-not-present" transactions. (Id. ¶ 162.) Thus, Global Payments' policies required more scrutiny of card-not-present merchants. (Id. ¶ 163.) The CFPB alleges, however, that Global Payments, Pathfinder, and Frontline all failed to monitor the Debt Collectors' accounts for signs of unlawful conduct and thus "knowingly or recklessly provided substantial assistance" to the Debt Collectors' scheme. 12 U.S.C. § 5536(a)(3). Furthermore, the CFPB alleges that this conduct amounted to unfair acts or practices. 12 U.S.C. §§ 5531(a), (c)(1), 5536(a)(1)(B). Because the parties' arguments turn on the ISOs' and Global Payments' levels of knowledge and respective culpabilities, the Court recounts the specific allegations as to each Defendant below.



AO 72A
(Rev.8/82)

Case 1:15-cv-00859-RWS Document 149 Filed 09/01/15 Page 6 of 59

## II. Pathfinder's Underwriting and Risk Monitoring

The CFPB alleges that Pathfinder failed to follow up on a number of red flags in the Debt Collectors' applications for Global Payments processing accounts. In February 2011, Defendant Bagga submitted an application on behalf of Credit Power. (Id. ¶ 165.) Pathfinder's underwriting process was supposed to include a review for criminal activity, associates, verification of addresses, business filings, and corporate affiliations. (Id. ¶ 166.) Credit Power's chief executive officer had recently completed a sentence for drug trafficking and shared an address with Mr. Bagga, but Pathfinder and Global Payments approved the application. (Id. ¶ 167.)

Mr. Bagga applied for a second account with Pathfinder, this time on behalf of UDPS. (Id. ¶ 168) Mr. Bagga listed the same address on the application for both his residence and UDPS. (Id. ¶ 170.) Pathfinder's vice president for compliance recognized that a merchant operating out of his home indicated the business may not be legitimate. (Id. ¶ 171.) Moreover, when Pathfinder conducted a site survey of UDPS's business premises—also Mr. Bagga's residence—Pathfinder recorded that the premises was leased, and "the amount of inventory and merchandise on the shelves and floor appear to be

consistent with the type of business." (Id. ¶ 172.) The UDPS application further showed that Mr. Bagga had minimal income and had a subprime credit score. (Id. ¶ 173.) Yet even though Global Payment's risk policy stated that creditworthiness was critical to the underwriting decision, Pathfinder and Global Payments approved the application. (Id. ¶ 174.)

The CFPB next alleges that when Credit Power and UDPS began processing transactions, Global and Pathfinder continued to ignore indicators that the collectors were committing fraud. In January 2012, for instance, Pathfinder recognized that UDPS was processing payments for another merchant called RSB Equity Group, LLC ("RSB"). (Id. ¶ 177.) Even though Global Payments' policy prohibits the practice of factoring, it allowed UDPS and Credit Power to continue processing payments for RSB. (Id.)

Then, in November 2012, Pathfinder received an alert for UDPS and RSB from MasterCard's "Member Alert to Control High-Risk Merchants," or "MATCH," system to identify and prevent fraud. (Id. ¶¶ 178-79.) Global Payments, Pathfinder, and Frontline were all required to consult the MATCH system under MasterCard and Global Payments' rules. (Id. ¶ 179.) According to the MATCH alert, another processor had terminated affiliates of UDPS and



AO 72A
(Rev.8/82)

Case 1:15-cv-00859-RWS Document 149 Filed 09/01/15 Page 8 of 39

RSB after investigating and finding factoring and an excessive chargeback volume. (Id. ¶ 180.)

In March 2013, Global Payments notified Pathfinder that Visa had prohibited Credit Power from processing payments using its network. (Id. ¶ 182.) Then, on July 8, 2013, Global Payments notified Pathfinder that Discover was requiring it to close UDPS's account due to "prohibited business practices." (Id. ¶ 184.) Global Payments and Pathfinder continued to allow Credit Power and UDPS to process payments with MasterCard for almost another year. (Id. ¶ 185.)

Communication with the Debt Collectors was also a problem that the CFPB alleges should have served as a warning signal. Pathfinder had difficulty contacting representatives of UDPS and Credit Power because mail was often returned and voicemail boxes were full. (Id. ¶¶ 186-87.) And when Pathfinder called UDPS customer service, the owner of RSB answered the phone. (Id. ¶ 188.) The CFPB alleges that these communication problems "should have caused the ISO to more closely monitor or terminate the Debt Collectors." (Id. ¶ 189.) By August 2013, UDPS changed its address to that of a UPS store. (Id. ¶ 193.)



AO 72A
(Rev.8/82)

Another issue was the high chargeback rate. Pathfinder considered any chargeback rate greater than zero to be a sign of suspicious activity. (Id. ¶ 190.) Still, Pathfinder took no action when it got data from Global Payments showing that Credit Power's chargeback rate in July 2013 was 28.5%, and UDPS's chargeback rate in August 2013 was 31%. (Id. ¶ 191.) The CFPB asserts that these high rates should have caused both Pathfinder and Global Payments to investigate the Debt Collectors' business practices or terminate their accounts. (Id. ¶ 192.)

**III. Frontline's Underwriting and Risk Monitoring**

The CFPB alleges that Frontline similarly ignored red flags in its underwriting process. In March 2013, Mr. Bagga applied for payment processing accounts on behalf of UDPS and Credit Power. (Id. ¶ 196.) Frontline does not include debt collectors on its list of prohibited merchants. (Id. ¶ 197.) Still, the CFPB contends the Debt Collectors' merchant-processing applications were "replete with indicators of fraudulent activity." (Id. ¶ 199.) For example, on its application UDPS identified an address it never occupied. (Id. ¶¶ 200-01.) It was also apparent that Mr. Bagga faxed the application from a FedEx Office location, and the address on the voided check UDPS provided

Case 1:15-cv-00859-RWS Document 149 Filed 09/01/15 Page 10 of 59

along with its application belonged to another collection agency. (Id. ¶ 202.)

UDPS stated in its application that it was in the debt-collection business. (Id. ¶ 204.) Frontline, however, identified UDPS with a merchant category code for "Family Clothing Stores" even though Frontline's own underwriting manual emphasized the importance of using the correct merchant category codes "for activity tracking, reporting, and risk management purposes." (Id. ¶¶ 203-04.) On its underwriting summary, Frontline noted that UDPS was a prohibited business under Global Payments' credit guidelines. (Id. ¶ 205.) But both Frontline and Global approved the application. (Id. ¶¶ 206-07.)

Weeks later, on March 23, 2013, Mr. Bagga submitted another application on behalf of Credit Power. (Id. ¶ 208.) The address for Credit Power was a UPS store, and the application was also faxed from the same FedEx Office as the UDPS application. (Id. ¶¶ 209-10.) The underwriting package included a Better Business Bureau ("BBB") review of Credit Power showing that it was rated "F" and identified Credit Power's principal as an ex-felon. (Id. ¶¶ 211-12.)

According to Frontline's underwriting policy, it is responsible for verifying information contained in the application, like the customer service



AO 72A
(Rev.8/82)

# EXHIBIT B

# In the Matter of:

## CFPB v. Universal Debt & Payment Solutions, LLC, et al.

*July 1, 2015*
*Mohan Singh Bagga*

**Condensed Transcript with Word Index**

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

SJ
59

Q LexisNexis?

A Uh-huh.

Q Who had an account with LexisNexis?

A I had an account with them.

Q Was it in your name personally?

A Yes.

Q Who did you provide skip tracing services to?

A I didn't, but the Credit Power was using and they were paying the fee, monthly fee.

Q So is the account -- the account's in your name?

A Account was in my name, but they were paying the $270 a month.

Q Credit Power was?

A Yeah, credit Power. And also for some time Roy Mullman was using it and he paid for them, too.

Q And how were you compensated for providing the skip tracing service?

A Nothing.

Q You weren't compensated anything?

A Zero.

Q How did you pay for it?

A There were no costs.

Q Skip tracing is free?

A No, I say 270. $135 a month per account.

Q Per account?

A Yeah. So we had two accounts for $270 a month.

Q So there's one with Credit Power and one with Mohan Bagga?

A No, wasn't -- they don't give you -- as far as your personal liability, it's only personal name, half with Credit Power and Mohan Bagga.

Q Yeah, but you said --

A Had two accounts.

Q So whose names were the two accounts with?

A My name, Credit Power.

Q Did Credit Power have two different accounts with LexisNexis?

A That's right. No, not two different accounts. There were two -- what you call -- you have a PIN code. You can type that PIN code in and you get access to their system.

Q So two different -- two people --

A Two different people can go on the system same time.

Q Okay. Who had control of those PIN

codes?
A Yes.
Q Who?
A Robert Whitaker had first, he was the one. Then after that then this guy, for some little time, Roy Mullman had. Then after that, what his name, Marcus Brown had. And then we disconnected this for CBC.
Q Why did you disconnect the LexisNexis account?
A Because they said it was time consuming.
Q It was what?
A Time consuming.
Q Time consuming.
When did that happen? When was it closed down?
A It was 2012 sometime. Early part of 2012.
Q The next sentence says, They have financial capability to buy debt bundles.
A Who?
Q I'm reading the email. It says, They have financial capability to buy debt bundles.
Do you see that?
A Yeah. They have financial capability.

Q Who does that refer to?
A It means that they have the capability to buy debt in wholesale.
Q But who does "they" refer to?
A I have no idea.
Q What's a debt bundle?
A Debt bundle means larger debt put together, that's what I can think.
Q What's it look like, a spreadsheet?
A Yeah.
Q On a computer?
A Yeah.
Q Have you ever seen one of those?
A Yes.
Q Where have you seen those?
A I have seen on Marcus checking these accounts in my computer at home. And then after he checks, then he deletes them.
Q So Marcus has used your computer at home?
A Well, he -- not all the time, maybe two, three times maybe a month.
Q Two or three times a month?
A Yeah. He comes to my home and he goes on the computer and checks his email. And then he deletes all the information.

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA,
ATLANTA DIVISION**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSAL DEBT & PAYMENT SOLUTIONS, LLC; *et al.*<br><br>Defendants. | Civil Action No. 1:15-CV-01009-RWS |

**AMENDED DECLARATION OF LAUREN BLACK
REGARDING CONSUMER COMPLAINTS
PURSUANT TO 28 U.S.C. § 1746**

I, Lauren Black, declare and state as follows:

1. I am a citizen of the United States and am over eighteen years of age. The following facts are known to me personally and, if called as a witness, I could and would competently testify thereto. This declaration is submitted in connection with the Bureau's Motion for Summary Judgment in this case.

2. I am an employee of the Consumer Financial Protection Bureau (Bureau). I am a paralegal working in the Office of Enforcement within the



SJ
1A

Bureau in Washington, D.C. As an employee of the Bureau, my current duties include conducting document review, including consumer complaint review, and other factual research for investigations and cases. I also manage document productions and service of documents and pleadings in the cases that I am assigned to. I have been an employee of the Bureau since August 4, 2014.

3. I worked on the Bureau's investigation of this matter and I am also the paralegal assigned to this litigation. I have handled numerous tasks in connection with the litigation, including service and filing of documents, document review and production, data compilation, and deposition preparation.

4. (A) I was asked to review and summarize (A) consumer complaints concerning Defendants that were provided to the Bureau by the Better Business Bureau Serving Greater Cleveland (BBB); and (B) consumer complaints concerning Defendants contained in chargeback advices that were produced by former defendants in this litigation.

(B) I am submitting this Amended Declaration because Bureau staff has discovered that the following documents that former defendant EMS produced to the Bureau as an attachment to one email were inadvertently not produced to the parties: chargeback advices against LLC Defendant SPPS (Bates numbered S-Pay 00045-57), LLC Defendant WNYAS (Bates numbered

WNY00042-69), and LLC Defendant UDPS (Bates numbered UDPS(1) 00080-94). This Amended Declaration eliminates reference to those documents and corrects the summary information in Part B of the Declaration accordingly.[1]

A. <u>Complaints Received From the BBB</u>

5. As part of the Bureau's investigation of this matter, in September 2013, the Bureau requested that the BBB provide copies of complaints that it had received concerning LRS Litigation (LRS), which I understand is one of the fictitious business names used by the Defendants when making alleged debt collection calls. The BBB produced to the Bureau 126 consumer complaints they had received since March 2013 concerning LRS.

6. During the discovery period in this case, the Bureau produced to all Defendants copies of those complaints, marked Confidential pursuant to the Protective Order in order to shield consumers' personally identifying information. The Bates range of the complaints as produced by the Bureau is CFPB-0146658 – CFPB-0147043.

7. I have reviewed the complaints. Each complaint contains the consumer's name and contact information, such as address, telephone number, and email address. Each complaint identifies LRS as the entity that is the subject of the complaint.

[1] A redlined version of this Declaration (SJ 1A) against the prior version (SJ 1) is attached hereto as Attachment P.

LRS's conduct. There were 124 BBB complaints with narratives about LRS's conduct (Consumer BBB Complaints).

9. Of the 124 Consumer BBB Complaints, 106 consumers, or 85%, reported that LRS threatened them with legal action when calling to collect on an alleged debt. 60 consumers, or 48%, reported that LRS threatened to contact third parties such as employers or family members about the debt the consumer allegedly owed. 35 consumers, or 28%, reported that in phone calls with LRS representatives, LRS misrepresented that the consumer owed the debt or that LRS had the right to collect on the debt. 67 consumers, or 54%, reported that LRS told them they had to pay quickly to avoid consequences such as legal action or arrest.

10. Of the 124 Consumer BBB Complaints, 23 consumers, or 19%, reported that LRS failed or refused to provide a written confirmation of the amount of the debt and the name of the creditor the debt was owed to.

11. Of the 124 Consumer BBB Complaints, 51 consumers, or 41%, reported excessive numbers of calls made to them by LRS. 38 consumers, or 31%, reported that LRS contacted third parties such as employers or family members about the consumer's alleged debt. 15 consumers reported that LRS callers used abusive language on the phone. 14 consumers reported that LRS used false names or committed spoofing to mask their identity. 6 consumers reported that LRS callers accused the consumers of committing fraud.

used false names or committed spoofing to mask their identity. 6 consumers reported that LRS callers accused the consumers of committing fraud.

12. In instances where the Consumer BBB Complaints contained a specific description of the type of debt that LRS purported it was collecting on, 34 consumers reported that it was an alleged payday loan or loans. One consumer reported that it was an alleged bank loan, and one consumer reported it as "online lender."

13. Below is a sample of the narratives consumers wrote in the Consumer BBB Complaints describing their experiences (with any typos and misspellings reproduced as is). True and correct copies of the complaints excerpted below are attached to this Declaration as Attachments A - G.

(a) I received a call at my work saying I had a restraining order against me for nonpayment of a payday loan and if I don't agree to a settlement they will contact my employer and issue a warrant to me. It was early today and I was not thinking clearly because they scared me real bad. I just enrolled in a debt mgmt program and making payments to pay off all my debt. I assumed maybe I forgot this one and better work it out, stupid me. . . . They knew my name, address, where I worked, what bank I use and the last four digits of my social security number. I, again, being stupid and scared, authorized a payment of $100 on my debut card and arranged monthly payments . . . . I googled them and found all the scam information about them. I called my bank to stop payment and was told that cant be done for debit card transactions . . . . I know I can't recover the $100 but please if you can put these people out of 'business'. (Complaint dated 09/09/13 from a consumer in Nevada, Attach. A).

(b) This company called and left several messages on mine and my husbands phone that he needed to contact them and that he had

him who the debt collector was for and he said he did not know . . . he said I would receive paperwork in the mail and would be detailed of the debt and the arrangement set up never received anything. We paid one month and then found out they are scamming people. The place is supposedly in Cleveland Ohio and is suppose to be LRS litigations but the transaction comes from UNIVERSAL DEBT & PAYME 404-6552472 GA D. . . . Just want to get the word out there to avoid this company! (Complaint dated 08/13/13 from a consumer in Iowa, Attach. B).

(c) I received a call from Universal Debt/LRS Litigation (855-626-5688) from Cleveland Ohio which got my information from the internet about me having a payday loan . . . . Thinking that the company was legit, but inturn it was a Third party, and I made a payment of Four Hundred Dollars. I got a call from the actual company today stating that they had not received payment from me. (Complaint dated 09/13/13 from a consumer in Arizona, Attach. C).

(d) Called me at my employment claiming that I owe cash advance over 1,000 in payday loans. They threatened to contact my employer and send a supenoa to me at my place of employment. . . . They took $100 off my debit card. I want it back. (Complaint dated 09/25/13 from a consumer in Texas, Attach. D).

(e) This company called me several times on my work and cell phone from a blocked number and leaving threatening messages. . . . Some lady (never gave me her name) threatened to have me arrested at work due to outstanding debt from 2011 that I knew nothing about. She told me that the loan was a payday loan . . . of 500 that I defaulted on and that it was now 1300 in charges, another 2500 for fraud and that I would be charged with fraud and it would be placed on my permanent record. But I could settle this debt today for 400.00 which I didn't have. I ended up making a payment of 70.00 that day and payment arrangement on the rest. After I told my husband what happened he looked them up and realized it was fraud. I canceled my debit card (they had all of that information prior to the call, SS#, address, phone #, and place of employment) and filed a dispute with my bank. My bank came back and said that after an extensive investigation (ha ha) they found this was not unauthorized and

had all of that information prior to the call, SS#, address, phone #, and place of employment) and filed a dispute with my bank. My bank came back and said that after an extensive investigation (ha ha) they found this was not unauthorized and they could not refund my money. . . . I don't know how these people got this info but beware. They are crafty and their threats are very scary. (Complaint dated 08/18/13 from a consumer in Arkansas, Attach. E).

(f) The company called me saying they have a restraining order against me. When I called back a woman picked up and said there is no restraining order they just used that so I would call them back. She said they were taking me to court over a past due pay day loan and listed a company I never heard of. I informed her I paid off all my loans and if she just tells me the company then I can show her the receipt, she then yelled at me and said she would just supboena me and igive my receipts there. . . . She then accused me of being a liar and said she had more clients that were willing to pay their bills and then she cursed at me and hung up. (Complaint dated 09/09/13 from a consumer in California, Attach. F).

(g) I have been receiving phone calls from this business for about a week now stating that my husband and would have a restraining order on him if he did not call them back within 24 hours. I have tried numerous times to get ahold of someone but all I get is a voicemail box that is full. The problem is my husband has been deceased for 15 years now as he was killed in an automobile accident. All I want to do is to be left alone. (Complaint dated 09/23/13 from a consumer in Pennsylvania, Attach. G).

## B. <u>Complaints in Consumer Chargeback Advices</u>

14. During the discovery period in this case, former Defendants Global Payments, Inc. (Global) and Francis David Corp. d/b/a Electronic Merchant Systems (EMS) (together, Payment Processors) produced to the parties, among other documents, consumer chargeback adjust advices related

chargeback advices, as they were produced to the parties by the Payment Processors, are listed in Attachment H to this Declaration.[1]

15. My understanding is that chargeback advices[2] are essentially requests from a cardholder for a refund of a credit or debit card transaction with a merchant. The chargeback advices contain forms submitted by the consumer's issuing bank, filled out with information provided by the consumer either directly or to an issuing bank employee, requesting that a merchant refund the consumer's credit card account with the issuing bank. I also understand that the chargeback advices were sent to the merchant's payment processor, Global or EMS, and that the Payment Processor then forwarded the chargeback advice to the merchant.

16. The chargeback advices produced by the Payment Processors were directed to the following LLC Defendants that had merchant accounts with one or more of the Payment Processors: Credit Power, LLC (Credit Power) and~~;~~ Universal Debt & Payment Solutions, LLC (UDPS). ~~; WNY Account Solutions, LLC (WNYAS), and S Payment Processing Services, LLC~~

---

[1] The Payment Processors stamped the chargeback adjust advices as Confidential.

[2] Global Payments used a transmittal form for the issuing bank's form that it calls a "chargeback adjust advice." My understanding is that EMS did not use such a transmittal form, and sent the issuing bank's form to the merchants as is. For simplicity, I refer to all the materials described herein that the Payment Processors sent to the LLC Defendants as "chargeback advices."

directed to Credit Power and UDPS used the name Mohan Bagga in the mailing address as well as the LLC name.

17. I am informed that there were more than 1,000 chargeback advices produced concerning consumers' transactions with Credit Power and UDPS, and only a small percentage of the chargeback advices contained consumer narratives describing the events that caused the consumer to request a reversal of the charge on his or her credit card.

18. During document review in this case, the Bureau litigation team separated the chargeback advices produced by the Payment Processors that contained consumer narratives from those that did not. I reviewed the chargeback advices that contained consumer narratives. After eliminating duplicates and chargebacks that did not contain the names of the consumers complaining, there were a total of 89 chargeback advices with both narratives and identified consumers (Consumer Chargeback Complaints).

19. Of the 89 Consumer Chargeback Complaints, 52 were addressed to UDPS and 37 were addressed to Credit Power.

20. The Consumer Chargeback Complaints name several different entities that are the subjects of the complaints. Of the 89 Consumer Chargeback Complaints, 28 consumers named Credit Power. 23 consumers named Universal Debt & Payment or Universal Debt. Ten consumers named LRS, LRS Equity, or LRS Litigation. Other entities that consumers named

20. The Consumer Chargeback Complaints name several different entities that are the subjects of the complaints. Of the 89~~100~~ Consumer Chargeback Complaints, 28 consumers named Credit Power. 23~~5~~ consumers named Universal Debt & Payment or Universal Debt. Ten consumers named LRS, LRS Equity, or LRS Litigation. Other entities that consumers named were Worldwide Requisitions (~~5~~4 consumers), IRS Litigation, Investigation, or Equity (4~~5~~ consumers), Arbitration Resolution (2 consumers), and National Recovery Service (1 consumer).

21. The dates that the complaints were submitted range from May 13, 2011 to ~~October 3~~August 8, 2014.

22. Of the 89~~100~~ Consumer Chargeback Complaints, ~~82~~ 71 consumers, or 80~~2~~%, reported that the debt collector entity had misrepresented that the consumer owed the debt or stated that the entity had the right to collect on the debt. 30 consumers, or 34~~3~~%, reported that the debt collector entity threatened them with legal action. Seven consumers reported that LRS threatened to contact third parties such as employers or family members.

23. Of the 89~~100~~ Consumer Chargeback Complaints, 23 consumers, or 26~~5~~%, reported that the debt collector entity failed or refused to provide a written confirmation of the amount of the debt and the name of the creditor the debt was owed to.

24. Of the 89~~100~~ Consumer Chargeback Complaints, 12~~3~~ consumers, or 13~~4~~%, reported the debt collector entity used a false name or committed spoofing during debt collection calls.

25. In instances where the Consumer Chargeback Complaints contained a specific description of the type of debt the entity purported to be collecting on, 23 consumers reported that it was an alleged payday loan or loans. 10~~2~~ consumers reported that it was an alleged credit card balance. Six~~even~~ consumers reported that it was an alleged bank loan or bank product.

26. Here is a sample of the narratives consumers wrote in the Consumer Chargeback Complaints describing their experiences (with any typos and misspellings reproduced as is). True and correct copies of the complaints excerpted below are attached to this Declaration as Attachments I - O.

(a) [T]he Credit Power Company attempted to scam me by using my handicapped brother. . . . They said my brother Andrew defaulted on a cash advance in 2010 and he needed to pay them 500.00 dollars or they would send a Sherriff over to serve him court papers. I tried to explain to them that he is mentally handicapped and he would not even understand court papers. I told them I would give them 100.00 dollars up front and would require documentation proving this default. . . . A week went by and I received nothing. I tried contacting them at 202 803 5785 numerous times and they hung up on me every time. (Complaint dated 3/4/2014 from a consumer in Florida, Attach. I.)

Case 1:15-cv-00859-RWS Document 543-1 *SEALED* Filed 03/06/18 Page 102 of 102

(Complaint dated 11/21/13 from a consumer in Kansas, Attach. M.)

(f) They called me and told me I commited fraud (Bank) and I had to pay them 2,326.90 or they were taking me to court. Then I asked what it was for they said they could not tell me anything. . . . [A representative] said the lowest they could go was $500 by paying $100.00 per month But if I paid Right then $450.00 it would be paid off. And they said I could only have 15 minutes to decide cause she was going to Court & it had to be settled before she left. . . .They told me it was the National Recovery Servers LLC, IRS Litigations LLC @ gmail.com. (Complaint dated 3/20/14 from a consumer in New York, Attach. N.)

(g) I received a call from a company called Arbitration Resolution claiming I owed A debt to Capital One Bank And that it was in lawyers hands now so if I didn't settle it today I would be subject to a judgment on my bank accounts. They misled & lied to me. After I payed them they processed the payment through Universal Debt & Payment. After work I called Capital One and they confirmed that there was no such account for me. (Complaint dated 2/8/14 from a consumer [state unknown], Attach. O.)

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January __, 2018~~November 14, 2017~~.

____________________________

Lauren Black

# EXHIBIT D

(b) Universal Debt & Payment Solutions, LLC took $300 from my credit card saying it was a debt I owed. They told me if I didnt pay it right then that the police would come pick me up and I would go to jail for a payday loan I owed in 2005. Come to find out this company is a fraudulent company . . . The place I owed the payday loan to said this money is not going towards what I owe them because they were fraud. Besides the payday loan place says I only owe 1 loan of $57.50 and that's all! (Complaint dated 7/15/12 from a consumer [state unknown], Attach. J.)

(c) I had authorized Credit Power LLC to take one payment out of my account in the amount of $100 on 3/28/11. They wanted to put me on a payment plan but I told them I was unable to due to the fact that I was on temp disability . . . Once they took out the payment for $402.20 out of my account, I called to speak with the manager and spoke with Stan Black and Robert Whittaker both of them gave me the run away and was not able to help me. (Complaint dated 5/13/2011 from a consumer in Virginia, Attach. K.)

(d) In 2011 I borrowed $500.00 from a company called 500 Fast Cash over the internet. . . . On October 30th, 2013 I received a phone call on my cell phone at work. On the line was a foreign lady saying she was a debt collector from 500 Fast Cash company. She said my current amount I owed was $1300 because of the interest but if I were to set up a payment plan right then they would reduced the overal payment to $500.00 and if I didn't agree to this she would come to my place of employment . . . and begin to garnish my wages. I paniced . . . and I proceeded to make my first payment for $125.00 . . . On January 13th, 2014 I received an actual call from 500 Fast Cash and they went to my account and they don't deal w/ a company called Credit Power LLC and there had not been any funds applied to my account. (Complaint dated 1/31/14 from a consumer in Michigan, Attach. L.)

(e) Scam collection agency – At first I thought it was legit, they threatened me w/ law suits & court, so I paid. Today 11/21/13 I called back & they now have no record of me @ IRS Equity. LRS says the Verizon I'm calling is disconnected. [Form shows payments of $100 to IRS Equity LLC and LRS Litigation at the Merchant Location of 600 Superior Ave. E. Cleveland OH 44114].

# StellarOne

## Cardholder Statement of Disputed Item-Fraud

Name: Rita L Guilmore Date: 5/13/11
Address: 8735 Lawyers Rd
City, State, Zip: Spotsylvania VA 22553
Checking Account Number: 483145406 Employee and Branch No. CSmoot 784

Re: Card Number: 4334 3866 0107 6633 Case No (CDC Use Only): ____
Transaction Date: 4/4/11 Transaction Amount: 402.20
Merchant: Credit Power LLC Reference No: ____

I am disputing the above charge due to the following reason (check only one reason):

☐ I have not, nor has anyone authorized by me engaged in this transaction.
My card was lost on (date): ____
My card was stolen on (date): ____
(Please give brief description of error below)

☐ I have not authorized or participated in this transaction in any way. My card has not been out of my possession. (Please give brief description of error below)

☒ I have participated in one transaction at the merchant location, but NOT the transaction listed. I, or someone authorized by me was in possession and control of all cards at the time of the transaction. The authorized transaction amount was $ 100.00 on (date) 3/28/11 . (Please give brief description of error below)

☐ I am disputing the listed ATM withdrawal. I have explained the details below.

☐ I have contacted the merchant.
***If mail/phone/internet merchant, please state below how or when you attempted to identify the transaction. The customer should attempt contact the merchant.

Please provide specific details below, on back or a separate sheet of paper.

I had authorized Credit Power LLC to take one payment out of my account in the amount of $100 on 3/28/11. They wanted to put me on a payment plan but I told them I was unable to due to the fact that I was on temp disability and wasn't too sure when I would start getting checks. I told them not to set me up on a payment plan since I didn't have the funds. Once they took out the payment for $402.20 out of my account. I called to speak with the manager and spoke with Stan Black and Robert Whittaker both of them gave me the run away and was not able to help me. The account with Credit Power LLC is in the name of Christopher Coleman my son. I was making a payment on his account since he didn't have debit card or credit card. The lady that I spoke with is an inspector or investigator.

Signature: [signature] Date: 5/13/11

Phone Day: (540) 854-6433 Evening: ( )

***I understand that my current checkcard number will be blocked in order to reverse and recover unauthorized transactions on my account. I will be issued a new checkcard number; however my checking account will be unaffected. Because my checkcard number will change, I must notify any merchants who currently bill my checkcard for services of the new checkcard number.

0510655

# EXHIBIT E

BLACK CONSUMER COMPLAINTS DECL.- ATTACHMENT J

CHARGEBACK LOSS
PREVENTION SERVICE

UNIVERSAL DEBT ; PAYMENT SOLUTIONS LLC
MOHAN BAGGA
11175 CICERO DRIVE
ALPHARETTA, GA 30022

6/15/2012

This is a notification of a chargeback initiated by: FIRST PREMIER BANK

**CHARGEBACK ADJUST ADVICE** **Respond By: 06/22/2012**

Reason: Non-receipt of Merchandise

| | | | |
|---|---|---|---|
| CODE: | 4855 | CASE NO: | 2216511056 1 0 |
| TYPE: | Retail Sale | CARDHOLDER NO: | 517800XXXXXX4715 |
| MERCHANT NO: | 8788730002232 | REFERENCE NO: | 55421352067987162175812 |
| TRANSACTION AMOUNT: | USD 300.00 | TRANSACTION DATE: | 03/06/2012 |
| CHARGEBACK AMOUNT: | USD 300.00 | POSTING DATE: | 03/07/2012 |
| INVOICE/TICKET NO: | | RESOLVED DATE: | 06/14/2012 |
| ORIGINAL REF NO: | 6704308 | GL AMOUNT: | |

UNIQUE ID: UNIVERSAL DEBT AND PAY

**ACTION TAKEN BY MERCHANT SERVICES**

- Verified this chargeback is valid and has been received within timeframes established by Visa/Mastercard rules and regulations.
- The above Chargeback Adjustment Advice Information is accurate.
- Your account has been adjusted because:

  Cardholder claims merchandise was not received. Please provide signed proof that the cardholder or a person authorized by the cardholder received the merchandise.

**Please Be Aware:**

- Review the "Merchant Action Necessary to Remedy Chargeback" section of the accompanying Chargeback Adjustment Reversal Request form. This will aid you in identifying the proper information or documents needed for us to make every effort to resolve this chargeback and collect your funds.
- Complete and return the Chargeback Adjustment Reversal Request form with your rebuttal documentation.
- You must supply chargeback rebuttal documentation no later than 06/22/2012 . Failure to do so will result in the forfeiture of your reversal rights established by current Visa/Mastercard rules and regulations.
- Your business checking account has been debited for the chargeback amount.
- Should you have further questions, a Merchant Services Representative is available to assist you Monday through Friday from 7am until 9pm at (800) 367-2638.

Transaction Record(s)

| | | | |
|---|---|---|---|
| ACQUIRER REFERENCE NUMBER: 55421352067987162175812 | CARDHOLDER ACCOUNT: 517800XXXXXX4715 | MERCHANT NUMBER: 8788730002232 | |
| TRANSACTION AMOUNT: USD 300.00 | TRANSACTION CODE: 05 | TRAN DATE: 03/06/2012 | INVOICE/TICKET NO: |
| AUTH SOURCE: 0 | CARDHOLDER ID METHOD: 1 | TRAN ID: MCGEKYYHP 0306 | |
| CURRENCY CODE: 840 | MCC CODE: 7399 | POS ENTRY MODE: 01 | |
| ORIGINAL REFERENCE NUMBER: 6704308 | BATCH DATE: | BATCH NUMBER: | BATCH AMOUNT: |

DocuSign Envelope ID: 7F95EEA8-63BA-4C62-A022-79DB44F2BAAF

# CBCINNOVIS - APPLICATION FOR SERVICES

## IV. PURPOSE (Application will not be processed unless this information is provided)

Describe the specific purpose for which you will be using consumer information obtained from CBCInnovis.
OBTAIN CURRENT TELEPHONE NUMBER AND ADDRESS OF DEBTORS

## V. BILLING INFORMATION

Contact Name: MOHAN BAGGA CELL Phone: 770-572-6239
Address: 1175 CELERO DRIVE Fax: 678-292-5201 Email: mbagga102@yahoo.com
City: ALPHARETTA State: GA Zip Code: 30022

## VI. PRINCIPAL OF THE COMPANY

I understand and consent to CBCInnovis using the information provided below to access my consumer credit report, which CBCInnovis may use in deciding to provide services to company, partnership or myself and in the future for collecting on any amounts that the company, partnership or myself may owe CBCInnovis for unpaid fees or charges including any late fees or interest as specified in the billing invoice. *(MUST be the same person signing Section VIII)*

Principal Name: Mohan Bagga
Title or Position: Managing Member CELL Phone: 770-572-6239
Social Security Number: 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 Date of Birth: 8/15/43
Residential Street Address: 6375 WHITESTONE Place
City: Duluth State: GA Zip Code: 30097

## VII. CERTIFICATION/SIGNATURES

I certify that the information contained in this application is correct to the best of my knowledge and that I will use the consumer information I receive from CBCInnovis for no other purpose than what is stated in the Purpose section on this application.

I acknowledge that CBCInnovis will conduct an investigation into the Company and in so doing I consent to CBCInnovis contacting business and bank references and verifying the information in this application. If CBCInnovis accepts the application for services, continued services are subject to compliance with the provisions and requirements of applicable law.

Further, by my signature, I individually and personally guarantee payment of all fees and charges owed to CBCInnovis.

| Approved by Authorized CBCInnovis Manager or Representative | UNIVERSAL DEBT & PAYMENT SOLUTIONS, LLC<br>Company Name |
|---|---|
| Signature: DocuSigned by: Kenneth Viviano 4A1452892AAD4F1... | X [signature]<br>Signature of Owner, Officer or Authorized Representative (individual and representative capacity) |
| Printed Name: ~~Kevin Amato~~ Kenneth Viviano | Printed Name: MOHAN BAGGA |
| Title: VP | Title: MANAGING MEMBER |
| Email: | Email: mbagga102@yahoo.com |
| Date: 02/10/12 Office Location: PGH | Date: 1/31/12 |

Customer agrees not to disassemble, decompile, manipulate, or reverse engineer the Services. If Customer uses a third party to access the Services, Customer is responsible for the third party's use of such Services. All other rights to the Services not expressly granted herein by CBCInnovis are reserved.

6. Limitation of Liability. Unless otherwise stated in the Schedule(s), IN NO EVENT SHALL CBCINNOVIS, ANY CBCINNOVIS AFFILIATES, OR ANY OF THE RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, OR AGENTS BE LIABLE FOR LOST PROFITS, OR DIMINUTION OF VALUE OF THE PROPERTY, LOSS OF USE OR INTERRUPTION OF BUSINESS, NOR FOR CONSEQUENTIAL INDIRECT, SPECIAL, PUNITIVE, OR INCIDENTAL DAMAGES UNDER THIS AGREEMENT. Unless otherwise stated in the Schedule(s), the maximum liability of CBCInnovis in connection with any Services provided shall not exceed an amount equal to the price paid by Customer for such Services.

7. Right to Audit. During the term of this Agreement, either party may audit the other party's policies, procedures and records that pertain to this Agreement to ensure compliance with this Agreement upon reasonable notice and during normal business hours.

8. General Provisions.

(a) Successors and Assigns. Either party may assign this Agreement by obtaining prior written consent of the other party, which such consent shall not be unreasonably withheld. CBCInnovis may assign this Agreement to an affiliate upon notice to Customer.

(b) Entire Agreement/Amendment. This Agreement and any accompanying Schedule(s) constitutes the entire agreement between the parties and supersedes all prior oral or written agreements or representations. No modification of this Agreement (including any additional or different terms) shall be binding unless agreed to in writing. In the event of any inconsistencies between this Agreement and any Schedule, such Schedule shall control but only to the extent of such inconsistency.

(c) Waiver. No course of dealing or failure by CBCInnovis to strictly enforce any term, right, or condition of this Agreement shall be construed as a waiver of such term, right, or condition.

(d) Governing Law; Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of the state of Ohio, regardless of conflict of laws principles.

(e) Force Majeure. Neither party to this Agreement shall be considered to be in default of its obligation under this Agreement to the extent that failure to perform any such obligation arises from causes beyond the control and without the fault or negligence of the affected party.

(f) Severability. If any provision of this Agreement is or becomes void or unenforceable by force or operation of law, the other provisions shall remain valid and enforceable.

(g) Counterparts/Facsimile Copies. This Agreement may be executed via facsimile and in counterparts, and all such executed counterparts shall constitute the same Agreement.

(h) Survival. Sections 4, 5, 6, and 7 shall survive termination of this Agreement.

(i) Notices. All notices required or permitted hereunder will be in writing, to the addresses set forth above, and will be deemed to have been properly given: (i) upon delivery if delivered personally or by a courier or overnight delivery service; or (ii) five (5) business days after mailing by certified mail, postage prepaid, return receipt requested, to the parties at the following addresses (or to such other address of which either party may notify the other in a notice that complies with the provisions of this section).

IN WITNESS WHEREOF, each party has executed this Agreement effective as of the date first above written.

| CBCInnovis, Inc. | | Customer: | Universal Debt & Payment Solutions LLC |
|---|---|---|---|
| Signature: | DocuSigned by: Kenneth Viviano 4A1452992AAD4F1... | Signature: | [signature] |
| Name: | Kenneth Viviano (Please Print) | Name: | Mohan Bagga (Please Print) |
| Title: | VP | Title: | MANAGING MEMBER |
| Date: | 02/10/12 | Date: | 1/31/12 |

# SCHEDULE #6:
# IDENTIFICATION PRODUCTS & SERVICES
# GLB CERTIFICATION

**Customer:** Universal Debt & Payment Solutions LLC **Effective Date:** 1/31/12

This Schedule ("Schedule") is made by and between CBCInnovis, Inc. ("CBCInnovis") and Customer under a certain Master Agreement for Services ("Agreement") and Application for Services incorporated by reference. Exhibits or other documents attached to the Agreement and this Schedule are fully incorporated into and constitute a part of the substantive provisions of this Schedule. Terms not otherwise defined in this Schedule will have the same meaning as set forth in the Agreement.

Customer desires to purchase and CBCInnovis desires to sell identification products and services including nonpublic personal identification information such as name, address, social security number and, telephone number to be used by the Customer for one of the permitted uses ("Consumer Information Services") identified under the federal Gramm-Leach-Bliley Act, 15 U.S.C. §6801, *et. seq.*("the GLB Act"). Therefore, in consideration of the foregoing and subject to the terms and conditions set forth herein, the parties agree as follows:

## I. CERTIFICATION OF PERMITTED USE

Both parties shall use the Consumer Information Services only as permitted under the GLB Act, its implementing regulations, and other applicable state laws. Specifically, the Customer hereby certifies that it will only request and use Consumer Information Services under the following circumstances (**Please check all that apply**):

- ☐ To protect against or prevent actual or potential fraud, unauthorized transactions, claims or other liability
- ☐ You, the Customer, hold a legal or beneficial interest relating to the consumer.
- ☒ For settlement, billing and collections of amounts charged, debited, or otherwise paid using a debit, credit or other payment card, check, or account number or by other payment means.

## II. USES NOT PERMITTED

Neither party will use the Consumer Information Services for marketing or solicitations of any kind or for direct-to-consumer sales.

Customer certifies that the Consumer Information Services provided pursuant to this Schedule do not constitute consumer reports as defined by the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681a(d) and are not subject to the FCRA. The parties agree that the identification information contained in the Consumer Information Services does not bear on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living.

In this regard, Customer certifies that the Consumer Information Services will not be used in whole or in part as a factor in determining a consumer's eligibility for credit or insurance to be used primarily for personal, family or household purposes, employment purposes, in connection with the underwriting of insurance involving the consumer; in connection with a determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status; as a potential investor or servicer, or current insurer, in connection with a valuation of, or an assessment of the credit or prepayment risks associated with, an existing credit obligation; when it has a legitimate business need for the information; to review an account to determine whether the consumer continues to meet the terms of the account and for employment purposes, as that term is defined under 15 U.S.C. §1681a(h).

Customer will not use the Consumer Information Services to take any "adverse action" as that term is defined in §603(k) of the FCRA [15 U.S.C. §1681a].

## III. COMPLIANCE WITH OTHER STATE AND FEDERAL LAWS AND LIMITATION OF LIABILITY.

Each party agrees to comply with all other applicable state and federal laws that either relate to the use and disclosure of consumer data or that otherwise applies to the obligations of a party as set forth in this Schedule, including any such laws in effect on the effective date of this Schedule and any such laws enacted or implemented thereafter. Except as stated herein, CBCInnovis disclaims any warranty, express or implied, with respect to the Services provided hereunder; provided, however, that it does hereby warrant that it has complied, and will continue to comply, with all applicable laws, regulations and third-party data provider contracts in providing the Services. CBCInnovis does not guarantee or warrant the correctness, completeness, merchantability, or fitness for a particular purpose of the Services or information provided therein. Because the information comes from third party sources, CBCInnovis makes no representations or warranties that the Services will be error free. Customer acknowledges that the fees CBCInnovis charges for the Services are based upon the expectation that the risk of any loss or injury that may be incurred by use of the Services will be borne by Customer and not CBCInnovis.

# Find a Location

×

RSB Equity Group has **2** locations, listed below.

*This company may be headquartered in or have additional locations in another country. Please select a different country below to view those locations.

× BBB accredited

city, state or zip USA ×

Filter

## RSB Equity Group

**1117 Perimeter Ctr STE N211 Atlanta, GA 30338-5451**

## RSB Equity Group

**11175 Cicero Dr Ste 100 Alpharetta, GA 30022-1166**

1

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA,
ATLANTA DIVISION

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSAL DEBT & PAYMENT SOLUTIONS, LLC; *et al.*<br><br>Defendants. | Civil Action No. 1:15-CV-0859-RWS |

**DECLARATION OF RYAN THOMAS**
**REGARDING CASH FLOW**
**PURSUANT TO 28 U.S.C. § 1746**

I, Ryan Thomas, declare and state as follows:

1. I am a United States citizen over 18 years of age. The following facts are known to me personally and, if called as a witness, I could and would competently testify thereto. This declaration is submitted in connection with the Bureau's Motion for Summary Judgment in this case.

2. I am an employee of the Consumer Financial Protection Bureau (the "Bureau"). I am an investigator working in the Office of Enforcement within the Bureau in Washington, D.C. As an employee with the Bureau, my current



SJ
3

duties include conducting financial and data analysis for investigations. I have been an employee of the Bureau since December 3, 2012.

3. I have been a Certified Public Accountant (CPA) since 2004, and am currently licensed as a CPA in Maryland. I have been a Certified Fraud Examiner (CFE) since 2004. I am a member of the Association of Certified Fraud Examiners (ACFE), the organization that issues the CFE designation. I have also earned the Master Analyst in Financial Forensics (MAFF) credential from the National Association of Certified Valuators and Analysts (NACVA).

4. I was assigned to work on the case styled *Consumer Financial Protection Bureau v. Universal Debt & Payment Solutions*, No. 15-CV-0859, pending in the United States District Court for the Northern District of Georgia.

5. For purposes of this declaration, I collectively refer to Universal Debt & Payment Solutions (UDPS), Universal Debt Solutions (UDS), WNY Account Solutions (WNYAS), Credit Power, S Payment Processing & Solutions (SPPS), WNY Solutions Group, and Check & Credit Recovery, as the "LLC Defendants."

6. I was asked to calculate:

a. The total amount of checks written from LLC Defendant bank accounts to Marcus Brown, Mohan Bagga, Sumant Kahn, Tasha

Pratcher, Sarita Brown, and Varinderjiit (Veena) Bagga (collectively, Individual Defendants);

b. The total amount of checks written from one LLC Defendant bank account to another and to cash;

c. The total amount of checks written from LLC Defendant bank accounts to certain LLC Defendant "litigators"; and

d. The total amount of checks written from LLC Defendant bank accounts to certain third parties.

7. In order to perform these calculations, I reviewed bank statements and copies of checks produced by the LLC Defendants and their banks for the following bank accounts:

a. Credit Power PNC Bank account (ending in 1775)

b. UDPS PNC Bank account (ending in 0451)

c. SPPS PNC Bank account (ending in 8413)

d. WNYAS Bank of America account (ending in 6399)

e. UDS Bank of America account (ending in 2131)

## A. <u>Individual Defendants</u>

8. Marcus Brown received a total of $321,992 in checks made out to him by the various LLC Defendants. This amount, which does not include cash payments or payments made in the form of personal purchases using the debit cards for the LLC Defendants' bank accounts, consists of the following:

a. $600 in checks written from the Credit Power account at PNC Bank;

b. $44,942 in checks written from the UDPS account at PNC Bank;

c. $76,500 in checks written from the SPPS account at PNC Bank; and

d. $199,950 in checks written from the WNYAS account at Bank of America.

9. Mohan Bagga received a total of $22,730 in checks made out to him by the various LLC Defendants. This amount, which does not include cash payments or payments made in the form of personal purchases using the debit cards for the LLC Defendants' bank accounts, consists of the following:

a. $3,800 in checks written from the Credit Power account at PNC Bank;

b. $16,430 in checks written from the UDPS account at PNC Bank; and

c. $2,500 in checks written from the WNYAS account at Bank of America.

10. Sumant Khan received a total of $22,750 in checks made out to him by the various LLC Defendants. This amount, which does not include cash payments or payments made in the form of personal purchases using the debit cards for the LLC Defendants' bank accounts, consists of the following:

a. $7,450 in checks written from the UDPS account at PNC Bank; and

b. $15,300 in checks written from the WNYAS account at Bank of America.

11. Tasha Pratcher received a total of $122,910 in checks written from the WNYAS account at Bank of America. This amount does not include cash payments or payments made in the form of personal purchases using the debit cards for the LLC Defendants' bank accounts.

12. Sarita Brown received a total of $200 in checks written from the WNYAS account at Bank of America. This amount does not include cash payments or payments made in the form of personal purchases using the debit cards for the LLC Defendants' bank accounts.

**B. Cash transfers between LLC Defendants**

13. Bank account records show that the LLC Defendants transferred over $2.5 million of money via checks between their respective accounts.

14. UDPS wrote checks totaling $1,230,500 to WNYAS, $433,000 to UDS, and $10,700 to Credit Power.

15. An additional $12,600 in checks from the UDPS account were made payable to UDPS.

16. $531 in checks from the UDPS account were made payable to "Cash."

17. Credit Power wrote checks totaling $196,500 to WNYAS, and $157,500 to UDS.

18. An additional $5,000 in checks from the Credit Power account were made payable to Credit Power.

19. $21,500 in checks from the Credit Power account were made payable to "Cash."

20. WNYAS wrote checks totaling $44,250 to UDPS, $281,000 to UDS, $18,800 to Credit Power, and $2,500 to SPPS.

21. An additional $1,300 in checks from the WNYAS account were made payable to "Cash."

22. SPPS wrote checks totaling $149,000 to WNYAS.

<u>So-called "litigator" employees</u>

23. I reviewed a three-page handwritten list of 76 Defendant LLC "Litigators." WYNAS paid 20 of the individuals on this list by check, totaling $81,067. A copy of the handwritten list is attached as Attachment A. A list of individual so-called "litigator" names and amounts paid is attached as Attachment B.

<u>Third Parties</u>

24. I reviewed checks sent by the LLC Defendants to various third parties.

25. Thermicia Charles received a total of $22,150 in checks made out to her by WNYAS. This amount does not include cash payments or payments made

in the form of personal purchases using the debit cards for the LLC Defendants' bank accounts.

26. Jamarrow West received a total of $98,670 in checks made out to him by WNYAS. This amount does not include cash payments or payments made in the form of personal purchases using the debit cards for the LLC Defendants' bank accounts.

27. Midtown Two TSO received a total of $28,729 in checks from WYNAS.

28. Lead Publisher received a total of $10,001 in checks from WYNAS.

29. Buffalo Water received a total of $3,157 in checks from WYNAS.

30. City of Buffalo received a total of $11,913 in checks from WYNAS. One of these checks included a memo that said "sewer & garbage" and another check's memo said "property taxes."

31. Love to Drive Motors received a $29,000 check from WYNAS.

32. New Birth, New Life, and New Life World Harvest received a total of $8,800 in checks from WYNAS. One of the checks to New Life included a memo that said "Brown Family Tithe." One of the checks to New Life World Harvest included a memo that said "From Marcus & Tasha Brown."

33. St. Josephs Collegiate Institute received a total of $2,200 in checks from WYNAS. One of the checks included a memo that said "Marcus Brown."

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 14, 2017 in Washington, D.C.

Ryan Thomas

# EXHIBIT G

**INDEX NO: 2019-600121**

Date: May 6, 2019

**NOTICE OF IN REM FORECLOSURE**

TO: Tasha Pratcher c/o Real Estate of Distinction
237 Dartmouth
Buffalo NY 14215

You are the presumptive owner or lienor of one or more of the parcels set forth below and mentioned and described in the list referred to in the enclosed Petition and Notice of Foreclosure.

A proceeding to foreclose on such property based upon the failure to pay real property taxes has been commenced. Foreclosure will result in the loss of ownership of such property and all rights in that property. You may wish to contact an attorney to protect your rights.

Unless the taxes and assessments and all other legal charges are paid, or an answer is interposed, as provided by statute, such property will be sold at tax foreclosure as provided in the In Rem provisions of the Erie County Tax Act.

To avoid loss of ownership or of any other rights in the property, all unpaid taxes and other legal charges must be paid prior to **July 1, 2019** or you must interpose a duly verified answer in the proceeding prior to **July 22, 2019.**

You may make payment to the Erie County Department of Real Property Tax Services, 1st Floor, Rath Building, 95 Franklin Street, Buffalo, New York, 14202 in the amount of all such unpaid taxes and legal charges prior to that date. For payment information, please contact the Erie County Department of Real Property Tax Services at 716-858-8333 or sara.hart@erie.gov.

Should the taxes and assessments and all other legal charges remain unpaid and the property sold at tax foreclosure auction, you as the presumptive owner or lienor may be entitled to surplus monies, if any, resulting from the sale of the property.

If you are in the military or if anyone else within your knowledge of information, who is the presumptive owner or lienor of any such parcels set forth below and mentioned and described in the list referred to in the enclosed Petition and Notice of Foreclosure is in the military, please advise.

This Notice is required to be sent or posted by law. **IF YOU HAVE NO INTEREST IN THE PROPERTY NOTED BELOW, YOU MAY DISREGARD THIS NOTICE.**

Should you have any questions regarding this Notice, please call the offices of Lippes Mathias Wexler Friedman, LLP at (716) 884-3135.

Joseph L. Maciejewski
Director of Real Property Tax Services

*Margaret A. Hurley, Esq.*
*LIPPES MATHIAS WEXLER FRIEDMAN, LLP*
*Attorneys for the County of Erie*
*50 Fountain Plaza, Suite 1700*
*Buffalo, New York 14202*
*(716) 884-3135 telephone*

**ADDRESS:** **237 Dartmouth, Buffalo, New York**
**SERIAL:** **000049**
**SBL:** **0798000003014000**

**PROPERTY OWNER(S):**
**Tasha Pratcher**
**Tasha Pratcher c/o Real Estate of Distinction**

This communication is from a debt collector and is an attempt to collect a debt.
Any Information obtained will be used for that purpose.
www.lippes.com/foreclosures
http://www2.erie.gov/ecrpts/

STATE OF NEW YORK
COUNTY COURT : COUNTY OF ERIE

IN THE MATTER OF FORECLOSURE OF TAX LIENS BY PROCEEDING IN REM PURSUANT TO THE IN REM PROVISIONS OF THE ERIE COUNTY TAX ACT AND THE RESOLUTION OF THE ERIE COUNTY LEGISLATURE AS SHOWN BY RESOLUTION NO. 54 AT PAGE 179 OF THE MINUTES OF THE PROCEEDINGS OF SAID LEGISLATURE FOR THE YEAR 2019

**PETITION AND NOTICE OF FORECLOSURE OF TAX LIENS BY THE COUNTY OF ERIE BY ACTION IN REM**

IN REM NO. 167
INDEX NO. 2019-600121

Please take notice that on the 6th day of May, 2019 the County of Erie pursuant to law, filed with the Clerk of the County of Erie a list of parcels of property affected by unpaid tax liens held and owned by the County of Erie which on such date had been due and unpaid for a period of at least two years after the date on which the unpaid tax liens were sold. Such list contains as to each such parcel (a) a brief description of the property affected by each tax lien, (b) the name of the last known owner of such property as it appears on the latest tax roll in the hands of the Director of Real Property Tax Services or a statement that the owner is unknown if such be the case, (c) a statement of such tax liens upon such parcel of property including any tax sale certificates owned by the County of Erie which shall have been due for less than two years, together with the interest and penalties due as of the list date and (d) a statement that the amount required to redeem any such parcel of property, and the amount to be recovered by the County of Erie, includes all tax sale certificates owned by the County of Erie and affecting such property, together with all interest, penalties, additions and expenses as in this act provided, and also includes an "in rem fee" of $500.00 per parcel to cover the presumptive cost to the County of Erie for reasonable and necessary attorneys' fees, abstracts of title and other disbursements in connection with such foreclosure pursuant to law.

The above-captioned proceeding was commenced to enforce the payment of delinquent taxes which have accumulated and become liens against certain property. The parcels to which this proceeding applies were identified on the List of Delinquent Taxes which was filed in the Erie County Clerk's Office on the 6th day of May, 2019. Take further notice that the ownership by the County of the tax sale certificates set forth on the List of Delinquent Taxes is conclusive evidence of the fact that the taxes, assessments and other legal charges represented thereby have not been paid to the County.

EFFECT OF FILING: All persons having or claiming to have an interest in the real property described in the List of Delinquent Taxes are hereby notified that the filing of said List constituted the commencement by the County of Erie of a proceeding in the County Court to foreclose each of the tax liens therein described by a foreclosure proceeding In Rem. Pursuant to

Section 11-7.0 of the Erie County Tax Act, the filing of such List of Delinquent Taxes constitutes and has the same force and effect and is deemed to have given the same notice of such foreclosure proceeding as the filing and recording in the Erie County Clerk's Office of an individual Notice of Pendency of a Tax Foreclosure Action and of the filing in the County Court of a separate and individual Complaint by the County of Erie against the owners of the real property proceeded against and described in the List of Delinquent Taxes.

NATURE OF PROCEEDING: This proceeding is brought against the real property only and is to foreclose the tax liens described in the List of Delinquent Taxes. No personal judgment will be entered herein for such liens/taxes or other legal charges or any part thereof.

PERSONS AFFECTED: This notice is directed to all persons having or claiming to have an interest in the real property described in the List of Delinquent Taxes. Such persons are hereby notified further that a duplicate of this Petition and the List of Delinquent Taxes has been filed in the Erie County Clerk's Office and the Office of Real Property Tax Services, and will remain open for public inspection up to and including the date specified below as the last day of redemption.

RIGHT OF REDEMPTION: Any person having or claiming to have an interest in any such real property and the legal right thereto may on or before the 1st day of July, 2019 redeem the same by paying the amount of all such unpaid tax liens thereon, including all interest and penalties and other legal charges which are included in the lien against such real property, computed to and including the date of redemption.

**Payments shall be made to: Director of Real Property Tax Services, Rath Building, 95 Franklin Street, Buffalo, New York, 14202, by CASH, CERTIFIED CHECK, BANK CHECK or MONEY ORDER.**

In the event that such tax liens are paid by a person other than the record owner of such real property, the person so paying shall be entitled to have the tax liens affected thereby satisfied of record or to receive an assignment of such tax liens evidenced by a proper written instrument.

LAST DAY OF REDEMPTION: The last day of redemption is hereby fixed as the 1st day of July, 2019.

SERVICE OF ANSWER: Every person having any right, title or interest in or lien upon any parcel of real property described in the List of Delinquent Taxes may serve a duly verified Answer upon the attorney for the Tax District, as set forth below, setting forth in detail the nature and amount of his or her interest, and any defense or objection to the foreclosure. Such Answer must be filed in the office of the County Clerk and served upon the attorney for the Tax District, Margaret A. Hurley, Esq., Lippes Mathias Wexler Friedman, LLP, 50 Fountain Plaza, Suite 1700, Buffalo, New York, 14202, (716) 884-3135, on or before the 22nd day of July, 2019.

FAILURE TO REDEEM OR ANSWER: In the event of failure to redeem or answer by any person having the right to redeem or answer, such person shall be forever barred and foreclosed of all his or her right, title and interest and equity of redemption in and to the parcel described in the List of Delinquent Taxes and a judgment in foreclosure may be taken by default.

DATED: May 6, 2019

**ENFORCING OFFICER:**
JOSEPH L. MACIEJEWSKI
Director of Real Property Tax Services

STATE OF NEW YORK )
COUNTY OF ERIE ) ss:
CITY OF BUFFALO )

I, JOSEPH L. MACIEJEWSKI, being duly sworn, depose and say: I am the Director of Real Property Tax Service for the County of Erie. I have read this Petition and Notice, which I have signed, and I am familiar with its contents. The contents of this Petition and Notice are true to the best of my knowledge, based upon the records and tax roll of the County of Erie, in the hands of the Department of Real Property Tax Services. I do not know of any errors or omissions in this Petition.

JOSEPH L. MACIEJEWSKI
Director of Real Property Tax Services

Sworn to before me this
6th day of May, 2019.

Notary Public:
AMY HONAN
No. 01HO6348829
Notary Public, State of New York
Qualified in Erie County
My Commission Expires Oct. 3, 2020

**ATTORNEYS FOR TAX DISTRICT:**
Margaret A. Hurley, Esq.
Lippes Mathias Wexler Friedman, LLP
50 Fountain Plaza, Suite 1700
Buffalo, New York 14202
(716) 884-3135

If you have a delinquent User Fee payment it becomes a lien on your property, which may be subject to public foreclosure. Please see the back of this form for more information. Full or partial past due payments may be made at any time.

## WEEKLY CURBSIDE COLLECTION RULES

1. Garbage and recycling totes, two pieces of bulk trash, and yard waste must be set out no earlier than 7:00 p.m. the evening before, and no later than 7:00 a.m. on the morning of the regularly scheduled collection day. Excessive amounts of trash outside of required totes are subject to a fine, unless a PICK & PAY* is scheduled accordingly. If your garbage or recycling tote is not emptied, please call 311.
2. Refrigerators, stoves and other appliances need to be placed at the curb at the same time as your totes so that they can be recorded and picked up by a special crew. Each household is permitted one annual refrigerator disposal Note: refrigerator doors must be removed. **TVs, computers, construction debris, tires, paint or other hazardous materials will NOT be collected.**
3. **LEAF AND YARD WASTE MUST BE PLACED IN CLEAR PLASTIC OR PAPER BAGS.** Sticks and branches MUST be tied in bundles and no longer than 4ft. in length. **Do not rake or blow leaves into the street.** Residents are encouraged to bring brush, limbs and vegetation waste to 1120 Seneca Street to be composted.
4. No other containers other than City of Buffalo garbage and recycling totes can be left out for curbside collection. Residents are encouraged to put their address on their totes.
5. Residents are permitted to leave out 2 pieces of large trash per week on their regular garbage collection day.
6. **Failure to comply with any of the rules of the curbside collection program will result in a legal summons.**

## TIRE DROP-OFF EVENTS

**JULY 27, 2019 • SEPTEMBER 7, 2019**
**APRIL 18, 2020 • MAY 23, 2020**

Tires can be dropped off at the Broadway Garage, 197 Broadway, between 7:30am and 3:00pm, **ON THE DATES ABOVE.** City of Buffalo RESIDENTS ONLY will be permitted to drop off a maximum of four (4) tires. Tires must be clean and off of the rims.

## ADDITIONAL WAYS FOR RESIDENTS TO DISPOSE OF GARBAGE

### * PICK & PAY PROGRAM:

Residents can schedule additional bulk trash pick-up at their property. For a fee starting at $105, the City will collect an area of trash that does not exceed 12'L x 3'H 3'W. Larger areas will cost more. **No TVs, computers, construction/demolition debris, tires, paint or other hazardous materials allowed.** Do not place bulk trash at the curb until an appointment has been scheduled by calling 311.

### EAST SIDE TRANSFER STATION:

Annually, owner-occupied residences are allowed to dump one (1) ton of trash at the East Side Transfer Station at 793 S. Ogden St. Residents must provide two forms of proof of residency (eg. driver's license <u>and</u> utility bill). Residential trash is accepted on weekdays from 6:30am – 9:00am and 1:00pm – 3:00pm, and on Saturdays from 8:00am – 12:00pm. For additional information, please call 311.

### HOUSEHOLD HAZARDOUS WASTE:

Oil-based paints, solvents and pesticides have to be disposed of at a special collection event. Call (716) 858-6800 for more information or visit erie.gov/recycling.

▼ DETACH COUPON AND MAIL WITH PAYMENT ▼ ▼ DETACH COUPON AND MAIL WITH PAYMENT ▼ ▼ DETACH COUPON AND MAIL WITH PAYMENT ▼

## PUBLIC USER FEE PAYMENT COUPON:

THIS PROPERTY IN FORCLOSURE

RC-902

Service Address: 237 DARTMOUTH
Bill Number: 06999600

| | |
|---|---|
| Current Due: | $747.23 |
| Annual Balance: | $925.43 |
| Due Date: | AUG. 15, 2019 |
| Amount Enclosed: | |

☐ Enclosed Annual Fee (make check payable to City of Buffalo/User Fee)
☐ Enclosed Quarterly Fee (make check payable to City of Buffalo/User Fee)

**GO PAPERLESS OR PAY ONLINE AT BUFFALONY.GOV/PAY**

**Include BILL NUMBER on your check**
**Make check out to and mail payment to:**
Division of Treasury
PO Box 27, Buffalo, NY 14240-0027

1908150699960070000000000074723

VISIT WWW.BUFFALONY.GOV/PAY

hazardous materials allowed.

If you have a delinquent User Fee payment it becomes a lien on your property, which may be subject to public foreclosure. Please see the back of this form for more information. Full or partial past due payments may be made at any time.

## WEEKLY CURBSIDE COLLECTION RULES

1. Garbage and recycling totes, two pieces of bulk trash, and yard waste must be set out no earlier than 7:00 p.m. the evening before, and no later than 7:00 a.m. on the morning of the regularly scheduled collection day. Excessive amounts of trash outside of required totes are subject to a fine, unless a PICK & PAY* is scheduled accordingly. If your garbage or recycling tote is not emptied, please call 311.
2. Refrigerators, stoves and other appliances need to be placed at the curb at the same time as your totes so that they can be recorded and picked up by a special crew. Each household is permitted one annual refrigerator disposal Note: refrigerator doors must be removed. **TVs, computers, construction debris, tires, paint or other hazardous materials will NOT be collected.**
3. **LEAF AND YARD WASTE MUST BE PLACED IN CLEAR PLASTIC OR PAPER BAGS.** Sticks and branches MUST be tied in bundles and no longer than 4ft. in length. **Do not rake or blow leaves into the street.** Residents are encouraged to bring brush, limbs and vegetation waste to 1120 Seneca Street to be composted.
4. No other containers other than City of Buffalo garbage and recycling totes can be left out for curbside collection. Residents are encouraged to put their address on their totes.
5. Residents are permitted to leave out 2 pieces of large trash per week on their regular garbage collection day.
6. **Failure to comply with any of the rules of the curbside collection program will result in a legal summons.**

## TIRE DROP-OFF EVENTS

**JULY 27, 2019 • SEPTEMBER 7, 2019**
**APRIL 18, 2020 • MAY 23, 2020**

Tires can be dropped off at the Broadway Garage, 197 Broadway, between 7:30am and 3:00pm, **ON THE DATES ABOVE.** City of Buffalo RESIDENTS ONLY will be permitted to drop off a maximum of four (4) tires. Tires must be clean and off of the rims.

## ADDITIONAL WAYS FOR RESIDENTS TO DISPOSE OF GARBAGE

### * PICK & PAY PROGRAM:

Residents can schedule additional bulk trash pick-up at their property. For a fee starting at $105, the City will collect an area of trash that does not exceed 12'L x 3'H 3'W. Larger areas will cost more. **No TVs, computers, construction/demolition debris, tires, paint or other hazardous materials allowed.** Do not place bulk trash at the curb until an appointment has been scheduled by calling 311.

### EAST SIDE TRANSFER STATION:

Annually, owner-occupied residences are allowed to dump one (1) ton of trash at the East Side Transfer Station at 793 S. Ogden St. Residents must provide two forms of proof of residency (eg. driver's license and utility bill). Residential trash is accepted on weekdays from 6:30am – 9:00am and 1:00pm – 3:00pm, and on Saturdays from 8:00am – 12:00pm. For additional information, please call 311.

### HOUSEHOLD HAZARDOUS WASTE:

Oil-based paints, solvents and pesticides have to be disposed of at a special collection event. Call (716) 858-6800 for more information or visit erie.gov/recycling.

▼ DETACH COUPON AND MAIL WITH PAYMENT ▼ ▼ DETACH COUPON AND MAIL WITH PAYMENT ▼ ▼ DETACH COUPON AND MAIL WITH PAYMENT ▼

## PUBLIC USER FEE PAYMENT COUPON:

THIS PROPERTY IN FORCLOSURE

RC-944

Service Address: 150 PARKRIDGE
Bill Number: 07380600

| | |
|---|---|
| Current Due: | $688.37 |
| Annual Balance: | $866.57 |
| Due Date: | AUG. 15, 2019 |
| Amount Enclosed: | |

❑ Enclosed Annual Fee (make check payable to City of Buffalo/User Fee)
❑ Enclosed Quarterly Fee (make check payable to City of Buffalo/User Fee)

**GO PAPERLESS OR PAY ONLINE AT BUFFALONY.GOV/PAY**

**Include BILL NUMBER on your check**
**Make check out to and mail payment to:**
Division of Treasury
PO Box 27, Buffalo, NY 14240-0027

1908150738060020000000000068837

R2307N1.3152-04

UNITED STATES POSTAL SERVICE®

PRIORITY® MAIL

FROM:
TASHA Pratcher
1070 Chestnut Ridge Road
Amherst, NY 14228

CLEARED
AUG 23 2019
U.S. Marshals
Atlanta Ga

- Date of delivery specified*
- USPS TRACKING™ included to many major international destinations.
- Limited international insurance.
- Pick up available.*
- Order supplies online.*
- When used internationally, a customs declaration label may be required.

TO:
US District Court Clerk
75 Ted Turner Dr NW
Suite 2211
Atlanta, GA 30303

EXPECTED DELIVERY DAY: 08/23/19

USPS SIGNATURE TRACKING NUMBER

9510 8150 3155 9233 2108 85

To schedule free Package Pickup, scan the QR code.

USPS.COM/PICKUP

* Domestic only. × For Domestic shipments, the maximum weight is 70 lbs. For International shipments, the maximum weight is 4 lbs.