UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CONSUMER FINANCIAL
PROTECTION BUREAU,

                          Plaintiff,          Case No.: 1:15-CV-00859-RWS

vs.

UNIVERSAL DEBT & PAYMENT
SOLUTIONS, LLC, *et al.*,

                          Defendants.
_____/

**MEMORANDUM IN SUPPORT OF MOTION
FOR ENTRY OF ORDER DIRECTING FRONTLINE PROCESSING CORP.
AND *GLOBAL PAYMENTS* TO SHOW CAUSE
<u>WHY THEY SHOULD NOT BE HELD IN CONTEMPT OF THIS COURT</u>**

MARK J. BERNET (the "Receiver"), as receiver for Universal Debt & Payment Solutions, LLC ("UDPS") and Credit Power LLC ("Credit Power"), submits his memorandum in support of his motion for an order directing FRONTLINE PROCESSING CORP. ("Frontline") and GLOBAL PAYMENTS, INC. (*"Global"*) to show cause why they should not be held in contempt due to their intentional violation of the Court's Preliminary Injunction (doc. no. 16) and the Court's Order appointing the Receiver (doc. no. 624).

Global, a card payment processor, and its independent sales organization, Frontline, admit that on the date this Court entered its TRO Global held $179,352.06 in reserves for the card processing accounts of UDPS and Credit Power.  Global learned of the TRO no later than April 2, 2015 and appeared via its counsel at the April 7, 2015 hearing before this Court to consider entry of the Preliminary Injunction.  Frontline learned of the TRO no later than April 6, 2015 and was served with the Preliminary Injunction no later than April 9, 2015.  Even though the TRO and Preliminary Injunction contained "asset freeze" provisions precluding Global and Frontline from transferring or concealing assets of the Receivership Entities, Global transferred the money to Frontline after entry of the Preliminary Injunction.  Now, both Global and Frontline refuse to pay the money over to the Receiver.  The intentional post-injunction transfer of the money, and the refusal to return it to the Receiver, constitute clear violations of the Court's Preliminary Injunction and Receivership Order.  The Court therefore should enter an order directing Global and Frontline to show cause why they are not in contempt of this Court, and provide them an opportunity to purge a contempt finding by paying the money back, with interest, along with the Receiver's reasonable attorneys' fees.

A.    BACKGROUND.

A detailed description of the procedural history of this case is set forth in the *Receiver's Initial Report* (doc. no. 639).  The Receiver adopts that portion of his Initial Report by this reference.

B.      UNCONTESTED FACTS.

The following facts are, or should be, uncontested:

1.      Global provides merchant processing services, or credit/debit card processing services, to business entities.  Under a Merchant Services Agreement dated April 12, 2001, as subsequently amended ("MSA"), Frontline functioned as an independent sales organization ("ISO") for Global.

2.      Under the MSA Frontline's "limited role was to market Global's 'merchant processing services to merchants,' 'prescreen all potential merchants,' and 'retain a complete application package containing all required information and supporting documentation.'" *Frontline Processing Corporation's Memorandum of Law in Support of Motion to Dismiss Complaint with Prejudice* ("Frontline's Supporting Memorandum"), p. 4 (doc. no. 97-1).  *See also* MSA (doc. no. 97-2).

3.      Frontline was compensated for its services as an ISO by Global. Frontline had no contractual duty or ability under the MSA to charge or collect fees from merchants who used Global's merchant processing services.  *See* MSA (doc. no. 97-2).

3

4.    As Global's ISO, in March, 2013, Frontline obtained applications from the Defendants Universal Debt & Payment Solutions LLC ("UDPS") and Credit Power LLC ("Credit Power") for Global to provide card processing services in connection with UDPS's and Credit Power's debt collection businesses.  Frontline presented these applications to Global, which accepted them.

5.    Upon Global's acceptance of a merchant applicant, the merchant enters into a contract for payment processing services.  Frontline Supporting Memorandum, p. 5.  Attached as Composite Exhibit "A" are the two Card Services Agreements entered into by UDPS and Credit Power, which were exhibits to Frontline's Motion to Dismiss.[1]  *See Frontline Processing Corporation's Motion to Dismiss Complaint with Prejudice* ("Frontline's Motion to Dismiss") (doc. nos. 97, 97-3 & 97-4).

6.    The Card Services Terms & Conditions attached to each merchant application make clear that the relationship is by and among Global, the merchant, and the member bank, which in turn is a member of the various card networks such as Visa and MasterCard.  Frontline Supporting Memorandum at 5;

---

[1] The two agreements are identical substantively.  Under one, the term "Merchant" is defined as UDPS, while under the second the term is defined as Credit Power.

Ex. A, Card Services Agreements § 1 ("The 'Card Services Agreement' consists of these Card Services Terms & Conditions and the Merchant Application and is made by and among Merchant (or 'you'), Global Payments Direct, Inc. ('Global Direct'), and Member (as defined below).").

7.     Frontline was never a party to the Card Services Agreements and has no rights or duties thereunder.  *See* Paragraphs 5 & 6, *supra*, and Frontline's Supporting Memorandum at p. 5 ("the relationship is by and between Global, the merchant, and the member bank").

8.     Under the Card Services Agreements, Global had the right to withhold a portion of the funds it collected from merchants and retain those funds as "reserves" to secure the merchants' performance under the Agreements.  Card Services Agreements ¶ 15.  Global exercised this right with respect to UDPS and Credit Power.

9.      The Card Services Agreements gave Frontline no rights or duties concerning the creation or funding of the reserve accounts, or concerning the disposition of the reserves held therein.  *See* Card Services Agreements ¶ 15.

10.     No later than June 30, 2014, Global determined that it would no longer process card payments for UDPS or Credit Power, and it closed their card

processing accounts.  At the time, Global was holding at least $179,352.06 in reserves (the "Reserve Funds"), as follows:

      a.     For UDPS, Global held $98,437.83.

      b.     For Credit Power, Global held $80,914.23.

Global held and controlled the Reserve Funds through March 31, 2015.

11.    The CFPB filed its Complaint and Ex Parte Motion for a Temporary Restraining Order (TRO) under seal on March 26, 2015.  On the same day the Court entered its TRO (doc. no.  5) containing, among other things, customary "asset freeze" provisions.  The case, including the TRO, remained under seal until April 2, 2015, when copies of all the relevant pleadings and orders (including the TRO) were served on Frontline and Global, and other parties.[2]

12.    On March 31, 2015, presumably without notice of the TRO, Frontline employee Jeannette Troutman posted on Global's electronic interface system "One-Time Miscellaneous Fee" charges to UDPS's and Credit Power's reserve accounts, with the charges being precisely the amount of money then held in reserve by Global.[3]  At the time, the merchant processing accounts of UDPS and Credit

---

[2] Global and Frontline were Defendants in the case until the Court dismissed the claims against them in 2017.

[3] Although Frontline and Global had not been served with the TRO as of March 31, 2015, they knew that the CFPB was investigating UDPS and Credit Power

Power had been closed for at least nine months, and the Reserve Funds were due to be released to UDPS and Credit Power because the chargeback periods had expired. *See* Card Services Agreements ¶15 ("Any funds in the Reserve Account may be held until the later of (a) the expiration of any applicable chargeback rights … and (b) the period necessary to secure the performance of Merchant's obligations under the [Card Services Agreements]").

13.     At the time Frontline levied its "One-Time Miscellaneous Fee" charges neither UDPS nor Credit Power owed anything to Frontline.  Frontline has declined to provide any explanation of these charges to the Receiver.  Instead, Frontline has represented that it provided no services to UDPS or Credit Power apart from soliciting the initial applications for the Card Services Agreements.  *See Frontline Processing Corporation's Reply Memorandum in Support of Motion to Dismiss Complaint, with Prejudice* (doc. no. 124), p. 9 ("Frontline never assisted the Debt Collectors or processed payments for the Debt Collectors").[4]

14.     On April 2, 2015, the Plaintiff served copies of the Complaint and the TRO on Global.  *See* fn. 6, *infra.*

----

because of civil investigative demands the CFPB had served on Global and Frontline.

[4] Even if Frontline had a claim to the funds (it does not), payment after the entry of the Preliminary Injunction was prohibited.

15.     On April 3, 2015, one day after being provided a copy of the TRO, Global transferred the Reserve Funds from the reserve accounts to "Collection Accounts."  This was so that Global could pay the Reserve Funds to Frontline in response to Frontline's imposition of its "One-Time Miscellaneous Fee" charges.

16.     On April 6, 2015, the Plaintiff provided copies of the Complaint and the Court's TRO to Frontline.  *See* fn. 7, *infra.*

17.     On April 7, 2015, the Court held a hearing to consider the CFPB's request for a preliminary injunction, and later that day the Court entered its *Preliminary Injunction with Asset Freeze, Expedited Discovery, and other Equitable Relief* (doc. no. 16) ("Preliminary Injunction") containing the same "asset freeze" provisions that were in the TRO.  Global's attorneys attended the preliminary injunction hearing, and they received a copy of the Preliminary Injunction through PACER when it was docketed later that day.

18.     On April 9, 2015, and as directed by Section IV.D of the Court's Preliminary Injunction Frontline, through its employee Kori Marolf, executed an affidavit stating in part:

> Frontline identified the following accounts held by the Debt Collectors as identified [above]:
>
> a.     UDPS:

        i.      Universal Debt & Payment Solution, reserve account for merchant account 8788370013623.   Reserve balance is currently $98,437.83.

        b.     Credit Power

        i.      Credit Power LLC, reserve account for merchant account 8788370013280.   Reserve balance is currently $80,914.23.

Affidavit of Kori Marolf, attached as Exhibit "B," at ¶ 5.  Thus, as of April 9, 2015, Frontline (i) had received the Preliminary Injunction, and (ii) recognized the Reserve Funds were held as "reserves." Frontline made no claim to the Reserve Funds, despite having imposed "One-Time Miscellaneous Fee" charges nine days earlier.

19.   On April 13, 2015, Global produced documents indicating that it held the above-referenced amounts in Reserve Funds as of April 6, 2015.  Global did not provide a sworn affidavit as required by the Preliminary Injunction.

20.   On April 15, 2015, eight days after entry of the Preliminary Injunction, Global transferred the $179,352.06 Reserve Funds to Frontline, presumably based on Frontline's request for payment of its "One-Time Miscellaneous Fee" charges.[5]

---

[5] According to Global's counsel, the total transfer from Global to Frontline on April 15, 2015 was $462,856.30 because the funds transferred included the Reserve Funds and other amounts Global owed Frontline on other merchant accounts.

21.     By letter dated June 29, 2020, addressed to counsel for Frontline and Global, the Receiver demanded turnover of $179,352.06.  A copy of the June 29, 2020 letter is attached as Exhibit "C."

22.     Global's counsel advised that Global would not turn over the funds because (i) it previously transferred them to Frontline, and (ii) too much time had elapsed since the entry of the Court's TRO and Preliminary Injunction.

23.     Neither Frontline nor its counsel have responded to the Receiver's June 29, 2020 letter.  This is consistent with other behavior exhibited by Frontline.  *See Receiver's Motion to Compel Frontline Processing Corp. to Comply with Records Subpoena* (doc. no. 654).

24.     The Reserve Funds are the property of the Receivership Entities and should be delivered to the Receiver.

C.     <u>LEGAL STANDARD</u>.

Contempt of court consists of the disregard of judicial authority, and a court's ability to punish such conduct is a part of its inherent authority. Disobedience to the lawful orders of a court can constitute contempt.  Wright, Miller & Kane, *Federal Practice & Procedure: Civil 2d*, §2960. A finding of civil contempt is within the discretion of the trial court issuing the order alleged to have

been violated.  *McGregor v. Chierico*, 206 F.3d 1378, 1383 (11th Cir. 2000); *United States v. City of Miami*, 195 F.3d 1292, 1298 (11th Cir. 1999).

To hold a person in civil contempt for failure to comply with an order, the party seeking the contempt order must show, by clear and convincing evidence, that:  (1) the underlying order allegedly violated was valid and lawful; (2) the underlying order was clear, definite, and unambiguous; and (3) the target of the contempt proceedings had the ability to comply with the underlying order.  *United States v. Koblitz*, 803 F.2d 1523 (11th Cir. 1986).

Once a *prima facie* showing of a violation has been made, the burden shifts to the targets of the contempt proceedings to show why they should not be held in contempt.  *Commodity Futures Trading Commission v. Wellington Precious Metals, Inc.*, 950 F.2d 1525 (11th Cir. 1992); *Howard Johnson Co., Inc. v, Khimani*, 892 F.2d 1512 (11th Cir. 1990).  If the alleged contemnor makes a sufficient showing to satisfy this burden, then the burden shifts back to the party seeking the contempt finding. *Wellington Precious Metals*, *supra*.

Here, it is clear that, at Frontline's request, Global transferred the Reserve Funds to Frontline in violation of the Preliminary Injunction.  It is equally clear that Global and Frontline refuse to return the money to the Receiver, in violation of the Receivership Order.  Contempt is the appropriate sanction.

11

D.   <u>ARGUMENT</u>

The Preliminary Injunction enjoined all persons, including in particular payment processors, from transferring or otherwise disposing of any Assets of any of the Receivership Entities.  The Preliminary Injunction also directed all persons to retain possession of all Assets of the Receivership Entities.  Both Frontline and Global violated the Preliminary Injunction by transferring the Receivership Entities' funds from Global to Frontline.  Both refuse to return these Assets.  Contempt is the appropriate sanction for this intentional misbehavior.

The Court's Receivership Order (doc. no. 624) appoints the Receiver as receiver for the Receivership Entities and directs him to take exclusive control of all of the Assets of the Receivership Entities.  The Receivership Order further directs all persons who received a copy to cooperate with the Receiver, and not to conceal Assets of the Receivership Entities.  The actions of Global and Frontline in stonewalling the Receiver is a violation of the Court's Receivership Order.  Contempt is also the appropriate sanction for this separate violation of one of the Court's orders.

1.   <u>The Orders are Valid and Lawful</u>.

The Preliminary Injunction has been in effect for 5 ½ years.  It contains findings that it was entered in compliance with Rule 65, Fed. R. Civ. P.  *See*

Preliminary Injunction, pp. 1-3.  Neither Global nor Frontline (both of which were Defendants when the Preliminary Injunction was entered), nor anyone else, has complained that the Preliminary Injunction is unlawful or invalid; in fact, Frontline complied with the Preliminary Injunction by providing sworn statements to the Plaintiff identifying "Assets" of the Receivership Entities, while Global has turned over to the Receiver reserves from other merchant accounts of the Receivership Entities.  Global and Frontline thus both recognize the validity of the Preliminary Injunction.

Nor can Global or Frontline complain that they cannot be bound by the Preliminary Injunction for acts occurring prior to their April 15, 2015 transfer of the Reserve Funds.  This is because they both were on notice of the Preliminary Injunction prior to the transfer:

- Global was served with the Complaint and TRO on April 2, 2015,[6] while Frontline was served with the Complaint and TRO on April 6, 2015.[7]

- Global's attorneys, Benjamin W. Cheesbro and Michael A. Caplan of Caplan Cobb LLP, filed appearances in the case on April 6, 2015.

- Mr. Caplan appeared at the preliminary injunction hearing on behalf of Global on April 7, 2015, together with four additional Global attorneys from the Venable law firm who applied for admission *pro hac vice* on April 6, 7 and 8, 2015.

- Mr. Cheesbro and Mr. Caplan, and likely the four Venable attorneys, received electronic service of a copy of the Preliminary Injunction on April 7, 2015, by PACER.

- Frontline received notice of the preliminary injunction hearing when it was served with a copy of the TRO on April 6, 2015.  Frontline was

---

[6] There is no return of service logged in the court file.  However, on April 10, 2015, Global filed a *Consent Motion for Extension of Time for Defendant Global Payments, Inc. to Respond to the Complaint* (doc. no. 223), in which it represented that its deadline to respond to the Complaint was April 23, 2015.  It follows from this assertion that Global was served with the Complaint on April 2, 2015.

[7] Frontline acknowledged it was served with the Complaint on April 6, 2015.  *See Consent Motion for Extension of Time for Defendant Frontline Processing Corporation to Respond to Complaint* (doc. no. 51), ¶ 2.

aware of the Preliminary Injunction no later than April 9, 2015, when it provided the Marolf Affidavit to the Plaintiff as required by Section IV.D (p. 13) of the Preliminary Injunction.  *See* Exhibit "B."  Moreover, Frontline's attorney James W. Hays of Hays Potter & Martin LLP filed his appearance in the case on April 14, 2015.

In light of the foregoing, it is clear that the Preliminary Injunction was valid and enforceable, and that Global and Frontline were aware of and bound by it prior to April 15, 2015.

Similarly, the Receivership Order is valid and enforceable.  That order was entered after the Plaintiff filed a motion citing numerous violations of the Preliminary Injunction by Defendants Marcus Brown, Tasha Pratcher, and Sarita Brown.  While Global and Frontline had been dismissed as "parties" by then, the Court permitted the remaining parties a full and fair opportunity to brief the issue, and to advance arguments at hearings.  Nothing in the records suggests that the Receivership Order is invalid.

Further, Global and Frontline both acknowledged the legitimacy of the Receivership Order.  Under Section VII of the Receivership Order, the Receiver issued records subpoenas to Global and Frontline requesting certain records.  *See* Composite Exhibit "D."  Global duly responded to its subpoena by providing the

15

requested records without objection.  Frontline likewise did not object to the subpoena, opting instead to ignore it until the Court ordered it to comply.  *See Order* dated August 13, 2020 (doc. no. 667).  Global and Frontline therefore cannot credibly claim that the Receivership Order is invalid.

        2.    <u>The Orders are Clear and Unambiguous</u>.  The Preliminary Injunction enjoins the "Debt Collector Defendants" (defined to include UDPS and Credit Power) and "any financial institution, ***payment processor****,* and all other persons in active concert or participation with any of them" from transferring, concealing or otherwise disposing of any Asset of the Receivership Entities. Preliminary Injunction, Section III, p. 10 (emphasis added).  Also, all persons who received a copy of the Preliminary Injunction were required to "hold, preserve and retain" possession of all Assets of the Debt Collector Defendants.  Preliminary Injunction, Section IV, pp. 11-12.  This language could not be more clear:  **<u>Any person who held property of any of the Receivership Entities was enjoined from transferring or disposing of it</u>.**  Global and Frontline, however, transferred the Reserve Funds, as payment for a non-existent debt, to prevent the Receivership Entities from obtaining them.  This is a violation of the Preliminary Injunction.

In the Receivership Order the Court directed the Receiver to "[t]ake exclusive custody, control, and possession of all Assets and Documents of ... the Receiver Entities, wherever situated."  The Court also ruled that:

> Defendants, and any other Persons, including but not limited to Financial Institutions, Electronic Data Hosts, and Payment Processors, shall transfer or deliver access to, possession, custody, and control of the following to the Receiver:
>
> a.    all Assets held by or for the benefit of the Receivership Entities [emphasis added].

Receivership Order, Ex. A, Section V (beginning on p. 44 of the docketed entry).

Further, the Court specifically directed all persons who received a copy of the order to "fully cooperate with and assist the Receiver."  Receivership Order, Ex. A, Section IV (beginning on p. 40).  All of these provisions are clear and unambiguous.

The Receiver anticipates that Global and Frontline may argue that the term "Asset" is ambiguous or unclear, or that the Reserve Funds were not an "Asset" because they were "owned" by Global or Frontline.  The term "Asset" is defined broadly in both the Preliminary Injunction and the Receivership Order:

> "Asset" means any legal or equitable interest in, right to, or claim to any real, personal, or intellectual property, including, but not limited to, chattel, goods … funds, cash, and trusts … wherever located, whether in the United States or abroad.

Preliminary Injunction, p. 3, Receivership Order, pp 1-2.

17

The Reserve Funds represent money collected from consumers who were victimized by the Defendants' debt collection scam by paying money to the Defendants with their credit and debit cards.  Global processed card payments consumers made to UDPS and Credit Power, but as a mere processor it did not "own" those funds.  In all card transactions money held in a merchant account is owned by the merchant (in this case, UDPS and Credit Power), and can be withdrawn by the merchant.  However, if a customer successfully challenges a credit card payment posted to his or her credit card, then the credit card processor or merchant bank must refund the amount of the charge to the customer.  The processor then must seek reimbursement from the merchant.  *See FTC v. MOBE*, 2018 WL 4960232 (M.D. Fla.).

To protect itself in high risk industries, like debt collection, a card processor may choose to establish a "reserve account."  This account typically is funded with a portion of the merchant's funds collected in the merchant account, with the amount of the reserve being determined based on the history of chargeback activity for the particular merchant.  The card processor then claims an interest in the reserve account to secure the merchant's obligation to reimburse the processor for any chargebacks it pays.  *MOBE*, *supra*.

That is precisely what occurred here.  From the inception of Global's relationship with UDPS and Credit Power, Global retained a portion of the card payments that consumers made to each company and held them as "reserves."  Global was authorized to do this under paragraph 15 of the Card Services Agreements, which specifically authorized Global at any time to "establish a reserve account to secure the performance of [UDPS and Credit Power's] obligations under this Card Services Agreement…."  Under the Card Services Agreements, the reserve account could be funded

> at [Global's] sole discretion, through any of the following:  (a) Direct payment by Merchant – At the request of [Global], Merchant will deposit funds in the Reserve Account; (b) The proceeds of indebtedness presented for purchase; or (c) The transfer by [Global] into the Reserve Account of funds withdrawn from any of [Merchant's accounts with Global].

Ex. A, Card Services Agreements ¶ 15.

The card charges collected by Global were from consumers who intended to pay a purported debt being collected by UDPS or Credit Power, with neither Global nor Frontline (according to them) having any role in the operation of that business other than to process payments.  Neither Global nor Frontline sold anything to anybody, but instead, by contract Global collected money paid to UDPS or Credit Power, and then withheld a portion of the collected funds as reserves to cover chargeback claims.

On April 2, 2015, the date on which Global received the TRO containing "asset freeze" provisions, the Reserve Funds were still held by Global as "reserves" under the Card Services Agreements.  The Reserve Funds were to pay valid chargeback claims, but when there were no more chargeback claims, the leftover money had to be paid to UDPS and Credit Power; it was their money.  By transferring the Reserve Funds from the reserve account to "Collection Accounts," Global admitted that it no longer had any claim to the funds for any purpose.  The money belonged to UDPS and Credit Power.  It was an "Asset" covered by the Preliminary Injunction.

As to the argument that Global and Frontline somehow "owned" the Reserve Funds, the United States District Court for the Eastern District of Pennsylvania considered the identical issue in *FTC v. NHS Systems,* 708 F. Supp. 2d 456 (E.D. Pa. 2009).  The defendants in that case were telemarketers selling health benefit plans.  Teledraft processed remote check and ACH payments for the health plan providers.  The Court found that Teledraft was a "middleman between the customer and the health care provider."  708 F. Supp. 2d at 459.  Although Teledraft was not a defendant or party to the lawsuit, the Court found that it was bound by the Court's TRO, which applied to freeze assets of the defendants.

The heart of Teledraft's argument – that it owned the credit card reserves – was summarily rejected, with the court holding that "it defies common sense that funds collected by Teledraft – which is essentially nothing more than a middleman – for the Receivership should be considered the property of Teledraft." *Id.* at 464-465.  The Court distinguished the cases cited by Teledraft, as none of them directly address a situation involving "a bank or other similar financial institution that holds funds on behalf of a receivership entity." *Id.* at 465 n. 10.  The Court ordered Teledraft to turn over the funds the receiver requested. *Id.* at 471. *See also FTC v. MOBE*, 2018 WL 4960232 (M.D. Fla.).

In this case, of course, it "defies common sense" to conclude that Global or Frontline "owned" the Reserve Funds.  Just as in *NHS,* Global was a mere "middleman" doing nothing more than facilitating payment, while for its part Frontline (according to it) was a stranger to the entire process.  In fact, the Reserve Funds were not even "reserves" when Global paid them to Frontline; at that time, the two Receivership Entities' card processing accounts had been closed for over nine months, and there was and could be no further chargeback activity.  Global acknowledged that the Reserve Funds were no longer needed for chargeback claims by transferring the funds out of the reserve account and into separate "Collection Accounts."  Frontline never had any legitimate claim to the money, but

21

even if it did, the Preliminary Injunction operated to preclude Global from transferring it, and Frontline from accepting it. Given that (i) the money was the property of UDPS and Credit Power, and (ii) the Preliminary Injunction clearly precluded *everybody* (including in particular payment processors) from transferring or concealing the property of UDPS and Credit Power, the transfer of the Reserve Funds violated the Court's Preliminary Injunction.

       3.    <u>Global and Frontline Can Comply with the Court's Orders</u>. Finally, Global and Frontline have, and always had, the ability to comply with the Preliminary Injunction and the Receivership Order. As to the Preliminary Injunction, compliance is about as simple as it gets: Global and Frontline were required to do nothing. Instead:

> • On April 3, 2015, they made accounting entries in Global's electronic interface system to move the Reserve Funds from the Reserve Account specified in paragraph 15 of the Card Services Agreements to "Collection Accounts," which do not exist under those agreements.[8] These accounting entries were designed so that Global could transfer the

---

[8] Of course, whether or not "Collection Accounts" are contemplated by the Card Services Agreements is irrelevant to improper post-injunction transfers of funds.

Reserve Funds to Frontline, but at the time of the accounting entries Global had been served with the TRO and thus knew of its "asset freeze" provisions.

- On April 15, 2015, they transferred the Reserve Funds from Global to Frontline.  This occurred a week or more after Frontline and Global had actual notice of the Preliminary Injunction and its "asset freeze" provisions.

Nothing hints at any reason why Global and Frontline could not "do nothing" after receiving notice of the TRO and Preliminary Injunction.  Neither Global nor Frontline made any claim to the Reserve Funds at the time of entry of the Preliminary Injunction, or afterwards during the expedited discovery ordered by the Preliminary Injunction, or at any time while they were parties to this case. Both Global and Frontline were entirely capable of leaving the Reserve Funds intact, as was required by the TRO and Preliminary Injunction, but they wanted the money for themselves and therefore chose to violate the Court's orders.

Similarly, there is no reason Global and Frontline cannot cooperate with the Receiver and turn over the Reserve Funds they took, in violation of the Preliminary Injunction.  To successfully argue that they were unable to comply with the Court's Receivership Order Global and Frontline "must go beyond a mere assertion of inability," *United States v. Hayes*, 722 F.2d 723, 725 (11th Cir. 1984), and

establish that they have made "in good faith all reasonable efforts" to satisfy the terms of the Receivership Order. *Commodity Futures Trading Commission v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir. 1992). *See also Combs v. Ryan's Coal Co.*, 785 F.2d 970, 984 (11th Cir. 1986) ("We construe this requirement strictly. Even if the efforts he did make were 'substantial,' 'diligent' or 'in good faith,' ... the fact that he did not make "all reasonable efforts" establishes that [respondent] did not sufficiently rebut the ... prima facie showing of contempt").

Global and Frontline easily could have avoided transferring the Reserve Funds in violation of the TRO and Preliminary Injunction. Global and Frontline just as easily could have returned the Reserve Funds to the Receiver when he demanded them. They chose to do neither, and there is no justification for their decisions. Consequently, the Receiver also requests that, should the Court grant relief to the Receiver, the Court assess interest from June 29, 2020, the date of the Receiver's demand letter, and award the Receiver his reasonable attorneys' fees.

E.    CONCLUSION

For the foregoing reasons, the Receiver is compelled to request that this Court enter an order directing Global and Frontline to show cause why they should not be held in contempt of this Court based on their intentional violations

of the Court's orders.  Assuming they cannot demonstrate sufficient cause, the Receiver submits that the Court should hold them both in contempt and afford them an opportunity to purge their contempt by paying over to the Receiver $179,352.06, plus interest from June 29, 2020, plus the Receiver's reasonable attorneys' fees.

LOCAL RULE 7.1 CERTIFICATION

Pursuant to Local Rule 7.1(D) the Receiver certifies that he has prepared this motion and supporting memorandum utilizing a 13-point, Book Antiqua font, as permitted by Local Rule 5.1(C).

Dated:        December 22, 2020

> */s/ Mark J. Bernet*
> Mark J. Bernet, Receiver
> Akerman LLP
> 401 E. Jackson Street, Suite 1700
> Tampa, Florida  33602
> Telephone:  (813) 223-7333
> Facsimile:  (813) 218-5495
> Email:  mark.bernet@akerman.com
> Secondary:  brooke.rollins@akerman.com